UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X-----------------------------------------------------------------X

JONATHAN NNEBE, and ALEXANDER
KARMANSKY, individually and on behalf of all others
similarly situated,

                                         Plaintiffs,

             -Against-

MATTHEW DAUS, CHARLES FRASER, JOSEPH
ECKSTEIN, ELIZABETH BONINA, THE NEW
YORK CITY TAXI AND LIMOUSINE
COMMISSION, AND THE CITY OF NEW YORK

                                         Defendants.

X-----------------------------------------------------------------X

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

**JURY TRIAL DEMANDED**

**06-CV-4991 (KMK)**

Plaintiffs Jonathan Nnebe and Alexander Karmansky, individually and on behalf of all others similarly situated, by their attorney, Daniel L. Ackman, as and for their complaint, allege as follows:

## INTRODUCTION

1.       The New York City Taxi and Limousine Commission (TLC) maintains a practice of summarily suspending without due process of law the license of any taxi driver who is arrested on any charge.  The TLC begins these suspensions without a hearing of any kind and continues them for an indefinite period.  The suspensions are relaxed only when the criminal charge incident to the arrest is resolved in the taxi driver's favor.  (If the criminal charge leads to a conviction at trial or by plea, the TLC reserves the right to revoke the taxi driver's license, though this practice, too, is unauthorized by law.)

2. The TLC practice is to allow the suspended taxi driver to request a hearing to "review" the suspension. Such hearings, conducted by a TLC Administrative Law Judge (TLC judge), are a sham. The TLC's practice at such hearings is to call no witnesses and present no evidence apart from a copy of an "arrest notification" form, which states only the fact and date of the arrest and the related charges. The outcomes of such hearings are preordained.

3. At the conclusion of the so-called summary suspension hearings, the TLC judge, resting on the allegations alone, invariably "recommends" to the TLC chairperson that the suspension be continued. The chairperson invariably accepts that recommendation.

4. Plaintiffs bring their claims pursuant to the United States Constitution, as amended, the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the New York State Constitution. They seek redress for defendants' deprivation, under color of state law, of their rights, privileges, and immunities secured by the Constitution and laws of the United States and by the New York State Constitution. As the TLC's practice has no basis in state law or city ordinance, plaintiffs seek redress under state law as well.

**JURISDICTION AND VENUE**

5. This action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and under the New York State Constitution, Article 1, § 12.

6. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(4), 1367, 2201.

7. The acts complained of occurred in part the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b). The Taxi and Limousine Commission maintains its headquarters in the Southern District of New York.

### JURY DEMAND

8. Plaintiffs demand trial by jury in this action.

### PARTIES

9. Plaintiff Jonathan Nnebe has been a New York City Taxi Driver since 1992. His license was suspended by defendant TLC on May 30, 2006. He is a resident of Queens County.

10. Plaintiff Alexander Karmansky has been a New York City Taxi Driver since 1988. He is a resident of Kings County.

11. Defendant Matthew Daus is chairperson of the Taxi and Limousine Commission. He has overall responsibility for enforcing TLC policy. He is responsible for implementing and overseeing the policies of the commission and for ensuring that TLC personnel obey the Constitution and laws of the United States and of the State of New York.

12. Defendant Charles Fraser is a deputy commissioner and general counsel of the TLC.

13. Defendant Joseph Eckstein is a deputy commissioner of the TLC in charge of its Adjudications Department.

14. Defendant Elizabeth Bonina is the Chief Administrative Law Judge of the TLC.

15. Defendant Taxi and Limousine Commission is an agency of the City of New York charged with licensing taxi and limousine drivers and regulating the taxi industry. The

TLC is a non-mayoral agency, meaning it is insulated by the City Charter from direct mayoral control. The TLC is a nine-member commission, with one member acting as a chairperson, who also has executive responsibilities. It is empowered by the Charter to act by a majority vote of its members. In addition to the City Charter, the TLC is governed by the Administrative Code of the City of New York, enacted by the City Council, and by the TLC rules, enacted by majority vote of the full TLC.

