UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X----------------------------------------------------------------X

JONATHAN NNEBE, ALEXANDER KARMANSKY,
EDUARDO AVENAUT, KHAIRUL AMIN and the NEW
YORK TAXI WORKERS ALLIANCE, individually and
on behalf of all others similarly situated,                              **06-CV-4991 (KMK)**

                                                    Plaintiffs,

                    -Against-

MATTHEW DAUS, CHARLES FRASER, JOSEPH
ECKSTEIN, ELIZABETH BONINA, THE NEW
YORK CITY TAXI AND LIMOUSINE
COMMISSION, AND THE CITY OF NEW YORK

                                                    Defendants.

        X----------------------------------------------------------------X


        DECLARATION OF DANIEL ACKMAN IN SUPPORT
        OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Daniel L. Ackman declares pursuant to 28 U.S.C. § 1746:

        1.   I am a member of the New York bar and attorney for the plaintiffs in this

action.   I make this declaration in support of plaintiffs' motion for class certification.

        2.   I was lead class counsel in *Padberg, et al. v. McGrath-McKechnie*, et al., No.

3355 Civ. 2000 (RJD).  This action in the Eastern District of New York was certified as a

class action. It resulted in a settlement that entitles the plaintiff class members to roughly

$7 million in damages and resulted in equitable relief as well.  I have successfully

prosecuted two other actions against the Taxi and Limousine Commission as well.

        3.   I hereby transmit to the Court true and correct copies of the following

documents attached as exhibits hereto:

(a) the Declaration of Marc Hardekopf, sworn to August 18, 2006;

(b) the Declaration of Michael Spevack, sworn to June 30, 2006;

(c) the Declaration Michele Parker, sworn to Oct. 5, 2006;

(d) the Declaration of Isaac Godinger, sworn to Oct. 5, 2006;

(e) TLC Request for Proposals dated March 2, 2005, pp. 60-6; and

(f) Excerpts from the deposition testimony of Peter Mazer.

I declare under perjury that the foregoing is true and correct.

Dated: New York, NY
       November 21, 2006


_____/s/_____
Daniel L. Ackman

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

JONATHAN NNEBE, and ALEXANDER
KARMANSKY, individually and on behalf of all others
similarly situated,

                               Plaintiffs,

               - against -

MATTHEW DAUS, CHARLES FRASER, JOSEPH
ECKSTEIN, ELIZABETH BONINA, THE NEW YORK
CITY TAXI AND LIMOUSINE COMMISSION, AND
THE CITY OF NEW YORK,

                             Defendants.

------------------------------------------------------------------------X

**DECLARATION OF
MARC T. HARDEKOPF
IN OPPOSITION TO
PLAINTIFF'S SECOND
MOTION FOR A
PRELIMINARY
INJUNCTION**

06 CV 4991 (KMK)
ECF Case

      **MARC T. HARDEKOPF,** declares under the penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

      1.      I am an Assistant General Counsel in the office of the New York City Taxi and Limousine Commission ("TLC"), and I have been employed in this capacity since September 2000. My responsibilities include, *inter alia*, certain matters relating to the suspension of taxicab driver's licenses. I am fully familiar with the facts and circumstances set forth herein based upon my review of the records of the City of New York and conversations with employees, officers and agents of the City of New York.

      2.      I submit this declaration in opposition to plaintiffs' second motion for a preliminary injunction,[1] which seeks to enjoin TLC from continuing the temporary suspension of

---

[1] The papers served by plaintiff do not include a notice of motion, and the memorandum of law is denominated "Supplemental Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction." As this is plaintiff's second application for preliminary injunctive relief, it is more properly denominated "Plaintiffs' Second Motion for Preliminary Injunction," and is referenced as such herein.

the taxicab driver's license of plaintiff JONATHAN NNEBE, and to respond to the statements set forth in the Declaration of Mohammad Choudhry, dated August 11, 2006 ("Choudhry Dec."), which was annexed as part of plaintiffs' application.

3.      The instant motion is moot as to plaintiff ALEXANDER KARMANSKY. Effective August 17, 2006, TLC lifted the suspension of the taxicab driver's license of Mr. Karmansky, based on information provided by Assistant District Attorney Arlene Markarian, supervisor of the Elder Abuse Unit in the office of the Kings County District Attorney, the unit responsible for the investigation and prosecution of the criminal action against Mr. Karmansky. As per ADA Markarian, the matter against Mr. Karmansky is likely to be dismissed on August 28, 2006.  The above-described actions by TLC were undertaken pursuant to TLC's regular practice and procedure.  When informed by the District Attorney's office that the criminal matter against the licensee is likely to be dismissed, TLC reinstates drivers' licenses immediately.  To the extent the Court may deem it relevant, attached as Exhibit "A" is a copy of the transcript of the post-suspension hearing provided Mr. Karmansky on June 8, 2006.


