# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

———————————

Nº 06 Civ. 4991 (RJS)

———————————

JONATHAN NNEBE, ALEXANDER KARMANSKY, EDUARDO AVENAUT, KHAIRUL AMIN, and THE NEW YORK TAXI WORKERS ALLIANCE, individually and on behalf of all those similarly situated,

Plaintiffs,

VERSUS

MATTHEW DAUS, CHARLES FRASER, JOSEPH ECKSTEIN, ELIZABETH BONINA, THE NEW YORK CITY TAXI AND LIMOUSINE COMMISSION, and THE CITY OF NEW YORK,

Defendants.

———————————

OPINION AND ORDER
September 30, 2009

———————————

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Jonathan Nnebe, Alexander Karmansky, Eduardo Avenaut, Khairul Amin, and the New York Taxi Workers Alliance ("NYTWA") bring this putative class action against Defendants Matthew Daus, Charles Fraser, Joseph Eckstein, Elizabeth Bonina, the New York City Taxi and Limousine Commission ("TLC"), and the City of New York, alleging violations of the United States Constitution, New York state law, and New York City municipal law.

Before the Court are the parties' cross-motions for summary judgment and Plaintiffs' motion for class certification. For the reasons set forth below, the Court grants Defendants' motion for summary judgment as to Plaintiffs' federal claims, denies Plaintiffs' motion for summary judgment as to Plaintiffs' federal claims, declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, and denies Plaintiffs' motion for class certification as moot.

## I. BACKGROUND

This case arises from the TLC's policy of suspending a taxi driver upon notification of the driver's arrest, without providing either a pre-deprivation hearing or a post-deprivation hearing that does more than confirm the fact of the driver's arrest.

### A. Facts[1]

#### 1. The Parties

Defendant TLC is a commission, established pursuant to the New York City Charter (the "Charter"), that regulates taxicabs and other for-hire vehicles in the City of New York.  (Defs.' 56.1 ¶ 1.)

Defendant Daus is the Chairman of the TLC.  (Decl. of Matthew Daus in Supp. of Defs.' Mot. ("Daus Decl.") ¶ 1.)  Defendant Fraser is a deputy commissioner and general counsel of the TLC.  (Decl. of Charles Fraser in Supp. of Defs.' Mot. ("Fraser Decl.") ¶ 1.) Defendant Eckstein is the deputy commissioner of the TLC tasked with oversight of the TLC's Adjudications Department.  (Decl. of Joseph Eckstein in Supp. of Defs.' Mot. ("Eckstein Decl.") ¶ 1.) Defendant Bonina is the Chief Administrative Law Judge for the TLC. (Decl. of Elizabeth Bonina in Opp'n to Pls.' Mot. ("Bonina Opp'n Decl.") ¶ 1.)

Plaintiffs Nnebe, Karmansky, Avenaut, and Amin are taxi drivers whose licenses were suspended pursuant to the challenged procedures.  (Defs.' Opp'n 56.1 ¶ 3.)  Their suspensions are discussed more fully below in section I.A.5, *infra*.

Plaintiff NYTWA is a not-for-profit corporation that seeks to improve the working conditions of taxi drivers, safeguard their rights, and promote reform of the industry. (Decl. of Mary O'Sullivan in Supp. of Defs.' Mot. ("O'Sullivan Decl.") Ex. RR (Dep. Tr. of Bhairavi Desai ("Desai Dep. Tr.")), at 5:17-22.)

#### 2. Statutory and Regulatory Framework

The TLC is charged by the New York City Charter with establishing an overall policy for the taxicab and for-hire vehicle industry, including the adoption of criteria and standards for customer service, driver safety, and equipment safety and design.  Charter Ch. 65, § 2300.  To ensure that these criteria and standards are followed, the Charter grants the TLC the authority to regulate and supervise the taxicab and for-hire vehicle industry, including the power to issue, revoke, and suspend the drivers' licenses.  *Id.* § 2303(b)(5).  Pursuant to this authority, the TLC is empowered by the Charter and the New York City Administrative Code (the "Administrative Code") to promulgate certain rules and regulations to effectuate its prescribed purposes.  Charter § 2303(b)(11); Administrative Code § 19-503.

---

[1]  The following facts are taken from the Local Rule 56.1 statements submitted by the parties and the affidavits and exhibits submitted in connection with the motions.  Where only one party's Rule 56.1 statement is cited, the opposing parties do not dispute that fact or have offered no admissible evidence to controvert that fact.  Citations to additional facts in the Discussion section follow the same conventions.  The abbreviation "Pls.' 56.1" refers to Plaintiffs' Amended Local Rule 56.1 statement in support of their motion for summary judgment, while "Pls.' Opp'n 56.1" refers to Plaintiffs' Local Rule 56.1 statement in opposition to Defendants' motion for summary judgment.  Similarly, "Defs.' 56.1" refers to Defendants' Local Rule 56.1 statement in support of their motion for summary judgment, while "Defs.' Opp'n 56.1" refers to Defendants' Local Rule 56.1 statement in opposition to Plaintiffs' motion for summary judgment.

### 3.  The Suspension Procedure Generally

The Administrative Code provides that the TLC may

> for good cause shown relating to a direct and substantial threat to the public health or safety and prior to giving notice and an opportunity for a hearing, suspend a taxicab or for-hire vehicle license issued pursuant to this chapter and, after notice and an opportunity for a hearing, suspend or revoke such license.

Administrative Code § 19-512.1(a).

TLC Rule 8-16 implements the summary suspension procedures at issue in this case. *See* 35 Rules of the City of N.Y. 8-16(a). The version of TLC Rule 8-16 in effect until December 2006, pursuant to which the individual Plaintiffs were suspended, provided that "[i]f the Chairperson finds that emergency action is required to insure public health or safety, he/she may order the summary suspension of a license or licensee, pending revocation proceedings."[2]

If a license is summarily suspended pursuant to this procedure, the TLC is required to provide notice of the suspension within five calendar days; the licensee may request a hearing before the TLC or a competent administrative tribunal within ten days of receipt of the notice of suspension. Administrative Code § 19-512.1(a); TLC Rule 8-16(c).  The TLC generally must afford the licensee a hearing within ten calendar days of receiving the licensee's request. Administrative Code § 19-512.1(a); TLC Rule 8-16(c).

After the hearing, the tribunal must issue a written recommendation that the Chairperson may accept, modify, or reject; the Chairperson's decision represents "the final determination of the Commission with respect to the summary suspension." TLC Rule 8-16(e).  Should the Chairperson fail to issue a final decision within sixty days of the conclusion of the suspension hearing, the suspension is stayed until a decision is made. TLC Rule 8-16(f).

### 4.  Suspension Hearings

All taxicab-license applicants are fingerprinted as part of the license-application process. Administrative Code § 19-505(b)(4). These fingerprints are kept on file with the New York State Division of Criminal Justice Services ("DCJS"). (Defs.' 56.1 ¶ 13.) The fingerprints allow the DCJS both to provide the TLC with an applicant's criminal history,

---

[2] On December 2, 2006, TLC Rule 8-16 was amended to add a new section (c), which provides that "the Chairperson may summarily suspend a license . . . based upon an arrest on criminal charges that the Chairperson determines is relevant to the licensee's qualifications for continued licensure."  TLC Rule 8-16(c).  The amended rule explains that at the post-deprivation hearing, "the issue shall be whether the charges underlying the licensee's arrest, if true, demonstrate that the licensee's continued licensure during the pendency of the criminal charges would pose a threat to the health or safety of the public."  *Id.* Defendants have represented that the revised Rule did not substantively change the summary suspension policy (*see* Decl. of Daniel L. Ackman in Supp. of Pls.'

