UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-22-13
```

JONATHAN NNEBE, *et al.*,

            Plaintiffs,

-v-

MATTHEW DAUS, *et al.*,

            Defendants.

No. 06 Civ. 4991 (RJS)
AMENDED[1] MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Jonathan Nnebe, Alexander Karmansky, Eduardo Avenaut, and Khairul Amin – all New York City taxi drivers – together with the New York Taxi Workers Alliance ("NYTWA," and collectively, "Plaintiffs"), bring this putative class action against Matthew Daus, Charles Fraser, Joseph Eckstein, Elizabeth Bonina, the New York City Taxi and Limousine Commission ("TLC"), and the City of New York (the "City" and, with the other defendants, "Defendants"), alleging that the TLC's policy of suspending taxi drivers upon notification of their arrest violates the United States Constitution, New York state law, and New York City municipal law. Now before the Court are Plaintiffs' and Defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motions are denied.

---

[1] This Amended Memorandum and Order amends this Court's Memorandum and Order of July 23, 2013, (Doc. No. 201) to reflect that Plaintiff's motion for summary judgment was pending. In all other respects, the July 23, 2013, Order remains unchanged.

## I. BACKGROUND

### A. Facts

The Court presumes the parties' familiarity with the facts and history of this case.[2] The central issue here is whether the TLC's policy of suspending taxi drivers upon notification of their arrest comports with federal and state due process guarantees. The specific suspension procedures at issue in this case are set forth in a rule promulgated by the TLC pursuant to its rulemaking authority under the New York City Charter and New York City Administrative Code. *See* N.Y.C. Charter § 2303(b)(5); N.Y.C. Admin. Code § 19-512.1. The version of the rule in effect until December 2006 provided that "[i]f the [TLC] Chairperson finds that emergency action is required to insure public health or safety, he/she may order the summary suspension of a license or licensee, pending revocation proceedings."[3] *Nnebe v. Daus* (*Nnebe I*), 665 F. Supp. 2d 311, 316 (S.D.N.Y. 2009). Since revised, the rule now provides that "[t]he Chairperson can summarily suspend a [l]icense based upon an arrest on criminal charges if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety."[4] 35 RCNY § 68-21(d)(1).

---

[2] Unless otherwise indicated, the following facts are taken from the Local Rule 56.1 statements submitted by the parties and the affidavits and exhibits submitted in connection with the motion. Where only one party's Rule 56.1 statement is cited, the opposing parties do not dispute that fact or have offered no admissible evidence to controvert it. In deciding this motion, the Court has also considered the numerous rounds of briefing and supporting exhibits submitted by the parties, which comprise too many submissions to list individually here.

[3] Until April 2011, this rule was codified at 35 Rules of the City of New York ("RCNY") § 8-16, and *Nnebe I* accordingly refers to it as "TLC Rule 8-16." *See, e.g., Nnebe I*, 665 F. Supp. 2d at 316. Effective April 1, 2011, however, the TLC repealed its body of rules and promulgated a new set under Chapters 51 through 70 of Title 35 of the RCNY. (Defs. Post-Remand 56.1 ¶ 5.) What was formerly TLC Rule 8-16 thus now appears in 35 RCNY § 68-21.

[4] The rule evidently has been revised more than once since Plaintiffs initiated this action, for as of 2009, it read: "[T]he Chairperson may summarily suspend a license . . . based upon an arrest on criminal charges that the Chairperson determines is relevant to the licensee's qualifications for continued licensure." *Nnebe I*, 665 F. Supp. 2d at 316 n.2. As the Court noted at that time, Defendants represented that the 2009 version of the rule "did not substantively change the summary suspension policy . . . and, to the extent applicable, Plaintiffs raise the same objections to the revised [r]ule." *Id.* Given that the current version of the rule resembles the 2006 version even more closely than the 2009 version did, and because neither party has argued that the current version meaningfully

2

Whenever the TLC suspends a license, it must notify that licensee within five days. *Id.* § 68-21(a)(3). The licensee has ten days from receiving such notice to request a hearing before an administrative law judge ("ALJ"), and the TLC in turn has ten days from receiving a licensee's request to actually hold the hearing.[5] *Id.* § 68-21(b)(2). At the hearing, "the issue [is] whether the charges underlying the [l]icensee's arrest, if true, demonstrate that the continuation of the [l]icense while awaiting a decision on the criminal charges would pose a direct and substantial threat to the health or safety of the public." *Id.* § 68-21(d)(3). After the hearing, the ALJ issues a written recommendation that the TLC Chairperson (the "Chairperson") may accept, modify, or reject. *Id.* § 68-21(c)(3). The Chairperson's decision represents "the final determination of the [TLC] with respect to the summary suspension." *Id.* § 68-21(c)(4).

