UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────

No. 06-cv-4991 (RJS)
───────────────────

JONATHAN NNEBE, *et al.*,

Plaintiffs,

VERSUS

MATTHEW DAUS, *et al.*,

Defendants.

───────────────────

OPINION AND ORDER
August 7, 2014
───────────────────

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Jonathan Nnebe, Eduardo Avenaut, and Khairul Amin, together with the New York Taxi Workers Alliance ("Plaintiffs"), bring this putative class action against Defendants Matthew Daus, Charles Fraser, Joseph Eckstein, Elizabeth Bonina, the New York City Taxi and Limousine Commission ("TLC"), and the City of New York (the "City" and, with the other defendants, "Defendants"), alleging that the TLC's policy of summarily suspending taxi drivers upon notification of their arrest violates the United States Constitution, New York state law, and New York City municipal law. (Doc. No. 42 ("Sec. Am. Compl.").) Having held a bench trial in this action, the Court issues the following Findings of Fact, as required by Rule 52(a) of the Federal Rules of Civil Procedure. Specifically, after carefully considering the evidence introduced at trial, the arguments of counsel, and evidence of which the Court has taken judicial notice, the Court concludes that:

- The TLC summarily suspends drivers who are arrested if it determines that the charged crime is sufficiently serious, and normally summarily suspends only for certain crimes, which are found on a list, and are limited to (1) misdemeanors related to violence, driving, or sexual misconduct; and (2) all felonies;

- Drivers may seek review of their summary suspension and may argue to an Administrative Law Judge ("ALJ") and the TLC Chairperson (the "Chairperson") that, even if the charges are true, continued licensure does not pose any safety concerns because there is no nexus between the charges and public health or safety;

- Between 2003 and 2007, when the hearings were held before TLC ALJs, ALJs would consider only whether (a) the suspended driver had been charged with a crime, (b) the charge was still pending, and (c) there was a nexus between the charged crime, as defined by its statutory elements, and public health or safety;

- Between 2007 and the present, at hearings before ALJs employed by the New York City Office of Administrative Trials and Hearings ("OATH"), ALJs have considered whether (a) the suspended driver has been charged with a crime, (b) the charge is still pending, and (c) assuming the charges are true, the particular driver would pose a direct and substantial threat to public health or safety;

- When reviewing a summary suspension, the Chairperson considers only whether (a) the suspended driver has been charged with a crime, (b) the charge is still pending, and (c) there is a nexus between the charged crime, as defined by its statutory elements, and public health or safety;

- The Chairperson never considers or attempts to determine whether the particular driver would pose a direct and substantial threat to public health or safety;

- Only the Chairperson's review, and not the ALJ hearing, affects a driver's suspension because the Chairperson makes the final decision and is not bound by the ALJ's recommendation;

- The standard applied in the summary suspension review process was not made public until 2006 at the earliest; and

- No driver has ever had her or his suspension lifted through the summary suspension review process.

In light of these findings, the Court orders the parties to submit additional briefing addressing whether the TLC's summary suspension process violates the Plaintiffs' procedural due process rights under the Fourteenth Amendment.

I. BACKGROUND

The Court presumes the parties' familiarity with the facts and history of this case. Put briefly, the Court entered summary judgment in Defendants' favor on September 30, 2009. *Nnebe v. Daus* (*Nnebe I*), 665 F. Supp. 2d 311 (S.D.N.Y. 2009). On appeal, the Second Circuit vacated the Court's order and remanded to the Court to "to conduct additional fact-finding, in the manner it deems appropriate, to determine whether the post-suspension hearing the City affords does indeed provide an opportunity for a taxi driver to assert that, even if the criminal charges are true, continued licensure does not pose any safety concerns." *Nnebe v. Daus* (*Nnebe II*), 644 F.3d 147, 163 (2d Cir. 2011). The Court subsequently denied a post-remand

summary judgment motion. *Nnebe v. Daus* (*Nnebe III*), No. 06-cv-4991 (RJS), 2013 WL 4494452 (S.D.N.Y. Aug. 22, 2013).

On January 13, 2014, the Court began a bench trial on the issue identified by the Court of Appeals in *Nnebe II*. At the trial, Plaintiffs introduced the deposition testimony of Marc Hardekopf and called Bhairavi Desai, Khairul Amin, Eduardo Avenaut, Eric Gottlieb, Thomas Coyne, Matthew Daus, Tynia Richard, Meera Joshi, Michael Spevack, and Allison Green; Defendants called Meera Joshi, Charles Fraser, and Joseph Eckstein. The parties also introduced numerous exhibits, most of which were admitted by stipulation, and most of which were documents generated during the summary suspension process – for example, notification letters, transcripts, ALJ recommendations, and Chairperson decisions. Trial concluded on January 21, 2014, and the parties filed post-trial submissions on January 31, 2014. (Doc. Nos. 303, 313.)

II. FINDINGS OF FACT

The Second Circuit, in its Opinion, sought more detail on the TLC's summary suspension process both "de facto [and] de jure." *Nnebe II*, 644 F.3d at 161. The Court therefore addresses both the written legal standards and the process as it has been practiced throughout the alleged class period of 2003 to the present. (*See* Sec. Am. Compl. ¶ 19.)

