# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

No. 06-cv-4991 (RJS)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-28-16

JONATHAN NNEBE, *et al.*,

Plaintiffs,

VERSUS

MATTHEW DAUS, *et al.*,

Defendants.

MEMORANDUM AND ORDER
April 28, 2016

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Jonathan Nnebe, Eduardo Avenaut, and Khairul Amin, together with the New York Taxi Workers Alliance ("Plaintiffs"), bring this putative class action against Defendants Matthew Daus, Charles Fraser, Joseph Eckstein, Elizabeth Bonina, the New York City Taxi and Limousine Commission (the "TLC"), and the City of New York (the "City") (collectively, "Defendants"), alleging that the TLC's policy of summarily suspending a taxi driver's license upon notification of the driver being charged with a crime violates the United States Constitution, New York state law, and New York City municipal law. (Doc. No. 42.) Having held a bench trial in this action, and having issued findings of fact as required by Rule 52(a) of the Federal Rules of Civil Procedure (*see* Doc. No. 323 (the "Findings of Fact")), the Court hereby issues its Conclusions of Law. Collectively, this Memorandum and Order and the Findings of Fact form the Court's bench opinion as to Plaintiffs' constitutional claims. For the reasons set forth below, the Court finds that the notice provided by the TLC with respect to summary post-suspension hearings held prior to December 2006 violated the procedural component of the Due Process Clause of the United States Constitution. In all other respects, the Court finds that Plaintiffs have failed to prove their constitutional claims.

## I. Background

The Court presumes the parties' familiarity with the facts and long history of this case, which are set forth in detail in the Findings of Fact. Put briefly, the TLC summarily suspends the taxi licenses of taxi drivers who are arrested on criminal charges that the TLC considers serious. Ordinarily, a driver's license is suspended when he has been arrested for a certain crime found on a list maintained by the TLC. That list includes all felonies and certain misdemeanors related to violence, driving, or sexual misconduct.

Currently, the TLC derives its authority to summarily suspend taxi drivers' licenses from § 19-512.1(a) of the New York City Administrative Code, which authorizes the TLC to (1) suspend a license "prior to giving notice and an opportunity for a hearing" for "good cause shown relating to a direct and substantial threat to the public health or safety," and (2) "suspend or revoke" a license "after notice and an opportunity for a hearing." NYC Admin. Code § 19-512.1(a). The provision also requires the TLC to notify drivers of a summary suspension within five days and to hold a hearing within ten days of a driver's request for a hearing, "unless the [TLC] . . . determines that such hearing would be prejudicial to an ongoing criminal or civil investigation." *Id.* Pursuant to its authority to implement provisions of the Code through rules and regulations, *see id.* § 19-503, the TLC has promulgated a rule delineating the circumstances under which a taxi driver's license may be suspended after that driver has been arrested (the "Rule"). The current version of the Rule is codified at Chapter 68 § 68-15 of the Rules of the City of New York. *See* R.C.N.Y. § 68-15(d) (Nov. 2014).

As relevant, the current version of the Rule provides:

(d) Summary Suspension for Criminal Charges.

(1) The Chairperson [of the TLC] can summarily suspend a License based upon an arrest or citation if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety. Such charges include but are not limited to the following:

(A) Any arrest for a crime which constitutes a felony;

(B) Or any arrest or citation for the following offenses:

[A list of eighteen categories of misdemeanor offenses.]

(2) The Chairperson need not commence revocation proceedings while the criminal charges are pending. However, the Respondent is entitled to request a Summary Suspension hearing.

(3) At the Summary Suspension hearing, the issue will be whether the charges underlying the Licensee's arrest, if true, demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to public health or safety.

R.C.N.Y. § 68-15(d) (Nov. 2014).[1]

Plaintiffs in this action are taxi drivers in New York City who have had their licenses suspended by the TLC on the basis of having been charged with a crime.   In essence, Plaintiffs object to the TLC's decision to suspend their licenses without a pre-suspension hearing and without extending the scope of a *post*-suspension hearing to an individual assessment of whether continued licensure of the particular driver poses a risk to public safety. Specifically, each named Plaintiff is a taxi driver whose license was suspended in 2005 or 2006, after an arrest.   Plaintiff Nnebe was charged with third-degree assault with intent to cause physical injury, Plaintiff Avenaut with third-degree assault with intent to cause physical injury, Plaintiff Amin with second-degree menacing with a weapon and third-degree assault with intent to cause physical injury, and Plaintiff Alexander Karmansky with first-degree criminal contempt and second-degree criminal trespass.   *See Nnebe v. Daus* ("*Nnebe II*"), 644 F.3d 147, 153 (2d Cir. 2011).[2]   Plaintiffs were each summarily

suspended upon arrest, and with the exception of Avenaut, who did not request a post-deprivation hearing, each received a post-suspension hearing before an administrative law judge ("ALJ").   The outcome at each hearing was the same – that is, the ALJ recommended the continued suspension of the driver's license pending resolution of the criminal proceedings against the driver, and the TLC Chairperson (Daus) accepted the ALJ's recommendation. All four drivers eventually secured the reinstatement of their licenses when the charges against them were dropped or otherwise dismissed.   In each driver's case, his license was suspended for approximately three to four months.

On September 30, 2009, the Court entered summary judgment in favor of Defendants on Plaintiffs' due process claims, finding that (1) the TLC's policy of suspending a license without first affording the driver a hearing did not violate procedural due process, (2) the agency's post-suspension hearing also did not violate procedural due process, (3) these summary suspension procedures did not violate Plaintiffs' substantive due process rights, and (4) Plaintiffs had fair and adequate notice that they faced suspension if arrested for certain crimes.   *Nnebe v. Daus* ("*Nnebe I*"), 665 F. Supp. 2d 311, 325–26, 330–33 (S.D.N.Y. 2009).   On March 25, 2011, the Second Circuit affirmed the Court's conclusion that no pre-suspension hearing was necessary to comply with the Due Process Clause, but vacated *Nnebe I* and remanded to the Court "to conduct additional fact-finding, in the manner it deems appropriate, to determine whether the *post*-suspension hearing the City affords does indeed provide an opportunity for a taxi driver to assert that, even if the criminal charges are true, continued licensure does not pose any safety concerns."   *Nnebe II*, 644 F.3d at 163 (emphasis added).   On

---

[1] Prior to December 2006, the Rule simply provided that a license could be summarily suspended if such "emergency action [was] required to insure public health, safety or welfare," and that the TLC Chairperson made the final determination following the summary suspension hearing.   R.C.N.Y. § 8-16 (1999).   Notably, this early version of the Rule did not indicate what standard would apply, or what issue(s) would be decided, at the hearing.   (*See* Findings of Fact at 4.)   Since then, the Rule has been amended a number of times.   (*See id.* at 3–7.) However, in all ways material to the Court's conclusions, the substance of the Rule since December 2006 has remained unchanged.   Thus, except where otherwise noted, all references to the Rule are to the current, November 2014 version.

[2] Plaintiff Karmansky passed away in 2013, and although his estate continues to represent him in this action in his individual capacity, he no longer represents the putative class.   (*See* Doc. No. 252.)

July 8, 2011, the Second Circuit issued its mandate (Doc. No. 163), pursuant to which the Court directed the parties to submit additional declarations, affidavits, and supplemental memoranda of law regarding their cross-motions for summary judgment (*see* Doc. No. 190).  The Court also held oral argument and allowed the parties to file post-argument submissions.  (*See* Doc. No. 209.)  Thereafter, the Court denied the parties' post-remand cross-motions for summary judgment in *Nnebe v. Daus* ("*Nnebe III*"), No. 06-cv-4991 (RJS), 2013 WL 4494452 (S.D.N.Y. Aug. 22, 2013).