16. Defendant City of New York is a municipality of the state of New York for which the TLC is an administrative agency.

## CLASS ACTION ALLEGATIONS

17. The plaintiff class seeks a (i) declaration that the TLC policy of summarily suspending licenses is unconstitutional; (ii) an order enjoining defendants from suspending or revoking licenses prior to affording taxi drivers hearings on the merits; (iii) an order mandating that unlawfully revoked or suspended licenses be reinstated.

18. Plaintiffs sue on behalf of themselves and all other similarly situated individuals, and seek to represent pursuant to Rule 23 (a), Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure two overlapping classes comprised of all taxi drivers who have had their licenses suspended or revoked prior to hearings on the merits.

19. The class period commences on the date three years prior to the date of the initial complaint in this case and extends to the date on which the defendants are enjoined from, or otherwise cease, enforcing their unconstitutional policies and practices.

20. The members of the class are so numerous as to render joinder impracticable. Upon information and belief, based on TLC public records, there are more than 100 drivers whose licenses have been suspended prior to hearings on the merits. In addition, there are

more than 41,000 yellow taxi drivers licensed by the TLC, all of whom are subject to the TLC's license suspension and revocation policies.

21.     Upon information and belief, joinder is impracticable given the number of absent class members and because many members of the class are low-income persons, many of whom do not speak English well, and likely would have great difficulty in pursuing their rights individually.

22.     The questions of law and fact common to the class include whether the class members have common rights under the Fifth and Fourteenth Amendments to be free from unconstitutional license suspension and revocations.

23.     The named plaintiffs are adequate representative of the class.  The violations of law alleged by the named plaintiffs stem from the same course of conduct by defendants, which violated and continue to violate the rights of members of the class; the legal theory under which the named plaintiffs seek relief is the same or similar to that on which the class will rely.  In addition, the harm suffered by the named plaintiffs is typical of the harm suffered by absent class members.

24.     The named plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  Counsel for the plaintiffs knows of no conflicts among members of the class.

25.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (a) the prosecution of hundreds or thousands of separate actions would be inefficient and wasteful of legal resources; (b) the members of the class may be scattered throughout New York City and State and are not likely to be able to vindicate and enforce their Constitutional and statutory rights unless this action is maintained

as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single class action than piecemeal in many separate actions; (d) the resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations; (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications with respect to individuals pursuing claims against defendants which would establish incompatible standards of conduct for defendants; (f) defendants have acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate; and (g) questions of law and/or fact common to members of the class especially on issues of liability predominate over any question, such as that of individual damages, that affect individual members.

### FACTS

TLC Suspension Practice:

26.     In order to work as a taxi driver in the City of New York, an individual must possess a valid taxi driver's license (also known as a hack license).

27.     The TLC maintains a practice (purportedly based on TLC Rule 8-16) by which it claims the right to summarily suspend a taxi driver license without a hearing simply upon the chairperson's determination that a suspension is necessary to insure "public health, safety or welfare" pending "revocation proceedings."  There are no other published standards determining whether or when a taxi driver may be summarily suspended.  (TLC Rules do provide for defined suspension periods *following* adjudication on the merits and a finding of violation of certain TLC rules.)  This entire scheme deprives plaintiffs of their rights and their livelihoods without due process of law.

28. In actual practice, the TLC orders summary suspensions without any determination by the chairperson. The suspensions, in practice, are ordered by a TLC lawyer reflexively on receipt of a report that a taxi driver has been arrested, without any inquiry into the charges incident to the arrest.

29. As part of this practice, the TLC reflexively suspends the license of any taxi driver who has been arrested (except if the arrest is for a low level misdemeanor or a violation). The TLC maintains this practice regardless of whether the arrest was in any way related to the taxi driver's work as a taxi driver.

30. No provision of the New York City Administrative Code requires the suspension of a tax driver upon his arrest.

31. No provision of the TLC rules requires the suspension of a tax driver upon his arrest.

32. TLC rules require that revocation proceedings following a summary suspension be initiated within five days of the summary suspension (TLC Rule 8-16B).

33. The TLC Rules contain no legal standard for determining whether a summary suspension should continue or for how long it may continue.