**<u>STATEMENT OF RELEVANT FACTS</u>**

**<u>Mohammad Choudhry</u>**

4.      On or about January 22, 2004, the TLC Legal Department received an Arrest Notification, identified as New York State Identification ("NYSID") No. 9712235K, indicating Mohammad Choudhry had been arrested by the New York City Police Department ("NYPD") on January 21, 2004 for violating Penal Law 120.14(01), Menacing in the Second Degree, with a Weapon.  A copy of the arrest notification is attached in Exhibit "B."  Attached as

Exhibit "C" is a copy of TLC's Activity Log, which sets forth pertinent dates in connection with Mr. Choudhry's suspension.

5.       Because the TLC Chairperson delegates the determination to suspend in such cases to the Legal Department, by letter dated January 22, 2004, I notified Mr. Choudhry of, *inter alia*, the immediate suspension of his taxicab driver's license, based on information indicating Mr. Choudhry had been arrested for the crime of Menacing in the Second Degree, and his right to request a hearing, within ten (10) days of the letter, to challenge the suspension. A copy of the letter is attached in Exhibit "D."

6.       On or about February 20, 2004, Mr. Choudhry contacted TLC to request a hearing. Although more than ten days had passed since the date of the suspension letter, as Mr. Choudhry provided TLC with proof of having been out of the country until February 19, 2004, I scheduled a hearing. See Exhibit "C," Activity Log.

7.       By letter dated February 23, 2004, TLC notified Mr. Choudhry that his hearing was scheduled for February 26, 2004, at 11:15 a.m. A copy of the letter is attached in Exhibit "D." The letter further advised, *inter alia*, that Mr. Choudhry could bring legal representation to the hearing, and that his failure to appear could result in the hearing being held in his absence. See Exhibit "D." TLC's Activity Log indicates Mr. Choudhry failed to appear at the hearing on February 26, 2004. See Exhibit "C."

8.       According to my notes in the Activity Log, on or about March 11, 2004, I spoke with Assistant District Attorney Bill King, who advised me that the D.A.'s office would not be seeking a criminal conviction against Mr. Choudhry, but instead would be seeking a conviction on a violation, which is not a "crime." See Exhibit "C," Activity Log. Based on this information, TLC reinstated Mr. Choudhry's license that same day, on March 11, 2004. It is my

standard practice to contact the licensee or the licensee's attorney upon lifting a suspension to provide notice of reinstatement of a license.

9.      I note that Mr. Choudhry's declaration appears to indicate that his taxicab driver's license was suspended for ten (10) months, from January 24, 2004 until October 12, 2004.  See Choudhry Dec., ¶¶ 5-6 and Supplementary Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, p. 2.  This is contrary to my notes, as set forth in the Activity Log (Exhibit "C"), and contrary to TLC's database records, as set forth in a printout showing that the suspension was permanently lifted on March 11, 2004.  A copy of this printout is attached as Exhibit "E." Further, as explained below, this is contrary to other TLC records, which indicate Mr. Choudhry was operating a taxicab during the period from March 2004 to October 2004.

10.      For example, TLC's computer database indicates Mr. Choudhry was issued a number of TLC summonses during the period he alleges his license was suspended. Attached in Exhibit "E" is a copy of a printout from TLC's computer database, which indicates Mr. Choudhry was charged with violating TLC's rules while operating a taxicab on the following dates:  May 3, 2004 (3 summonses, hearing date:  June 9, 2004), May 19, 2004 (hearing date:  October 14, 2004),  June 30, 2004 (hearing date:  September 28, 2004) and July 19, 2004 (hearing date:  August 4, 2004).

11.      In addition, attached as Exhibit "F" is a copy of a "trip sheet" completed by Mr. Choudhry on June 30, 2004, a date on which Mr. Choudhry was issued a summons, in connection with his operation of taxicab medallion number 7B19.

12.      Furthermore, by letter dated August 27, 2004, *All Taxi Management* reported to TLC that on May 19, 2004, Mr. Choudhry had been involved in an unreported motor vehicle accident while he was operating taxicab medallion number 1K22, and that Mr. Choudhry

4

had failed to provide *All Taxi Management* with a required statement pertaining to the accident. A copy of the letter is attached as Exhibit "G."  The letter provides that the accident occurred at 148th Street and S. Cargo Road, in Queens.  See Exhibit "G".