Mot. ("Ackman Decl.") Ex. B. (Dep. Tr. of Charles Fraser ("Fraser Dep. Tr.")), at 236:23-237:5), and, to the extent applicable, Plaintiffs raise the same objections to the revised Rule.

if any, and to notify the TLC if a licensee is arrested. (*Id.*)

If a licensee is arrested, the DCJS arrest notification contains, in addition to the licensee's identifying information, the date and location of the arrest, the arrest charges, and the penal code section pursuant to which the licensee was arrested.    It does not, however, contain any of the alleged factual bases for the arrest. (*See, e.g.*, O'Sullivan Decl. Ex. A (Nnebe DCJS Notice); *id.* Ex. K (Karmansky DCJS Notice); *id.* Ex. V (Amin DCJS Notice); *id.* Ex. GG (Avenaut DCJS Notice).)

The TLC maintains a list of offenses for which it will summarily suspend a driver upon arrest. (*See* Pls.' 56.1 ¶ 5; Ackman Decl. Ex. A (Dep. Tr. of Marc Hardekopf ("Hardekopf Dep. Tr.")), at 12:13-17; Fraser Dep. Tr. at 115:7-14.)  Offenses qualify for inclusion on the list if, presuming the charges are true, "continued licensure during the pendency of the criminal charges would pose a risk to public health or safety." (Defs.' 56.1 ¶ 14.)

Upon receipt of an arrest notification from DCJS, and prior to any hearing, a TLC attorney decides whether to suspend the driver, and, if the driver is suspended, notifies the driver. (Pls.' 56.1 ¶¶ 2, 4-5; Defs.' Opp'n 56.1 ¶¶ 1, 5.)  Neither the factual allegations underlying the arrest, nor the licensee's driving record, nor the licensee's prior criminal record affect the decision to suspend. (Pls.' 56.1 ¶ 5; Defs.' Opp'n 56.1 ¶ 5.) Generally, neither the TLC Chairperson nor the full Commission is consulted before a suspension is instituted. (Hardekopf Dep. Tr. at 13:24-14:5; Fraser Dep. Tr. at 108:6-23.)

At the post-suspension hearing, a TLC attorney provides the Administrative Law Judge ("ALJ") with a copy of the DCJS form, as well as a copy of the relevant penal code section describing the elements of the offense in question. (Hardekopf Dep. Tr. at 51:10-18.)  The TLC attorney generally presents no other material. (*Id.*)  A licensee may testify and present evidence that he was not actually arrested or that the offense listed in the DCJS notice is incorrect. (Eckstein Decl. ¶ 6; Daus Decl. ¶ 9.)  A licensee may also argue that the charges, even if true, "do not demonstrate that the licensee's continued licensure would pose a threat to public health or safety." (Eckstein Decl. ¶ 6.)

In considering whether the suspension should be lifted, the ALJ does not assess the likelihood of a licensee's actual guilt or the driver's criminal, personal, or professional history. (Ackman Decl. Ex. G (Dep. Tr. of Thomas Coyne ("Coyne Dep. Tr.")) at 53:4-54:24.)  Rather, the standard applied by the ALJ at the suspension hearing is whether, if the charges against the licensee are true, the licensee poses a risk to the public health or safety. (Ackman Decl. Ex. D (Dep. Tr. of Elizabeth Bonina ("Bonina Dep. Tr.")) at 62:14-21; Coyne Dep. Tr. at 34:2-9; Eckstein Decl. ¶ 5.)

The vast majority of the ALJs' recommendations following a hearing recommend continuing the licensee's suspension during the pendency of the criminal proceedings. (Pls.' 56.1 ¶ 12.)  It is undisputed that the TLC Chairperson typically accepts the recommendation that the suspension be continued. (Pls.' 56.1 ¶ 20.)

5.  The Individual Plaintiffs' Suspensions

a.  Nnebe

Nnebe was suspended on May 29, 2006, after he was arrested for and charged with Assault with Intent to Cause Physical Injury, 3rd Degree, a misdemeanor.  (Defs.' 56.1 ¶ 22.)  A May 30, 2006, letter from TLC attorney Marc Hardekopf advised Nnebe of the suspension and his right to request a hearing within ten days of receipt of the letter.  (*Id.* ¶ 23.)

On June 1, 2006, Nnebe requested a hearing, and the hearing was held June 8, 2006, in front of ALJ Frank Fioramonti.  (*Id.* ¶¶ 24-26.)   ALJ Fioramonti issued his recommendation to the TLC Chairperson, dated June 13, 2006, recommending the continued suspension of Nnebe's license; Nnebe was notified of the decision and his right to respond to the recommendation by letter dated the same day.  (*Id.* ¶¶ 29-30.)

By letter dated June 22, 2006, counsel for Nnebe responded to the recommendation, and on July 3, 2006, Chairman Daus notified Nnebe by letter of the continued suspension of his license.  (*Id.* ¶¶ 31-32.)  On September 27, 2006, following notification by the New York County District Attorney's Office that the charges against Nnebe would be dropped, Nnebe's license was reinstated.  (*Id.* ¶ 34.)

b.  Karmansky

Karmansky was suspended on May 23, 2006, after he was arrested for and charged with Criminal Contempt, 1st Degree, a felony, and Criminal Trespass, 2nd Degree, a misdemeanor.  (*Id.* ¶ 35.)  By letter dated May 26, 2006, Hardekopf advised Karmansky of the suspension and his right to request a hearing within ten days of receipt of the letter.  (*Id.* ¶ 36.)

On June 5, 2006, Karmansky requested a hearing, and on June 8, 2006, a hearing was held before ALJ Fioramonti.  (*Id.* ¶¶ 37, 39.)  On June 13, 2006, ALJ Fioramonti recommended the continued suspension of Karmansky's license; Karmansky was notified of the decision and his right to respond to the recommendation by letter dated the same day.  (*Id.* ¶¶ 45-46.)

By letter dated June 21, 2006, Chairman Daus notified Karmansky of the continued suspension of his license.  (*Id.* ¶¶ 46-47.)  On August 17, 2006, the Assistant District Attorney in charge of Karmansky's case advised Hardekopf that the charges against Karmansky would be dropped on August 28, 2006; thereafter, Karmansky's license was immediately reinstated.  (*Id.* ¶ 48.)

c.  Avenaut

Avenaut was suspended on July 17, 2006, after he was arrested for and charged with Assault with Intent to Cause Physical Injury, 3rd Degree.  (*Id.* ¶ 52.)  Avenaut was notified of the suspension and his right to request a hearing within ten days by letter dated July 20, 2006.  (*Id.* ¶ 53.)  Avenaut did not request a hearing, but on October 27, 2006, his license was reinstated based on documents showing that the case against him had been dismissed.  (*Id.* ¶ 54.)

#### d.  Amin

Amin was suspended on June 11, 2005, after he was arrested for and charged with Menacing in the 2nd Degree, with a Weapon, and Assault with Intent to Cause Physical Injury, 3rd Degree, on June 11, 2005.  (*Id.* ¶ 58.)  A June 14, 2005, letter from the TLC advised Amin of his suspension and his right to request a hearing on the suspension within ten days of receipt of the letter.  (*Id.* ¶ 59.)