Not every arrest triggers suspension, and the categories of arrests that do have changed over the years. Prior to November 2006, the TLC's policy was to automatically suspend licensees arrested for a wide range of both violent and non-violent felonies and misdemeanors, including misdemeanor welfare fraud, forgery, and obstruction of governmental administration. (*See* Defs. Post-Remand 56.1 ¶ 8; Reply Decl. of Mary O'Sullivan, dated July 17, 2007, Doc. No. 146 ("O'Sullivan Reply Decl."), Ex. HHH.) The TLC narrowed that list significantly in November 2006, and as of October 2011, it comprised only felonies; misdemeanors involving sexual misconduct, assault, forcible touching, reckless endangerment, child endangerment, public lewdness, criminal possession of a weapon, animal torture, and driving misconduct; and

---

affects the merits of Plaintiffs' claims, the Court will assume that Plaintiffs raise the same objections to the current version as to the 2006 version.

[5] In November 2007, the City transferred the post-suspension hearings from the TLC to the Office of Administrative Trials and Hearings ("OATH"). (Defs. Post-Remand 56.1 ¶ 10.) Plaintiffs, however, raise the same objections to the new system. *See Nnebe v. Daus (Nnebe II)*, 644 F.3d 147, 151 (2d Cir. 2011).

the infraction of driving while ability impaired. (*See* Defs. Post-Remand 56.1 ¶ 7); *Nnebe II*, 644 F.3d at 151, 163.

Plaintiffs are four licensed New York City taxi drivers (the "Individual Plaintiffs") and an association representing taxi drivers' interests. Each of the Individual Plaintiffs was suspended following an arrest. Amin was suspended on June 11, 2005 after he was arrested for and charged with Menacing in the 2nd Degree, with a Weapon, and Assault with Intent to Cause Physical Injury, 3rd Degree – both misdemeanors. *Nnebe I*, 665 F. Supp. 2d at 319. Karmansky was suspended on May 23, 2006 after he was arrested for and charged with Criminal Contempt, 1st Degree – a felony. *Id.* at 318. Nnebe was suspended on May 29, 2006 after he was arrested for and charged with Assault with Intent to Cause Physical Injury, 3rd Degree. *Id.* Avenaut was suspended on July 17, 2006 after he too was arrested for and charged with Assault with Intent to Cause Physical Injury, 3rd Degree. *Id.* at 318–19. Except for Avenaut, each of the Individual Plaintiffs requested a hearing, and in each case the ALJ recommended, and the Chairperson approved, continuation of the suspension. *Id.* Ultimately, each of the Individual Plaintiffs' suspensions was lifted after the criminal charges against them were dropped. *Id.*

B. Procedural History

Following discovery, the parties filed cross-motions for summary judgment and Plaintiffs also moved for class certification. (*See* Doc. Nos. 44, 96, 104.) On September 30, 2009, the Court entered summary judgment in favor of Defendants as to Plaintiffs' federal claims, declined to exercise supplemental jurisdiction over Plaintiffs' state law claims, and denied Plaintiffs' class certification motion as moot. *Nnebe I*, 665 F. Supp. 2d at 315. The Court held that (1) the NYTWA lacked standing to bring a § 1983 suit on behalf of its members, *id.* at 321; (2) the TLC's policy of suspending drivers before affording them a hearing did not violate procedural

due process, *id.* at 325–26; (3) the post-suspension hearings, which were limited to "determining whether the plaintiff was actually arrested," also did not violate procedural due process, *id.* at 326–30; (4) the summary suspension procedures did not violate Plaintiffs' substantive due process rights, *id.* at 330–32; (5) Plaintiffs had fair and adequate notice that they faced suspension if arrested, *id.* at 332–33; and (6) the post-suspension hearings did not violate Plaintiffs' Fifth Amendment right against self-incrimination, *id.* at 333.