A. The Law as Written

1. Statutory Law

The source of the TLC's authority to summarily suspend a driver is § 19-512.1(a) of the New York City Administrative Code (the "Code"), which was originally enacted in 1999. *See* N.Y.C. Code § 19-512.1(a); New York City, N.Y., Local Law No. 20 Int. 472-C (1999). That provision authorizes the TLC to suspend a driver, "prior to giving notice and an opportunity for a hearing," "for good cause shown relating to a direct and substantial threat to the public health or safety." *Id.*[1] The provision also requires the TLC to notify drivers of a summary suspension within five days and to hold a hearing within ten days of a driver's request for a hearing, "unless the [TLC] . . . determines that such hearing would be prejudicial to an ongoing criminal or civil investigation." *Id.*

The TLC can implement the provisions of the Code through rules and regulations. *See* N.Y.C. Code § 19-503 ("The commission shall promulgate such rules and regulations as are necessary to . . . implement the provisions of this chapter."). Pursuant to that authority, the TLC has implemented its § 19-512.1-summary-suspension powers through a summary-suspension rule (the "Rule"). The history and content of that rule is discussed below.

2. Implementing Regulations

The Rule has been amended and renumbered several times since 2003. The Court addresses each change in turn.

a. The 1999 Version

The earliest version of the Rule, then designated § 8-16, was enacted in 1999. The full text of that version reads:

§ 8-16 Emergency Suspension to Protect the Public Welfare

---

[1] Before 2008, the provision required a "threat," but not a "direct and substantial threat." *See* New York City, N.Y., Local Law No. 16 Int. No. 256-A (2008) (amending § 19-512.1(a) to change "threat" to "direct and substantial threat").

3

(a) If the Chairperson finds that emergency action is required to insure public health, safety or welfare, he/she may order the summary suspension of a license or licensee, pending revocation proceedings.

(b) Such revocation proceedings shall be initiated within five (5) calendar days of the summary suspension.

(c) The Commission shall notify the licensee either by personal service or by both first class and certified mail of the summary suspension within five (5) calendar days of the suspension.  If the licensee wishes to receive a hearing concerning the suspension, he or she may request a hearing within ten (10) calendar days of the receipt of the notice of suspension.  Upon receipt of a request for a hearing, the Commission shall schedule a hearing, which shall be held within ten (10) calendar days of the request, unless the Commission determines that such hearing will be prejudicial to any ongoing civil or criminal investigation.

(d) A summary suspension hearing conducted pursuant to this section shall be held before an ALJ who shall consider relevant evidence and testimony under oath, according to the hearing procedures set forth in this Chapter.  In any such hearing, the affirmative defenses set forth in subdivision b of § 19-512.1 of the Administrative Code may be available.[2]

(e) Upon the conclusion of the summary suspension hearing, the ALJ shall issue a written Recommended Decision to the Chairperson, who may accept, reject or modify the recommendation.  The decision of the Chairperson shall be the final determination of the Commission with respect to the summary suspension.

(f) In the event no decision is rendered by the Chairperson within sixty (60) calendar days of the conclusion of the suspension hearing, the suspension shall be thereafter stayed until such decision is rendered.

(Plaintiffs' Exhibit ("PX") B ("§ 8-16 (1999)").)

Compared to later versions of the Rule, the 1999 version is notable for what it does not say.  Although the Rule allowed a driver to challenge her or his suspension at a hearing, it did not indicate what standard would apply at the hearing or what issue the hearing would decide.  Similarly, the Rule required ALJs to "consider relevant evidence and testimony under oath" (*id.*), but gave no guidance on what kinds of evidence might be relevant.  In other words, the Rule stated that drivers could challenge their suspension, but it did not state how they might succeed in that challenge.

---

[2] These affirmative defenses relate to the "exercise[] [of] due diligence in the inspection, management and/or operation of" vehicles, and are not relevant to summary suspensions for arrests.  *See* § 19-512.1(b).

4


### b. The 2006 Version

The Rule was amended in December 2006. The most relevant change was the addition of a new subdivision (c), which stated:

> (c) Notwithstanding subdivision (b) of this section, the Chairperson may summarily suspend a license subject to the provisions of subdivisions (a) and (d) [formerly subdivision (c)] through (g) [formerly subdivision (f)] of this section based upon an arrest on criminal charges that the Chairperson determines is relevant to the licensee's qualifications for continued licensure. At the hearing pursuant to subdivision (e) [formerly subdivision (d)] of this section, the issue shall be whether the charges underlying the licensee's arrest, if true, demonstrate that the licensee's continued licensure during the pendency of the criminal charges would pose a threat to the health or safety of the public. Revocation proceedings need not be commenced during the pendency of the criminal charges. In such a case, within five (5) calendar days of the Commission's receipt from the licensee of a certificate or disposition of the criminal charges, the Chairperson shall either lift the suspension or commence revocation proceedings.

(PX C ("§ 8-16 (2006)").)

This version provided the standard that had been missing in the previous version. The new version explained that a driver would succeed at a hearing if the Chairperson determined that "the charges underlying the licensee's arrest, [even] if true, [did not] demonstrate that the licensee's continued licensure during the pendency of the criminal charges would pose a threat to the health or safety of the public." *Id.*

### c. The 2008 Version

In 2008, in order to track the newly amended language of § 19-512.1(a), subdivision (c) was amended to change "threat" to "direct and substantial threat." *See supra* note 1; N.Y.C. TLC, *Notice of Public Hearing and Opportunity to Comment on Proposed Rules* at 5, 6 (2008), http://www.nyc.gov/html/tlc/downloads/pdf/proposed_rules_08_07_2008.pdf. In all other respects, the Rule remained unchanged.

### d. The 2011 Version

In 2011, § 8-16 was amended and renumbered as § 68-21 as part of a general reworking of the City's rules and regulations. Although the language of the Rule changed slightly, the changes were stylistic only. As relevant here, the new version of the Rule stated:

> § 68-21. Special Procedures – Summary Suspension Pending Revocation.
>
> . . .
>
> (d) Summary Suspension for Criminal Charges.
>
> > (1) The Chairperson can summarily suspend a License based upon an arrest on criminal charges if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety.