Between January 13 and 21, 2014, the Court held a bench trial on the issue identified by *Nnebe II* – that is, the standard actually applied at post-suspension hearings.  The Court issued its Findings of Fact on August 7, 2014.  In the Findings of Fact, the Court found that although ALJs – who constitute the first level of review for a driver contesting his or her suspension – have employed different standards at various times in the last decade, the TLC Chairperson, who is vested with the ultimate authority to determine whether a taxi driver's license suspension should continue, has consistently considered *only* whether (a) the suspended driver has been charged with a crime, (b) the charge is still pending, and (c) the underlying charges, if true, are sufficiently connected to public health or safety.  (*See* Findings of Fact at 2, 12); *see also* R.C.N.Y. § 68-15(d)(3).  The Court will refer to this substantive standard as the "arrest-plus-nexus" standard, and it is this standard that the TLC actually employs at post-suspension hearings.

In determining whether there is a sufficient nexus between the charged crime on the one hand, and public health or safety on the other, the TLC Chairperson considers only the statutory elements of the crime charged, and does not look to the

particularized facts underlying the charges or any facts relating to the individual characteristics of the driver.  (Findings of Fact at 12.)  Indeed, as the Court found in the Findings of Fact, the TLC maintains a list of offenses – specifically, all felonies and certain misdemeanors – for which it will summarily suspend a driver upon arrest.  In essence, this list captures those offenses that the TLC views as "constitut[ing] a direct and substantial threat to public health or safety."  R.C.N.Y. § 68-15(d) (listing specific crimes that the TLC has deemed as satisfying the arrest-plus-nexus standard).  Thus, if the crime with which a driver is charged is on this list, that is sufficient for purposes of the nexus inquiry.

With respect to the notice given to drivers of a suspension and their right to a post-suspension hearing to challenge it, the Court found that drivers whose licenses have been suspended receive two notices in the mail from the TLC, and that at least one of those notices references the Rule pursuant to which the license has been suspended.  (Findings of Fact at 8–9.)  However, the Court also found that neither notice on its face contains the actual standard applied at post-suspension hearings – that is, the arrest-plus-nexus standard.  (*Id.*)  Moreover, neither notice reflected the different considerations employed by ALJs at different times.  Specifically, with respect to hearings prior to November 2007, the Court found that TLC ALJs actively encouraged drivers to argue anything that they wanted, "including that they were not a threat to public health or safety or that they were innocent," so that "those arguments could be included in the record," despite the fact that the TLC Chairperson never meaningfully considered those factors when deciding whether a suspension should be continued.  (*Id.* at 10.)  Since November 2007, however, the TLC's post-suspension hearings have been held before ALJs employed by the

Office of Administrative Trials and Hearings ("OATH"). With respect to these hearings, the Court found that "although OATH ALJs presume that the driver committed the crime with which he . . . was charged, . . . they also consider evidence beyond the charge, such as the driver's character and the likelihood of recurrence," and that, under this standard, although the number of recommendations to lift a suspension remains low, "drivers are more likely to receive a recommendation that a suspension be lifted than was the case before TLC ALJs." (*Id.* at 11.) In addition, both before and after November 2007, the Court found that once the ALJ makes its recommendation, the TLC mails the driver a copy of the recommendation and notifies the driver that he may submit to the TLC Chairperson a written response to the recommendation, which "must be limited solely to any exceptions or objections [the driver] ha[s] to the conclusions contained in the [recommendation]," and that "[n]o evidence outside of the hearing record can be considered." (*Id.*) Moreover, the Court determined that, like the TLC's prior suspension notices, this letter does not inform drivers of the arrest-plus-nexus standard to be applied by the TLC Chairperson. (*Id.* at 11–12.)

With respect to the TLC Chairperson's final review of summary suspensions, the Court found that the Chairperson has never lifted a suspension where the driver was charged with one of the TLC's enumerated offenses. (*See id.* at 10–14.) Similarly, the Court determined that in the relatively few instances in which ALJs recommended that a driver's license be restored for reasons other than dismissal of the underlying charge, the TLC Chairperson rejected that recommendation. (*See id.*)

At the conclusion of the Findings of Fact, the Court directed the parties to submit briefing as to the legal implications of the facts found on Plaintiffs' due process claims. Thus, on October 3, 2014, Plaintiffs submitted a post-trial memorandum of law in support of their claims. (Doc. No. 338 ("Pl. Mem.").) On November 14, 2014, Defendants filed their response (Doc. No. 347 ("Def. Mem.")), and the issue was fully briefed following Plaintiffs' November 21, 2014 reply (Doc. No. 348). On December 5, 2014, the Court held oral argument. (Doc. No. 349.) Thereafter, the Court received a number of supplemental letters from the parties, including: (1) a post-argument letter from Plaintiffs, dated January 7, 2015; (2) Defendants' response, dated January 10, 2015; (3) a letter from Plaintiffs, dated January 30, 2015, informing the Court of a "recent TLC decision" issued on November 14, 2014; (4) a letter from Plaintiffs, dated April 28, 2015, raising new claims with respect to the March 2015 suspension of an individual (Mr. Youcef Yazli) who is not a party to this action; and (5) Defendants' response, dated May 1, 2015. (Doc. Nos. 351–55.)[3] In addition, the parties submitted dueling letters – dated September 8, 2015, September 17, 2015, September 22, 2015, October 6, 2015, and October 14, 2015 – regarding recent decisions by the Second Circuit and another court in this District that Plaintiffs claim lend support to their due process arguments. (Doc. Nos. 356–60.)

## II. DISCUSSION

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due

---

[3] Since Mr. Yazli is not a party to this action, the Court does not address his claims in this Memorandum and Order.

process "is fully applicable to adjudicative proceedings conducted by state and local government administrative agencies." *N.Y.S. Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 163 (2d Cir. 2001). Due process has both a substantive component and a procedural component. *See Pabon v. Wright*, 459 F.3d 241, 250 (2d Cir. 2006). The substantive component "protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense," *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995), while the procedural component ensures that, before a person is deprived of life, liberty, or property, he is provided "constitutionally adequate procedures," *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

Here, Plaintiffs principally rely on procedural due process in arguing that (1) the TLC provided constitutionally inadequate notice because the agency's letters to suspended taxi drivers do not explain what evidence would be relevant to the post-suspension hearing; and (2) Defendants refused to take into account whether the drivers posed a "genuine, substantial, and ongoing" threat to public health or safety in determining whether to continue or lift their suspensions. (Pl. Mem. at 57.) Nevertheless, because parts of Plaintiffs' arguments drift into considerations that appear to sound in *substantive* due process, the Court will address Plaintiffs' claims under both the procedural and substantive components of the Due Process Clause.

## A. Whether *Procedural* Due Process Requires an Individualized Determination of Dangerousness

Plaintiffs' primary argument is that procedural due process requires an individualized assessment of a driver's actual dangerousness in order to justify the continued suspension of a taxi driver's license. Specifically, Plaintiffs argue that the TLC, at a minimum, must "demonstrate by a preponderance of the evidence" that allowing a particular driver to continue to hold his license pending resolution of his criminal charge represents a "genuine, substantial and ongoing threat to public health or safety." (*Id.*) Thus, according to Plaintiffs, procedural due process demands that the scope of the TLC's post-suspension hearing extend to a consideration of whether an individual driver personally poses a risk to the public.[4] In assessing this argument, the Court will first discuss the legal principles underlying procedural due process before applying that standard to the facts of this case.