34. In contradiction to the five-day hearing rule, in practice, the TLC routinely extends the summary suspension period for much longer periods.

35. Although by rule the TLC must hold a revocation hearing within five days, it permits itself five days just to notify the suspended taxi driver of the fact of his suspension (TLC Rule 8-16C). At that point, it allows the taxi driver to request a hearing concerning his suspension.

36.     Such hearings are conducted by TLC judges.  TLC judges are supposed to consider "relevant evidence."  But the TLC imposes on itself no burden of proof or burden of production of evidence in determining whether to continue the summary suspension.  (TLC Rule 8-16D).  In fact, TLC judges regularly accept the statements of TLC lawyers as sufficient proof at such hearings and do not require TLC lawyers to present evidence or testimony in support of allegations that supposedly have led to the summary suspension.  Although the suspended taxi driver is invited and expected to testify, neither the TLC lawyer nor the TLC judge informs him (even if he is appearing *pro se*) of his right to remain silent or the possible peril of testifying when criminal charges are pending.  Though there is a hearing in form, it is meaningless and does not comport with the constitutional guaranty of due process.

37.     Based on information from lawyers who regularly appear before the TLC tribunal and a review of hundreds of summary suspension hearings, the results of the summary suspension hearings are pre-ordained.  The TLC judge always (with some rare exceptions) orders that the suspension be continued.

38.     Based on information concerning TLC practice, the TLC has informed its ALJs on an ex parte basis that they must rule that suspensions should continue following the summary suspension hearing.

The New York City Administrative Code:

39.     Like all city agencies, the TLC is governed by the City Charter and the New York City Administrative Code (Administrative Code).  The City Charter enacts the TLC as a nine-member commission which acts by majority vote of its members. The TLC Chairperson is one member of the commission.  The chairperson has an equal vote with the

other commissioners. He also has executive responsibilities for insuring that the Administrative Code, enacted by the city council, and TLC rules, exacted by the nine-member commission be properly executed.

40. In contrast to the TLC's own rules and its own practice, the Administrative Code permits summary suspensions only by action by the Commission. The Administrative Code authorizes the Commission to suspend a taxi driver's license for good cause shown relating to public health or safety, but does not authorize the chairperson to do so.

41. Pursuant to the Administrative Code, a taxi driver may request a hearing to review his suspension. The Administrative Code provides that such a hearing will be before the commission or other administrative tribunal of competent jurisdiction (such as the New York City Office of Administrative Trial and Hearings) not before a single TLC judge appointed by the chairperson.

42. In contrast to the TLC's own practice, which allows for indefinite summary suspensions, the Administrative Code provides that a decision shall be made with respect to any such proceeding within sixty calendar days after the close of the hearing. Otherwise, pursuant to the Code, the taxi driver's license must be restored. In practice, the TLC regularly maintains longer pre-hearing suspensions.

<u>Jonathan Nnebe</u>:

43. Consistent with TLC practice, Mr. Nnebe's license was suspended without a hearing of any kind by letter on May 30, 2006. After a perfunctory hearing on June 8, 2006, the TLC ordered that his suspension be continued.

44. At no time did the TLC present any competent evidence of Mr. Nnebe's alleged wrongdoing. Nor was Mr. Nnebe permitted to confront his accusers or cross-

examine witnesses.  The record indicates that TLC never contacted or interviewed Mr. Nnebe's accuser.  At the time of his hearing, no criminal complaint against him had been filed.  No one from the TLC ever contacted the detective who made the arrest and filled out the Desk Appearance ticket.  There was no suggestion that Mr. Nnebe has any record of misconduct—as he has no such record—or that his continuing to drive a taxi is somehow a "threat" to public safety.

Events Leading to Mr. Nnebe's Suspension:

45.    The following narrative is based on the report and recommendation of the TLC ALJ:  On or around May 6, 2006 at 3 o'clock in the morning, Mr. Nnebe, who was driving the nightshift, picked up a man and a woman at the Port Authority Bus Terminal on 41st Street and 8th Avenue in Manhattan.  The passengers asked to make two stops, the first at 23rd Street and the FDR Drive in Manhattan, the second in the Bronx.  Because Mr. Nnebe was near the end of his shift, he told the passengers (who have not been identified and who remain unknown to plaintiffs) that he could not wait long at the first stop.