**Jonathan Nnebe**[2]

13.    On May 30, 2006, TLC received an Arrest Notification, identified as New York State Identification ("NYSID") No. 1742900N, indicating plaintiff JONATHAN NNEBE had been arrested and/or charged by the New York City Police Department ("NYPD") on May 29, 2006, with the crime of Assault with Intent to Cause Physical Injury, under Penal Law § 120.00(01), a Class A Misdemeanor.  See Exhibit "H," for copies of the TLC Activity Log concerning suspension of Mr. Nnebe's license and Arrest Notification NYSID No. 1742900N.

14.    By letter dated May 30, 2006, TLC notified Mr. Nnebe of the suspension of his taxicab driver's license, based on his arrest for Assault in the Third Degree on May 29, 2006, pursuant to Section 8-16 of TLC's rules, which authorizes emergency action to insure public health, safety and welfare.  The letter advised that should Mr. Nnebe be found guilty of the criminal charges, TLC could initiate proceedings to revoke his license.  The letter further advised that Mr. Nnebe could seek review of the suspension by requesting a hearing no later than ten (10) days from the date of the letter, and that the license suspension would be rescinded if the charges are dismissed or adjourned in contemplation of dismissal.  The letter advised Mr. Nnebe to notify TLC immediately if he pleads guilty to a lesser charge or is convicted, and to fax the certificate of disposition to TLC upon disposition of criminal matter.  See Exhibit "I."

---

[2] The facts as to Mr. Nnebe were previously provided to the Court in connection with defendants' opposition to plaintiff's first motion for a preliminary injunction, but are repeated herein, for the Court's convenience.

15.     The TLC Activity Log indicates that on June 1, 2006, TLC received a telephone call from Mr. Nnebe, requesting a suspension hearing.  See Exhibit "H."

16.     By letter dated June 1, 2006, TLC notified Mr. Nnebe that a suspension hearing would be held on June 8, 2006, at 10:30 a.m.  The letter further advised that Mr. Nnebe could bring legal representation to the hearing.  See Exhibit "J."

The Hearing of June 8, 2006

17.     On June 8, 2006, Mr. Nnebe was provided with a suspension hearing before TLC administrative law judge Frank R. Fioramonti.  Mr. Nnebe appeared *pro se*, and I represented TLC.   The transcript of the suspension hearing of June 8, 2006 (hereinafter "Tr.") is attached as Exhibit "K."

18.     During the course of the suspension, the transcript indicates I advised the ALJ, *inter alia*, as follows:

> [Mr. Nnebe] was arrested for Assault in the Third Degree, … a violation of Penal Law [120.00], a Class A misdemeanor.  Now, … TLC considers this to be very serious.  [U]nder New York State law, this is …. punishable by up to one year in jail. So, [TLC] believes that demonstrates the severity of the offense, in and of itself.
>
> Additionally, assault involves some sort of a … physical contact with another individual.   We believe that reflects on the fitness of the licensee to be expected to safely interact with members of the public.  Also, … assault is an offense that can be punishable by [license] revocation which we believe further demonstrates the nexus between the allegations of this offense and [suspension of a] TLC license.
>
> Now, the TLC is not going to decide the innocence or guilt of this charge.  That's going to be up to the Criminal Court in Manhattan  … However, based upon the seriousness of the charge, TLC does believe that [Mr. Nnebe] presents a threat to the public safety, health and welfare.  And until

there is a final determination, TLC is going to
request the license [be suspended].

<u>See</u> Exhibit "K," Tr. 3-5.

19.     At the end of the hearing, as is my normal practice, I provided Mr. Nnebe

with my direct telephone number, advising that his criminal attorney should telephone me with

questions and/or in the event that the charges are dropped, adjourned in contemplation of

dismissal or pleaded down to a violation, in which case, I advised Mr. Nnebe, TLC would

immediately return his license, the same day.  <u>See</u> Exhibit "K," Tr. 14.

<u>The ALJ's Recommendation to TLC Chairperson</u>

20.     By "Recommendation to TLC Chairperson" dated June 13, 2006, the ALJ

recommended continuation of the suspension of Mr. Nnebe's license.  The ALJ concluded that

"[inasmuch] as the Licensee was alleged to have caused physical injury to another person with

intent to do so, I find sufficient allegations exist to continue the suspension of his license due to

the risk that he poses to the public."  <u>See</u> Exhibit "L."

21.     By letter dated June 13, 2006, the ALJ notified Mr. Nnebe of his

recommendation to continue the suspension of Mr. Nnebe's license and included a copy of the

"Recommendation to TLC Chairperson."  The letter further notified Mr. Nnebe that he could

submit a letter to the Chairperson in order to respond to the ALJ's recommendation.  <u>See</u> Exhibit

"M."