On June 17, 2005, Amin requested a hearing, and on June 22, 2005, a hearing was held before ALJ Fioramonti.  (*Id.* ¶¶ 60, 62.)  On June 22, 2005, ALJ Fioramonti recommended the continuation of the suspension to Chairman Daus; Amin was notified of that recommendation and of his right to respond by letter dated the same day.  (*Id.* ¶¶ 66-67.)

On August 24, 2005, Amin's license was reinstated based on notification to the TLC that the charges against him were adjourned in contemplation of dismissal.  (*Id.* 56.1 ¶ 69.)

### B.  Procedural History

The first Complaint, which named Nnebe and Karmansky as Plaintiffs, was filed on June 28, 2006, and was assigned to the Honorable Kenneth M. Karas, United States District Judge.  An Amended Complaint was filed on August 3, 2006.  On October 27, 2006, the Second Amended Complaint ("SAC") was filed, adding Avenaut, Amin, and the NYTWA as named Plaintiffs.  Plaintiffs' motion for class certification was filed on November 22, 2006, and the motion was fully submitted on December 12, 2006.

Plaintiffs' and Defendants' respective motions for summary judgment were fully submitted on July 20, 2007, and on September 4, 2007, the matter was reassigned to the docket of the undersigned.  Oral argument on the pending motions was held on March 13, 2009.

## II.  STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Matican v. City of N.Y.*, 524 F.3d 151, 154 (2d Cir. 2008).  The moving party bears the burden of showing that he or she is entitled to summary judgment.  *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  "'A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor.'"  *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

## III.  DISCUSSION

Before reaching the merits of Plaintiffs' challenges to the summary suspension procedures, the Court addresses two threshold issues relating to whether (1) the TLC is a suable entity, and (2) the NYTWA has

standing to bring these claims. As explained herein, the Court resolves both questions in the negative.

### A. TLC as a Defendant

As a preliminary matter, all claims against the TLC must be dismissed because, as an agency of the City of New York, it is not a suable entity. *See, e.g., Cruz v. N.Y. City Taxi & Limousine Comm'n*, No. 06 Civ. 6614 (CBA) (LB), 2007 WL 4243861, at *3 (E.D.N.Y. Nov. 29, 2007) ("[T]he TLC, an agency of the City of New York, cannot be sued under § 1983."); *Gabris v. N.Y. City Taxi & Limousine Comm'n*, No. 05 Civ. 8083 (HB), 2005 WL 2560384, at *2 n.4 (S.D.N.Y. Oct. 12, 2005) (collecting cases and holding that "to the extent plaintiff raises *any* claims against defendant TLC, an agency of the City of New York, such claims are dismissed as a New York City agency cannot be sued in its own capacity" (citations omitted)).

### B. Standing of the NYTWA

Defendants challenge the NYTWA's standing to bring this action. Specifically, they argue that the NYTWA may not raise Section 1983 claims on behalf of its members, and that, in its own capacity, it has demonstrated only de minimis injury. For the following reasons, the Court finds that the NYTWA lacks standing.

#### 1. Applicable Law

An organization generally may have standing to vindicate its own interests or to bring claims on behalf of its members. *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998). The Second Circuit

has held, however, that Section 1983 creates a right of action "personal" to the injured party, and thus that organizations do not have standing to vindicate the rights of their members under Section 1983. *See League of Women Voters of Nassau County v. Nassau County Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984) ("This Circuit has restricted organizational standing under § 1983 by interpreting the rights it secures to be personal to those purportedly injured."); *Aguayo v. Richardson*, 473 F.2d 1090, 1099 (2d Cir. 1973) ("Neither [the statutory] language nor the history . . . suggests that an organization may sue under the Civil Rights Act for the violation of rights of members."); *Alexandre v. N.Y. City Taxi & Limousine Comm'n*, No. 07 Civ. 8175 (RMB), 2007 WL 2826952, at *6 n.9 (S.D.N.Y. Sept. 28, 2007); *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 275 (E.D.N.Y. 2002).[3]

An organization may also have standing to bring claims on its own behalf. In order "to

---

[3] The Second Circuit has recognized a limited exception to the general rule that organizations may not bring Section 1983 claims on behalf of their members where the organization alleges a violation of the First Amendment right to freedom of association. *See Aguayo v. Richardson*, 473 F.2d 1090, 1099-1100 (2d Cir. 1973) (distinguishing claims seeking to vindicate First Amendment associational rights from other Section 1983 claims); *see also Lopez Torres v. N.Y. State Bd. of Elections*, 462 F.3d 161, 170 n.1 (2d Cir. 2006) (holding that an organization could bring claims on behalf of its members because of "the First Amendment associational interests that this suit seeks to vindicate"). In this case, Plaintiffs have not asserted a violation of their First Amendment rights to free association, and their briefing asserts only that the NYTWA has standing to sue in its own capacity. (*See* Pls.' Opp'n at 24-25). The Court thus addresses only whether the NYTWA has standing to vindicate injury to its own interests.

satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.,* 528 U.S. 167, 180-81 (2000).

The Supreme Court has said that an organization suffers sufficient injury to confer Article III standing when its activities are "perceptibly impaired" because its resources are diverted to fighting a challenged practice. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("Such concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources — constitutes far more than simply a setback to the organization's abstract social interests."). Thus, in *Padberg*, the court concluded that the NYTWA had standing to challenge a City policy because the policy forced the NYTWA to divert resources from other policy priorities. *Padberg*, 203 F. Supp. 2d at 275.

## 2. Analysis

Because of the Second Circuit's holding that Section 1983 creates only a personal cause of action, the NYTWA does not have standing to bring the federal constitutional claims asserted here on behalf of its members. The NYTWA has further failed to demonstrate that it has suffered meaningful injury in its own capacity.

Plaintiffs assert that the NYTWA is injured by the challenged practice because "the NYTWA devotes resources to addressing summary suspension, diverting resources from its broader mission of seeking reform in the taxi industry." (Pls.' Opp'n at 25.) As Plaintiffs note, NYTWA Executive Director Bhairavi Desai did testify at her deposition that one of the purposes for which the NYTWA was founded was "to make systemic reform." (Desai Dep. Tr. at 5:22.)

While Desai's deposition testimony indicates that the NYTWA does more than assist drivers whose licenses have been suspended pursuant to the challenged procedures, her testimony provides scant evidence for the proposition that the NYTWA's efforts in these areas were "perceptibly impaired." *Havens Realty Corp.*, 455 U.S. at 379. Although Desai testified that the NTYWA counsels drivers whose licenses have been suspended pursuant to the challenged policy (Desai Dep. Tr. at 10:7-10; 11:6-21), it appears that the organization does so infrequently. For example, when Desai was deposed in February 2007, the NYTWA had only assisted two drivers with license suspension issues under the challenged policy so far that year. (*See id.* at 13:7-21.) Plaintiffs have pointed to no other evidence that the NYTWA is involved with a substantial number of summary suspension cases.

Even if the NYTWA were involved with many summary suspension cases, moreover, it has not identified the priorities on which it was unable to focus as a result of the summary suspension procedures. Although Desai testified to the efforts that the NYTWA sometimes engages in when a driver is

8

suspended, Desai never testified that the NYTWA is rendered less able to provide other services by assisting suspended drivers, and Plaintiffs have pointed to no other evidence that would allow a fact finder to conclude as much.

Thus, unlike in *Padberg*, here the NYTWA has put forward insufficient evidence to allow a reasonable fact finder to conclude that "it has had to divert greater resources to more individualized services and away from . . . reform efforts." *Padberg*, 203 F. Supp. 2d at 275. Because the NYTWA has provided virtually no evidence that its activities have been "perceptibly impaired" by the existence of the summary suspension procedures, it lacks standing to prosecute this action.