Plaintiffs appealed the Court's ruling, and in March 2011 the Second Circuit (1) affirmed the Court's holding that due process did not require the TLC to provide a pre-deprivation hearing, *Nnebe II*, 644 F.3d at 158–59; (2) reversed the Court's finding that the NYTWA lacked standing in this action, *id.* at 158; (3) vacated and remanded the Court's grant of summary judgment that the post-suspension hearings satisfy due process,[6] *id.* at 163; and (4) vacated the Court's dismissal of Plaintiff's state law claims, *id.*

With respect to the post-suspension hearings, the Second Circuit focused on a factual dispute between the parties regarding the standard that ALJs applied in the post-suspension hearings. At oral argument, Defendants asserted that drivers could avoid suspension by demonstrating that "the charges, even if true, did not demonstrate that continued licensure would pose a threat to public safety," while Plaintiffs insisted that ALJs actually applied a *per se* standard of continuing suspensions whenever the licensee was actually arrested for an offense that triggers suspension. *Id.* at 160. The Second Circuit found the record before it insufficiently clear to determine which side was correct, although it characterized the evidence supporting Defendants' assertion as "scant" and that supporting Plaintiffs' as "considerable." *Id.* at 160–61. Accordingly, the Circuit reserved judgment as to the minimum process post-suspension hearings

---

[6] Plaintiffs stated on appeal that they did not intend to bring any substantive due process claims, and thus the Second Circuit did not review any of their claims in terms of substantive due process. *Nnebe II*, 644 F.3d at 153 n.2.

must offer and instead remanded the action for additional fact-finding as to "whether the post-suspension hearing the City affords does indeed provide an opportunity for a taxi driver to assert that, even in if the criminal charges are true, continued licensure does not pose any safety concerns." *Id.* at 163.

Pursuant to the Second Circuit's mandate, the Court directed the parties to submit additional declarations, affidavits, and supplemental memoranda of law regarding Plaintiffs' and Defendants' motions for summary judgment. The Court then held oral argument on July 31, 2012, at which it permitted the parties to file post-argument submissions. The motions were fully submitted as of September 15, 2012. (Doc. No. 200.)

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of proving that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (internal citations and quotation marks omitted).

In ruling on a motion for summary judgment, a court must resolve any ambiguity in favor of the nonmoving party. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). A court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854

(2d Cir. 1996). As a result, summary judgment will not issue where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "a complete failure of proof concerning an essential element of the nonmoving party's case" renders summary judgment proper. *Celotex*, 477 U.S. at 323.

### III. DISCUSSION

On remand, the Court's mandate is narrow and well-defined. First, it must determine what standard the City actually applies in post-suspension hearings. That is a factual question, and as such can be resolved at this stage only if the answer is not genuinely in dispute. *See* Fed. R. Civ. P. 56(a). If the Court can resolve that question, it must then determine whether the standard the City actually applies satisfies the requirements of due process. Finally, if the Court determines that the hearing does not satisfy due process, it must reconsider its ruling in its entirety, including its refusal to exercise supplemental jurisdiction over Plaintiffs' state- and municipal-law claims. *See Nnebe II*, 644 F.3d at 163.

The Court begins with the threshold inquiry into the standard the City actually – that is, in practice – applies at the post-suspension hearings.[7] Defendants assert that the actual standard matches the official one: "whether the charges underlying the [l]icensee's arrest, if true, demonstrate that the continuation of the [l]icense while awaiting a decision on the criminal charges would pose a direct and substantial threat to the health or safety of the public." 35 RCNY § 68-21(d)(3). Thus, Defendants contend, a licensee may present, and an ALJ will

---

[7] This inquiry includes hearings before OATH ALJs. Plaintiffs question the relevance of such hearings to this case given that each of the Individual Plaintiffs' hearings was before an ALJ employed directly by the TLC. (*See* Doc. No. 183 ("Pls. Post-Remand Reply") at 2.) However, consistent with the fact that Plaintiffs seek injunctive relief, the Second Circuit's mandate instructs the Court to assess the adequacy of "the post-suspension hearing the City *affords*." *Nnebe II*, 644 F.3d at 163 (emphasis added). The Circuit's use of the present tense is no accident; its entire opinion is clearly concerned with the current process available to licensees to challenge their suspensions. *See, e.g., id.* at 160 (remanding because "the evidence in the record is insufficient to establish that the post-suspension hearing the City describes to us is in fact the hearing that it *offers*" (emphasis added)). Accordingly, the standard applied in the OATH hearings is decidedly relevant.

7

consider, evidence that even if the charges are true, suspension is unwarranted because the licensee does not pose a sufficient public danger. (*See* Doc. No. 143 at 17; Doc. No. 180 ("Defs. Post-Remand Mem.") at 5; Doc. No. 197 at 6–8); *see also Nnebe II*, 644 F.3d at 161 ("[I]t is *not* the City's position that arrest for one of the offenses listed on the TLC's summary suspension chart is *per se* evidence that the licensee's continued licensure would pose a threat to public health or safety." (internal quotation marks omitted)).