5

(2) The Chairperson need not commence revocation proceedings while the criminal charges are pending. However, the Respondent is entitled to request a Suspension Hearing.

(3) At the Summary Suspension Hearing, the issue will be whether the charges underlying the Licensee's arrest, if true, demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to the health or safety of the public.

(4) Within five calendar days from the date the Commission receives from the Licensee a certificate of disposition of the criminal charges, the Chairperson must either lift the suspension or commence revocation proceedings.

(PX E ("§ 68-21 (2011)").)

e. The 2014 Version

In January 2014, while the trial was under way, the City amended the Rule once more and renumbered it as § 68-15. Neither party brought the change to the Court's attention until several weeks after the trial had ended. (Doc. Nos. 312, 314, 315.) The amendment did not change the standard set forth in subdivision § 68-21(d)(3) (2011), but elaborated on the Chairperson's authority under subdivision (d)(1). Specifically, the new version states:

(d) Summary Suspension for Criminal Charges.

(1) The Chairperson can summarily suspend a License based upon an arrest on criminal charges if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety. Such charges include but are not limited to the following:

(A) Any act, as prohibited by these Rules, of driving a TLC licensed vehicle while Impaired by intoxicating liquor (regardless of its alcoholic content), or Drugs;

(B) Any act, as prohibited by these Rules, of bribery, fraud, material misrepresentation, theft, threat against a person, harassment, abuse, or use of physical force;

(C) Any act, as prohibited by these Rules, involving the possession of a Weapon in a vehicle licensed under these Rules;

(D) Any felony conviction;

(E) Or any conviction of the following criminal offenses:

[A list of eighteen categories of offenses.]

N.Y.C. TLC, *TLC Rules and Local Laws*: *Chapter 68 – Procedures Relating to Enforcement* at 13–15 (2014), http://www.nyc.gov/html/tlc/downloads/pdf/rule_book_current_chapter_68.pdf ("§ 68-15 (2014)").

6

The Court notes that Defendants claim that most of these changes were made in error, and that subdivisions (d)(1)(D) and (E) should say "arrest" instead of "conviction," and subdivisions (d)(1)(A) through (C) should not have been included at all. (Doc. No. 312.) Nevertheless, neither party disputes that the amendments were enacted, and that the January 2014 version is the most current version of the Rule.

### B. The Summary Suspension Process in Practice

Despite the numerous versions of the Rule, the summary suspension process has for the most part continued unchanged. Even the most significant change to the Rule – the addition of the substantive standard in 2006 – merely reflected and restated pre-existing practice. (Tr. at 335:21–336:18; *see* PX 17 at 3188 (pre-2006-amendment Chairperson decision stating the post-2006 standard); PX 17 at 3238 (same).) Consequently, the Court's description of the process generally applies equally to the entire relevant period. To the extent the practice has changed, the Court notes the change specifically.

The Court addresses the summary suspension process in two stages: (1) the initial suspension process; and (2) the summary suspension review process.

#### 1. The Initial Suspension Process

The process of suspending a driver usually starts when the New York Division of Criminal Justice Services ("DCJS") sends the TLC an arrest notification, which informs the TLC that a TLC driver has been arrested. (Tr. at 588:22–589:12; Dep. of Marc Hardekopf, dated Dec. 13, 2013, PX A1, at 7:6–14, 12:4–8.)[3] The arrest notifications include a driver's name; identifying information, such as a Social Security number and date of birth; and the offense or offenses for which the driver was arrested. (PX A1 at 7:15–20, 12:11–15; *see* PX 9 (example of a DCJS arrest notification); Defendants' Exhibit ("DX") J-1 to J-15 (same).) Upon receiving an arrest notification, a TLC employee checks the identifying information on the arrest notification against the TLC's internal database to make sure that the person arrested is actually a TLC driver. (Tr. at 589:17–22; PX A1 at 7:21–24.) If the arrested person is in fact a driver, and if the TLC employee determines that the charged offense is serious, the employee suspends the driver. (Tr. at 589:17–590:4; PX A1 at 7:22–24.) The Chairperson is never involved in the initial suspension process. (PX A1 at 16:10–12.)

To determine if an offense is serious, the employee looks to a list of offenses created in 2000 (and modified in 2006 and 2009) for use by TLC staff. (Tr. at 590:23–591:10, 701:7–14; PX A1 at 9:18–24, 18:2–5, 41:5–42:7, 46:23–48:1); *see* DX A (the list of offenses in use from June 2009 to the present).) The crimes on this list are all either (1) misdemeanors involving violence, driving, or sexual misconduct; or (2) felonies. (DX A.) Generally, if the offense is on the list, the TLC suspends the driver, and if the offense is not on the list, the TLC does not suspend the driver. The list was not publicly available before this case, and neither its existence nor its contents were

---

[3] PX A1 is a transcript from portions of Marc Hardekopf's deposition that were played during the trial. The video of those portions of the deposition is PX A.

disclosed to drivers or members of the public. (PX A1 at 41:5–44:8.)[4]

In some very rare cases the TLC might vary from the list. For instance, if an offense appears serious but is not on the list, the TLC might still suspend the driver. *See TLC v. Nahamov*, OATH Index No. 1796/12 (June 4, 2012) (reviewing a suspension for promoting prostitution in the fourth degree, an offense that is not on the list)[5]; (Tr. at 590:23–591:4; PX A1 at 9:18–10:06). In the vast majority of cases, however, the TLC employee considers only the fact of arrest and whether the charged offense is on the list, and does not consider any additional facts. (Tr. at 589:21–22, 590:16–19, 598:20–24, 600:23–601:16; PX A1 at 9:18–10:06, 17:11–18:5, 55:6–55:16.)