## 1. Legal Standard: Procedural Due Process

The procedural component of the Due Process Clause "provides that certain substantive rights – life, liberty, and property – cannot be deprived except

---

[4] As an initial matter, the Court notes that Plaintiffs devote much of their opening brief to the assertion that because Defendants did not acknowledge on appeal that the TLC actually employs the arrest-plus-nexus standard at post-suspension hearings, they are "judicially estopped from contending that an arrest-plus-nexus hearing is constitutionally adequate and have waived that claim." (Pl. Mem. at 51.) The Court disagrees. In any event, regardless of Defendants' positions here or before the Second Circuit, *Plaintiffs* have the burden of establishing that the TLC's hearing is constitutionally infirm. *See, e.g.*, *Miner v. City of Glens Falls*, 999 F.2d 655, 660 (2d Cir. 1993) ("In this Circuit, the burden is normally on the plaintiff to prove each element of a § 1983 claim."). Accordingly, the Court will not declare the TLC's procedures *unconstitutional* merely because lawyers for Defendants claimed at oral argument that the TLC employed a different process than the one found by the Court.

pursuant to constitutionally adequate procedures." *Loudermill*, 470 U.S. at 541. Thus, in evaluating a claim for a denial of procedural due process, a court must consider two questions: (1) "whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or . . . [by] statute[]"; and if so, (2) "what process was due before the plaintiff could be deprived of that interest." *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995).

As to the first question, property interests do not spring from the Constitution. *See, e.g., Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Moreover, the Supreme Court has determined that, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. . . . He must, instead, have a legitimate claim of entitlement to it." *Id.* Accordingly, with respect to licenses, while a "person does not have a protected interest in a possible future . . . license," since that "involves a purely speculative property interest," once "the government has granted a business license to an individual, the government cannot deprive the individual of such an interest . . . without . . . appropriate procedural safeguards." *Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (alterations and citation omitted). Thus, in *Barry v. Barchi*, the Supreme Court found that the respondent "clear[ly] . . . had a property interest in his [horse trainer] license sufficient to invoke the protection of the Due Process Clause," given that, "[u]nder New York law," such a license could only be suspended "upon proof of certain contingencies," and not "at the discretion of the racing authorities." 443 U.S. 55, 64 & n.11 (1979); *see also, e.g., Spinelli*, 579 F.3d at 169 (recognizing that plaintiff had a "property interest in [her] gun dealer license" sufficient "to invoke the protection of the Due Process Clause" where "the City did not have unfettered discretion" to revoke or suspend the license (citation omitted)).

Once a court finds that a plaintiff has a protected property interest, it must then turn to the second question and determine what process is due before the plaintiff may be deprived of that interest. This question as to what the "minimum procedural requirements" are in a given case is "a matter of federal law." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 319 (2d Cir. 2002) (citation omitted). That is to say, "[t]he Constitution, not state law sources . . . , determines what process is due." *Id.* As a matter of federal law, the "touchstone" of procedural due process is "the requirement that a person in jeopardy of serious loss [be given] notice of" and an "opportunity" to respond to "the case against him." *Spinelli*, 579 F.3d at 169 (alteration in original) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976)); *see also Bd. of Regents of State Colls.*, 408 U.S. at 592 n.7 ("While many controversies have raged about . . . the Due Process Clause, . . . it is fundamental that except in emergency situations . . . due process requires that when a [s]tate seeks to terminate a protected interest . . . , it must afford notice and opportunity for [a] hearing appropriate to the nature of the case before the termination becomes effective." (alterations and citation omitted)). Moreover, the notice and opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (citation omitted). "However, due process is flexible and calls for such procedural protections as the particular situation demands." *Spinelli*,

579 F.3d at 170 (citation omitted); *see also Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (noting that due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances"). Thus, in any given circumstance, procedural due process requires a hearing that is "meaningful" and "appropriate to the nature of the case." *Bell v. Burson*, 402 U.S. 535, 541–42 (1971) (citations omitted).

In determining the adequacy of the procedures given and the need for additional process, courts must consider the following three factors identified by the Supreme Court in *Mathews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335. In applying the second factor, the relevant consideration is "the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Id.* at 344. Moreover, in assessing *procedural* due process, the underlying substantive standard must be accepted as a given. *See Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003); *see also Mathews*, 424 U.S. at 343 ("Central to the evaluation of any administrative process is the nature of the relevant inquiry."). Thus, the factors identified in *Mathews* for evaluating procedural due process all focus solely on the adequacy of the procedure

– that is, the hearing necessary to vindicate the substantive standard – and not the fairness of the standard itself. *See* 424 U.S. at 341–49. By contrast, substantive due process considers the fairness of the underlying standard and not the adequacy of the procedures used to implement that standard. Consequently, in evaluating a procedural due process claim, the question a court must ask is whether the governmental entity provides adequate procedures for a party to challenge whether the applicable substantive standard has been met. As a matter of *procedural* due process, the hearing must "accord the plaintiff [the opportunity] to prove or disprove a particular fact or set of facts" when, and *only* when, "the fact in question" is "relevant to the inquiry at hand." *Conn. Dep't of Pub. Safety*, 538 U.S. at 7. Thus, although the determination of what process is due before a property right may be impaired is a constitutional question, the requirements as to the *factual scope* of the hearing required are bound up with the applicable substantive standard. Put simply, a person being deprived of a liberty or property interest has a procedural due process right to challenge the existence or non-existence of certain facts if, and only if, such facts would be relevant to the underlying substantive standard.

This point is well-illustrated by the Supreme Court's decision in *Connecticut Department of Public Safety v. Doe*. There, the Supreme Court analyzed the constitutionality of Connecticut's sex offender registry law, which required the plaintiff to publicly register as a sex offender based solely on the fact of his conviction and not on a showing of dangerousness to the community. Like Plaintiffs here, the plaintiff in that case argued that he was not in fact dangerous and that the statute therefore deprived him of a liberty interest without due process. *See*

*Conn. Dep't of Pub. Safety*, 538 U.S. at 6–7. Rejecting this argument, the Supreme Court determined that, under the substantive standard established by the Connecticut law, "even if [the plaintiff] could prove that he is not likely to be currently dangerous, Connecticut has decided that the registry information of all sex offenders – currently dangerous or not – must be publicly disclosed." *Id.* at 7 (emphasis omitted). The Supreme Court therefore found that procedural due process "d[id] not entitle [the plaintiff] to a hearing to establish a fact" – such as his dangerousness (or lack thereof) – "that [was] not material under the Connecticut statute." *Id.* Accordingly, the Supreme Court concluded that, unless the plaintiff "c[ould] show that [the] *substantive* rule of law [was] defective (by conflicting with a provision of the Constitution), any hearing on current dangerousness [would be] a bootless exercise," and that the plaintiff's claim was "actually a substantive challenge to Connecticut's statute 'recast in procedural due process terms.'" *Id.* at 7–8 (quoting *Reno v. Flores*, 507 U.S. 292, 308 (1993)).