46.    Despite assurances that the stop would be brief, the male passenger entered an apartment building and did return for at least 20 minutes.  Mr. Nnebe asked the female passenger to telephone her friend to advise him that Mr. Nnebe could not wait any longer.  The male passenger still did not return; the female refused to leave the cab, and a dispute arose.

47.    Complying with TLC Rule 2-39A, Mr. Nnebe began driving to the nearest police precinct in an effort to secure his fare then on the meter and to resolve the dispute.  At a red light the female jumped out of the cab with three bags, dropping one.  Mr. Nnebe picked up the bag and returned to his taxi.  When the female demanded the bag be returned,

the dispute continued.  A passer-by drove by, counseled Mr. Nnebe to return the bag and forget the fare, which he did.

48. Several weeks later, Mr. Nnebe received a call from NYPD Detective Michael Paul, who told him that an assault complaint had been lodged against him.  Mr. Nnebe offered to meet the detective at the precinct to discuss the matter.  On May 29, at the end of the conversation, the detective told Mr. Nnebe that he had to place him under arrest, which he did.  The detective gave Mr. Nnebe a Desk Appearance Ticket (DAT), citing PL 120 (misdemeanor assault in the third degree) and released him.

49. Mr. Nnebe was arraigned based on a police officer's statement (as to what he had been told by others) on July 29.

50. To date, no witness with knowledge of what occurred in the pre-dawn hours of May 6 has testified against Mr. Nnebe and none has signed a sworn statement against him.

51. Mr. Nnebe's next appearance in New York County Criminal Court date is scheduled for August 10.

<u>The TLC Suspension</u>:

52. On May 30, a TLC prosecutor named Mark Hardekopf wrote a letter to Mr. Nnebe advising him that his taxi license had been suspended based on his arrest.  If Mr. Nnebe wanted a hearing concerning the suspension, he would have to request one within 10 days, Mr. Hardekopf advised.  The letter also threatened Mr. Nnebe with license revocation.

53. A hearing was held on June 8 before TLC ALF Frank Fioramonti.

54. Like all TLC ALJs, Mr. Fioramonti is a lawyer in private practice.  (Mr. Fioramonti's specializes in lobbying and has does no litigation in his private practice.)  He is an at-will employee of the TLC who works on a per diem basis.

55.     Mr. Nnebe appeared *pro se*. Mr. Hardekopf appeared for the TLC. Neither Mr. Hardekopf nor TLC ALJ Fioramonti advised Mr. Nnebe of his right to remain silent.

56.     The only submission Mr. Hardekopf made at the hearing was an arrest report.

57.     The TLC made no effort to hear testimony from the complaining witness. It did not contact the detective who issued the DAT.

58.     Mr. Nnebe denied the charges and recounted then events of the early morning of May 6.

59.     Following the hearing, TLC ALJ Fioramonti ruled the suspension should continue.

60.     In his "recommendation" to Chairperson Daus, TLC ALJ Fioramonti stated initially that the standard was "whether sufficient credible evidence was presented to support the continued suspension of Mr. Nnebe."

61.     But in the end, he recommended a continued suspension based on "sufficient allegations." He cited no evidence—as there was no evidence presented—that the alleged assault had ever occurred.

62.     On July 3, TLC Chairperson Daus accepted the TLC judge's recommendation.

63.     As a result, Mr. Nnebe's taxi license—the basis of his livelihood—remains on indefinite suspension.

Alexander Karmansky:

64.     Mr. Karmansky was arrested on May 23. The arrest was for criminal trespass in the second degree, criminal contempt in the second degree, both misdemeanors, and harassment in the second degree, a violation.

65.     His license was suspended by letter from a TLC lawyer the following day.

66. He was afforded a summary suspension hearing on June 8.

67. At the hearing, the TLC lawyer offered nothing beyond the arrest notification form. The TLC lawyer had made no inquiry into the nature of the charges that led to the arrest and offered no evidence as to those charges. TLC Judge Fioramonti presided over the hearing. Mr. Karmansky appeared *pro se*, denied the charges, and offered an explanation.