22.     By letter dated June 22, 2006, Mr. Nnebe's attorney provided the

Chairperson with information to be considered along with the ALJ's recommendation.  <u>See</u>

Exhibit "M."

23.     By letter dated July 3, 2006, TLC's Chair notified Mr. Nnebe of the

continued suspension of his taxicab driver's license pending the final outcome of the criminal

matter, based on the finding that the allegations against Mr. Nnebe (that he intentionally caused physical injury to another individual), if proven, would indicate that Mr. Nnebe's continued licensure as a taxicab driver would pose an unreasonable risk to the public.  A copy of this letter is attached as Exhibit "N."

24.     TLC obtained a copy of the complaint in the criminal proceeding against Mr. Nnebe, which is attached as Exhibit "O."  The complaint, sworn to under penalty of perjury by NYPD Detective Michael Paul, Shield 01177, on June 12, 2006, states that the information contained therein was provided to Detective Paul by the alleged victim and a bystander who witnessed the alleged assault.  The complaint provides, in pertinent part, as follows:

> Deponent states that deponent is informed by Sandra Kawekwa, of an address know to the District Attorney's Office, that [Mr. Nnebe] grabbed informant by the wrists and dragged informant along the street, causing bruises and pain to informant's knee and substantial pain to informant's back.

> Deponent is further informed by James Barber, of an address known to the District Attorney's Office, that informant observed [Mr. Nnebe] grab a woman at the above location and time and defendant was dragging said woman across the pavement.  Deponent is further informed that said woman was yelling and screaming as defendant was dragging her along the street.

See Exhibit "O."[3]

Dated:     New York, New York
           August 18, 2006

_____
                    MARC T. HARDEKOPF

[3] Two copies of the complaint are annexed:  a copy of the signed original and an unsigned copy from the D.A.'s computer database, which is more legible.

**EXHIBIT B**

JUN-30-2006  16:02

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X-------------------------------------------------------------------X

JONATHAN NNEBE,

                                        Plaintiff,

            -Against-

MATTHEW DAUS, CHARLES FRAZIER, JOSEPH
ECKSTEIN, ELIZABETH BONINA, THE NEW
YORK CITY TAXI AND LIMOUSINE
COMMISSION, AND THE CITY OF NEW YORK

                                        Defendants.

X-------------------------------------------------------------------X

## DECLARATION OF MICHAEL SPEVACK

Michael Spevack declares pursuant to 28 U.S.C. § 1746:

1.      I am a member of the New York bar and a graduate of New York
University School of Law. I regularly represent taxi drivers in the Taxi & Limousine
Commission (TLC) tribunal as well as in other courts. I have been engaged in this
practice for ten years.

2.      In my experience, the TLC summarily suspends any taxi driver who is
arrested, regardless of the crime charged and regardless of the underlying evidence so
long as the crime rises above certain low level misdemeanors (for instance subway
turnstile jumping is not a crime for which TLC normally suspends drivers in my
experience). It does not matter whether the arrest was for an alleged crime related to taxi
driving. Any arrest for almost any crime (including for arrests in alleged domestic abuse
situations, which are most common) leads to a summary suspension. If the TLC
maintains any exception to this rule, I have not seen it.

3.      In the course of my practice, I represented taxi drivers at so-called summary suspension hearing on many occasions.

4.      In my experience, the TLC ALJ recommends the suspension of the taxi driver be continued in every case, again regardless of the evidence (or lack of evidence) presented at the hearing.  The same is true when the "emergency" suspension is purportedly based on some other alleged "threat" apart from an alleged crime.  The TLC ALJ recommends suspension be continued. The results of these hearings, in other words, appear pre-ordained.  In addition, the TLC chair, almost without exception, accepts these "recommendations."

5.      Indeed, at this point, if a taxi driver wants me to represent him at a summary suspension hearing, I generally decline since I do not feel it proper to accept money to act at a hearing where the result is not in doubt.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
        June 30, 2006

Michael Spevack

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X-----------------------------------------------------------------X

JONATHAN NNEBE, and ALEXANDER
KARMANSKY, individually and on behalf of all others
similarly situated,

                                        Plaintiffs,

                    -Against-

MATTHEW DAUS, CHARLES FRASER, JOSEPH
ECKSTEIN, ELIZABETH BONINA, THE NEW
YORK CITY TAXI AND LIMOUSINE
COMMISSION, AND THE CITY OF NEW YORK

                                        Defendants.

X-----------------------------------------------------------------X

## DECLARATION OF MICHELE PARKER

Michele Parker, attorney at law, declares pursuant to 28 U.S.C. § 1746:

1.      I am licensed to practice law in New York State. I specialize in representing taxi drivers in the Taxi & Limousine Commission (TLC) tribunals. I have been engaged in this practice for nine (9) years.