C. Plaintiffs' Constitutional Challenges

The SAC alleges numerous constitutional wrongs, including violations of both the procedural and substantive due process protections of the Fourteenth Amendment and violations of the Fifth Amendment. Because the precise nature of Plaintiffs' claims is rather ambiguous from the SAC, the Court construes and summarizes them here before proceeding to its analysis.

Plaintiffs' first claim for relief, "Lack of Hearing," is explicitly brought under Section 1983. It challenges the TLC's practice of suspending taxi drivers' licenses without providing a pre-deprivation hearing. (SAC ¶ 99.) The Court construes this claim as seeking to vindicate Plaintiffs' procedural due process rights.

Plaintiffs' second claim for relief, "Sham Hearings," is also explicitly brought under Section 1983. It claims that the post-deprivation hearings are inadequate because "taxi drivers may have their license suspended based on a [sic] unproven allegations in the absence of evidence and without a meaningful hearing" (*id.* ¶ 103), and because the TLC authorizes continued suspensions on the assumption that the facts supporting the arrests are true (Pls.' Mem. at 30). The Court also construes this claim as seeking to vindicate Plaintiffs' procedural due process rights.

Plaintiffs' third, fourth, and fifth claims for relief, all brought under Section 1983, apparently seek to vindicate Plaintiffs' substantive due process rights. The third and fifth claims for relief allege that drivers' licenses are suspended without a finding of good cause by the full TLC commission, in violation of Administrative Code § 19-512.1. (SAC ¶¶ 107, 115.) The fourth claim for relief alleges that licenses are suspended without a finding of good cause by the TLC Chairperson, in violation of TLC Rule 8-16. (*Id.* ¶ 111.) Although Plaintiffs do not explicitly state how these actions implicate their rights under Section 1983, the Court construes these three claims as substantive due process challenges predicated on the TLC's violation of state law.

Plaintiffs also argue that, because neither Administrative Code § 19-512.1 nor the pre-December 2006 version of TLC Rule 8-16 explicitly provides for summary suspension as a result of an arrest, drivers receive no prior notice that they may be suspended for engaging in certain conduct. (*See* Pls.' Mem. at 23-24.) Though a claim of inadequate

notice is not clearly identified in a claim for relief, the Court addresses it because it arguably falls within the ambit of the SAC's due process challenges.

Plaintiffs' twelfth claim for relief — the only other federal claim in the SAC — is not explicitly brought under Section 1983. It does, however, allege violation of Plaintiffs' Fifth Amendment Rights. Specifically, it alleges that Defendants "invite and expect" suspended licensees to testify at their summary suspension hearings, that the licensees "are led to believe, however falsely, that their testimony may lead to reinstatement of their license [sic]," and that Defendants do not "inform[] the taxi driver of his right to remain silent pursuant to the 5th Amendment." (SAC ¶ 137.)

### 1. Procedural Due Process Claims

As discussed above, Plaintiffs raise procedural due process challenges to both the absence of a pre-deprivation hearing and the adequacy of the post-deprivation hearing.

### a. Applicable Law

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Thus, "the Due Process Clause provides that certain substantive rights — life, liberty, and property — cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

The procedural due process analysis comprises two steps. The court "must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of life, liberty, or property; if protected interests are implicated, [the court] then must decide what procedures constitute due process of law." *Ingraham v. Wright*, 430 U.S. 651, 672 (1972) (internal quotation marks omitted). Procedural due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," but rather "is flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (internal citations and quotation marks omitted).

The process required in a given situation is dictated by the balancing of three factors identified in *Mathews*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail.

424 U.S. at 335. While due process often "'requires an opportunity for a hearing before a deprivation of property takes effect,'" *Brody v. Vill. of Port Chester*, 434 F.3d 121, 135 (2d Cir. 2005) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 88 (1972)), "where a State must act quickly, or where it would be impractical to

provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause," *Gilbert*, 520 U.S. at 930. The *Mathews* test thus governs "both when a hearing is required (that is, pre- or post-deprivation) and what kind of procedure is due a person deprived of liberty or property." *Brody*, 434 F.3d at 135.

### b. Analysis

It is undisputed that a taxi driver has a protected property interest in his license. *See Bell v. Burson*, 402 U.S. 535, 539 (1971) ("[L]icenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."); *Padberg*, 203 F. Supp. 2d at 276 ("[T]axicab drivers have a property interest in their taxicab licenses sufficient to trigger due process protection."). The question for the Court is simply what process is due.

### i. Pre-Deprivation Hearing

Procedural due process generally requires a hearing prior to the State's interference with a protected property or liberty interest. *Brody*, 434 F.3d at 135. Nonetheless, the Supreme Court has repeatedly "rejected the proposition that [due process] *always* requires the State to provide a hearing prior to the initial deprivation of property." *Gilbert*, 520 U.S. at 930 (alteration in original and internal citations and quotations omitted) (collecting cases); *see also Zinermon v. Burch*, 494 U.S. 113, 128 (1990); *FDIC v. Mallen*, 486 U.S. 230, 240 (1988). Rather, "an important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify

postponing the opportunity to be heard until after the initial deprivation." *Gilbert*, 520 U.S. at 930-31.

Plaintiffs argue that in this case "a pre-suspension hearing is required as a matter of due process." (Pls.' Mem. at 27.) They contend that the first two prongs of the *Mathews* test clearly favor a pre-suspension hearing, as the drivers have a strong interest in earning a living and the challenged procedures create a great risk of erroneous deprivation because the vast majority of arrests do not result in conviction. (*Id.* at 28.) Plaintiffs further argue that the TLC has little interest in suspending Plaintiffs' licenses before a hearing is held. This is so, Plaintiffs claim, because the TLC suspends licenses regardless of whether the alleged criminal conduct took place on the job and does so without examining the facts giving rise to the arrest. (*Id.* at 29.) "Absent some real evidence of immediate danger," Plaintiffs contend, "there is no compelling interest in immediate suspension." (*Id.*)

With respect to the first *Mathews* factor, the private interest at stake here is undoubtedly significant, as the Supreme Court has consistently "recognized the severity of depriving someone of the means of his livelihood." *Gilbert*, 520 U.S. at 932; *see also Mallen*, 486 U.S. at 243. At the same time, however, the Supreme Court has also noted that the deprivation of a protected interest is mitigated by the availability of prompt post-deprivation review. Thus, "[s]o long as the suspended [party] receives a sufficiently prompt post-suspension hearing," procedural

due process is not offended. *Gilbert*, 520 U.S. at 932.[4]

In this case, the TLC is required by statute to act promptly following a pre-hearing suspension. The TLC must notify a licensee of the suspension within five days, afford the licensee a summary suspension hearing before an ALJ within ten days of the licensee's request for a hearing (unless the licensee requests otherwise), and issue a final decision no later than sixty days from the conclusion of the hearing. Administrative Code § 19-512.1; TLC Rule 8-16.[5] Thus, although the private interest asserted by Plaintiffs is undoubtedly significant, the impact is mitigated by the availability of prompt post-deprivation review. *See Mallen*, 486 U.S. at 243 ("In many cases, perhaps most, [a period of ninety days prior to a final decision] will be justified by an important government interest coupled with factors minimizing the risk of an erroneous deprivation.").