Plaintiffs, conversely, argue that the actual and official standards are not identical. They maintain that, in practice, the City *does* apply a *per se* standard whereby "the fact of the arrest and the pendency of an allegation [are] dispositive" that the regulatory standard has been met and that the suspension must continue. (Doc. No. 176 at 6.) Thus, Plaintiffs assert, "ALJs d[o] not investigate or consider evidence that would speak to the existence of an alleged threat to public safety," and so even though a licensee *technically* can introduce such evidence, doing so *effectively* is whistling into the wind. (*Id.*); *see also Nnebe II*, 644 F.3d at 160 (observing that the official standard "appears to be an oft-quoted nullity that in no way resembles a part of the standard ALJs must apply"); *id.* at 161 ("[T]he record strongly suggests that, whether *de facto* or *de jure*, an ALJ is strictly prevented from considering anything other than the identity of the driver and the offense for which he was charged upon arrest.").

The Second Circuit observed that "considerable" evidence supports Plaintiffs' view, *id.*, and that remains true even after Defendants' post-remand submissions supplemented the record. The Deputy Chief ALJ has testified that in order to have a summary suspension lifted, a licensee "would have to prove at the summary suspension hearing that they have the wrong person, that he wasn't charged with those offenses. I can't think of anything else." (Decl. of Daniel L. Ackman, dated Sept. 23, 2011, Doc. No. 171 ("Ackman Post-Remand Decl."), Ex. 7 ("Coyne

8

Dep.") at 162:6–10.) Numerous ALJs similarly attest that they do not consider a licensee's driving or employment record, criminal history, or family background. (*See, e.g.*, Coyne Dep. at 53:20–22, 103:2–7; Ackman Post-Remand Decl. Ex. 8 at 25:20–26:21, 27:8–11; *id.* Ex. 10 at 76:14–77:10.) Finally, although the City insists that "a driver could bring in his criminal complaint and argue that 'these are the facts that are alleged in the criminal complaint . . . [and] I wouldn't pose a risk to public safety,'" *Nnebe II*, 644 F.3d at 161 (citation omitted and ellipsis in original), the City still has yet to produce a single instance where a driver successfully did so.

The City has, however, produced instances where ALJs considered but then rejected such arguments from licensees. In one case, for example, a licensee charged with assault, grand larceny, reckless endangerment, resisting arrest, and disorderly conduct argued that "the facts underlying the charges show that he does not pose a risk to the public safety." (Decl. of Mary O'Sullivan, dated Oct. 4, 2011, Doc. No. 177, Ex. KKK at 4.) He reasoned that, even if he had committed second degree assault, as he was charged with doing, that offense may involve only "minimal" physical contact and "is directed at a particular public official, rather than at the public in general." (*Id.*) The ALJ, rather than simply ignoring this argument or rejecting it out of hand, offered a reasoned explanation for why it was unavailing. She questioned whether "causing serious physical injury to a member of the public is significantly different than causing simple physical injury to a law enforcement official," and observed that, contrary to the licensee's position, "one could conclude that assaulting a police officer, a guardian of public safety sworn to enforce the law and to protect the public, is more serious." (*Id.* at 4–5.)

In another case, a licensee arrested for multiple counts of grand larceny, criminal possession of stolen property, and unauthorized use of a vehicle argued that the fact that he was free without bail indicated that he posed no risk to passengers. (*Id.* Ex. TTT at 4.) The ALJ

disagreed, and explained his reasoning. He noted that the fact that the licensee was not perceived to be a flight risk did not necessarily mean that his continued operation of a taxicab posed no risk to passengers. (*Id.*) Assuming the charges of auto theft to be true, as he was required to do, the ALJ concluded that there was a risk that the licensee might cheat, deceive, or even abduct passengers. (*Id.*)

Several other cases likewise evince consideration by ALJs of evidence beyond the mere fact of arrest. (*See, e.g., id.* Ex. OOO at 4 (rejecting licensee's argument that he did not pose a public threat because "the arrest was based on a domestic issue which has since been resolved").) They include, in fact, a trio of cases highlighted by Plaintiffs in which the ALJ, Eric Gottlieb, recommended lifting the suspension of a licensee but was ultimately overruled by the TLC Chairperson. In two of those cases, Gottlieb offered identical grounds for his recommendation: (1) the arresting officer issued the licensee a desk appearance ticket rather than placing him in custody; (2) Gottlieb believed there was an "overwhelming likelihood this prosecution will result in a non-criminal disposition"; and (3) the licensee had "never committed a moving violation and has only one minor TLC infraction during his entire tenure of licensure." (*See* Decl. of Daniel L. Ackman, dated May 25, 2007, Doc. No. 111, Ex. 14 at 2–5.) In the third, Gottlieb again emphasized the "overwhelming likelihood this prosecution will result in a non-criminal disposition," and also noted that the licensee, who had been arrested for assault during a domestic dispute, had presented medical evidence that he does not suffer from any anger management disorders. (*Id.* at 6–7.) On top of being overruled, Gottlieb's recommendations drew a rebuke from his supervisor, who emailed to tell Gottlieb that the recommendations were improper because Gottlieb relied on the fact that the licensee "was issued a [desk appearance

10

ticket] and/or because [Gottlieb] speculate[d] that he [would] receive a 'non[-]criminal disposition.'" (*Id.* Ex. 13 at 1.)