Once the TLC employee suspends the driver, the TLC informs the driver of the suspension by letter. (Tr. at 177:7–178:4, 590:9–15; *see* PX 32, 72, 73 (samples of suspension notice letters); DX K-1 to K-16, K-18 to K-23 (same).) The letter states that (1) the TLC has learned of the driver's arrest, (2) the driver's license has been suspended, and (3) the driver can schedule a hearing to contest the suspension by calling the TLC. (*See* PX 32, 72, 73; DX K-1 to K-16, K-18 to K-23.) Although the letter cites to the version of the Rule in force at the time of the letter's issuance, it does not otherwise state what standard will be applied at the hearing. (*Id.*) In addition, the letter states that the TLC may lift the suspension if the charges are disposed of in the driver's favor and urges drivers to notify the TLC of any changes in the criminal case. (*Id.*)

If the driver contacts the TLC to request a hearing – about nine out of ten do – the TLC begins the review process, which is described below in Subsection II.B.2. (Tr. at 591:16–24.) If a driver contacts the TLC to inform it that the charges against the driver have been dismissed, reduced to an offense that is not on the list, or otherwise resolved in the driver's favor, the TLC employee lifts the suspension. (Tr. at 391:24–393:6; PX A1 at 134:05–09.) The driver can notify the TLC of a favorable disposition and have the suspension lifted at any time, even after going through the review process. *See TLC v. Choukri*, OATH Index No. 1058/14, at 1 n.* (Nov. 22, 2013) (noting that the suspension was lifted by the agency after the hearing before the ALJ); *TLC v. Singh*, OATH Index No. 1278/10, at 1 n.* (Dec. 2, 2009) (same); *TLC v. Bogy*, OATH Index No. 989/09, at 1 n.* (Oct. 1, 2008) (same); (Tr. 392:25–393:6). The TLC does not consider why the charge is no longer pending – all that matters is that the driver is no longer charged with an offense on the list. (PX A1 at 135:11–136:03.) Ultimately, more than 75% of suspended drivers have their suspension lifted through this informal process. (*Id.* at 138:20–139:03.)

2. The Summary Suspension Review Process

If a driver requests a hearing, the TLC schedules a hearing and notifies the driver of the hearing by letter. (PX A1 at 29:2–30:1; *see* PX 27–29, 31 (samples of hearing notice letters); DX L-1 to L-23 (same).) The letter informs the driver of the time, date, and location of the hearing and states that drivers can present evidence and call witnesses on their behalf. (PX 27–29, 31; DX L-1 to L-

---

[4] As set forth above, the current version of the Rule now enumerates offenses for which the TLC may suspend drivers and includes all of the offenses from the most recent TLC list. *See supra* Subsection II.A.2.e; *compare* § 68-15(d)(1)(E) (2014), *with* DX A.

[5] All OATH opinions cited throughout this Opinion can be found through the searchable OATH Tribunal Database, located at http://a820-isys.nyc.gov/ISYS.

8

23.) The letter states that "the purpose of th[e] hearing will be to determine whether your TLC license should remain suspended pending the final disposition of your criminal case," but does not state what standard will be applied at the hearing to make that determination. (PX 27–29, 31; DX L-1 to L-23.)

The hearings themselves proceed in two parts. In the first part (the "ALJ Hearing"), the driver and a TLC attorney can present evidence and argue before an ALJ, who subsequently issues a non-binding recommendation to the TLC Chairperson that the suspension either be continued or discontinued. (*See* Tr. at 270:7–9, 454:20–460:11.) In the second part ("Chairperson Review"), drivers can respond to the recommendation by submitting a letter to the Chairperson,[6] who then makes the final decision. The Court addresses these two parts separately.

The Court notes from the outset, however, that the final result of the review process has always been the same. Regardless of the recommendation from the ALJ, the Chairperson has always ultimately continued the suspension. (Tr. at 270:14–19, 479:24–480:6; PX A1 at 96:05–98:04, 133:22–134:03.)

a. The ALJ Hearing

Before November 2007, the ALJ Hearings were held before ALJs employed by the TLC. *See Nnebe III*, 2013 WL 3863867, at *1 n.4 (S.D.N.Y. July 23, 2013). After November 2007, the hearings were held before ALJs employed by OATH.

(*Id.*) Because the hearings before the TLC and OATH ALJs operated differently, the Court addresses the historical practice before TLC ALJs first and then turns to the current practice before OATH ALJs.

i. Hearings Before TLC ALJs

At TLC ALJ Hearings, the ALJ determined only: (1) whether the suspended driver had been charged with a crime (Tr. at 271:20–25, 283:3–9; PX A1 at 65:22–66:03), (2) whether the charge was still pending (Tr. at 271:20–25), and (3) whether there was a "nexus" between the charged crime and public health or safety (Tr. at 258:7–18, 594:24–595:23; PX A1 at 24:11–20, 65:22–66:9).

The first two issues – whether the driver had been charged with a crime and whether the charges were still pending – were factual questions and were decided through the presentation of evidence. (Tr. at 339:20–340:9.) In practice, however, the TLC always met its burden by submitting the DCJS notification, a printout from the TLC's database showing that the suspended driver was the same person named in the arrest notification, a copy of the penal statute for the charged crime, and – on some occasions – a copy of the criminal complaint. (Tr. at 195:21–196:24, 257:5–14, 593:17–594:4, 595:24–596:7; PX A1 at 23:1–25, 24:21–25, 65:22–66:09; PX 55 (excerpt from the TLC ALJ Manual).)