The Second Circuit recently came to the same conclusion in *Doe v. Cuomo*, 755 F.3d 105 (2d Cir. 2014), which, like *Connecticut Department of Public Safety*, addressed constitutional challenges to a state sex offender registration statute. In *Cuomo*, the plaintiff – a convicted sex-offender subject to the challenged statute's registration requirements – had filed a petition in state court seeking relief from those requirements on the ground that he did not in fact pose a danger to the community. *See* 755 F.3d at 112–13. The state court denied the plaintiff's petition, noting that the statute "required level-one offenders like [the plaintiff] to remain registered for a minimum period of twenty years without providing any avenue for relief from registration," and that the plaintiff had only

been registered for ten years. *Id.* at 109. In challenging the state statute in federal court, the plaintiff claimed that he was deprived of procedural due process because his petition was denied "without a hearing or other opportunity to show that he was not a danger to the community." *Id.* at 113. The Second Circuit rejected this argument, finding that "[a]ll of the facts necessary to conclude" that the plaintiff was subject to the statute's registration requirements were "known and unchallenged" when the plaintiff's petition was denied. *Id.* Indeed, the Circuit emphasized that the plaintiff was not challenging "the procedure by which New York State" passed the registration statute, "the procedure by which [the] State convicted" the plaintiff of a relevant offense under the statute, or "the procedure" by which the State "determined that [the plaintiff] was a level-one (low risk) offender" required to register under the statute; nor did the plaintiff otherwise suggest "that he was not convicted of a relevant offense." *Id.* Accordingly, the Circuit concluded that "[t]here [was] no inquiry left to be made and no reason to require elaborate procedures to make it." *Id.* As for the plaintiff's assertion that he was nevertheless "entitled to due process in the determination [of] whether he [was] sufficiently dangerous to justify subjecting him to [the registration statute]," the Circuit found that this argument – a substantive due process challenge recast in procedural due process terms – failed in light of the Supreme Court's decision in *Connecticut Department of Public Safety*. *Id.*

In short, it is well-established that procedural due process does not require a government agency to provide a party with an individualized hearing where the purpose of such a hearing would be to address a fact not relevant to the applicable substantive inquiry. *See Conn. Dep't of Pub. Safety*, 538 U.S. at 7–8; *see, e.g., Michael H. v.*

*Gerald D.*, 491 U.S. 110, 120–21 (1989) (rejecting plaintiff's procedural due process claim that he was entitled to an evidentiary hearing before the state could deny him his paternity status because whether the plaintiff was in fact the child's biological father was irrelevant to the substantive rule of law of the paternity statute that plaintiff sought to challenge); *Black v. Snow*, 272 F. Supp. 2d 21, 34 (D.D.C. 2003) (applying *Connecticut Department of Public Safety* to statute prohibiting felons from possessing guns and noting that "where the fact to be proven at the hearing is not relevant to the legal scheme responsible for the deprivation (that is, where it is clear that the government would strip the individual of his liberty even if he were able to prove or disprove the particular fact or set of facts), such a hearing would be an exercise in futility, which is not required by *procedural* due process"), *aff'd sub nom. Black v. Ashcroft*, 110 F. App'x 130 (D.C. Cir. 2004); *see also Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 897 (2d Cir. 1960) (Lumbard, C.J.) (where regulation barred commercial pilots from flying after the age of 60, procedural due process did not require individualized hearings as to the fitness of "each contesting airman"). Instead, procedural due process only requires that the individual be granted an opportunity to prove or disprove facts relevant to the substantive standard selected by the legislature.

### 2.  Application

With respect to the first prong of the *Mathews v. Eldridge* test, the Court finds that Plaintiffs had a protected property interest in their taxi licenses, since Plaintiffs' licenses had already been issued at the time of suspension and, pursuant to the City's rules and regulations, the TLC does not have unfettered discretion to revoke or suspend taxi drivers' licenses, *see, e.g.*, R.C.N.Y. § 68-15. Indeed, the Second Circuit previously found as much in *Nnebe II*. 644 F.3d at 158 (stating that "a taxi driver has a protected property interest in his license" for purposes of procedural due process (quoting *Nnebe I*, 665 F. Supp. 2d at 323)). Accordingly, the Court directs its focus to what minimal process a taxi driver is due before he may be deprived of his property interest in his license, and whether the process afforded drivers is sufficient for such purposes.

As discussed above, the TLC's Rule provides the substantive standard with respect to summary suspension of a taxi license. Specifically, the Rule provides that "the Chairperson can summarily suspend a License based upon an arrest . . . if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety." R.C.N.Y. § 68-15(d)(1). Moreover, the Rule states that, in the event a licensee wishes to have a post-suspension hearing, "the issue will be whether the charges underlying the Licensee's arrest, if true, demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to public health or safety." *Id.* § 68-15(d)(3).

The parties offer starkly different interpretations of the Rule. According to the TLC, the Rule requires the continuation of a driver's suspension where the driver has been charged with a crime that has a nexus with public health or safety. In contrast, Plaintiffs argue that the Rule requires individualized consideration of the risk to public health or safety posed by the specific driver contesting the suspension. (*See* Pl. Mem. at 57.)

Having carefully parsed the language of the Rule, the Court finds that Defendants have the better argument. Pursuant to the

Rule, the initial, pre-hearing suspension decision is based on whether the *charges – presumed to be true* – demonstrate a threat to public health or safety. R.C.N.Y. § 68-15(d)(1). Similarly, § 68-15(d)(3), which sets forth the substantive standard for the post-suspension hearing, expressly states that the "issue" to be resolved is "whether the *charges* underlying the Licensee's arrest, *if true*, demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to public health or safety." *Id.* § 68-15(d)(3) (emphases added). A plain reading of the Rule shows that the entire regulatory scheme turns on whether the *charges* reflect a threat to public health or safety, *not* on whether an individual driver in fact poses a risk to public health or safety.

Significantly, Plaintiffs do not contend that their reading of the Rule is based on principles of statutory interpretation. Rather, they assert that, as a matter of procedural due process, a taxi driver may not be deprived of his license "without first being afforded the chance to show that he is not dangerous." *Black*, 272 F. Supp. 2d at 34. But just as in *Connecticut Department of Public Safety*, the dangerousness of an individual driver is simply not relevant in deciding whether to continue a suspension under the Rule. Rather, the decision to continue suspension is "based on the fact of [an arrest and criminal charges], not the fact of current dangerousness." *Conn. Dep't of Pub. Safety*, 538 U.S. at 4. Accordingly, as in *Connecticut Department of Public Safety*, the hearing before the TLC is a limited one, and an inquiry into the individual driver's dangerousness would be a "bootless exercise." *Id.* at 8. Put another way, even if the driver were able to convince the hearing officer that he was not dangerous, that determination would not be relevant to the standard articulated by the Rule, since the standard simply requires that the *charges*

demonstrate a threat to public health or safety. Given the limited focus of the Rule, the driver's individual characteristics and evidentiary arguments relating to the strength of the criminal case against him are simply not relevant to the regulatory framework, which rests on a limited inquiry into the fact and nature of the *charges*. Thus, an additional hearing on an irrelevant issue would have no bearing on or otherwise prevent an "erroneous" license deprivation. *Mathews*, 424 U.S. at 335.

*Krimstock v. Kelly* – to which the parties devote much of their briefing – does not require otherwise. 306 F.3d 40 (2d Cir. 2002). That case involved the seizure of motor vehicles from those "accused of driving while intoxicated and of committing other crimes for which a motor vehicle could be considered an instrumentality," and focused on what process an individual was due after the seizure but "prior to judgment in any civil forfeiture proceeding." *Id.* at 43–44. In particular, the plaintiffs in *Krimstock* challenged the fact that they were not provided with any opportunity to promptly challenge "the City's retention of the vehicles" prior to the formal civil forfeiture proceedings themselves. *Id.* at 44. While Plaintiffs seek to analogize *Krimstock* to this case, such an analogy is unsound.