68. At no time did the TLC present any evidence of Mr. Karmansky's alleged wrongdoing. Nor was Mr. Karmansky permitted to confront his accusers or cross-examine witnesses. The record indicates that the TLC never contacted or interviewed Mr. Karmansky's accuser. No one from the TLC ever contacted the police officer who made the arrest. There was no suggestion that Mr. Karmansky has any record of misconduct that is any way demonstrates he is somehow a "threat" to public safety.

69. TLC Judge Fioramonti issued an order dated June 13 recommending that Mr. Karmansky's suspension be continued based on "sufficient allegations" that he posed a risk "to the public." (TLC Judge Fioramonti also stated, incorrectly, that one of the charges against Mr. Karmansky is a felony.)

70. On June 10, subsequent to the hearing, Ms. Karmanskaya sent a letter (The letter was sworn to before a notary public) to Mr. Hardekopf informing him Mr. Karmansky had been "charged with crimes he didn't commit." She also denied several of the statements in Ms. Cronin's declaration, saying they must have been the result of an inaccurate translation from Ms. Karmanskaya's statements in Russian.

71. Mr. Karmansky offered via Mr. Hardekopf to submit this letter to TLC Judge Fioramonti, who had not yet ruled. Mr. Hardekopf told Mr. Karmansky that the letter was irrelevant and that he shouldn't bother.

72. Mr. Karmansky's next appearance in Kings County Criminal Court is scheduled for August 28, 2006.

Events Leading to Mr. Karmansky's Suspension:

73. According to the criminal complaint filed by Michelle Cronin, a legal assistant in the King's County District Attorney's Office (which was not available to the TLC at the time of the suspension), on the evening of May 23, Mr. Karmansky visited his mother's house. According to the complaint, Mr. Karmansky barged in on his mother apartment. He allegedly refused to leave and used profanity. Such conduct allegedly violated an order of protection issued in favor of his mother, Polina Karmanskaya, on Dec. 14, 2005.

74. Ms. Karmanskaya refused to sign a statement swearing to the charges against her son. In fact, she attempted to have the charges withdrawn.

## FIRST CLAIM FOR RELIEF / 42 U.S.C. § 1983 – DUE PROCESS

75. Plaintiffs repeat and reallege paragraphs 1 through 74 as if the same were fully set forth at length herein.

76. By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which taxi drivers may have their licenses summarily suspended and revoked based on a unproven allegations in the absence of evidence and without due process of law, defendants have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983,

and of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

77. All defendants have acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth, and Fourteenth amendments to the United States Constitution. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof), and failed to prevent one another from doing so.

78. Defendants' actions were deliberate, reckless and indifferent to plaintiffs' constitutional rights.

**SECOND CLAIM FOR RELIEF / 42 U.S.C. § 1983 – ADMINISTRATIVE CODE**

79. Plaintiffs repeat and reallege paragraphs 1 through 78 as if the same were fully set forth at length herein.

80. By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which taxi drivers may have their licenses summarily suspended based on actions by TLC attorneys (or the TLC chairperson) acting without consultation with or consent from the full TLC commission, defendants have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, and of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

81. All defendants have acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth, and Fourteenth amendments to the United States Constitution. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof), and failed to prevent one another from doing so.

82. Defendants' actions were deliberate, reckless and indifferent to plaintiffs' constitutional rights.

### THIRD CLAIM FOR RELIEF/ New York State Constitution Art. 1, § 6

83. Plaintiffs repeat and reallege paragraphs 1 through 82 as if the same were fully set forth at length herein.

84. By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which taxi drivers may have their licenses summarily suspended or revoked without due process of law, defendants have deprived and will continue to deprive each and every plaintiffs and members of the plaintiffs class of rights, remedies, privileges and immunities guaranteed to every citizen of the State of New York in violation of the New York State Constitution, Article 1, § 6. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof), and failed to prevent one another from doing so.

85. All defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment. Said acts by said

defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their rights secured by the New York State Constitution, Article 1, § 6.