2.      As part of my TLC practice, I have represented and continue to represent taxi drivers in so-called summary suspension hearings. Summary suspension hearings are held to determine if a driver's license to drive a taxi (hack license) should remain on suspension. When a hack license is suspended, a driver can not work. Summary suspension hearings are held in front of an Administrative Law Judge (ALJ) who issues a recommendation that goes to the Commissioner of the TLC for a final decision. The

driver has ten (10) days to respond to the ALJ's recommendation before the Commissioner makes the final decision.

3. In my experience and knowledge, the TLC summarily suspends any taxi driver who is arrested regardless of the crime charged, regardless of the underlying evidence, and regardless of whether the crime charged relates to driving a taxi and without giving him notice he is entitled to a hearing to determine if his license should be suspended. Any arrest (including for arrests in alleged domestic abuse situations, which are most common) leads to a summary suspension. In every case the Commissioner decided to continue the suspension of a driver until the resolution of the underlying criminal matter. In every case, it did not matter what the driver said at the hearing or in his response, the Commissioner decided to continue the suspension. This has been my experience and my knowledge for nine (9) years.

4. In my experience, the TLC ALJ recommends the suspension of the taxi driver be continued in almost every case, again regardless of the evidence (or lack of evidence) presented at the hearing. The same is true when the "emergency" suspension is purportedly based on some other alleged "threat" apart from an alleged crime. If the ALJ recommends that the suspension be continued every time, the Commissioner concurs. And if the ALJ recommends the suspension be lifted, the Commissioner over turns that decision and continues the suspension. It is extremely rare for the ALJ to recommend the suspension be lifted. It is so rare it is not done anymore.

5. In short, the results of the summary suspension hearings are pre-ordained. The Commissioner decides the driver's hack license remain suspended regardless of the

recommendation of the ALJ. The ALJ's have learned not to recommend a suspension be

lifted. The driver can therefore not support his family.

    I declare under penalty of perjury that the foregoing is true and correct.

Date: New York, NY
      October 5, 2006

Michele Parker

**EXHIBIT D**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

X------------------------------------------------------------------X

JONATHAN NNEBE, and ALEXANDER
KARMANSKY, individually and on behalf of all others
similarly situated,

Plaintiffs,

-Against-

MATTHEW DAUS, CHARLES FRASER, JOSEPH
ECKSTEIN, ELIZABETH BONINA, THE NEW
YORK CITY TAXI AND LIMOUSINE
COMMISSION, AND THE CITY OF NEW YORK,

Defendants.

X------------------------------------------------------------------X

## DECLARATION OF ISAAC GODINGER

Isaac Godinger declares pursuant to 28 U.S.C. § 1746:

1.      I am a member of the New York bar and a graduate of New York
University School of Law. As part of my practice, I regularly represent taxi drivers in the
Taxi & Limousine Commission (TLC) tribunal as well as in other courts. I have been
engaged in this practice for approximately seven years.

2.      As part of my TLC practice, I have represented numerous taxi drivers in
so-called "summary suspension" cases. In my experience, the TLC summarily suspends
any taxi driver who is arrested, with certain limited exceptions where the TLC Legal
department does not seek suspension based on the type of crime (such as PL 230.03,
Patronizing a Prostitute in the Fourth Degree, a Class B Misdemeanor, and PL 155.25,
Petit Larceny, a Class A Misdem,eanor). In cases where TLC seeks suspension, the

suspension is routinely ordered regardless of the crime charged (except as noted above),

regardless of the underlying evidence, and regardless of whether the crime charged

relates to taxi driving. Any arrest (including for arrests in alleged domestic abuse

situations, which are most common, but, as noted above, with limited exceptions where

TLC does not seek suspension) leads to a summary suspension. I have never experienced

a case where a TLC judge failed to continue the suspension of a driver following an

arrest.

3.      In my experience, TLC ALJs recommend that the suspension of the taxi

driver be continued in every case, again regardless of the evidence (or lack of evidence)

presented at the hearing, and based simply on the fact that it is established that the

computerized arrest records in fact reflect that the particular crime was charged. The

same is true when the "emergency" suspension is purportedly based on some other

alleged "threat" apart from an alleged crime, in that TLC ALJs recommend that the

suspension be continued every time. In short, the results of the summary suspension

hearings are pre-ordained, with ALJs in fact exercising no discretion. In addition, the

TLC chair, as far as I know without exception, accepts these "recommendations."