With respect to the second *Mathews* factor, the government's interest counsels strongly against requiring a pre-deprivation hearing. Among the most critical functions performed by the TLC are ensuring the safety of the taxi-riding public and maintaining the public's trust in the safety of taxis. *See Buliga v. N.Y. City Taxi & Limousine Comm'n*, No. 07 Civ. 6507 (DLC), 2007 WL 4547738, at *4 (Dec. 21, 2007) (noting the TLC's strong interest in ensuring passenger safety). A taxi passenger is in a uniquely vulnerable position, in a confined space with a stranger who may lock the doors, block egress, and limit the passenger's ability to summon police assistance. Passengers consent to what would otherwise be a perilous situation because a TLC license reflects the TLC's opinion that a licensee meets the standard of fitness for licensure set forth in the TLC Rules. Accordingly, the TLC has a strong interest in ensuring both that passengers are not placed in a vulnerable position with possibly dangerous drivers and in ensuring that the public perceive the taxi industry to be safe. (Fraser Decl. ¶ 11.)

Although the majority of the individual Plaintiffs were suspended following misdemeanor arrests, the offenses at issue were uniformly serious and generally involved an element of violence. As discussed in section I.A.5, *supra*, Nnebe was charged with Assault with Intent to Cause Physical Injury, 3rd Degree. Karmansky was charged with Criminal Contempt, 1st Degree (a felony), as well as Criminal Trespass, 2nd Degree. Avenaut was charged with Assault with Intent to Cause Physical Injury, 3rd Degree. Finally, Amin was charged with Menacing in the 2nd Degree, with a Weapon,

---

[4] Plaintiffs also challenge the adequacy of the post-suspension hearings. Because, as discussed in section III.C.1.b.ii., *infra*, the post-suspension hearings satisfy the requirements of procedural due process, the Court addresses only the promptness of those hearings at this stage in the analysis.

[5] TLC Attorney Hardekopf attested that summary suspension hearings must take place within ten days "unless it is determined that the hearing would be prejudicial to any ongoing civil or criminal investigation" or the licensee requests that it take place later, and he noted that he "often extends the ten day limit for requesting a hearing at licensee's request." Hardekopf Decl. ¶¶ 10-12. All named plaintiffs in this action received prompt notice. *See* section I.A.5, *supra*.

as well as Assault with Intent to Cause Physical Injury, 3rd Degree.

Plaintiffs' contention that no imminent danger sufficient to warrant summary suspension exists because most drivers are suspended for off-the-job incidents is unpersuasive. To only consider arrests for on-the-job conduct would significantly compromise the TLC's interest, forcing the public to bear the risk that a driver's unlawful behavior might not stop at the taxicab door. The Court sees no reason why this risk should be placed upon the taxi-riding public.

Nor is Plaintiffs' reliance on *Padberg* persuasive. The dispute in that case stemmed from the TLC's practice of summarily suspending taxi drivers' licenses upon charges of unjustified service refusals. *Padberg*, 203 F. Supp. 2d at 266. The court stated that "although racially-motivated service refusals perpetuate the problem of racial discrimination and those who commit such offenses must be held accountable, the circumstances do not present the sort of immediate threats to health and safety that would permit summary suspension." *Id.* at 281. "If a taxicab driver has refused service on the basis of race," the court explained, there is "little danger in holding him accountable at most ten days later at a meaningful hearing on the merits." *Id.*

Unlike in *Padberg*, the conduct giving rise to suspensions under the challenged TLC policy in this case is closely related to the safety of the taxi-riding public, thus falling squarely within the "health and safety" exception to the pre-suspension hearing requirement. The government interest thus weighs considerably more heavily than it did in the *Padberg* case.

The third and final *Mathews* factor — the risk of erroneous deprivation and the relative value of additional process — also weighs in favor of Defendants. As the Court explains below, the very existence of a criminal proceeding is a reason to suspend a driver, as pending criminal allegations — even if later dismissed — implicate the TLC's interest as licensor. Thus, the suspension is not "erroneous" simply because the charges against the driver are eventually dropped. Rather, the suspension pending the resolution of the criminal case protects the TLC's interest without regard to the ultimate disposition of the criminal charges.

In light of the factors discussed above, the Court concludes that Plaintiffs were not constitutionally entitled to a pre-deprivation hearing.

### ii. Post-Deprivation Hearing

Plaintiffs further argue that, even if the lack of a pre-deprivation hearing were constitutional, the post-deprivation hearing is not because its scope extends no further than determining whether the plaintiff was actually arrested. Necessarily implicit in this argument is the contention that the government must prove more than the fact of a licensee's arrest before suspending him. As discussed below, however, due process does not require such proof. Moreover, it would be difficult, if not impossible, for the TLC to prove that a driver had actually engaged in the charged criminal conduct without interfering with the criminal investigation.

As explained below, federal courts have held both (1) that an agency is entitled to suspend an employee on the basis of pending criminal proceedings against him, and (2) that because an agency may do so, a hearing that does no more than confirm the existence of such criminal proceedings does not violate the suspended employee's rights.

In *Brown v. DOJ*, 715 F.2d 662 (D.C. Cir. 1983), the United States Border Patrol suspended two agents after their indictment for crimes including conspiracy to defraud the United States. *Id.* at 664. The suspension was to remain in effect during the pendency of the criminal charges. *Id.* The agents claimed that the agency must have relied on the facts of the indictment in issuing the suspension, and thus that their inability to challenge the facts alleged by the indictment violated due process. *Id.* at 665.

The court rejected the claim. As it explained, the agency's suspension was based not on the facts alleged by the indictment, but by the existence of the indictment itself. *See id.* at 667 ("[T]he agency here relied solely on the fact of petitioners' indictment in suspending them; since the agency did not rely on petitioners' commission of the alleged criminal acts, the indictment was not used as evidence of those acts."). Because the suspensions were based solely on the existence of the indictment, the agents were entitled to contest no more than that fact itself:

> This observation effectively disposes of petitioners' due process argument, which is premised on their contention that the suspensions were in fact based on the wrongdoing charged in the indictment. Petitioners assert that because the agency produced no evidence of misconduct other than the indictment, they were denied an opportunity to confront the witnesses against them and to present evidence in their own behalf. However, as we have seen, the suspensions were based on the very fact of petitioners' indictment on job-related charges. Since the administrative proceedings offered them ample opportunity to contest this fact, their due process rights were not violated.

*Id.* at 667 n.2. The court further explained why the fact of an indictment itself, even absent proof of the underlying facts, could justify a decision to suspend the agents:

> [I]n allowing suspensions to be based solely on an employee's indictment on job-related charges, we are recognizing that when an employee is targeted by the criminal justice system, the administrative requirements of the agency are implicated. An indictment is a public record, and public knowledge that an individual formally accused of job-related crimes is still on duty would undoubtedly erode public confidence in the agency. In addition, if an employee indicted on work-related charges were retained on the job and if the employee engaged in conduct of the sort alleged in the indictment, the functioning of the agency might be severely hindered or even undermined.

14

*Id.* at 667; *see also Mallen*, 486 U.S. at 244-45 ("[T]he return of the indictment *itself is an objective fact* that will in most cases raise serious public concern that the bank is not being managed in a responsible manner." (emphasis added)).

As noted above, the TLC suspends arrested taxi drivers regardless of whether the alleged misconduct occurs on or off the job and regardless of whether the victim is a passenger. Nevertheless, while an assault of a non-passenger occurring when the taxi driver is off-duty is arguably less "job-related" than the alleged conduct in *Brown*, given the great trust that passengers place in taxi drivers, it is within the TLC's prerogative to conclude that any violent or other serious criminal conduct is necessarily related to the driver's job.