Gottlieb's reprimand is notable for several reasons, but one in particular is relevant here: his supervisor took him to task only for considering factors that implicitly questioned whether the allegations against the licensees were true. That is, the supervisor did not criticize Gottlieb for considering licensees' driving and TLC records or for considering evidence of their mental health. Thus, whatever else Gottlieb's experience suggests about the City's process, *see, e.g.*, *Nnebe II*, 644 F.3d at 152 (pointing to the reprimand as "evidence that . . . ALJs lack adequate decisional independence"), it may plausibly be interpreted as evidence that ALJs *could* consider factors beyond the mere fact of arrest.

Of course, Plaintiffs would be quick – not to mention correct – to point out that the licensee's suspension ultimately was continued in each of the foregoing examples. (*See* Pls. Post-Remand Reply at 3 (emphasizing that the argument that "arrest was not itself proof that the driver presented an ongoing threat to the public . . . was never successful").) Plaintiffs interpret the fact that licensees' suspensions are never lifted, no matter what arguments they offer, as evidence that even if licensees are permitted to *speak*, they "ha[ve] no meaningful opportunity to be *heard*."[8] (*Id.* (emphasis added).) Defendants suggest a competing explanation: since "[t]he criminal offenses for which TLC summarily suspends a license are uniformly serious," there are very few circumstances in which an ALJ, who must assume the criminal allegations to be true,

---

[8] Indeed, the reality is that even if ALJs meaningfully consider licensees' arguments, the TLC Commissioner has the final word on whether a suspension is continued. *See* 35 RCNY § 68-21(c)(3)–(4). Thus, although the Second Circuit's mandate directs the Court to undertake additional fact-finding only in connection with "the scope and process of the post-suspension *hearings*," *Nnebe II*, 644 F.3d at 149 (emphasis added), which take place before ALJs, clearly the Court's inquiry must address the question of whether the TLC Commissioner meaningfully considers arguments that, "even if the criminal charges are true, continued licensure does not pose any safety concerns," *id.* at 163.

11

would nevertheless conclude that a suspended licensee does not pose a public threat. (Defs. Post-Remand Mem. at 10.)

Both explanations are plausible. At this time, however, the Court need not decide which side's explanation is correct. The question of whether the City *meaningfully* considers evidence other than the fact of arrest is a factual one, and from the evidence in the record, it is genuinely in dispute. Because, on summary judgment, the Court cannot weigh evidence or make credibility assessments, *Weyant*, 101 F.3d at 854, at this stage it cannot determine "whether the post-suspension hearing the City affords does indeed provide an opportunity for a taxi driver to assert that, even if the criminal charges are true, continued licensure does not pose any safety concerns." *Nnebe II*, 644 F.3d at 163. Accordingly, the Court must deny both Plaintiffs' and Defendants' motions for summary judgment without reaching the second and third steps of its mandate.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' and Defendants' motions for summary judgment are DENIED.

SO ORDERED.

Dated:    August 21, 2013
           New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

13

Plaintiffs are represented by Daniel L. Ackman, 12 Desbrosses St., New York, NY 10013, and David T. Goldberg, Donahue & Goldberg, L.L.P., 99 Hudson Street, 8th Floor, New York, New NY 10013.

Defendants Matthew Daus, Charles Fraser, Joseph Eckstein, Elizabeth Bonina, and the City are represented by Mary M. O'Sullivan and Amy J. Weinblatt, New York City Law Department, Office of the Corporation Counsel, 100 Church St., New York, NY 10007.