The third issue – the nexus – was a "philosophical" question and was decided based on argument, not facts. (Tr. at 291:1–292:5.) A nexus between the charged crime and public health or safety was deemed to exist if there was a rational basis to conclude that allowing a driver who had, in fact, committed that crime to continue driving would pose a threat to public health or safety. (*See* Tr. at 282:3–19; PX 55.) In

---

[6] Since 2010, the Chairperson has delegated summary suspension reviews to the TLC General Counsel. (Tr. at 487:3–7.) For the purposes of this Opinion, the Court does not distinguish between decisions made by the Chairperson and decisions made by the Chairperson's designees.

other words, a nexus existed if a hypothetical driver who had committed the crime in question would *arguably* be a threat to public health or safety.

To decide whether there was a "nexus" between the crime and public health or safety, TLC ALJs considered each suspension on a case-by-case basis and did not rely on the TLC's list of offenses. (Tr. at 257:23–258:6, 269:2–19.) Nevertheless, because the nexus determination focused on a hypothetical driver, TLC ALJs did not make any assessment of, or consider any facts pertinent to, the threat to public health or safety posed by the particular suspended driver. (Tr. at 272:17–274:15, 282:9–14, 283:3–12, 290:8–12.) In addition, TLC ALJs did not consider any facts alleged in the criminal complaint against the driver, but instead focused solely on the penal code definition of the charged crime. (Tr. at 256:14–258:13, 273:24–274:1, 307:12–17.)

TLC ALJs did not tell drivers what the applicable standard was (Tr. 308:1–309:19; DX D-5 at 2:22–3:12 (transcript of a TLC ALJ hearing); DX E-5 at 4:6–21 (same); DX F-5 at 3:21–4:10 (same)), and most, if not all, suspended drivers did not understand what the standard was (Tr. at 312:12–24). Moreover, instead of focusing drivers on the standard, TLC ALJs encouraged drivers to argue anything they wanted – including that they were not a threat to public health or safety or that they were innocent – so that those arguments could be included in the record. (Tr. at 290:19–23, 292:23–293:4, 308:7–13; DX D-5 at 2:22–3:12; DX E-5 at 4:6–21; DX F-5 at 3:21–4:10.) Drivers were also permitted to call witnesses and present evidence. (PX 27–29, 31; DX L-1 to L-23.) Nevertheless, TLC ALJs did not consider any facts other than the three factors discussed above. (Tr. at 290:19–25, 292:23–293:6, 310:7–15.)

Ultimately, these hearings resulted in a nearly unbroken record of recommendations that the suspension be continued. Indeed, the Court heard evidence of only three occasions – out of hundreds of summary suspension hearings (Tr. at 312:12–15; PX A1 at 18:25–19:16, 90:11–15) – where a TLC ALJ recommended that the suspension be lifted.[7] On those three occasions, the ALJ – Eric Gottlieb – recommended that suspensions be lifted because he determined, based on facts particular to the driver, that the suspended driver was not a danger to the public. (Tr. 197:12–22, 214:11–231:12, 233:13–20, 246:22–248:11; PX 83 (copies of the recommendations).) As a result of those recommendations, however, ALJ Gottlieb was strongly admonished by his supervisor (Tr. at 188:4–11, 198:15–200:4, 201:13–202:24, 203:13–204:1, 213:9–14, 244:3–20; PX 44 (email correspondence between Gottlieb and his supervisor)), and the recommendations were rejected by the Chairperson, who continued the suspensions (PX A1 at 120:1–13).

ii. Hearings Before OATH ALJs

Procedurally, hearings before OATH ALJs are identical to the hearings that were held before TLC ALJs. (PX A1 at 87:7–88:04.) The standard applied at the hearings, however, is different.

While TLC ALJs focused on whether a hypothetical driver who had committed the charged crime would arguably be a threat to public health or safety, OATH ALJs seek to determine whether the particular suspended driver is, in fact, a direct and substantial threat to public health or safety. *See TLC v.*

---

[7] Although one witness suggested there "just might have been one or two" other occasions where a TLC ALJ recommended lifting a suspension (PX A1 at 19:18–20:10), no party admitted any evidence demonstrating that those "other" recommendations actually were made.

*Nau*, OATH Index No. 985/14, at 4, 6 (Nov. 22, 2013) (acknowledging that a nexus exists between drunk driving and public health or safety but stating that the standard is whether "considering [the evidence regarding the risk to public health or safety submitted by the driver] as well as [the driver]'s DWI arrest, would reinstating [the driver]'s license to drive pose a 'direct and substantial' risk to the public"); *TLC v. Ahmed*, OATH Index No. 1649/08, at 3 n.1 (Feb. 27, 2008) ("[A] particularized assessment of risk is required by rule 8-16(c)."). Thus, although OATH ALJs presume that the driver committed the crime with which he or she was charged, *see TLC v. Springle*, OATH Index No. 1011/008, at 3–4 (Nov. 30, 2007) ("[I]t must be assumed that [the driver] committed the crimes with which he is charged . . . ."); *accord TLC v. Basar*, OATH Index No. 874/12, at 4 (Jan. 20, 2012); *TLC v. Kamal*, OATH Index No. 2607/10, at 4 (June 1, 2010); *TLC v. Diao*, OATH Index No. 1641/08, at 5 (Mar. 6, 2008); (Tr. at 444:2–4), they also consider evidence beyond the charge, such as "the driver's character[] and the likelihood of recurrence," *TLC v. Khair*, OATH Index No. 1842/14 (Mar. 26, 2014), at 3; *see TLC v. Motala*, OATH Index No. 1465/14, at 2–3 (Feb. 6, 2014) (citing cases); *TLC v. Chauca*, OATH Index No. 1002/14, at 3 (Nov. 27, 2013) (same); (Tr. at 463:3–20, 466:16–468:22). Under this standard, although the number of recommendations to lift a suspension remain low, drivers are more likely to receive a recommendation that a suspension be lifted than was the case before TLC ALJs. Specifically, the record reflects that out of the hundreds of hearings conducted by TLC ALJs between 2000 and 2007, there were only three recommendations to lift suspensions. By contrast, there have been six recommendations to lift suspensions from OATH ALJs out of the few dozen hearings conducted between 2007 and 2014.[8]