First, in *Krimstock*, the procedural due process argument was based on the fact that the plaintiffs had *no* opportunity to promptly challenge the City's seizure and continued retention of their motor vehicles. Thus, the court in *Krimstock* had to determine whether procedural due process required the City to provide the plaintiffs with a prompt, post-deprivation hearing in the first place. *See id.* at 45, 48. By contrast, the issue here is not whether Plaintiffs are entitled to such a hearing, but rather whether the hearing they receive comports with procedural due process.

Second, in *Krimstock*, the court was also troubled by "the plight of innocent owners," *id.* at 48, since the owners of the seized motor vehicles – who were not necessarily the individuals who "participated in . . . the alleged illegal use of the property" – had no opportunity to "promptly [challenge] . . . the City's continued custody of the vehicle," *id.* at 71 n.9, 45. Here, unlike in *Krimstock*, the impaired property interest necessarily belongs to the individual driver charged with the crime. Furthermore, the taxi drivers here, unlike the plaintiff in *Krimstock*, have the opportunity to show at a summary suspension hearing that their licenses should be reinstated because they were not in fact charged with a crime and/or because the charges against them are no longer pending. (*See* Findings of Fact at 2, 9; *see also* Doc. Nos. 304–316 (Transcript of Proceedings, dated Jan. 13–21, 2014) ("Tr.") at 363:9–15 (Daus testifying that the post-suspension hearing is in part "to make sure basically these are the right people and you're not making a serious mistake").)

Finally, the constitutional concerns animating the court's decision in *Krimstock* were based not only on the Due Process Clause of the Fourteenth Amendment but also on the Fourth Amendment's substantive requirement that all searches and seizures be reasonable. 306 F.3d at 48 (finding the lack of a prompt hearing "constitutionally infirm" based on "the dictates of the Fourth *and* Fourteenth Amendments" (emphasis added)); *see also id.* at 50–51, 71 n.7. Indeed, the relevant substantive standard in *Krimstock* was the Fourth Amendment standard as applied in the context of civil forfeiture proceedings, *id.* at 48–49, pursuant to which the government must demonstrate "probable cause for the initial seizure or offer post-seizure evidence to justify continued impoundment" of the seized property, *id.* at 50. Therefore, the due process procedures in *Krimstock* had to be

adequate to adjudicate *that* substantive standard. In that context, the court in *Krimstock* found that procedural due process required a prompt post-seizure, pre-judgment hearing that, "at a minimum," "enable[d] claimants to test the probable validity of continued deprivation of their vehicles." *Id.* at 69.

Here, Plaintiffs do not argue – nor could they – that the suspension of a taxi license is a seizure for Fourth Amendment purposes or that the Fourth Amendment's substantive standard otherwise applies to the TLC's summary suspension hearings. Accordingly, since the applicable substantive standard in this case is meaningfully different than the substantive standard in *Krimstock*, the latter is simply not relevant, much less determinative, in deciding what process taxi drivers are due before the continuation of their license suspension. In other words, because *Krimstock* concerned a different substantive rule of law, it cannot answer the relevant question here as to whether the TLC's summary suspension procedures are adequate to adjudicate the Rule's substantive arrest-plus-nexus standard. As long as the TLC's procedures are adequate for purposes of adjudicating *that* standard, Plaintiffs' procedural due process claim must fail.

As set forth above, the TLC's post-suspension hearing is designed to determine whether (a) the suspended driver has been charged with a crime, (b) the charge is still pending, and (c) there is a nexus between the charged crime and public health or safety. (*See also* Findings of Fact.) Clearly, the hearing is sufficient for that purpose. With respect to the first two inquiries, Daus and other witnesses credibly stressed the significance of the fact and pendency of charges to the TLC's decision to continue a suspension, not to mention the fact that a driver had the opportunity to contest

whether he was actually the person charged with a crime and/or whether the crime charged was among those identified by the TLC as one that implicates public health or safety. (*See, e.g.*, Tr. at 340:4–9, 15–19; 342:11–25; 359:1–10; *see also id.* at 229:3 –6 (former ALJ testifying that his role was "to determine" whether "the person before me actually [was] arrested and charged with a criminal offense"); *id.* at 271:22–25 (another witness testifying that "[t]he licensee could come in and say it's not me, the charges are incorrect, the charges have been dismissed, the charges have been reduced").) As for the nexus determination, Daus and others credibly testified that this third inquiry was also relevant to the decision to continue the suspension of a taxi license. (*See, e.g.*, *id.* at 369:4–8, 13–17; *see also id.* at 247:24–248:7; 254:23–255:1; 256:15–24; 257:16–19; 258:10–13; 260–68; 290–291.) As the Court found, however, in determining whether this inquiry is satisfied in a particular case, the only relevant fact is the nature of the charged crime – that is, the statutory elements of the crime. (*See* Findings of Fact.) Moreover, the primary – if not exclusive – consideration with respect to this inquiry is whether the statutory crime charged is on the TLC's list of relevant offenses. In essence, this list reflects the fact that the TLC has already determined that certain crimes are sufficiently connected to public health or safety for purposes of the nexus inquiry. This short-hand for the analysis makes sense given that the inquiry is focused on the nature of the charges pending against a driver, and not the factual allegations underlying the charges or other individualized facts as to the danger or threat posed by a particular taxi driver.

Again, as noted above, the fact that the TLC's decisionmakers do not consider individualized evidence of a driver's dangerousness does not give rise to a procedural due process violation, since such evidence is simply not relevant under the TLC's statutory scheme. *See Conn. Dep't of Pub. Safety*, 538 U.S. at 8 ("Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme."). Therefore, even if Plaintiffs could prove that they do not present an actual danger or threat to public health or safety, that will not change the outcome of the hearing because the TLC has decided that, regardless of the underlying facts, certain statutory crimes are sufficiently related to public health or safety, and that being charged with one of those crimes is proof enough of a taxi driver's threat to public health or safety. Accordingly, as in *Connecticut Department of Public Safety*, a hearing to determine a particular taxi driver's dangerousness would be an exercise in futility, since that fact is "of no consequence" under the TLC's substantive arrest-plus-nexus standard. *Id.*

Moreover, while the TLC's substantive standard may ensnare some non-dangerous drivers, "principles of '*procedural* due process'" do not bar the TLC "from drawing such classifications." *Id.* (citation omitted). Thus, in arguing that due process requires an opportunity for a taxi driver to show that he does not in fact pose a risk to public health or safety, Plaintiffs really seem to be asserting a substantive due process challenge to the TLC's arrest-plus-nexus standard – that is, that the standard is "defective" because it "conflict[s] with a provision of the Constitution." *Id.* at 7–8. Although the Court will address this issue below, such arguments are simply not relevant to a *procedural* due process claim.

In sum, the record clearly shows that the TLC's post-suspension hearing is adequate to address the three relevant inquiries that comprise the substantive standard set forth

in the TLC's Rule. As a result, with the exception of the notice provided in connection with pre-2006 suspensions – which is also discussed below – the Court finds that the TLC's post-suspension hearing does not violate procedural due process.