86.     Defendants' actions were deliberate, reckless and indifferent to plaintiffs' constitutional rights.

### FOURTH CLAIM FOR RELIEF/ NYC ADMINISTRATIVE CODE

87.     Plaintiffs repeat and reallege paragraphs 1 through 86 as if the same were fully set forth at length herein.

88.     By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which taxi drivers may have their licenses summarily suspended without any finding by the full Taxi and Limousine Commission and without a right of appeal to that commission or an impartial administrative court, defendants have violated and continue to violate the New York City Administrative Code.

89.     Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

### FIFTH CLAIM FOR RELIEF/ TLC RULES

90.     Plaintiffs repeat and reallege paragraphs 1 through 89 as if the same were fully set forth at length herein.

91.     By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which taxi drivers may have their licenses summarily suspended without any finding by the TLC chairperson, defendants have violated and continue to violate the TLC rules, part of the New York City Rules and Regulations.

92. Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

### SIXTH CLAIM FOR RELIEF / CAPA

93. Plaintiffs repeat and reallege paragraphs 1 through 92 as if the same were fully set forth at length herein.

94. The enactment of the TLC's summary suspension policy without a compliance with the City Administrative Procedure Act (CAPA) was in contravention of the New York City Charter.  As such the policy was void from the outset and all penalties administered thereunder are also void and of no force or effect.

95. Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

### SEVENTH CLAIM FOR RELIEF / CAPA – EX PARTE CONTACTS

96. Plaintiffs repeat and reallege paragraphs 1 through 95 as if the same were fully set forth at length herein.

97. The TLC systemically and specifically with regard to its summary suspension policy engaged in ex parte contacts with TLC judges.  These contacts were in violation of CAPA as well as principles of legal ethics.  The results of all adjudications contaminated by such contacts are void and any penalties proscribed as a result of such adjudications are void and of no force or effect.

98. Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

## EIGHTH CLAIM FOR RELIEF / 5th AMENDENT

99. Plaintiffs repeat and reallege paragraphs 1 through 98 as if the same were fully set forth at length herein.

100. At their summary suspension hearings, defendants invite and expect the suspended taxi drivers to testify. Taxi drivers are led to believe, however falsely, that their testimony may lead to reinstatement of their license. Neither the TLC lawyer nor the TLC judge informs the taxi driver of his right to remain silent pursuant to the 5th Amendment to the Constitution.

101. Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

## IRREPARABLE HARM

102. If defendants' policy, practice and custom of summarily suspending taxi driver licenses based on a mere allegations of wrongdoing is not enjoined, the named plaintiffs and the members of the plaintiffs class will be subjected to immediate and irreparable injury for which no adequate remedy at law exists in that members of the plaintiffs class will suffer continued violations of their rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Article 1, § 12 of the New York State Constitution and under state law.

## RELIEF REQUESTED

WHEREFORE, plaintiffs ask this Court:

A. To enter an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b) for the plaintiffs class described herein and naming plaintiffs as the class representatives.

B. To enter a judgment declaring that defendants' policy, practice and custom summarily suspending and based on mere allegations of wrongdoing is unconstitutional.

C. To enter a judgment declaring that defendants' policy, practice and custom summarily suspending and based on mere allegations of wrongdoing is illegal under state law.

D. To issue an order enjoining defendants' policy, practice and custom of summarily suspending taxi driver licenses based on mere allegations of wrongdoing.

E. To issue an order requiring defendants to reinstate the license of every taxi driver whose license has been suspended based on mere allegations of wrongdoing.

F. To award the named plaintiffs and members of the class compensatory damages in an amount to be determined at trial.

G. To award the named plaintiffs and members of the class punitive damages in an amount to be determined at trial.

H. To award the named plaintiffs and members of the class reasonable attorney's fees and costs.

I. To grant such other and further relief as this Court shall find just and proper.

Dated: August 2, 2006
New York, New York

_____/s/_____
Daniel L. Ackman (DA-0103)
1 Liberty Place, 23rd Floor
New York, NY  10006
(917) 282-8178

Attorney for Plaintiffs