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
September 29, 2006

Isaac Godinger

**EXHIBIT E**



# New York City Taxi & Limousine Commission



**Michael R. Bloomberg**

**Mayor**

**Matthew W. Daus**

**Commissioner/Chair**

**Louis J. Tazzi**

**Deputy Commissioner for Administration**

**Agency Chief Contracting Officer**

**Request for Proposal**

**for**

**NYC MEDALLION TAXICAB TECHNOLOGY ENHANCEMENTS**

**PIN: 5P00198**

**March 2nd, 2005**

It is illegal to engage in practices that could undermine or prevent the fair award of a contract related to this solicitation.  The Comptroller of the City of New York is charged with the audit of all New York City contracts.  Any contractor who believes that there has been unfairness, favoritism or impropriety in the proposal process should inform the Comptroller of the City of New York, Office of Contract Administration, One Centre Street, Room 1005, New York, New York 10007; telephone number 212-669-2323.

**ATTACHMENT E: TAXICAB INDUSTRY OVERVIEW**

**Owners**

While all taxicabs deliver the same core transportation services, New York City taxicabs are owned and operated in a variety of ways.  While the diversity in taxicab operations has developed over the past 30 years, this is not apparent to the riding public.  Service to passengers is provided in the same manner, while cabs are operated in a variety of ways.  Prior to the early 1970s, cabs were operated in one of two ways:

- Taxis with individually owned licenses were driven by the medallion owner.

- Fleet cabs were dispatched each shift out of central garages that operated anywhere from 25 to several hundred cabs.

Today, taxis are operated primarily in three basic ways:

- Owner-operators: In these cases, an individual owns the medallion and the vehicle, and they drive one shift.  Forty percent of this segment of owner-drivers lease their cabs to other driver(s) for a second shift.

- Fleet-type operators that dispatch cabs from a central garage, leasing to drivers by the shift.  Fleets typically own the medallion and the vehicle.  Drivers pay a lease fee for each shift they work and return the cab to the garage at the end of the shift.  TLC officially recognizes some of these operators as fleets; others are recognized as "agents" and operate in essentially the same way.

- Long-term leasing, run by "agents" that lease vehicles and medallions, or solely medallions to drivers for periods of months.  Drivers pay a weekly lease fee and retain day-to-day control of the car.  Typically, the cab is leased to two drivers who arrange to pass the vehicle back and forth at the end of each 12-hour shift.

In practice, many fleets and fleet-type operators lease cabs both by the shift and on a long-term basis.  It is also notable that many long-term lessors and fleets are not actually the medallion owner.  In these cases, the medallion owner contracts with a leasing company or fleet to manage the medallion on the owner's behalf.

**Drivers**

Drivers greatly outnumber cabs.  There are about 40,000 licensed taxi drivers eligible to drive the 12,787 licensed taxicabs.  This number has held steady for over a decade.  Only a fraction of drivers work full-time.  Forty percent of all licensed drivers report having driven a cab five or more days in the preceding week.  Twenty-nine percent of all drivers report not having driven at all in the previous week.  The flow of new drivers tends to be converse to the economic cycle.  Over three thousand new drivers were issued licenses in fiscal year 2003.  The flow of drivers into the industry has been counter-cyclical at times.  The number of new drivers reached a low of 2,127 in fiscal year 2000 during the peak of the economic cycle but then rebounded as the economy deteriorated.

It's an immigrant industry with drivers originating from all over the world.  Historically, eighty-nine percent of new drivers were immigrants, born in eighty-four foreign countries ranging from Afghanistan to Turkey, Trinidad to Togo.  A few nations and regions of the world predominate.  On average, 43% of all applicants for a taxi driver's license were born on the Indian subcontinent, including 21% from Pakistan, 10% from Bangladesh and 10% from India.  The proportion from Africa and the former Soviet Union has also grown.  The proportion of applicants born in the U.S. dropped over the past decade.  The fraction from the Caribbean fell from 27% to 8%.  Most applicants have spent several years in the U.S.; only 12% report having been in the U.S. for only one year and 11% report two years in the U.S.  The median time here is six years.

Many languages spoken reflect the diversity described above.  Sixty languages are spoken among driver applicants.  Twenty-four percent of all applicants reported that they had learned English as a child.  Drivers are required to pass an English proficiency test as part of the licensing process.

Turnover is high among new drivers.  Studies have shown that 23% of first-year drivers leave the industry (i.e., fail to renew their licenses), as did 18% of drivers who were licensed for two years and 15% of those licensed for three years.

Why do some drivers stay and become long-term drivers while others leave?  What factors influence drivers' decisions?  This is a complex question with perhaps as many answers as there are drivers.  But some insight can be gleaned from looking at the background of drivers who stay in the industry versus those who move on.  Many drivers come into the industry saying they expected to earn more driving a cab than in their last job.  Other drivers come into the industry saying they "like to drive" were somewhat more likely to maintain their taxi license as compared with drivers who came just for the money.  Drivers from Bangladesh, the former Soviet Union, African countries, Pakistan and India show higher retention rates than drivers from the Caribbean, Central America and – especially – Europe and the U.S.