Several other circuits have also concluded that the existence of a criminal proceeding may justify governmental interference with a protected property right. In *James A. Merritt & Sons v. Marsh*, 791 F.2d 328 (4th Cir. 1986), a military contractor was suspended from eligibility for government contracts after its indictment for filing false claims in connection with Navy contracts. *Id.* at 329. The suspension was to remain in effect pending resolution of the criminal proceedings. *Id.* The court rejected the company's claim that an indefinite suspension based solely on the fact of the indictment violated its due process rights:

> The Constitution does not require the government to wait for the outcome of the criminal proceedings before implementing an administrative suspension when a contractor has been accused of fraud after the grand jury's investigation and deliberative process. An indictment triggers a judicial process which protects the rights of the accused while determining guilt or innocence.

*Id.* at 330-31.

Similarly, in *Cooke v. Social Security Administration*, 125 F. App'x 274 (Fed. Cir. 2004), the plaintiff was suspended from his job as a Claims Representative after the United States Attorney filed a criminal complaint accusing him of violations of the Computer Fraud and Abuse Act, with the suspension to remain in effect pending the resolution of his criminal charges. *Id.* at 275. The court rejected his contention that the suspension violated his due process rights:

> Mr. Cooke argues that the agency has an incorrect policy to impose indefinite suspension once criminal charges are filed against an employee regardless of the merits of any response. . . . [T]he Government interest outweighs Mr. Cooke's interest because of the need to retain the trust of the public, whose social security records may be viewed and changed by employees like Mr. Cooke.

*Id.* at 277-78. *Cooke* is particularly relevant precedent in light of the fact that the suspension in that case followed only a criminal complaint, and not the issuance of an indictment.

The Second Circuit has not held contrary to the D.C., Federal, and Fourth Circuits. *See Komlosi v. N.Y. State Office of Mental*

*Retardation & Developmental Disabilities*, No. 88 Civ. 1792 (JFK), 1994 WL 465993, at *10 (S.D.N.Y. Aug. 23, 1994) ("Neither the United States Supreme Court nor the Second Circuit has held that a public employee [sic] who suspends an employee without pay violates due process by staying an administrative appeal pending disposition of criminal charges arising from the alleged misconduct."), *rev'd in part on other grounds*, 64 F.3d 810 (2d Cir. 1995).

The conclusion that Plaintiffs are not entitled to a full adversarial hearing before the TLC is bolstered by the third factor in the *Mathews* analysis: the value of additional procedures and the burden that such additional procedures would entail. Put simply, requiring the TLC to prove that each driver engaged in the charged conduct would unacceptably interfere with the parallel criminal proceeding. A hearing such as the one that Plaintiffs advocate, in which the ALJ would be required to evaluate the driver's "criminal record (if any), his driving record, his personal history, the credibility of his accusers, the circumstances of the alleged crime, his guilt or innocence, or whether the crime occurred while the driver was driving his taxi" (*see* Pls.' Opp'n Mem. at 13), would be unworkable. Holding such a hearing would present the significant possibility of interference with the criminal investigation and proceedings, including the risk that a criminal defendant might get a free preview of the criminal case against him through the parallel civil proceeding. Indeed, it is by no means clear that the police or the District Attorney would cooperate, given the risk of interference with a criminal investigation or prosecution.

Further, additional safeguards of the sort that Plaintiffs advocate would present a significant financial and administrative burden on the TLC. Defendants have put forth evidence that additional information about a licensee's arrest is either not available or not accessible through the DCJS system. (Fraser Decl. ¶¶ 14-15.) Accordingly, information pertaining to "whether an arrest was based on a police officer's personal observations or on a complaint reported to the police, whether an arrest was made pursuant to [an] arrest warrant, whether the arrestee was arraigned or indicted, whether bail was required, and whether a complaint, information, or supporting affidavit was filed" would need to be obtained "on a case-by-case basis" from the court or from the prosecutor handling the licensee's criminal case. (*Id.* ¶ 15.) Given that the number of summary suspensions based on arrest averaged slightly fewer than forty-six per month in the six months following the filing of this action (*id.* ¶ 16), procuring this information on a case-by-case basis would present a significant burden.

The District of Columbia Circuit reached a similar conclusion in *Brown*. As the court there noted, "any administrative hearings that precede trial on the criminal charges would constitute improper interference with the criminal proceedings if they churn over the same evidentiary material." *Brown*, 715 F.2d at 668. "Thus, the interests of both the employee and the public are better protected by allowing suspension based on the fact of indictment alone, rather than requiring administrative inquiry into the unlawful conduct alleged in the indictment." *Id.*; *accord Rutigliano Paper Stock, Inc. v U.S. Gen. Servs. Admin.*, 967 F. Supp. 757, 767

(E.D.N.Y. 1997) (noting that the General Services Administration was not bound to hold fact-finding hearings after suspending indicted contractors, as it lacked the capacity to subpoena accusing witnesses or compel the production of evidence).

Plaintiffs rely largely on *Krimstock v. Kelly* (*Krimstock I*), 306 F.3d 40 (2d Cir. 2002), to support their argument that the present post-deprivation hearing is insufficient. In the *Krimstock* litigation, plaintiffs challenged New York City's retention of seized vehicles from initial seizure following an arrest for drunk driving through judgment in a civil forfeiture proceeding. Although the relevant civil forfeiture statute provided for a hearing upon request, those proceedings were often stayed pending resolution of the criminal proceedings. *Id.* at 45.

In *Krimstock*, plaintiffs argued that the lack of a prompt post-seizure hearing to determine the validity of continued retention of the seized vehicles violated their procedural due process rights. The Second Circuit held that a post-seizure, pre-forfeiture-hearing opportunity to be heard was required, finding significant the "months or even years" that the plaintiffs might be deprived of their property, the fact that the lack of a post-deprivation hearing might result in the deprivation of the property of innocent owners, and the fact that the City's primary asserted interest in the forfeiture was financial. *Id.* at 60-67. Subsequently, in *Krimstock v. Kelly* (*Krimstock II*), 464 F.3d 246 (2d Cir. 2006), the court held that the government must — albeit by ex parte process — justify its continued retention of the vehicles even when its reason for seizing the vehicles is for use as evidence at trial. *Id.* at 255.

Both *Krimstock I* and *Krimstock II* are readily distinguishable from the case at hand. The first difference between this case and *Krimstock* pertains to the government interest. A taxi license represents the TLC's judgment that the licensee is qualified to drive a taxi and interact with passengers; as the District of Columbia Circuit noted in *Brown*, "public knowledge that an individual formally accused of job-related crimes is still on duty would undoubtedly erode public confidence in the agency." *Brown*, 715 F.2d at 667. As a result, every license issued by the TLC necessarily implicates its interest as a licensor. This interest is analogous to the interest as government employer identified in *Brown* and *Cooke*. No such interest existed in *Krimstock*, where only private ownership of automobiles was at stake.