### b. Chairperson Review

After the ALJ makes its recommendation, the TLC mails the driver a copy of the recommendation and notifies the driver that he or she may submit to the Chairperson a written response to the recommendation. (DX P-1 to P-20 (samples of letters to drivers notifying them of the recommendation).) The notification also informs drivers that their response "must be limited solely to any exceptions or objections [they] have to the conclusions contained in the [recommendation]" and that "[n]o evidence outside of the hearing record can be considered." (*Id.*) Like other notices, this letter does not inform drivers what standard will be applied by the Chairperson.

Although the Chairperson thoroughly reviews the recommendation and any submission by the driver (Tr. at 337:23–339:4, 342:10–25, 350:12–19, 407:14–22, 501:8–502:3), the standard the Chairperson

---

[8] Hearings before OATH ALJs are significantly less frequent than they were before TLC ALJs. (*Compare* PX A1 at 90:11–15 (stating that there were between two and ten driver suspension hearings before TLC ALJs every week), *with* PX A1 at 89:25–90:10 (stating that there is "maybe one [driver suspension hearing before OATH ALJs] every three months").) The drop in the number of hearings is largely due to the pre-hearing conferences held at OATH, at which an OATH ALJ – not the ALJ assigned to the hearing – meets with the driver and the TLC lawyer. (Tr. 448:1–449:24, 592:8–12; PX A1 at 106:6–14, 107:08–11.) At those conferences, the TLC lawyer advises the driver that the suspension will be lifted if the charges are dropped or reduced. (PX A1 at 106:18–25; *see* Tr. at 453:6–21.) In addition, the OATH ALJ discourages drivers from going forward with the hearing by informing the driver that there is "little or no chance" that the driver will ultimately prevail. (PX A1 at 112:14–113:23.) After the conference, most drivers agree to waive or postpone their hearing. (PX A1 at 122:18–123:11.)

11

applies in making her or his decision is narrow. Like TLC ALJs, the Chairperson at all times has focused only on whether (a) the suspended driver has been charged with a crime, (b) the charge is still pending, and (c) there is a nexus between the charged crime and public health or safety. *See TLC v. Bhatti*, Comm'n Dec. (Sept. 24, 2013), *rejecting* OATH Index No. 2364/13 (Aug. 27, 2013)[9]; (Tr. at 342:18–24, 358:23–359:10, 361:13–362:1, 406:23–407:13; *see also* Tr. at 363:9–15 (testimony by Daus that "It's a very simple hearing. . . . [I]t's like a sufficiency hearing or a safeguard hearing that was put into place that we decided to do to make sure basically these are the right people and you're not making a serious mistake.")).

With respect to the first two inquiries – the identity of the driver and the pendency of the charges – the Chairperson can consider the driver's testimony and other evidence, including the criminal complaint against the driver or other official charging documents. *See TLC v. Riano*, Comm'n Dec. (July 11, 2008) ("A licensee may . . . offer evidence that she was not in fact the person arrested, or that the charges are incorrectly reflected in the arrest report, or that even if correctly reflected, the charges have been reduced or dismissed after the arrest report was made."), *rejecting* OATH Index No. 2554/08 (June 11, 2008); (Tr. at 358:23–359:10). However, charging documents would be considered only to determine "the nature of the charges" that are pending. *TLC v. Al-kafi*, Comm'n Dec. (Jan. 2, 2014), *adopting* OATH Index No. 580/14 (Nov. 7, 2013).[10] In other words, the charging documents would be relevant only to the extent they showed that the driver was not actually facing the charges identified by the TLC. (Tr. at 378:6–379:12, 380:23–381:7, 566:19–567:8.) For instance, a situation could arise where the DCJS arrest notification indicated that the driver had been arrested for a certain crime, but the criminal complaint supported a charge for a lesser charge only. In that situation, the Chairperson could rely on the charging documents to find that only the lesser charge was pending.[11]

The existence of the nexus, on the other hand, is a "common sense" determination (Tr. at 562:24–563:22), "based on the nature of the pending charges," *TLC v. Al-Kafi*, Comm'n Dec. (*See also* Tr. at 416:19–417:4 (testimony by Daus that a nexus would exist where "you could argue" that a person who had committed the crime "could possibly" pose a threat to public health or safety).) In making that determination, the Chairperson is not bound by the TLC's list of offenses and can determine that an offense on the list does not have a nexus to public health or safety or vice versa. (Tr. at 414:1–12, 553:1–15.) Nevertheless, the nexus decision is made based on the statutory elements of the crime (Tr. at 518:7–17; 562:24–563:14), not on the factual allegations in the criminal complaint or other charging documents. As discussed above, charging documents can be used to

---

[9] Chairperson decisions are appended to the end of the respective OATH recommendations.

[10] The Chairperson's decision in *TLC v. Al-kafi* is not available through the OATH database, but was introduced at trial as DX R-20.