### B. Whether *Substantive* Due Process Requires an Individualized Determination of Dangerousness

Although Plaintiffs have couched their arguments in the language of *procedural* due process, it could be argued that Plaintiffs actually mean to challenge the fairness of the underlying substantive suspension standard itself, and not the fairness of the procedures used in applying that standard. If that is the case, then Plaintiffs are really asserting a *substantive* due process challenge. *See, e.g.*, *Conn. Dep't of Pub. Safety*, 538 U.S. at 7–8 ("[Procedural] due process does not entitle [the plaintiff] to a hearing to establish a fact that is not material under the . . . statute. . . . It may be that [the plaintiff's] claim is actually a substantive challenge to Connecticut's statute recast in procedural due process terms." (citation omitted)); *Flores*, 507 U.S. at 308 (plaintiffs' argument that an immigration procedure "is unconstitutional because it does not require [a] . . . determin[ation] in the case of each individual alien juvenile that detention in [government] custody would better serve [the alien's] interests than release to some other 'responsible adult[]' . . . is just [a] 'substantive due process' argument recast in 'procedural due process' terms"); *Michael H.*, 491 U.S. at 119–21 (rejecting plaintiff's procedural due process argument that he was entitled to a hearing to demonstrate his paternity before he could be denied parental status pursuant to a state statute because he was really challenging the fairness of the law's substantive standard, "not the adequacy of procedures" provided); *see also Catlin v. Sobol*, 93 F.3d 1112, 1118

(2d Cir. 1996); *Cardoso v. Reno*, 127 F. Supp. 2d 106, 116, 115 (D. Conn. 2001) (finding that plaintiff's procedural due process claim seeking an individualized bail hearing was "simply her substantive due process argument recast in 'procedural due process' terms" because she was really "challeng[ing] the substantive constitutional underpinnings of the statute pursuant to which the government acted" in arguing that she "ha[d] a fundamental liberty interest" not to be detained "without some individualized determination of her flight risk and dangerousness"). Accordingly, the Court will address whether the TLC's arrest-plus-nexus standard meets the requirements of substantive due process.

### 1. Legal Standard: Substantive Due Process

As noted above, the Fourteenth Amendment's substantive due process component "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). In particular, substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Flores*, 507 U.S. at 302 (emphasis omitted). By contrast, where a fundamental right is not implicated, "[s]ubstantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'" *Kaluczky*, 57 F.3d at 211 (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)); *see also Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (where "a statute neither

interferes with a fundamental right nor singles out a suspect classification," the statute will be "invalidate[d] . . . on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose" (quoting *Molinari v. Bloomberg*, 564 F.3d 587, 606 (2d Cir. 2009))).

Given the different treatment of fundamental and non-fundamental rights, the Court's substantive due process "analysis must begin with a careful description of the asserted right." *Flores*, 507 U.S. at 302 (citation omitted). In determining whether an asserted right is constitutionally protected, the Supreme Court has recognized that "guideposts for responsible decisionmaking in this unchartered area are scarce." *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992). As a result, the Supreme Court has expressed a deep "reluctan[ce] to breathe . . . further substantive content into the Due Process Clause," *Michael H.*, 491 U.S. at 122 (citation omitted), and has stressed the need to exercise "judicial self-restraint" and "the utmost care whenever [it is] asked to break new ground in this field," *Collins*, 503 U.S. at 125. Moreover, for a right to be afforded constitutional protection under the substantive component of the Due Process Clause, the Supreme Court has "insisted not merely that the [alleged] interest be 'fundamental' (a concept that, in isolation, is hard to objectify), but also that it be an interest traditionally protected by our society." *Michael H.*, 491 U.S. at 122. Put another way, "the Due Process Clause affords only those protections 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)); *see also Kerry v. Din*, 135 S. Ct. 2128, 2134 (2015) ("[B]efore conferring constitutional status upon a

previously unrecognized liberty, we have required a careful description of the asserted fundamental liberty interest, as well as a demonstration that the interest is objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed." (citation omitted)). A plaintiff asserting a substantive due process claim thus bears the burden of establishing that the asserted right satisfies this high bar. *See Michael H.*, 491 U.S. at 125.

The substantive due process inquiry in this case is analogous to that in *Reno v. Flores*, in which the Supreme Court rejected a substantive due process challenge that, pending a deportation hearing, an alien juvenile was entitled to an individualized assessment as to whether it was in his best interest to be placed in the care of a private custodian rather than in the care of a government institution. 507 U.S. at 302. The Court identified the alleged right at issue as the right of an orphan child "to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.* Remarking on its novelty, the Court found that this alleged right "certainly" could not be "considered so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citation omitted). Accordingly, the Court determined that the substantive standard of the immigration regulation at issue "d[id] not violate the Constitution" because "[i]t [was] rationally connected to a governmental interest in 'preserving and promoting the welfare of the child,' . . . and [was] not punitive since it [was] not excessive in relation to that valid purpose." *Id.* at 303 (citations omitted).

In addition, after rejecting the notion that there is a categorical right to be placed in

private custody, the Supreme Court considered a "somewhat more limited constitutional right" asserted by the plaintiffs – namely, "the right to an individualized hearing on whether private [custody] placement would be in the [alien] child's 'best interests.'" *Id.* But this argument fared no better than the first, as the Court explained that the "best interests of the child" standard – while a "venerable phrase" in divorce and child custody proceedings – was "not traditionally the sole criterion," much less the "sole *constitutional* criterion," for "other, less narrowly channeled judgments involving children, where their interests conflict in varying degrees with the interests of others." *Id.* at 303–04. Thus, with respect to the government's custodial responsibilities, the Court found that, while certain "[m]inimum standards must be met, and the child's fundamental rights must not be impaired[,]" the government's "decision to go beyond those [minimum] requirements . . . is a policy judgment rather than a constitutional imperative." *Id.* at 304–05.

Finally, the Court found that the plaintiffs' "best interests of the child" argument was:

> in essence, a demand that the [challenged immigration] program be narrowly tailored to minimize the denial of [a child's] release into private custody. But narrow tailoring is required only when fundamental rights are involved. The impairment of a lesser interest (here, the alleged interest in being released into the custody of strangers) demands no more than a "reasonable fit" between governmental purposes (here, protecting the welfare of the juveniles who have come into the [g]overnment's custody) and the

means chosen to advance that purpose.

*Id.* at 305. The Court explained that this "reasonable fit" standard "leaves ample room for an agency to decide . . . that administrative factors . . . favor using one means rather than another." *Id.* Applying this standard, the Court concluded that "[t]here is . . . no constitutional need for an [individualized] hearing to determine whether private placement would be better, so long as institutional custody is . . . good enough." *Id.*[5]

## 2. Application

Here, as an initial matter, Plaintiffs have consistently and vigorously denied that they are asserting a *substantive* due process claim. (*See, e.g.*, Doc. Nos. 42 ¶¶ 107–12; 330 at 2–3; and Pl. Mem. at 8.) In fact, the Second Circuit made note of Plaintiffs' "express disavowal" of any such claims in *Nnebe II.* 644 F.3d at 153 n.2. Accordingly, it could be argued that Plaintiffs have waived any claim that the Rule violates substantive due process. However, even if Plaintiffs did *not* waive their substantive due process arguments, the Court nevertheless finds that Plaintiffs have failed to (1) establish that the Rule infringes on a categorical right "sufficient to trigger constitutional protection whenever a regulation in any way touches upon [that alleged right]," *Kerry*, 135 S. Ct. at 2135, or (2) demonstrate the lack of a rational relationship between the Rule on the one

---

[5] The Supreme Court also found that the plaintiffs' argument that *procedural* due process required an inquiry into whether detention would better serve a child's best interests was "just the 'substantive due process' argument recast in 'procedural due process' terms, and we reject it for the same reasons." *Flores*, 507 U.S. at 308.

hand and a legitimate governmental purpose on the other.