Word of mouth appears to be critical; 73% knew someone who drove a cab and 58% found the owner of the cab they would drive through a friend, relative or neighbor.  Fifty-eight percent of all applicants in 1991 wanted to drive a cab for two simple and basic reasons: to make money or because they needed a job.  One in three named attractive aspects of the job – liking to drive or the flexibility, independence or excitement of driving.  Most applicants saw driving a cab as an opportunity to make money and advance financially.

Most applicants also planned to drive "for many years" and hoped to buy a medallion license eventually.  These plans were not fulfilled for most applicants.  Studies show that one in ten of all prospective drivers sought to drive a cab for short-term financial reasons, often reflecting setbacks in their working lives during the early-90s recession.  These applicants held professional, supervisory or managerial jobs requiring high educational achievement or held skilled crafts jobs (e.g., mechanics) or used creative skills (e.g., artists, musicians, and photographers).  Many of these applicants expected to earn less driving a taxi than in their previous job, and planned to drive a cab for only a short while.

**Passengers**

The primary passengers in NYC taxicabs are Manhattan residents.  Seventy-one percent of all taxi trips transport Manhattan residents.  Outer-borough residents, suburbanites, U.S. residents from outside the New York area, and foreign visitors each account for between 5% and 10% of all trips.  Six percent of Manhattan residents "always" or "usually" use taxicabs for work trips and 20% "always" or "usually" take cabs for personal trips.  An additional 38% of Manhattan residents "sometimes" use taxicabs for work trips and 48% "sometimes" take cabs for personal trips.  Thus, two-thirds of Manhattan residents use cabs for work and/or personal trips at least some of the time.  Manhattan adults hail a cab an average of 100 times a year.  Sixty-six percent of Manhattanites' taxi trips are between home, work, and/or recreational pursuits (i.e., restaurants, entertainment, and shopping).  Providing quick, convenient, door-to-door service taxis function as the equivalent of the suburban family car – not surprising given that 77% of Manhattan households do not own a car.

Contractors should be familiar with the unique passenger profile in New York.  New York taxicabs typically make shorter trips, particularly around Manhattan, by frequent users.  Such trips account for approximately 70% of the 500,000 trips daily.  Longer rides (30+ minutes) are generally to the two main NY airports.

NYC taxicabs traveled a total of 796 million miles in 2003, or an average of 65,300 miles per cab.  Total industry mileage grew by 10% from 1993 to 2003.  The growth resulted in part from an increase in the number of double-shifted cabs.  Mileage varies considerably among operators.  Cabs run by fleets and other shift lessors, in service two shifts per day and seven (7) days per week, average 72,000 miles.

**EXHIBIT F**

1
2
3
    UNITED STATES DISTRICT COURT
4   SOUTHERN DISTRICT OF NEW YORK
    ----------------------------------------x
5
    JONATHAN NNEBE, and ALEXANDER KARMANSKY,
6   individually and on behalf of all others
    similarly situated,
7
                    Plaintiffs,
8
                                        Case No.
9      - against -          06 CV 4991 (KMK)
10  MATTHEW DAUS, CHARLES FRASER,
    JOSEPH ECKSEIN, ELIZABETH BONINA,
11  THE NEW YORK CITY TAXI AND LIMOUSINE
    COMMISSION, AND THE CITY OF NEW YORK,
12
                    Defendants.
13
    ----------------------------------------x
14
                                November 6, 2006
15                              10:50 a.m.
16
17
18      DEPOSITION of PETER M. MAZER, taken by
19  Plaintiffs, pursuant to Subpoena, held at
20  the offices of Veritext, LLC, 1350 Broadway,
21  New York, New York 10018, before Donna A. Metz,
22  a Registered Professional Reporter and Notary
23  Public in and for the State of New York.
24
25

```
2
 1
 2    A P P E A R A N C E S:
 3
 4        DANIEL L. ACKMAN, ESQ.
          Attorney for Plaintiffs
 5            One Liberty Plaza (23rd Floor)
              New York, New York 10006
 6
 7
 8
 9        NEW YORK CITY LAW DEPARTMENT
          OFFICE OF THE CORPORATION COUNSEL
10        Attorneys for Defendants
              100 Church Street (Room 5-174)
11            New York, New York 10007-2601
12        By:   MARY O'SULLIVAN, ESQ.,
              Assistant Corporation Counsel
13
14
15    A L S O    P R E S E N T:
16        NEW YORK CITY TAXI AND LIMOUSINE COMMISSION
              40 Rector Street
17            New York, New York 10006-1738
18        By:   AMY BANN, ESQ.,
              Assistant General Counsel
19
20
21
22
23
24
25
```