Rather, the *Krimstock I* court made clear that the City's primary interest in retaining the seized vehicles was financial. *See Krimstock I*, 306 F.3d at 64 ("The first, and the most compelling among [the interests that] the City has adduced, is to prevent a vehicle from being sold or destroyed before a court can render judgment in future forfeiture proceedings."). Indeed, the government's true motivation was revealed by the fact that the City retained and sought forfeiture of not all vehicles involved in drunk driving arrests, but only "those that might yield an attractive price at auction." *Id.* at 66.[6]

_____

[6] The *Krimstock I* court also noted the City's public-safety interest in denying drunk drivers access to vehicles but concluded that (1) the seizures had little public-safety benefit, since drivers remained free to

The second difference between *Krimstock* and this case pertains to the heightened risk of erroneous deprivation that existed on *Krimstock*'s facts.  Specifically, the risk of erroneous deprivation was elevated by the risk posed to innocent owners of vehicles merely driven by the arrestee, who would have no opportunity to press the defense of innocent ownership under the forfeiture statute until the initiation of civil forfeiture proceedings.  *Id.* at 55-57.  Here, there is no such risk of a similar problem, as licenses are only suspended after the particular licensee is arrested.

Finally, the third difference between *Krimstock* and this case pertains to the feasability of alternative procedures.  In *Krimstock*, the New York City Police Department was a party to both the criminal proceedings and the civil forfeiture proceedings; there was thus little difficulty in ordering the police to make an evidentiary showing to maintain the seizure of the car.  The TLC, as an independent agency, lacks the information that Plaintiffs would have it

provide to justify an interim suspension.  It was thus far easier for the Police Department to participate in a searching post-seizure hearing than it would be for the TLC to do so.[7]

*       *       *

Lastly, to the extent that Plaintiffs allege bias on the part of the ALJs who preside over the summary suspension hearings, Plaintiffs had recourse to an Article 78 proceeding, had they chosen to avail themselves of that mechanism.  This remedy is sufficient for purposes of due process.  *See Locurto v. Safir*, 264 F.3d 154, 174 (2d Cir. 2001) ("Petitioners proceeding under Article 78 may raise claims that the agency adjudicator was biased and prejudged the outcome . . . or that *ex parte* communications with other officials may have infected the adjudicator's ruling.  An Article

---

drive other cars, and (2) if the City truly had an interest in public safety, it would not seize only valuable cars. *Krimstock I*, 306 F.3d at 66-67.  Here, the Court concludes that the TLC has a valid public-safety interest, the TLC is not motivated by financial concerns, and suspending a taxi driver's license is a reasonably effective way of limiting the driver's potentially dangerous interactions with the public.

It should also be briefly noted that the *Krimstock II* court required some post-deprivation process when a vehicle is seized by the police for use as evidence, even though a nonfinancial government interest existed.  The court concluded that only an ex parte hearing was required, however, *Krimstock II*, 464 F.3d at 255, and so in light of the other remaining differences between *Krimstock* and this case, *Krimstock II* is weak support for Plaintiffs' contention that they are entitled to an adversarial hearing.

---

[7]  Plaintiffs have also called attention to the Second Circuit's recent decision in *Spinelli v. City of New York*, No. 07 Civ. 1237, 2009 WL 2413929 (2d Cir. Aug. 7, 2009), but it too is weak support for Plaintiffs' contention that the post-suspension hearings in this case are inadequate.  In *Spinelli*, a gun shop owner's license was suspended for 58 days after the New York City Police Department observed several violations of required security restrictions.  *Id.* at *1-2.  The Second Circuit concluded that the owner's procedural due process rights had been violated by the delay between the suspension and a post-suspension hearing.  *Spinelli* is distinguishable, however, for at least two reasons.  Critically, unlike in this case, *Brown*, *Cooke*, and *Marsh*, the suspending authority and the investigating authority were the same:  the New York City Police Department.  There was thus less difficulty in requiring the suspending authority to participate in a hearing.  Second, the court in *Spinelli* found that the the plaintiff received inadequate notice of her suspension, in the form of only cursory letters, *id*. at *8-9, a problem that does not exist in this case, where Plaintiffs were promptly notified of their suspensions.

78 proceeding therefore constitutes a wholly adequate post-deprivation hearing for due process purposes." (citations omitted)).

For the reasons stated above, Plaintiffs have failed to show a violation of their procedural due process rights.

### 2. Substantive Due Process Claims

Plaintiffs also raise substantive due process challenges to the summary suspension procedures. As explained herein, Plaintiffs' claims lack merit.

#### a. Applicable Law

The Due Process Clause "has been held to have a substantive component that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 144 (2d Cir. 1994) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The Second Circuit has held that "[s]ubstantive due process protects a liberty or property interest in pursuing the common occupations or professions of life." *N.Y. State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1311 (2d Cir. 1994) (internal quotation marks omitted).

Substantive due process represents the "outer limit on the legitimacy of governmental action." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). It thus protects against state actions that are "arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal quotation

marks and citations omitted). Accordingly, not every violation of state law by a government agency rises to the level of a substantive due process violation, no matter how "incorrect or ill-advised" that decision might be. *See, e.g.*, *Natale*, 170 F.3d at 263 (noting that the Due Process Clause "does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action" and holding that "[s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority").

#### b. Analysis

As described above, Plaintiffs' contention appears to be that Defendants have violated state law in a sufficiently outrageous way that substantive due process is implicated. As the Court construes Plaintiffs' occasionally enigmatic briefing, the third and fifth claims for relief allege that a finding of good cause to suspend must be made by the full commission, as the Administrative Code provides that "[t]he *commission* may, for good cause shown relating to a direct and substantial threat to the public health or safety and prior to giving notice and an opportunity for a hearing, suspend a taxicab or for-hire vehicle license issued pursuant to this chapter." Administrative Code § 19-512.1 (emphasis added). The fifth claim for relief, in contrast, argues that a finding of good cause must be made by the TLC Chairperson. This argument relies on TLC Rule 8-16, which provides that "the *Chairperson* may summarily suspend a license . . . based upon an arrest on criminal charges that the *Chairperson* determines is relevant to the

licensee's qualifications for continued licensure." TLC Rule 8-16(c) (emphasis added).

Plaintiffs' Complaint fails to allege a violation of substantive due process on its face. Not only is it far from clear that the TLC acted contrary to state law, but even if it did, the Court finds that Defendants' actions were not so "outrageously arbitrary" as to rise to the level of a substantive due process violation.

With respect to Plaintiffs' claim that the full commission must rule on every license suspension, Plaintiffs are likely incorrect in their interpretation of New York law. As at least one New York court has concluded, "[a] plain reading and common sense suggest that the drafters of section 19-512.1(a) did not mean 'full commission' every time the term 'commission' is used throughout this chapter of the Administrative Code." *Wai Lan Fung v. Daus*, 846 N.Y.S.2d 104, 105 (App. Div. 2007). Even if Plaintiffs are correct that their interpretation of the laws at issue is the proper one, however, substantive due process provides no protection "against government action that is" merely "incorrect or ill-advised." *Lowrance*, 20 F.3d at 537. Plaintiffs have made no attempt to argue that the TLC's action rises to the level of the "outrageously arbitrary." *Natale*, 170 F.3d at 263.

With respect to Plaintiffs' claim that the TLC Chairperson may not delegate his Rule 8-16 authority to TLC attorneys, Plaintiffs again appear to be incorrect as a matter of New York law. New York courts have held that, even where certain tasks are granted to the head of an administrative agency, the agency head may delegate these tasks to agency employees. *See Grant v. N.Y. State Continuing Legal Educ. Bd.*, 739 N.Y.S.2d 139, 140 (App. Div. 2002) (holding that a state agency's delegation of certain tasks to its staff was "'a commonsense proposition'" and "'an inevitable incident of hierarchical organization.'" (quoting *Suffolk County Bd. Ass'n v. County of Suffolk*, 46 N.Y.2d 613, 620 (1979)). Indeed, the City Charter specifically provides that the TLC chair "shall have charge of the organization of its office and have authority to employ, assign and superintend the duties of such officers and employees as may be necessary to carry out the provisions of this chapter." Charter § 2301(c). In light of the fact that the TLC oversees some 100,000 licenses (Fraser Decl. ¶ 13), the Court agrees that it is a "commonsense proposition" that the TLC Chairperson may delegate tasks to his employees. It certainly is not "outrageously arbitrary" for him to do so.