[11] Matthew Daus, the Chairperson from 2001 to 2010 (Tr. 318:18–21) and Meera Joshi, the Chairperson's designee from 2011 to 2014 (Tr. at 486:22–487:7), each testified that they "considered" evidence, when they meant they read the evidence and thought about it, even if the evidence was irrelevant and played no role in their decision. (*See, e.g.*, Tr. at 342:11–25, 407:14–22, 419:20–420:5, 514:3–22, 533:24–534:11, 536:3–23.) For purposes of this Opinion, when the Court says that a decision-maker "considered" evidence, it means that the decision-maker gave the evidence some weight in making her or his decision. As the Court uses the term, irrelevant evidence is not "considered," even if read.

challenge whether the driver was charged with the crime that the TLC alleges. Once the charge is determined, however, only the statutory elements of that charge matter.[12] *See TLC v. Nau*, Comm'n Dec. (Jan. 30, 2014) (focusing on the nexus between the "crime of driving while intoxicated" and public health or safety, as opposed to between the underlying conduct and public health or safety), *rejecting* OATH Index No. 985/14 (Nov. 22, 2013); *TLC v. Bhatti*, Comm'n Dec. (finding a nexus between "Assault in the Third Degree" and public health or safety, as opposed to between the particular assaultive conduct alleged and public health or safety); *TLC v. Mirakov*, Comm'n Dec. (Jan. 8, 2008) (finding a nexus because the "crime of assault in the third degree" is "a serious crime"), *rejecting* OATH Index No. 1053/08 (Dec. 7, 2007); *TLC v. Adjoor*, Comm'n Dec. (Dec. 20, 2007) (same), *rejecting* OATH Index No. 1044/08 (Dec. 7, 2007).

---

[12] This issue was also addressed and conceded by Defendants' counsel immediately before trial:

> MS. O'SULLIVAN:  . . . So your Honor, maybe I can say it this way. Are you saying that if the facts as alleged in the complaint meet the penal law elements, is there any other facts or any other factor that would be considered?
>
> THE COURT: That's a place to start, yes.
>
> MS. O'SULLIVAN: From the decisions that are in the record, it doesn't appear so, but the ALJs from OATH have considered the other factors. . . . As to the ALJs, yes, they consider other factors. As to the chair, the chair decisions have each come out in favor of deciding to continue the suspension based upon the elements. And the decisions don't use the word "elements," but based upon the charge, the arrest charge, if it was true.

(Tr. at 10:9–23.)

Like TLC ALJs, the Chairperson does not consider evidence that the driver might be innocent of the charges (Tr. at 359:18–360:1, 370:18–371:6) or that the particular driver would not pose a direct and substantial threat to public health or safety (Tr. at 407:14–22, 418:24–420:5, 421:10–422:12); *see also TLC v. Pugati*, Comm'n Dec. (Feb. 18, 2014) (rejecting the ALJ's consideration of whether the event underlying the arrest was "unusual" and whether there were "mitigating circumstances"), *rejecting* OATH Index No. 1245/14 (Dec. 27, 2013); *TLC v. Nau*, Comm'n Dec. (rejecting the ALJ's consideration of whether the driver suffered from alcoholism); *TLC v. Bhatti*, Comm'n Dec. (rejecting the ALJ's consideration of whether a driver "would assault passengers or members of the public" or whether "the police deemed [the driver] [to be] a serious threat to the public").

Although two witnesses – Charles Fraser, the Chairperson's designee from 2010 to 2011 (Tr. at 682:13–21), and Meera Joshi, the Chairperson's designee from 2011 to 2014 (Tr. at 486:22–487:7) – testified to a broader inquiry by the Chairperson, the Court does not find their testimony credible on that issue. The Court does not credit Fraser's testimony because, based on his demeanor and testimony, he appeared to have little memory of his actual experience reviewing summary suspension hearings, and what memory he did have was contradicted by the documentary record. For instance, Fraser claimed to have reviewed over 50 and likely over 100 such suspensions. (Tr. at 816:22–818:6.) In fact, the evidence shows that only four summary suspension hearings occurred while Fraser was the Chairperson's designee, *TLC v. Yim*, OATH Index No. 2365/11 (May 20, 2011); *TLC v. Koutroulos*, OATH Index No. 1205/11 (Dec. 15, 2010); *TLC v. Kastner*, OATH Index No. 835/11 (Oct. 12, 2010);

13

*TLC v. Kamal*, OATH Index No. 2607/10 (June 1, 2010), and that Fraser reviewed only three of those suspensions himself (*see* DX R-17 to R-19). Fraser also claimed to review drivers' submissions in response to the ALJ's recommendation. (Tr. at 684:13–685:1.) In fact, in each of the three decisions he authored, he specifically stated that the driver had not submitted a response. (DX R-17 to R-19.) Fraser further stated that he could not say "for sure" whether or not he had ever lifted a suspension. (Tr. at 685:2–9, 692:1–8.) Again, however, he issued only three decisions, and each was a form letter continuing the driver's suspension. (DX R-17 to R-19.) The Court does not credit Joshi's testimony on this issue because it flatly contradicts official Chairperson decisions she herself authored. (*Compare* Tr. at 550:3–15 (testimony by Joshi that the review process is individualized and includes consideration of the particular driver's dangerousness), *with TLC v. Nau*, Comm'n Dec. (decision written by Joshi in a case involving drunk driving rejecting consideration of a driver's risk of alcohol abuse), *and TLC v. Bhatti*, Comm'n Dec. (decision written by Joshi in a case involving an assault rejecting consideration of whether "there is [an] indication that [the driver] would assault passengers or members of the public").)