Viewed broadly, the right that Plaintiffs seem to assert is, in essence, the alleged right of a taxi driver who has been arrested and charged with a crime to have the suspension of his license lifted pending resolution of his criminal case.  But the Court is unaware "that any court . . . has ever held" that such a fundamental right exists, and, as in *Flores*, the "mere novelty" of this alleged right "is reason enough to doubt that 'substantive due process' sustains it."  507 U.S. at 303.  Indeed, courts in this Circuit have refused to recognize a fundamental right with respect to a person's property interest in using and possessing his own vehicle.  *See, e.g.*, *Fasciana v. Cty. of Suffolk*, 996 F. Supp. 2d 174, 183–84 (E.D.N.Y. 2014) (dismissing substantive due process claim because "[p]laintiff's property interest in his vehicle is not the type of fundamental right subject to substantive due process protections" (citation omitted)); *Reyes v. Cty. of Suffolk*, 995 F. Supp. 2d 215, 230 (E.D.N.Y. 2014) (same).  The Court sees no reason to conclude otherwise with respect to Plaintiffs' property interest in their taxi licenses.  Accordingly, in light of the Supreme Court's extreme reluctance to recognize new fundamental rights protected under the Constitution, other courts' refusal to confer such constitutional status on similar property rights, and the lack of any evidence in the record to suggest that a taxi driver's interest in having his suspended license returned to him pending resolution of his criminal case is so "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [that interest] was sacrificed," the Court finds that Plaintiffs' asserted right – even broadly construed – is not a categorical right "sufficient to trigger constitutional protection whenever a

regulation in any way touches upon an aspect" of it.  *Kerry*, 135 S. Ct. at 2134–35 (citation omitted).

As for whether the TLC's application of the arrest-plus-nexus standard is "arbitrary, conscience-shocking, or oppressive," Plaintiffs' arguments fail for the same reasons explained by the Supreme Court in *Flores*.  Specifically, as in *Flores*, Plaintiffs' assertion that they are entitled to an individualized determination as to dangerousness is really a demand that the TLC's summary suspension procedures be "narrowly tailored" to minimize the risk that non-dangerous drivers will have their licenses suspended pending resolution of their criminal charges.  But as the Supreme Court explained in *Flores*, "narrow tailoring is required only when fundamental rights are involved," which, for the reasons previously explained, is not the case here.  507 U.S. at 305.  To the contrary, where, as here, only a "lesser interest" is concerned, there need only be a "'reasonable fit' between governmental purpose" and "the means chosen to advance that purpose."  *Id.*  And as the Supreme Court determined in *Flores*, so long as this "reasonable fit" standard is met, there is "no constitutional need for a hearing to determine" an individual's actual dangerousness.  *Id.*; *see also Air Line Pilots Ass'n, Int'l v. Quesada*, 182 F. Supp. 595, 597 (S.D.N.Y.) (regulation setting mandatory retirement age for commercial pilots was reasonably related to the goal of air safety, even though "there [was] no doubt that many of these older pilots [could] successfully continue flying"), *aff'd*, 276 F.2d 892 (2d Cir. 1960) (Lumbard, C.J.).

Here, the Court has little difficulty concluding that there is a "reasonable fit" between the governmental purpose behind the TLC's Rule – that is, protecting the public from dangerous taxi drivers – and the substantive arrest-plus-nexus standard

applied by the TLC to advance that purpose. Indeed, it seems quite obvious that continuing the suspension of taxi drivers facing felonies or certain misdemeanor charges will further the governmental purpose of protecting public health and safety. The fact that there may be a subset of non-dangerous drivers whose licenses are suspended pursuant to the Rule's substantive standard does not alter the Court's conclusion that the Rule is rationally related to a legitimate governmental interest. *See Cuomo*, 755 F.3d at 113 (finding that there "is clearly a rational basis for the line that New York chose to draw" in deciding that "a conviction for a relevant offense was proof enough of dangerousness," even if the plaintiff "happen[ed] to fall within the subset of convicted sex offenders who are not actually dangerous"). Indeed, as *Flores* makes clear, the "reasonable fit" standard leaves "ample room" for the TLC to decide how to exercise its summary suspension responsibilities and to balance an individual driver's interests against competing administrative factors, such as the TLC's lack of expertise in analyzing an individual's actual dangerousness and the administrative burden that such an individualized determination would impose.[6]

Of course, reasonable minds may differ as to the wisdom of the means chosen by the TLC to further its goal of protecting public health and safety, and it may be that the costs associated with moving to an

individualized assessment of a driver's dangerousness would not be inordinately burdensome in relation to the benefits of such a scheme. However, the law is clear that, with respect to non-fundamental rights, the government need not narrowly tailor its legislation, and it is not for courts to rewrite statutes or "judge the wisdom, fairness, or logic of legislative choices." *Sensational Smiles, LLC*, 793 F.3d at 284. So long as there is a rational relationship between the legislation and a legitimate legislative purpose, which the Court finds exists here, that is enough as a matter of substantive due process. Accordingly, the Court finds that any claim by Plaintiffs sounding in substantive due process must fail.

## C. Whether the TLC's Notice Violates Procedural Due Process

The parties also contest the procedural due process implications of the Findings of Fact with respect to the notice given to suspended drivers. (*See* Pl. Mem. at 17–22; Def. Mem. at 24–30.) "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also Int'l House v. NLRB*, 676 F.2d 906, 911 (2d Cir. 1982) ("The very essence of due process is the requirement of notice and an opportunity to be heard."). Thus, notice must do more than simply inform an aggrieved party of his entitlement to a hearing. Rather, in order to satisfy the requirements of procedural due process, notice must adequately inform the party as to what the "critical issue[s]" of the hearing will be, *Turner v. Rogers*, 131 S. Ct. 2507, 2519 (2011), for purposes of "permit[ting] [the party] to 'present' [his] objections to the

---

[6] Additionally, although the Court acknowledges that the temporary suspension of a taxi driver's license is a serious deprivation with potentially significant collateral consequences to the driver's livelihood, the driver has a panoply of rights, including a constitutional right to a speedy trial, *see* U.S. Const. amend. VI, and a multitude of other statutory and constitutional protections designed to resolve the ultimate merits of the driver's criminal case in a timely fashion.

[decisionmaker]," *Spinelli*, 579 F.3d at 172. *See also Kapps v. Wing*, 404 F.3d 105, 124 (2d Cir. 2005) ("Claimants cannot know *whether* a challenge to an agency's action is warranted, much less formulate an effective challenge, if they are not provided with sufficient information to understand the basis for the agency's action."). "[A]ssessing the adequacy of a particular form of notice requires balancing the interest of the [s]tate against the individual interest sought to be protected by the Fourteenth Amendment." *Jones v. Flowers*, 547 U.S. 220, 229 (2006) (citation omitted); *see also Spinelli*, 579 F.3d at 172 ("The particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case; however, due process notice contemplates specifications of acts or patterns of conduct[.] . . . The degree of required specificity also increases with the significance of the interests at stake.").

Here, once a taxi driver's license is suspended, he is informed through the mail of the suspension and of the right to a hearing. And, although the notice does not, on its face, state the substantive standard and determinative inquiry to be applied at the hearing, it does make express reference to the Rule pursuant to which the suspension is being carried out. (Findings of Fact at 8.) In addition, after receiving this notice, a driver who requests a hearing receives a second letter from the TLC, which states (1) "the time, date, and location of the hearing," (2) that drivers "can present evidence and call witnesses on their behalf," and (3) that "the purpose of th[e] hearing will be to determine whether your TLC license should remain suspended pending the final disposition of your criminal case." (*Id.* at 8–9.)