40
```
 1                     Peter M. Mazer
 2  suspension hearing based on an arrest, that it
 3  should not be continued?
 4       A.    In what time period?
 5       Q.    When you were General Counsel.
 6       A.    Bear in mind that when I was General
 7  Counsel I did not review every decision of an
 8  Administrative Law Judge, but I do not have
 9  firsthand knowledge of a decision of an
10  Administrative Law Judge to discontinue the
11  summary suspension.
12       Q.    So, in other words, you have never
13  heard of a decision where an Administrative Law
14  Judge said the suspension should not be
15  continued?
16       A.    That's not what I said.
17            MS. O'SULLIVAN:   Objection; asked
18      and answered.
19       A.    That's not what I said anyway.
20       Q.    Is that true?
21       A.    I don't know.  I don't remember what
22  I've heard.
23            I've never seen one.
24       Q.    Just to clarify, you have never seen a
25  decision of an Administrative Law Judge
```

41
1                    Peter M. Mazer
2    determining that summary suspension should not
3    be continued?
4         A.    For an arrest?
5         Q.    Right.
6         A.    Where the premise for the summary
7    suspension was an arrest?
8         Q.    Right.
9         A.    I do not recall having seen a written
10   recommendation from an Administrative Law Judge
11   discontinuing a summary suspension for an
12   arrest.
13        Q.    Okay.
14        A.    That doesn't mean that summary
15   suspensions weren't discontinued.  It just
16   means I haven't seen a written decision from a
17   judge recommending that.
18        Q.    In your experience, did the chair,
19   whether it was the chairman or the chairwoman,
20   ever order that a summary suspension based on
21   an arrest not be continued?
22        A.    During what period of time?
23        Q.    When you were General Counsel or
24   Deputy General Counsel?
25        A.    When I was General Counsel there was

42
1                    Peter M. Mazer
2    the chairman, Matthew Daus.
3         Q.    I will just say the chair, whatever it
4    was.
5         A.    Daus was the chair when I was General
6    Counsel.
7              I do not recall seeing a decision from
8    him where a judge recommended that the summary
9    suspension continue and the chairperson
10   discontinued the summary suspension.
11             When Diane McKechnie was the
12   chairperson, Matthew Daus was the General
13   Counsel, I was his deputy, I was really not
14   involved with the summary suspension role and I
15   don't know what her decisions were.
16             I have no knowledge of her decision in
17   those cases.
18        Q.    As far as you are aware, every time a
19   driver was arrested, following his arrest that
20   summary suspension was continued?
21        A.    No.
22             MS. O'SULLIVAN:   Objection.
23        A.    No.   That's not what I said.
24             I said, I am not aware of a situation
25   where a judge recommended that the summary

67
```
 1                      Peter M. Mazer
 2  Counsel to commence revocation proceedings if
 3  an individual were convicted of the same
 4  charge for which he was arrested, and the
 5  arrest led to a summary suspension that was
 6  sustained.
 7       Q.    And was the outcome automatic of the
 8  revocation proceeding?
 9       A.    I mean, again, the revocation
10  proceeding is the same process.
11            It was a judge's recommendation after
12  a hearing and the chairperson would issue the
13  final decision.
14       Q.    Are you aware of any time in which the
15  driver was arrested and then convicted on the
16  same charge where he was not revoked?
17       A.    Where the chairperson issued a written
18  decision not to revoke the individual who was
19  convicted of the same charge for which he was
20  arrested?
21       Q.    Right.
22       A.    I am not aware of such a case.
23       Q.    How many drivers per year were
24  suspended, roughly, when you were General
25  Counsel, based on arrests?
```

68
1                    Peter M. Mazer
2        A.    On average, probably about 200 a year.
3             That would be a round number probably
4    to the nearest hundred.
5        Q.    Meaning it can be one hundred and it
6    could be three hundred?
7        A.    It could be from 150 to 250, something
8    like that.
9             I was General Counsel for three
10   years.  So the number changed.
11       Q.    What percentage of them would you say
12   were ultimately convicted of a crime on which
13   they were arrested?
14       A.    I don't know.
15       Q.    And I think you already answered this.
16            What would happen if they were
17   convicted?
18            MS. O'SULLIVAN:   Objection.
19       Q.    You can answer.
20       A.    If they were -- if the TLC learned of
21   the conviction we would commence revocation
22   proceedings.
23       Q.    And would there be a hearing on the
24   revocation proceeding?
25       A.    Yes.