For the reasons stated above, Plaintiffs have failed to show a violation of their substantive due process rights.

### 3. Due Process: Fair Notice

Plaintiffs contend that the summary suspension policy is unconstitutional because taxi drivers lack notice that they will be suspended after they are arrested for specified crimes. This argument lacks merit.

### a. Applicable Law

A regulation or statute that provides for the deprivation of a property interest "must be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable

opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Piscottano v. Murphy*, 511 F.3d 247, 281 (2d Cir. 2007) (internal quotation marks and citations omitted).  While a plaintiff may challenge the constitutionality of a statute or regulation on an as-applied or facial basis, to succeed on a facial vagueness challenge, the plaintiff must demonstrate that the challenged law is "'impermissibly vague in all of its applications.'"  *Rubin v. Garvin*, 544 F.3d 461, 471 n.2 (2d Cir. 2008) (quoting *Arriage v. Mukasey*, 521 F.3d 219, 224 n.2 (2d Cir. 2008)).  "Such a showing is impossible for a [litigant] whose as-applied challenge lacks merit, because he cannot establish that the statute is vague in his own case." *Id.*

Thus, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982); *accord Parker v. Levy*, 417 U.S. 733, 756 (1974).  Accordingly, "prohibitions phrased in general terms have been upheld when they were plainly applicable to the conduct of the . . . plaintiff, despite the existence of questions as to whether they would give fair notice with respect to other, hypothetical, conduct at the periphery." *Piscottano*, 511 F.3d at 281 (collecting cases).[8]

### b. Analysis

As discussed above, the Administrative Code and TLC Rules contain provisions that

provide for summary license suspension "for good cause shown relating to a direct and substantial threat to the public health or safety," Administrative Code § 19-512.1, or when "emergency action is required to insure public health, safety, or welfare," TLC Rule 8-16.  Each individual Plaintiff here was arrested for an offense that was a felony or involved some element of violence.  All drivers, by law, are fingerprinted as part of the license application process.  *See* Administrative Code § 19-505(b)(4).  Plaintiffs thus had notice that the TLC might learn of any arrests.   Under these circumstances, it is eminently within the intelligence of an ordinary licensee to grasp that an arrest for a violent or felony offense might be deemed a threat to public safety sufficient to warrant suspension, whether or not they had access to the list of offenses that resulted in suspension.  This is especially true given the vulnerable position in which passengers are placed when entrusting their safety to a stranger possessed of a TLC license.

The Second Circuit has upheld similarly general provisions where the plaintiff's conduct has clearly fallen within the ambit of the provision, regardless of whether other conduct might present a more questionable case. *See, e.g., Piscottano*, 511 F.3d at 280-84 (rejecting vagueness challenge to a regulation that penalized any behavior that "could . . . reflect negatively on the Department of Correction" because "it is not beyond the intelligence of an ordinary person, much less that of a correctional officer, to recognize that a criminal-justice-system officer's association with an organization whose affiliates engage in criminal activity reflects negatively on the agency that employs

---

[8]  The narrow exception to this rule, involving conduct protected by the First Amendment, does not apply here. *See Vill. of Hoffman Estates*, 455 U.S. at 495 n.7.

him" and collecting cases (internal quotation marks and citations omitted)). Accordingly, Plaintiffs' vagueness challenge fails.

#### 4. Fifth Amendment Claim

Plaintiffs also allege that the Defendants violated their Fifth Amendment rights by failing to advise Plaintiffs at their hearings of their right to remain silent. (SAC ¶¶ 136-38.) The Supreme Court has held, however, that a party is not compelled to be a witness against himself, and, consequently that there is no Section 1983 claim for violation of the Self-Incrimination Clause, where the statements at issue were not used against the speaker in a criminal proceeding. *Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (plurality opinion); *see also Higazy v. Templeton*, 505 F.3d 161, 171 (2d Cir. 2007) ("The Supreme Court concluded that an officer could not be subjected to civil liability for an alleged violation of the privilege against compelled self-incrimination where the coerced statement is not thereafter used against the person who gave the statement.").

Given that the record here is devoid of evidence that any statements made by Plaintiffs at their suspension hearings were later used against them in a criminal proceeding, Plaintiffs' Fifth Amendment claim is dismissed.

#### D. Jurisdiction Over State Law Claims

The SAC also alleges several claims under New York state law. (*See* SAC ¶¶ 117-35.) Because jurisdiction in this case is not premised on diversity of the parties pursuant to 28 U.S.C. § 1332, the Court has subject matter jurisdiction to decide the state law claims only if it exercises supplemental jurisdiction under 28 U.S.C. § 1367. *See Richardson v. N.Y. City Health & Hosps. Corp.*, No. 05 Civ. 6278 (RJS), 2009 WL 804096, at *22 (Mar. 25, 2009).

As discussed above, all of Plaintiffs' federal claims have been dismissed. "'When all bases for federal jurisdiction have been eliminated . . . the federal court should ordinarily dismiss the state claims.'" *Id.* (quoting *Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R. Co.*, 85 F.3d 35, 39 (2d Cir. 1996)); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) ("[W]hen the federal claims are dismissed the state claims should be dismissed as well." (internal quotation marks and citations omitted)). The decision to exercise jurisdiction over state law claims is within the sound discretion of the court, but "'the usual case . . . will point toward declining jurisdiction over the remaining state-law claims.'" *In re Merrill Lynch Ltd. P'Ships Litig.*, 154 F.3d at 61 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Here, reasons of judicial economy and comity militate against retaining jurisdiction over the state claims, as the Plaintiffs will suffer no prejudice as a result of being required to bring their state law claims in state court. *See Tishman v. Assoc. Press*, No. 05 Civ. 4278 (GEL), 2007 WL 4145556, at *9 (S.D.N.Y. Nov. 19, 2007) ("[S]ince New York's CPLR § 205 allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations, plaintiffs will not be prejudiced by the dismissal of their [state and municipal law] claims." (internal quotation marks and

citations omitted)); *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 281 (S.D.N.Y. 2007) (citing cases). The Court thus declines to exercise supplemental jurisdiction over the remaining state and municipal law claims in the SAC.

### IV. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Plaintiffs' federal claims, denies Plaintiffs' motion for summary judgment as to Plaintiffs' federal claims, declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, and, because there are no claims remaining before the Court, denies Plaintiffs' motion for class certification as moot.

The Clerk of the Court is respectfully directed to terminate the motions docketed at Doc. Nos. 47, 96, and 104, and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 30, 2009
      New York, New York

\*\*\*

Plaintiffs Jonathan Nnebe, Alexander Karmansky, Eduardo Avenaut, Khairul Amin, and the New York Taxi Workers Alliance are represented by Daniel L. Ackman, Esq., 12 Desbrosses St., New York, NY 10013.

Defendants Matthew Daus, Charles Fraser, Joseph Eckstein, Elizabeth Bonina, the New York City Taxi and Limousine Commission, and the City of New York are represented by Mary M. O'Sullivan, New York City Law Department, Office of the Corporation Counsel, 100 Church St., New York, NY 10007.

23