\*   \*   \*

As discussed above, the Second Circuit remanded this case for the Court "to determine whether the post-suspension hearing the City affords does indeed provide an opportunity for a taxi driver to assert that, even if the criminal charges are true, continued licensure does not pose any safety concerns." *Nnebe II*, 644 F.3d at 163. Based on the facts set forth above, the Court concludes that drivers do have such an opportunity: a driver who has been arrested may argue that continued licensure does not pose any safety concerns because the charged crime, based on its statutory elements, does not have a nexus to public health or safety. The argument may rarely succeed – so far, it never has – but the evidence in the record shows that drivers may make such arguments, the Chairperson may consider such arguments, and the Chairperson may lift a suspension if the argument is persuasive. That argument, however, is the only argument an arrested driver can make. A driver cannot argue, based either on any facts particular to the driver or on the factual allegations in the criminal complaint, that he or she would not pose any safety concerns. Put simply, once the Chairperson has determined that (1) the driver was charged with a crime, (2) the crime is still pending, and (3) the charged crime has a nexus to public health or safety, the inquiry is over and any other facts or arguments are irrelevant.

### III. NEXT STEPS

The Second Circuit held that, after further fact-finding, the Court "must then determine whether the hearing the City actually provides . . . comports with due process." *Nnebe II*, 644 F.3d at 163. Although the Court addressed this issue in a previous opinion, *see Nnebe I*, 665 F. Supp. 2d 311, the Court will allow the parties to submit additional briefing in light of these findings of fact.

In their briefing, the parties should focus only on procedural due process, as Plaintiffs have explicitly waived any substantive due process claims. *See Nnebe II*, 644 F.3d at 153 n.2 ("On appeal, the plaintiffs state that they did not intend to bring any substantive due process claims [and] expressly disavow any such claims . . . . Accordingly, we will not discuss the district court's substantive due process analysis and will not review any of the plaintiffs' claims in terms of

substantive due process."). Thus, the arguments should be limited to whether the TLC provided and provides adequate procedure – including notice – to allow drivers to meaningfully test whether the TLC's standard was met in their case. Arguments relating to substantive due process, such as attacks on the TLC's standard's fairness or reasonableness, should be avoided. *See Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012) ("*Substantive* due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." (emphasis added and internal quotation marks omitted)); *see also Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 896 (2d Cir. 1960) (holding that procedural due process does not require an agency to "afford[] each [person] affected [by a regulation] an opportunity to present evidence upon the fairness of the regulation"). In other words, the briefing should address only whether the TLC's procedures allowed and allow a driver to adequately challenge whether: (1) the driver was charged with a crime, (2) the crime is still pending, and (3) the charged crime has a nexus to public health or safety. Moreover, to the extent Plaintiffs intend to challenge the correctness of the TLC's interpretation of the Code and the Rule, those are state law arguments and should be reserved until after the Court has determined whether Due Process is satisfied, at which time the Court may reach Plaintiffs' state law claims. *See Nnebe II*, 644 F.3d at 163 ("Once the district court has determined how it will treat the federal claim, it may then examine how it will treat the state claims.").

In addition, the parties should keep in mind the potentially available remedies. If Plaintiffs are unable to establish a continuing violation or a risk of a future violation, they cannot receive an injunction. *See EEOC. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012) (stating that courts may issue injunctions only where "there exists some cognizable danger of recurrent violation"). To the extent Plaintiffs can establish a past violation – including for lack of sufficient notice prior to 2006 – they may be entitled to actual damages, provided they can meet their burden of showing that "the property or liberty deprivation[s] for which [they] [seek] compensation would not have occurred had proper procedure been observed." *Miner v. City of Glens Falls*, 999 F.2d 655, 660 (2d Cir. 1993). Further, even if Plaintiffs cannot show actual injury, they may still be entitled to nominal damages, *see Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[T]he denial of procedural due process should be actionable for nominal damages without proof of actual injury."), and punitive damages, *see King v. Macri*, 993 F.2d 294, 297–98 (2d Cir. 1993) (stating that punitive damages may be awarded even absent actual injury in § 1983 cases). In addition, if the Court finds liability for any constitutional violations, Plaintiffs may be able to seek class certification, attempt to revive all of their state law claims, and seek attorneys' fees pursuant to 42 U.S.C. § 1988.

## IV. CONCLUSION

IT IS HEREBY ORDERED THAT the parties shall submit briefing addressing whether, under the facts as found by the Court, the TLC's summary suspension process violates procedural due process. Plaintiffs shall submit their brief no later than September 5, 2014, Defendants shall submit a brief in opposition no later than September 26, 2014, and Plaintiffs shall reply no later than October 3, 2014. IT IS FURTHER ORDERED THAT the parties shall appear for oral argument on November 18, 2014 at 11:30 a.m.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: August 7, 2014
      New York, New York

\* \* \*

    Plaintiff Jonathan Nnebe is represented by Daniel Lee Ackman, 12 Desbrosses Street, New York, New York 10013, and David Thomas Goldberg of Donahue & Goldberg, L.L.P., 99 Hudson Street, 8th Floor, New York, New York 10013.

    Plaintiffs Khairul Amin, Eduardo Avenaut, and New York Taxi Workers Alliance are represented by Daniel Lee Ackman, 12 Desbrosses Street, New York, New York 10013; David Thomas Goldberg of Donahue & Goldberg, L.L.P., 99 Hudson Street, 8th Floor, New York, New York 10013; and Gregg L. Weiner and Michael Alexander Kleinman of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004.

    Defendants are represented by Mary M. O'Sullivan and Amy J. Weinblatt of the New York City Law Department, Office of the Corporation Counsel, 100 Church Street, New York, New York 10007.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/7/2014