With respect to suspensions *since* the December 2006 amendment to the Rule, the Court finds that although the TLC's notice letters to suspended drivers do not contain the Rule's substantive standard on their face, they do cite to the operative version of the Rule, which, since December 2006, has expressly stated the relevant "issue[s]" to be considered at the summary suspension hearing – that is, the three inquiries comprising the arrest-plus-nexus standard. Thus, a driver seeking to contest the TLC's decision to suspend his license would be able to access the text of the Rule and learn what the relevant substantive standard is, since the Rule itself clearly states that, at the hearing, "the issue will be whether the charges . . . demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to public health or safety." R.C.N.Y. § 68-15(d)(3); (*see* Findings of Fact at 5–6). Indeed, Plaintiffs have effectively conceded that everyone now knows the standard, which is why so few drivers demand hearings. (*See* Findings of Fact at 11 n.8.) Accordingly, the Court finds that the notice provided to suspended taxi drivers after December 2006 is constitutionally adequate.

The same cannot be said for the period prior to December 2006. As noted above, before December 2006, the text of the Rule did not indicate that the relevant inquiry for continued suspension was limited to whether the *charges, if true*, implicated public health or safety, even though in practice the TLC applied the same arrest-plus-nexus standard prior to December 2006. (*See id.* at 4.) Thus, before December 2006, even assuming that a driver looked up and read the language of the Rule cited in the suspension notice, the driver would have had no way of knowing that the "critical issues" relevant to the summary suspension hearing were limited to the fact of charges, the pendency of charges, and the nexus between those charges and public health or

safety. Moreover, until December 2007, the initial hearing was presided over by TLC ALJs, who "encouraged drivers to argue anything they wanted," including "that they were not a threat to public health or safety or that they were innocent," rather than focusing them on the arrest-plus-nexus standard that the TLC Chairperson actually and exclusively applied in making the ultimate suspension determination. (*Id.* at 10.) With respect to these TLC ALJ hearings, neither the pre-December 2006 notice nor the Rule itself conveyed to a driver that he would be allowed, and encouraged, to make arguments that went beyond – and in fact were not even relevant to – the arrest-plus-nexus standard. Accordingly, the Court concludes that the notice given to suspended drivers prior to December 2006 – which includes the notice received by each of the named Plaintiffs – was constitutionally inadequate as a matter of procedural due process because it did not provide a driver with sufficient "information" necessary "to prepare meaningful objections or a meaningful defense." *Spinelli*, 579 F.3d at 172.

### D. Damages

Having determined that there was a violation of Plaintiffs' procedural due process rights with respect to the notice provided to suspended drivers prior to December 2006, the Court must determine the appropriate form of relief with respect to this violation. As an initial matter, the Court finds that Plaintiffs are not entitled to injunctive relief. To have standing to seek such relief, Plaintiffs must prove that there is a continuing violation or a real risk of the same type of violation in the future. *See EEOC v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012) (stating that courts may issue injunctions only where "there exists some cognizable danger of recurrent violation"). Here, Plaintiffs have only established a past

due process violation. Thus, in light of the Court's finding that the TLC's notice since December 2006 has been sufficient, Plaintiffs cannot satisfy their burden of establishing that they face a cognizable danger of a continuing or future violation based on inadequate notice.

With respect to monetary damages, the Supreme Court has determined that "a plaintiff normally cannot recover any compensatory damages from the mere fact that constitutional rights were violated." *Ortiz v. Regan*, 769 F. Supp. 570, 573 (S.D.N.Y. 1991) (citing *Carey v. Piphus*, 435 U.S. 247, 262–63 (1978)). Thus, compensatory damages are generally not available if the deprivation would have occurred even if a plaintiff's procedural due process rights had not been violated. However, the Supreme Court has also held that "a plaintiff who is deprived of liberty or property without due process of law is entitled to nominal damages even if the deprivation was justified." *Carey*, 435 U.S. at 266; *see also id.* ("[T]he denial of procedural due process should be actionable for nominal damages without proof of actual injury."). Thus, in *Carey v. Piphus*, the Supreme Court found that students who had been suspended from school without a hearing would not be entitled to compensatory damages, but might still receive nominal damages of no more than one dollar if the district court on remand concluded that the students would have been suspended even if their procedural due process rights had not been violated. *Id.* at 264; *see, e.g.*, *Kim v. Hurston*, 182 F.3d 113, 121 (2d Cir. 1999) ("[T]he denial of procedural due process . . . was a technical violation that resulted in no compensable damages. The appropriate remedy is an award of only nominal damages.").

Here, it seems that while nominal damages are potentially available with

respect to the notice violation, compensatory damages are not. Specifically, Plaintiffs have failed to establish that they would have prevailed at their hearings and had their licenses restored had they received constitutionally adequate notice of the standard to be applied at the hearing. Put another way, Plaintiffs have not demonstrated that but for the TLC's inadequate notice, they would have been able to meet all three inquiries comprising the substantive arrest-plus-nexus standard. Accordingly, since it appears that Plaintiffs suffered no actual injury as a result of this procedural due process violation, it would seem that compensatory damages are not available to them. Nevertheless, because the parties have not yet had an opportunity to brief – or present evidence on – the issue of damages pertaining to the pre-2006 notice letters, the Court will allow the parties to address this issue, including the need for further briefing, discovery, and fact finding, in a letter to be jointly submitted to the Court.

Moreover, Plaintiffs may also be entitled to attorneys' fees pursuant to 42 U.S.C. § 1988, as well as punitive damages, provided that they can meet their burden of showing that Defendants' failure to provide constitutionally adequate notice prior to December 2006 was malicious. *See Carey*, 435 U.S. at 257 n.11. Accordingly, the parties should also address this issue in their joint letter.

### E. Plaintiffs' State Law Claims

Finally, now that the Court has determined Defendants' liability with respect to Plaintiffs' due process claims, the Court must consider whether it is appropriate to exercise pendent jurisdiction over Plaintiffs' remaining state law claims. However, since the parties have not yet had the opportunity to brief this issue in light of the Court's due process ruling, the Court will allow the parties to also address this topic in their joint letter.

### III. CONCLUSION

For the reasons set forth above, the Court finds that, with the exception of the notice provided to Plaintiffs prior to December 2006, Plaintiffs have failed to sustain their burden of proof with respect to their due process claims.

IT IS HEREBY ORDERED THAT, by May 27, 2016, the parties shall file a joint letter setting forth their positions as to the next steps required in this action with respect to damages, attorneys' fees, and Plaintiffs' remaining state law claims. IT IS FURTHER ORDERED THAT the parties shall appear for a conference on Friday, June 3, 2016 at 10:30 a.m. to address these issues.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated:   April 28, 2016
         New York, New York

\*        \*        \*

Plaintiffs are represented by Daniel L. Ackman, 222 Broadway, 19th Floor, New York, New York 10038; David T. Goldberg of Donahue & Goldberg, LLP, 99 Hudson Street, 8th Floor, New York, New York 10013; and Janice Mac Avoy and Michael A. Kleinman of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004.

Defendants are represented by Mary O'Sullivan and Amy Weinblatt of the New York City Law Department, Office of the Corporation Counsel, 100 Church Street, New York, New York 10007.