UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X----------------------------------------------------------------X

JONATHAN NNEBE, ALEXANDER
KARMANSKY, EDUARDO AVENAUT,
KHAIRUL AMIN and the NEW YORK TAXI
WORKERS ALLIANCE, individually and on behalf
of all others similarly situated,                                               06-CV-4991

                                          Plaintiffs,


                      -Against-

MATTHEW DAUS, CHARLES FRASER, JOSEPH
ECKSTEIN, ELIZABETH BONINA, THE NEW
YORK CITY TAXI AND LIMOUSINE
COMMISSION, AND THE CITY OF NEW YORK,

                                              Defendants.
X----------------------------------------------------------------X
X----------------------------------------------------------------X

ANTHONY STALLWORTH, PARICHAY
BARMAN, NOOR TANI and the NEW YORK
TAXI WORKERS ALLIANCE, individually and on
behalf of all others similarly situated,

                                          Plaintiffs,
                                                                                17-CV-7119
                      -Against-

MEERA JOSHI, CHRIS WILSON, STAS SKARBO,
AND THE CITY OF NEW YORK,

                                              Defendants.
X----------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR INJUNCTIVE RELIEF AND FOR AN
ORDER IMPLEMENTING THE SECOND CIRCUIT MANDATE**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ……………………………………………….. 1

FACTUAL AND LEGAL BACKROUND ……………………………………….. 2

    **1.**    **The TLC Suspension and Post-Suspension Practice** ………………………. 2

    **2.**    **The Litigation** ……………………………………………… 4

    **3.**    **The Court of Appeals' Decision and Mandate** ……………………….. 5

    **4.**    **The TLC's Post-Mandate Conduct** …………….………………….. 6

        A.    Suspensions / Error Rate ……………………………………… 6

        B.    Hearings ………………………………......…………………… 7

        C.    Chair Review……………………………….…...……………… 8

        D.    Duration of Post-Suspension Process ……………..……………… 9

        E.    Notice ………………………………………...……………… 9

        F.    The Paucity of Hearings ……………….………….……………..10

        G.    Recent TLC Admissions …………………….………..…………… 11

        H.    The Covid-19 Crisis and Its Impact on Suspensions …………….…11

ARGUMENT ……………………………………………….………………... 12

  I.  AN APPROPRIATE REMEDY MUST FULLY ADDRESS
THE TLC'S LONGSTANDING VIOLATIONS OF DRIVERS'
RIGHTS ………………………….…..……………………………...… 12

  II.  PLAINTIFFS HAVE MET THE STANDARD FOR PRELIMINARY
AND PERMANENT INJUNCTIVE RELIEF ………..………..……………….....… 13

  III.  THIS COURT SHOULD ENTER A PRELIMINARY INJUNCTION
BARRING DEFENDANTS FROM SUSPENDING LICENSES UPON
ARREST UNTIL PERMANENT INJUNCTIVE RELIEF IS
ORDERED AND IMPLEMENTED …………………………………..………………….15

  IV.  THIS COURT SHOULD ENTER A PERMANENT INJUNCTION
THAT ENSURES A POST-SUSPENSION PROCESS THAT IS FAIR,
ACCURATE, PROMPT AND SUFFICIENT TO REMEDY
LONGSTANDING CONSTITUTIONAL VIOLATIONS ………..………….…..…...….15

    A. **The Burden of Proof in Extending Suspensions Must be on the TLC** …….…………………….……..………………….. 16

    B. **Numerical Risk Assessment Should be used to Assess Dangerousness Post-Suspension and Could Also Help Determine Whether to Suspend** …….…………….…………………….…16

    C. **ALJs Must be Required to Consider Multiple Factors** ……….……………….18

    D. **Chair Review Should Be Abolished or Limited** ……….…………………...19

    E. **Each Aspect of the Post-Suspension Process should be Accelerated with ALJ Decisions Being Given Immediate Effect** …………… 20

    F. **No Suspension until there is Written Notice; Automatic Scheduling of Post-Suspension Hearings** …….…………..……………..…. 22

    G. **ALJ Rulings Should be Anonymous** …….…………..………………….… 23

    H. **Pre-Hearing Notices Should Fully Inform the Drivers about the Issues and Evidence to be Considered at the Hearing** ……….……..…..… 23

    I. **Pre-Hearing Notices Should Fully Inform the Drivers about the Issues and Evidence to be Considered at the Hearing** ……….………..………………. 23

V.  THE TLC SHOULD BE REQUIRED TO PUBLICIZE ITS NEW PRACTICES AND TO COLLECT AND REPORT DATA ABOUT THEIR OPERATION …….….……………………….…...…………………… 24

CONCLUSION …….…………………………….…………….…...…………………… 25

## PRELIMINARY STATEMENT

Plaintiffs submit this memorandum in support of their motion for preliminary and permanent injunctive relief and for imposition of a remedy consistent with the Court of Appeals' July 19, 2019 Decision in these actions (the Decision). This Court should:

- Issue a preliminary injunction barring defendants from summarily suspending taxi and for-hire vehicle drivers (taxi drivers or drivers) based on an arrest unless and until this Court has ordered a constitutionally adequate pre-hearing notice and directed the implementation of a rule that will ensure a fair hearing process.

- The preliminary injunction should remain in effect at least through the Covid-19 crisis, which has substantially slowed ordinary criminal cases and should require reinstatement of drivers currently serving suspensions due to such an arrest.

Plaintiffs respectfully request that this Court rule on the preliminary injunction request expeditiously at the close of briefing.

Plaintiffs further submit that this Court should:

- Issue a permanent injunction directing the implementation of post-suspension hearing process designed to fairly and promptly distinguish between drivers whose licensure pending the resolution of a criminal charge poses "a direct and substantial threat" to public safety from those who do not.

The permanent remedy should require a constitutionally adequate post-suspension and pre-hearing notice; should mandate the use of a numerical risk assessment score to help determine which drivers actually pose a direct and substantial threat; should state what factors shall be considered by a hearing judge and by the TLC chair in determining dangerousness; would require that ALJ decisions be given immediate effect; should mandate that post-suspension process be prompt; and should eliminate or at least limit chair review of ALJ decisions.[1]

---

[1] Injunctive relief would become permanent after the certification of a class. Per this Court's April 6 scheduling orders, plaintiffs' motion for class certification will be heard after the resolution of the instant motion.

Significant remedies are necessary in light of the breadth and persistence of defendants' constitutional violations, the defendants' documented failure to adhere to written rules and their repeated failures to describe their practices forthrightly to the courts in this case. They are also warranted in light of the TLC's post-remand admissions indicating that the likelihood of an erroneous suspension is actually even higher than this Court or the Court of Appeals knew.

## FACTUAL AND LEGAL BACKROUND

### 1. The TLC Suspension and Post-Suspension Practice

The facts and procedural history of this case are detailed in the two decisions by the Court of Appeals as well as in this Court's 2014 Findings of Fact. To summarize, for years and at least since 2003, the TLC has routinely suspended the licenses of taxi drivers who arrested for a long list of misdemeanor charges, a list long held secret by the TLC, or for any felony charge. The TLC ordered these suspensions, not waiting for the resolution of the criminal case and often before the driver was even arraigned, without a hearing of any kind, without any investigation or consideration of the facts and circumstances of the arrest and without regard to the driver's record or history. The TLC would then give drivers the option of appearing at a hearing, ostensibly to determine whether or not the driver's suspension should be continued pending resolution of the arrest charges. Findings 8.

The TLC purported to act based on an adjudications rule first enacted in 1999 and amended several times since, the specifics of which it often ignored. The most recent version of the Rule, as amended and numbered § 68-15(d)(1), provides: "The [TLC Chairperson] can summarily suspend a License based upon an arrest or citation if the Chairperson believes that the charges, if true, would demonstrate that continued licensure would constitute a direct and substantial threat to public health or safety." The rule then proceeds to list the charges that will trigger a summary suspension.

The rule also permits the suspended driver to request a hearing at which the issue to be determined would be "whether the charges underlying the Licensee's arrest, if true, demonstrate that the continuation of the License while awaiting a decision on the criminal charges would pose a direct and substantial threat to public health or safety." *Id.* § 68-15(d)(3). Following the hearing, the hearing judge (currently an administrative law judge (ALJ) employed by the City's Office of Administrative Trials and Hearings (OATH)) issues a report and recommendation to the TLC chair as to whether the suspension should be extended or lifted. The chair is then empowered to "determine whether to accept, modify, or reject the Recommendation" and is allowed up to 60 days to do so.

TLC rules have never indicated what factors the ALJs or the TLC chair should or must consider in determining whether an individual's licensure pending resolution of an arrest charge in fact poses a direct and substantial threat. Before the 2019 Decision, however, the various TLC chairs (or their general counsels acting as "designees") never considered factors beyond the fact that the driver had been arrested on a charge with an arguable "nexus" to public safety and that the charge was pending. Accordingly, even in the relatively few cases where the ALJ determined that the charges, if true, did not establish that a driver's licensure pending resolution of a criminal charge would not pose a substantial danger, the chair *never* reinstated the license of *any* taxi driver who the TLC had suspended on arrest. Where the ALJ recommended continuing the suspension, however, the chair always accepted the recommendation. As a result, the hearing process never resulted in driver's reinstatement.

When a criminal charge is resolved in the driver's favor, however (meaning it is dismissed, reduced or adjourned in contemplation of dismissal) the TLC reinstates the driver, again without consideration of the circumstances of the arrest and without regard to the driver's

record. This is what has happened in the overwhelming majority of cases. But the criminal

justice system is slow to process such cases, especially when (as is almost always true of

suspended drivers) the defendant is not in custody.

Over the years, "[D]rivers and their union representatives were being made aware in some

manner of the standard being applied to facts by the ALJs and the TLC Chair that rendered the

hearings futile." 931 F.3d at 89. Indeed, at OATH, the practice was to hold pre-hearing

conferences where the ALJ would "discourage drivers from going forward with a hearing by

informing the driver that there is 'little or no chance' that the driver will ultimately prevail." 931

F.3d at 73 n.7. Such advice led most drivers "to waive or postpone their hearing. Findings 11 n.

8. Thus, there were  just a "few dozen hearings conducted between 2007 and 2014." Findings 11.

### 2.   The Litigation

The *Nnebe* plaintiffs filed their complaint in 2006 and moved at that time for a preliminary

injunction and a TRO, both of which were denied. This Court granted defendants' motion for

summary judgment and dismissed plaintiffs' complaint in 2009. On appeal, the Second Circuit,

reinstated the complaint and specifically held that the New York Taxi Workers Alliance, the

institutional plaintiff, had standing to sue. *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). The

Court also expressed concern that even a 10-day deprivation of a driver's license would be an

"enormous" hardship. But it remanded based on defendants' representations that the TLC did not

have a categorical policy of continuing a suspension based on an arrest alone.

On remand, this Court held a bench trial in January 2014 and issued Findings of Fact in

August of that year. In 2016, this Court issued a memorandum and order ruling on legal issues. It

found that defendants' claims that the TLC provided a holistic review of drivers' suspensions

were false, but concluded plaintiffs' claims actually sounded in substantive due process and

found that plaintiffs had not proven a denial of procedural due process. Finally, in 2018, this

Court entered judgment for plaintiffs as to their pre-2006 notice claim and otherwise for defendants.

The *Stallworth* plaintiffs commenced their action in 2017, asserting many of the same claims as in *Nnebe*. Plaintiffs moved for a temporary restraining order and preliminary injunction along with their initial complaint. This Court denied both motions based on its 2016 decision in *Nnebe* and dismissed the complaint. Plaintiffs in both cases appealed. The *Nnebe* defendants cross-appealed on the single issue on which the district court had found in plaintiffs' favor.

### 3. The Court of Appeals' Decision and Mandate

The Court of Appeals "examine[d] the TLC's suspension procedures under the Due Process Clause to determine whether the TLC provides meaningful hearings to drivers whose licenses have been suspended pending the outcome of criminal proceedings" and "conclude[d] that it does not." 931 F.3d at 70. Focusing first on the TLC Rule, the Court concluded, based on a "close reading of the Rule," that suspension continuations must be determined based "not on the threat posed by the *charges*, but rather on the threat posed to the public by *the driver's licensure*." *Id.* The court further concluded that the structure of the Rule, the requirement that the threat "must be both 'direct' and 'substantial,'" had been added by the City "Ordinance under whose authority it was promulgated," and "the role that a due process hearing is designed to play when a person is threatened with the loss of a valuable property interest." *id.* at 83, contemplated a hearing where the proof burden was on the TLC and where evidence about "the conduct underlying the arrest and the overall record and character of the driver" would be considered. *Id.* at 82.

The Court then applied the three-part test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976). The Court found that the driver's stake in the continuation of their licensure is "enormous" given that "most taxi drivers rely on the job as their primary source of income and

often earn the sole income for large families. It further agreed that the rate of erroneous deprivations was very high as demonstrated by the high rate of reinstatement. 931 F.3d at 84-85. Thus, it concluded: "[W]hile we take seriously the Government interest implicated, we hold that, given the potential of conducting far more meaningful hearings at little or no additional financial or administrative cost to the TLC, that interest is outweighed by the private interest at stake and the unacceptably high risk of erroneous deprivation." 931 F.3d at 86.

Finally, the Court held that the TLC's pre-hearing notices have been constitutionally defective. It noted, "For notice to be effective, it must inform the affected party of what 'critical issue' will be determined at the hearing." 931 F.3d at 88 (citing *Turner v. Rogers*, 564 U.S. 431, 447 (2011)). While the Court did not require that the notice include a roadmap to a successful defense, it did mandate that "Adequate notice must 'reasonably . . . convey the required information that would permit [a driver] to present [his or her] objections' to the continuation of a suspension." *Id.* (quoting *Spinelli v. City of New York*, 579 F.3d 160, 172 (2d Cir. 2009)). In the Court's view, TLC's pre-hearing notice fell well short of this standard both before 2006 and after. The Court, noting "clear similarities" between this case and *Krimstock*, remanded, with the instruction that this Court "fashion a constitutionally adequate process, after hearing from the parties" and that it address "the motion for class certification and the damages, if any, to which plaintiffs are entitled." 931 F.3d at 87, 88, 91.

### 4. The TLC's Post-Mandate Conduct

### I. Suspensions / Error Rate:

Following the remand, the parties engaged in extensive settlement discussions, which were unsuccessful. Meanwhile, the TLC has continued to suspend drivers based on an arrest. In fact, since the trial, the number of suspensions has grown considerably along with the number of drivers licensed by the TLC. According to a TLC FOIL response, in the three-year period

between 2013 and 2015, the TLC suspended 3,379 licenses based on arrests. Then, between 2016

and 2018 the TLC suspended or arrest a total of 6,202 licenses, almost doubling the previous

rate, to more than 2,000 suspensions per year. Ex. 1.

Despite the surge in suspensions, it appears that the number of drivers who were convicted

on the arrest charge and had their licenses revoked has actually declined. The number of

convictions is very small. Indeed, during a five-year period between 2012 and the end of 2016,

during which time the TLC ordered 6,669 summary suspensions, "just 15 TLC-licensees [not

15%, 15 total] had their licenses revoked due to a criminal conviction." Ex. 2. Of these 15, just

two were for assault, while an equal number were for insurance or tax fraud. *Id*. Thus, all told,

the rate of erroneous suspensions, once thought to be between 75% and 90%, 931 F.3d at 84-85,

is actually even higher.[2] (There is, of course, no reason to assume that every eventually convicted

driver would have posed a direct and substantial threat while charges are pending—many people

who are ultimately convicted have been released pre-trial without incident). None of this data,

well known to the agency, has caused the TLC to re-think its suspension practice.

J.   **Hearings:**

There remains no TLC Rule or City ordinance that indicates what factors an ALJ must or

should consider at a hearing. At the hearings themselves, the TLC continues to rely as its sole

evidence what the ALJs term "documentary evidence," meaning a notice that cites the fact of

---

[2] The error rate of 75% or 90% excluding drunk driving cases found by this Court and the Court of Appeals was based on testimony by Marc Hardekopf, a longtime TLC prosecutor. Findings 8 (citing Hardekopf deposition testimony). Before the trial the TLC had never produced specific numbers of suspensions and revocations of the kind it has since provided in response to FOIL requests. Defendants may still argue, as they have, that the TLC does not know the disposition in every case. But since convictions are a matter of public record, the TLC could track convictions and possibly support their conjecture that some drivers they suspend are actually threats to public safety. But as with other aspects of the suspension-on-arrest program, defendants should not be permitted to gain from its speculation about outcomes about which the responsible agency remains deliberately ignorant.

arrest, a printout that shows the respondent holds a TLC license and, in some cases, a copy of a criminal complaint. *See*, *e.g.*, Ex. 3. Since the Second Circuit ruled, however, ALJs have cited *Nnebe* and have stated their intention to follow it. Since the Decision, ALJs have tended to rule in favor of the drivers: In 14 of the 19 hearings in which decisions have been made public, ALJs have recommended reinstatement. Ex. 4. These results are in sharp contrast to pre-Decision outcomes. For example, between 2014 and 2018, there were 15 reported decisions and drivers prevailed in only four. Ex. 5. And of course, during that period—as was also true from 2003 to 2014—the chair rejected each recommendation to reinstate a driver's license.

It also remains the case that hearings are extremely rare when compared to the number of arrest-suspensions. According to recent FOIL responses, the TLC has been suspending-on-arrest approximately 2,000 drivers annually (or 167 per month) in recent years. If that rate has held, it means that the TLC has suspended roughly 1,400 drivers since the Second Circuit ruled. Still, in that time, there have been just 19 hearings leading to ALJ decisions. Ex. 4. This tiny number of hearings powerfully suggests that the pervasive view among drivers that the post-suspension hearing process is futile remains unabated. A system where barely one out of a hundred suspended drivers has a hearing is not providing due process of law for the overwhelming majority.

### K.   Chair Review:

The rule stating that the TLC Chair may accept, modify, or reject an ALJ's recommended decision remains unchanged. As before, it provides no guidance and places no limit on what the chair should or should not consider. Even the notice the TLC sends inviting a response to the ALJ decision "does not inform the driver of the standard the Chair will apply." 931 F.3d at 72.

The TLC rule also requires no deference to rulings by ALJs even though the ALJs hear testimony and consider evidence at a hearing, which the chair never does.

Since the Second Circuit Decision, however, the chair (or designee) has issued a ruling in nine cases.3 In each case, they have accepted each ALJ recommendations, including six recommendations to reinstate, albeit without any stated explanation or rationale. In other cases, the chair has not ruled at all, effectively accepting those recommendations and extending suspensions at least for the time being.

### L.   Duration of Post-Suspension Process:

Chair review continues to considerably delay the post-suspension process, adding to the length of suspensions. In the nine cases where the chair has ruled, on average, he or she has not done so until 90 days from the suspension date (and 30 days from the OATH recommendation). This is despite the fact that the chair has not offered any written analysis in any of the cases and does not hear testimony or receive evidence. Thus, even where an OATH judge recommended that the driver should be reinstated and the chair agreed, the drivers were still denied their livelihoods for several months.

### M.  Notice:

After the remand, the TLC continued to rely on the same form of notice held by the Court of Appeals to be unconstitutional. The TLC persisted in sending suspended drivers the same letter as it had employed previously, giving drivers the option of a hearing, but offering no inkling of what evidence would be considered. Ex. 7. When a driver did request a hearing, the TLC filed a "petition" that re-stated the arrest charges and concluded, "[B]ased upon the

---

3 In some cases, a criminal court disposition may lead to reinstatement before the chair rules.

aforementioned arrest and charges. Accordingly, Respondent's TLC license should remain suspended, pursuant to TLC Rule 68-15(d)." Ex. 8.

In recent weeks, however, the TLC did change its notice practice unilaterally. The new practice leaves the suspension notice itself unchanged and does not alter the hearing notice or the petition. But it does include a separate insert entitled "About the Hearing on Your Arrest Suspension." The "About the Hearing" insert informs the drivers that they may introduce "evidence or testimony [that] may relate to the particular circumstances of your arrest, your TLC driving record, your character and standing in the community, or other factors that you believe show that you do not pose a direct and substantial threat to public safety." Ex. 9.

### N.   The Paucity of Hearings:

Defendants have intimated that the "the reasons for this [paucity of hearings] are unknown and outside the scope of the *Nnebe* decision." ECF #441. In fact, the Court of Appeals did express concern  that drivers have been discouraged from even requesting hearings. 931 F.3d at 73 n.7. And while it may be impossible to fully know why any particular driver did not take advantage of his right to a hearing, reasons why he might not do so are known and must be addressed. First, there has been and longstanding and reasonable belief that the hearing process was futile. *See* Decl. of Melissa Ader, ¶ 4, Ex. 6. That view may still be prevalent, especially since the TLC has done nothing to publicize that the hearing process has changed and has not even acknowledged the Second Circuit Decision. Second, the hearing process, even where the driver is ultimately successful, can last for months so some drivers might choose to wait for the criminal charge to be dismissed or reduced. *Id*., ¶ 5. Third, the OATH court has consistently rejected driver motions that their decisions be made anonymous. *Id*., ¶ 6. Thus, when the decision is published, the fact that the driver has been arrested and even details of the alleged

crime remain public even after the charges are dismissed and the arrest record itself is sealed pursuant to NY CPL § 160.50. Moreover, the TLC suspends even before giving notice by disabling the driver's ability to log into the TLC T-PEP system. This may cause confusion even before a written notice is served. Some drivers may not understand the notice when it arrives, especially where a majority of drivers are not native English speakers. Ader Decl. ¶ 6. TLC officials have been known to discourage drivers from exercising their rights by telling them that hearings are actually not available or that the only way to be reinstated is to produce a positive disposition on their criminal charge. Decl. of Daniel Ackman ¶¶ 4-10. Finally, the suspension notice itself, even now, fails to adequately inform drivers what evidence they may offer and what arguments they might advance at hearings.

### O. Recent TLC Admissions:

While there has been no discovery since the trial of the *Nnebe* action, the TLC has recently admitted that it does not track data that would support its persistent conjecture that its extraordinary suspension-on-arrest program has any demonstrable impact on passenger safety. First, the TLC admitted that it does not track how many drivers have been re-arrested while serving a suspension based on an arrest. Ex. 1. Second, the TLC does not record whether the alleged conduct resulting in an arrest involved a passenger. Ex. 10.

### H. The Covid-19 Crisis and Its Impact on Suspensions:

Just as it has upended so much of society at large, the Covid-19 pandemic has impacted the taxi industry and the New York courts. Non-essential functions of the courts are being postponed. Criminal cases are being administratively adjourned, making it nearly impossible for drivers to resolve their cases in a reasonable amount of time. The Chief Clerk of New York City Criminal Court clarified on March 16, 2020 that unless instructed otherwise by the Supervising

Judge, all cases in which the defendant is not in custody will be administratively adjourned for at least ninety days. These practices will delay resolution of criminal cases, extending suspensions and increasing the hardship to drivers. Meanwhile, the Governor has deemed TLC-licensed drivers to be essential workers as they provide critical services such as transporting individuals in need of medical care, transporting essential workers (including health care workers), and delivering meals to vulnerable populations. Ex. 12. The crisis has led advocates for drivers to urge in an April 3 letter to the TLC chair that the TLC should "temporarily cease its practice of suspending TLC licenses based on misdemeanor and non-violent felony arrests" and to "lift any active summary suspensions that are based on misdemeanor and non-violent felony arrests." Ex. 13. Yesterday, the chair rejected this plea. Ex. 14. The response relies on boilerplate about drivers "who may pose an immediate danger to the public," while eliding the fact that the TLC has never presented evidence—it has offered conjecture—that drivers who have been arrested, without regard to circumstances or the driver's record, generally pose a threat to the passengers.

## ARGUMENT

### VI.  AN APPROPRIATE REMEDY MUST FULLY ADDRESS THE TLC'S LONGSTANDING VIOLATIONS OF DRIVERS' RIGHTS

Although federal courts' remedial powers must spring from and be "related to" the conditions found to violate the Constitution, they are not confined to enjoining specific practices held unconstitutional. *Milliken v. Bradley*, 433 U.S. 267, 280 (1977). "'Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.'" *U.S. v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1236 (2d Cir. 1987) (quoting *Swann v. Charlotte–Mecklenburg Bd. of Education*, 402 U.S. 1, 15 (1971). "The appropriate remedy for a proven due process violation

often depends on the stage at which the violation is found and the relief sought." *Brody v. Village of Port Chester*, 345 F.3d 103, 119 (2d Cir.2003).

In this case, there is a long history of the TLC treating its rules as "oft-quoted nullit[ies]," 931 F.3d at 76, and of defendants misrepresenting their actual practice. There has also been a pervasive belief that the TLC's post-suspension process is futile. Thus, it is imperative that there be a clear break from prior practice and verifiable reforms. The remedial measures plaintiffs discuss below spring directly from the due process violations that the Second Circuit identified— from the risk of erroneous deprivation of drivers' property being extraordinarily high, meaning that many, indeed most, drivers whose suspensions are extended (either after a hearing or in the absence of a hearing) do not, in fact, pose a direct and substantial threat to public safety.  Thus, a proper remedy must focus on reducing the number of erroneous suspensions and ensuring that unnecessary, enormously burdensome deprivations are terminated as quickly as possible.

## VII.  PLAINTIFFS HAVE MET THE STANDARD FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

To be entitled to a preliminary injunction, a movant must demonstrate: 1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the movants' favor, and 3) that the public interest weighs in favor of granting an injunction.[4] The standard for a permanent injunction is essentially the same as the standard for a preliminary injunction, except that the moving party, instead of showing a likelihood of success on the merits, must show actual success on the merits. *Amoco Prod. Co. v. Village of Gambell*,

---

[4] In cases seeking to preliminarily enjoin government action pursuant to a regulatory scheme, the more rigorous likelihood-of-success standard must be satisfied. *E.g.*, *Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). In this case, of course, plaintiffs have already succeeded on the merits.

480 U.S. 531, 546 n. 12 (1987) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 392 (1981));

*see also Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012)).

In this case, plaintiffs have already succeeded on the merits as the Court of Appeal has

held that the TLC hearing and notice practices are unconstitutional. On the requirement of

irreparable harm, the Second Circuit has held as a general matter that such harm is presumed

when there is an alleged deprivation of constitutional rights. *Bery v. City of New York*, 97 F.3d

689, 694 (2d Cir. 1996); *see also Brewer v. W. Irondequoit Cent. Sch. Dist*., 212 F.3d 738, 744-

45 (2d Cir. 2000); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *Charette v. Town of Oyster

Bay*, 159 F.3d 749, 755 (2d Cir. 1998). Where the constitutional violation has actually been

established, "[T]he loss of constitutional freedoms, 'for even minimal periods of time,

unquestionably constitutes irreparable injury.'" *Mills v. D.C*., 571 F.3d 1304, 1312 (D.C. Cir.

2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (citing *New York

Times Co. v. United States*, 403 U.S. 713 (1971)).

Injunctive relief is particularly appropriate in this case, where the defendants'

constitutional violations have been so pervasive and systemic. The TLC's suspension practice

currently impacts more than 2,000 taxi drivers annually. Meanwhile, the TLC has never

presented any evidence that its suspension program materially enhances passenger safety.[6] Even

if defendants could substantiate their conjecture that public safety benefits from arrest-based

suspensions, there is no public interest in continuing suspensions of individuals whose returning

---

[6] A "very low" percentage involve alleged misconduct while on duty or involving taxi passengers. Coyne
Trial Testimony 274-275. Indeed, defendant Charles Fraser, the former TLC general counsel, testified
that the TLC only knew of two convictions of taxi drivers for crimes of violence in the four-year period
from 2005 through 2008. Neither was known to involve a taxi passenger. Fraser Trial Testimony 740-
742. Former TLC Chair Matthew Daus could not recall whether he had seen ever any evidence that a
driver who was accused of committing a crime off-duty is therefore more likely to assault a passenger.
Daus Trial Testimony 412-413. Moreover, since the remand, the TLC has admitted that it does not
"compile data" concerning whether the victim of an alleged crime resulting in a suspension was a
passenger or TLC official. Ex. 11.

to work has been determined, by neutral fact-finders, to not pose any direct and substantial danger.

**VIII.   THIS COURT SHOULD ENTER A PRELIMINARY INJUNCTION BARRING DEFENDANTS FROM SUSPENDING LICENSES UPON ARREST UNTIL PERMANENT INJUNCTIVE RELIEF IS ORDERED AND IMPLEMENTED**

In a preliminary injunction, the Court should order that the TLC cease its suspension-on-arrest program at least as to misdemeanor and non-violent felony arrests, until permanent injunctive relief (as set forth below) is ordered and implemented. Not only would such an order ensure that licenses would not continue to remain unconstitutionally suspended in violation of the Second Circuit's decision, pending a final judgment, but it is also particularly needed now during the COVID-19 crisis.  As set forth in the April 6th letter by advocates to the TLC, the crisis has slowed substantially the progress of criminal cases, including by general order requiring 90-day adjournments of cases where the defendant is not in custody. This Court has the authority to issue such preliminary injunctive relief, and it should do so. *Basank v. Decker*, 2020 WL 1481503, at *6 (S.D. N.Y. March 26, 2020) (granting TRO ordering release of, and enjoining ICE and DHS from arresting, certain civil immigration detainees pending immigration hearings, in light of COVID-19 crisis, given likelihood of proving due process violation).

**IX.   THIS COURT SHOULD ENTER A PERMANENT INJUNCTION THAT ENSURES A POST-SUSPENSION PROCESS THAT IS FAIR, ACCURATE, PROMPT AND SUFFICIENT TO REMEDY LONGSTANDING CONSTITUTIONAL VIOLATIONS**

In a permanent injunction, the Court must order defendants to adopt a process that will ensure that drivers' licenses be reinstated whose licensure pending resolution of a criminal charges would not endanger the public and that such individuals suffer as little burden as possible. Plaintiffs submit that the following remedial measures are both necessary and appropriate: the TLC should calculate a numerical risk assessment (RA) score for each driver its

suspends on arrest; that the RA score be used to aid in determining whether the driver's licensure poses an ongoing threat; and that the hearing judge must consider the RA score and a robust list of factors in assessing whether the driver poses a direct and substantial threat. Plaintiffs further submit that chair review should be eliminated or, at least, restrained and, in any event, that ALJ recommendations be given immediate effect; that pre-hearing notices must include the list of factors the ALJs shall consider; and that the TLC should schedule a hearing for every driver who it summarily suspends.

### J.   The Burden of Proof in Extending Suspensions Must be on the TLC

At the post-deprivation hearing, the Second Circuit held that the burden of proving a direct and substantial threat is on the TLC: "Read in context, the [TLC rule] is focused not on the threat posed by the *charges*, but rather on the threat posed to the public by *the driver's licensure*. The TLC must show that the charges, assumed to be true, 'demonstrate' that "the *continuation* of the License ... would pose a direct and substantial threat.' § 68-15(d)(3)." 931 F.3d at 82 (emphasis added). Thus, the Court determined that the TLC must demonstrate a direct and substantial threat. While the Court of Appeals' Decision is plain enough, this Court should order defendants to indicate clearly in the TLC rules that the agency must bear this burden.

### K.   Numerical Risk Assessment Should be used to Assess Dangerousness Post-Suspension and Could Also Help Determine Whether to Suspend

In order to inform the entire post-suspension process and to reduce the number  and duration of erroneous suspensions, the TLC should prepare a numerical risk assessment score (also known as a public safety assessment or PSA) of the kind used in federal courts and in many state courts in determining whether a criminal defendant should be released while charges are pending. Pretrial risk assessment scores were developed for use in the U.S. federal pretrial system to assess the likelihood that a defendant will commit pretrial violations including being

re-arrested for any crime or a violent crime or failing to make court appearances. Pretrial risk assessment tool use evidence based, neutral information to predict the likelihood that an individual will commit a new crime if released before trial.[8]

Federal Courts have adopted the Pretrial Risk Assessment Instrument (PTRA) in making bail determinations. Thomas H. Cohen et al., "Re-validating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary," Federal Probation, Sept. 2018. The PTRA weighs factors—or assigns points—according to the strength of the relationship between the factor and the likelihood a defendant will commit a new crime or a new violent crime while awaiting trial. The PTRA calculates a raw score for each of the outcomes and converts the scores to separate scales of one to six, with higher scores indicating a greater level of risk. Since the TLC and the OATH court is charged with making a similar judgment, whether the driver poses a direct and substantial threat while criminal charges are pending, a PTRA score could be used to guide ALJs and the chair is deciding whether the driver's suspension should be extended.

A PTRA score could be used for another purpose as well. While the TLC's current and longstanding practice is to suspend drivers on arrest reflexively, nothing in the TLC rules (and nothing in New York law) requires that it do so. (TLC Rule 68-15 says the TLC "can summarily suspend," not that it shall or must do so). A low PTRA score, such as one that might apply to a driver with no prior convictions, might even induce the TLC, in its discretion, to not suspend at all. It might also encourage the TLC not to pursue an extension of a summary suspension (which it now does reflexively at every hearing). In any event, a PTRA score would be a good reference

---

[8] The factors used to derive a score include: the defendant's age, whether the arrest charge is for a violent offense; whether the defendant had been charged with a violent offense before age 20; whether the defendant was already facing a criminal charge at the time of his instant arrest; whether he has a prior felony or misdemeanor conviction: whether he has a prior conviction for a crime of violence; whether he has failed to appear in court in the last two years: whether he has failed to appear at any time; and whether he has been previously sentenced to incarceration.

point for ALJs, who would still be allowed to exercise their discretion and weigh other factors in determining whether a suspension should be continued or whether it should be lifted.

### L.  ALJs Must be Required to Consider Multiple Factors

The current TLC rule does not specify any factors that an ALJ must or should consider in determining whether a driver poses a direct and substantial threat. The Court of Appeals and ALJs in their post-Decision recommendations, however, have indicated that various factors are material. Rather than rely on case law, however, the TLC should be required to enact a rule requiring ALJs and the TLC chair (if there is to be chair review at all) to weigh the following factors:

> (1) whether the driver was issued a desk appearance ticket at the time of his arrest or was released without bail at arraignment[9];
>
> (2) whether or not the driver has any prior convictions[10];
>
> (3) whether the driver has ever been convicted by the TLC tribunal of assaulting or threatening a passenger[11];
>
> (4) whether the driver has been suspended previously for violating a TLC rule[12];
>
> (5) the number of years the driver has been licensed[13];
>
> (6) the driver's overall TLC record[14];

---

[9] *See* TLC v. Francois, OATH Index No. 651/20 at 4  (Nov. 25, 2019), *adopted*, Comm'r Dec. (Dec. 24, 2019) (citing desk appearance ticket and that driver was 59 years old); TLC v. Ibrahim, OATH Index No. 891/20 at 4 (Nov. 25, 2019), adopted (Dec. 9, 2019) (citing desk appearance ticket).

[10] *See* TLC v. Azad, OATH Index No. 142/20 (Aug. 15, 2019) at 6, adopted (Oct. 15, 2019) (lack of prior criminal record a "favorable" factor for driver)

[11] *See* TLC v. Singh, OATH Index No. 701/20 at 7 (Nov. 1, 2019), adopted (Nov.  19, 2019) (suspension lifted for licensee charged with assault where it appeared that licensee,  who had a spotless history of law-abiding behavior and showed substantial regard for passenger safety, reacted to extraordinary provocation)

[12] *See* Francois at 6 (citing prior suspensions).

[13] *See* Francois at 8 (citing driver's 30-year tenure).

[14] *Nnebe*, 931 F.3d at 87-88 ("We emphasize that we do not require an inquiry into factual guilt or innocence to satisfy the due process inquiry; rather, a hearing that encompasses some level of conduct-specific findings based upon the facts underlying the complaint and the driver's history and characteristics, for example, would be sufficient"); TLC v. Singh, OATH Index No. 701/20 at 7 (Nov. 1,

(7) the driver's age and maturity (such as whether he supports a family)[15];

(8) The facts and circumstances surrounding the arrest[16];

(9) whether there are mitigating factors as to the alleged offense[17]; and

(10) whether the alleged offense occurred while the driver was on-duty and involved a passenger or TLC official.[18]

This list is not meant to be exhaustive, but would be a necessary guide to an ALJ's or the chair's determination of dangerousness.

### M. Chair Review Should Be Abolished or Limited

The most egregious aspect of defendant's post suspension practice was chair review of ALJ decisions. For more than a decade, the chair rejected each and every ALJ recommendation to reinstate. 931 F.3d at 74. This overriding aspect certainly influenced and biased the ALJs, who knew any recommendation favoring a driver would be rejected— and that any recommendation to continue a suspension would be accepted. Even recently, when the chair has accepted pro-driver recommendations, chair review causes unreasonable delay in the post-suspension process.

2019), adopted (Nov. 19, 2019) (suspension lifted for licensee charged with assault where it appeared that licensee, who had a spotless history of law-abiding behavior and showed substantial regard for passenger safety, reacted to extraordinary provocation); Francois at 4 ("'the overall record and character' of the respondent falls short of establishing that he poses a continuing direct and substantial threat to the public safety").

[15] *See* Ibrahim at 4 ("Respondent impressed me as a mature, credible witness"); Francois at 5 (noting that driver is sole supporter of his family).

[16] *Nnebe*, 931 F.3d at 90 ("the TLC must allow drivers to argue that the circumstances surrounding their arrest show that there is no reason to deem them a danger").

[17] *Id.* at 82 ("The underlying conduct, while perhaps satisfying the elements of a crime on the TLC's list, may also be such as to persuade an ALJ and the TLC Chair that the offense was technical or mitigated, such that continuation of the driver's license did not pose the kind of threat conjured by the general nature of the crime charged"); Taxi & Limousine Comm 'n v. Singh, OATH Index No. 701/20 at 6 (Nov. 1, 2019) ("this appears to be the type of situation discussed in *Nnebe*, where underlying conduct meets the technical definition of a crime, but does not show that the driver posed the kind of danger 'conjured by the general nature of the crime charged'"); Francois at 8 (lifting suspension where "conduct is mitigated").

[18] 931 F.3d at 82 ("Thus, for example, in the majority of cases, the further removed the crime is from the driver's job, the less 'direct' the threat may be if he or she remains licensed. Depending on the surrounding circumstances and the driver's history, the threat may also be more or less 'substantial'").

Worse, nothing in the TLC rules imposed any standard on the chair; he could be entirely arbitrary. Nor do the rules require the chair to afford any deference to the ALJs who actually heard the testimony and reviewed the evidence at hearings. As the TLC both initiated the suspensions and was the ultimate adjudicator, the TLC chair was a judge in his own case. Under New York law, serving as both prosecutor and adjudicator presents at minimum an appearance of unfairness or impartiality that requires recusal. *General Motors Corp.-Delco Prods. Div. v. Rosa*, 82 NY2d 183, 188 (1993); *Beer Garden v. New York State Liv. Auth.*, 79 N.Y.2d 266, 278 (1992) ("Fundamental fairness requires at least that one who participates in a case on behalf of any party . . . take no part in the decision of that case").

For these reasons, this Court should order that chair review be abolished. In the alternative, this Court should order that the chair review be deferential to the ALJs. Specifically, the chair should only be allowed to reject an ALJ recommendation to reinstate based on a written statement that finds the recommendation to be clearly erroneous or plainly unsupported by the evidence. In any event, there is simply no reason the chair may take 60 days to review an ALJ decision while the driver continues to lose his livelihood. The chair, if allowed to review at all, should rule in no more than five days.

### N. Each Aspect of the Post-Suspension Process should be Accelerated with ALJ Decisions Being Given Immediate Effect

Between scheduling the hearing (which must be within 10 days of the request, but sometimes takes longer), the drafting of a decision, and chair review (which can extend to 60 days) the post-suspension hearing process is rarely prompt. Indeed, on average, since the Second Circuit ruled, on average, the chair took 90 days from the suspension date to rule. While the Court of Appeals seems to accept that a hearing within ten days of the suspension was "a prompt

post-deprivation hearing" consistent with due process of law, 931 F.3d at 87, it certainly did not

hold or suggest that a ninety-day process is constitutionally acceptable.

The Supreme Court and the Second Circuit have both consistently held that for a hearing

to comport with due process it must be prompt as well as meaningful. *Barry v. Barchi*, 443 U.S.

55, 66 (1979) ("we have held that the opportunity to be heard must be "at a meaningful time and

in a meaningful manner") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also*

*Gilbert v. Homar*, 520 U.S. 924 (1997) ("So long as a suspended employee receives a

sufficiently prompt post-suspension hearing, the lost income is relatively insubstantial");

*Krimstock v. Kelly*, 306 F.3d 40, 69–70 (2d Cir.2002). For this reason, on remand in *Krimstock*,

the district court ordered that the OATH judge must decide the issues "not later than three

business days following the close of evidence and the completion of argument, if any, at the

hearing, unless both parties have consented on the record or in writing to extend the time." If not,

the  seized vehicle must be returned. *Krimstock* Order, Sept. 27, 2007, ¶ 3, Ex. 16. By contrast,

neither TLC rules nor OATH rules imposes any time limit on the recommended decisions of

OATH judges.

Consistent with this precedent, each phase of the process be accelerated. First, ALJs

should be encouraged to rule from the bench, with written opinions to follow. Where an ALJ has

heard testimony and considered evidence and decided that the driver does not pose a direct and

substantial threat to public safety, there is no ground for delaying his return to service. Thus, an

ALJ's recommendation should be given immediate effect rather than waiting for the chair to

adopt it. As plaintiffs propose above, chair review should be eliminated or limited and

accelerated. If there is to be any chair review at all, the chair could reject the ALJ decision at a

later date and, if necessary, re-impose the suspension. This practice would eliminate the delay

caused by chair review, which is, in any event, the most dubious part of the entire post-suspension process.

### O.  No Suspension until there is Written Notice; Automatic Scheduling of Post-Suspension Hearings

The TLC's current system is ineffective because, if for no other reason, it is barely used as a result of it being confusing, the pre-hearing notices being defective, and the longstanding view that is futile.[19] As detailed above, the vast majority of drivers who are suspended on arrest are never convicted of their arrest crimes and are reinstated, but also never have a post-suspension hearing. In order to encourage drivers to take advantage of their rights, the TLC should schedule a hearing in every case rather than putting the onus on the driver to do so. The TLC could demand that a driver confirm his desire for a hearing and if a driver wants to waive his right to a hearing he should be allowed to do so. But by making a hearing the default option, waivers are likely to be knowing and voluntary.

In their pre-motion letter, defendants take umbrage at this idea and lament "the administrative burden (both for OATH and TLC) of scheduling and preparing for numerous hearings that will never take place." ECF # 450. But the TLC would only have to "prepare" for hearings that drivers confirm. If there are too many hearings for OATH, the rules could be amended so hearings could also be held at the OATH Taxi & Limousine Tribunal, a separate tribunal that "holds hearings for summonses issued by the NYC Taxi and Limousine

---

[19] The TLC's written suspension notice often does not arrive until after the TLC has electronically blocked the driver's access to the taxi's meter or until after an e-hail taxi company (such as Uber) has blocked the driver from its app. There is no reason that the suspension should be enacted without or before any explanation. The TLC should not be allowed to suspend until it has sent a notice and given reasonable amount of time for it to be received (three days if the notice is sent by mail or one-day if sent by e-mail).

Commission."[20] Also, the TLC could easily reduce the number of hearings by reviewing the driver's record before it suspends and by deciding that in some (or most) cases, the known facts do not warrant a suspension.

### P.  ALJ Rulings Should be Anonymous

OATH ALJs have generally denied driver's request to omit their name from their decisions. *See, e.g.*, TLC v. Sow, OATH Index No. 467/20 at 1 n. 1 (Oct. 15, 2019), adopted (Oct. 17, 2019). In doing so, the ALJs have cited OATH Rule 1-49(d), which provides, "Unless the administrative law judge finds that legally recognized grounds exist to omit information from a decision, all decisions will be published without redaction." Thus OATH decisions remain public and posted on the OATH website even after arrest charges are dismissed. This practice violates at least the spirit of NY Criminal Procedure Law § 160-50, which generally requires that arrest records be sealed after the criminal action is terminated in favor of the accused. The practice is known to dissuade drivers from seeking a hearing because the fact of their arrest and even detailed and inculpatory—but false—allegations will become part of the public record, even if a decision is in their favor and even after criminal charges are dismissed. Ader Decl. ¶ 6.

### Q.  Pre-Hearing Notices Should Fully Inform the Drivers about the Issues and Evidence to be Considered at the Hearing

The TLC's suspension notice and its pre-hearing notice should both inform drivers of their right to a hearing and that the issue to be determined is not whether they have been arrested, but whether they pose a direct and substantial threat going forward. It should also inform drivers of their right to present testimony and offer evidence and of the factors that the ALJ shall consider. The factors would be the same as those stated in the TLC and listed in Section III.C, above. A

---

[20] A description of this tribunal, which is also part of the Office of Administrative Trials and Hearings is at the OATH-TLT website: http://home2.nyc.gov/html/oath/downloads/pdf/tlt_trib_brochures/OATH_TLT_Brochure.pdf.

proposed form of notice is included at Ex. 15. Stating the standard and listing these factors will

cost the TLC nothing. But doing so will allow for fair hearings and will encourage drivers to

exercise their constitutional rights, which are both in everybody's interest.

## X.   THE TLC SHOULD BE REQUIRED TO PUBLICIZE ITS NEW PRACTICES AND TO COLLECT AND REPORT DATA ABOUT THEIR OPERATION

The TLC routinely communicates with the taxi industry, with drivers and with the public

through blast e-mails, industry notices, public rulemaking and press releases. Since the Court of

Appeals' Decision, the agency has issued six industry notices. *See*

https://www1.nyc.gov/site/tlc/about/industry-notices.page. It has passed two new sets of rules

and proposed two others. *See* https://www1.nyc.gov/site/tlc/about/tlc-rules.page. In that time,

however, the TLC has not issued or proposed any new rule regarding suspensions on arrest. It

has not communicated any new policy. It has not even acknowledged the Court of Appeals

Decision.

Meanwhile, in their pre-motion letter, defendants insist their "current summary suspension

procedures currently [sic] comport with *Nnebe*." Whatever the truth of that statement, the TLC

has not acted in a way any functioning agency would by informing its constituents of new

policies or practices. If the TLC is now, for example, following a practice that meaningfully

differs from those the Court of Appeals held unconstitutional, it should be required to announce

those changes to drivers and to amend its rules. And, of course, it must seek approval of this

Court, which is required to craft a remedy. If the TLC acted properly, drivers who are suspended

might know their rights and take advantage of them. The TLC should also be required to issue

periodic reports concerning the number of suspensions, the number of hearings, and the number

of reinstatements. The TLC's failure to do so speaks to its continuing preference that drivers who

are summarily suspended—and are likely to be reinstated ultimately—not be afforded prompt and meaningful review of those suspensions.

## CONCLUSION

The Court of Appeals spoke clearly that the TLC's longstanding practices were unconstitutional. Still the agency, while suspending more drivers than ever, has failed to engage in meaningful reform—even in response to an ongoing public health crisis—and has not so much as acknowledged the Decision. For the reasons stated, this Court should preliminarily enjoin defendants from suspending drivers based on arrests until it installs a post-suspension regime that is consistent with due process of law and should also enjoin suspensions-on-arrest generally during the Covid-19 crisis. Finally, the Court should order a permanent injunction mandating significant reforms in the TLC's post-suspension process as to provide prompt, meaningful and accurate review of summary suspensions consistent with the regulatory standard.

Dated: New York, New York
     April 9, 2020

/s/_____

| | | |
|---|---|---|
| Daniel L. Ackman | David T. Goldberg | Shannon Liss-Riordan |
| Law Office of Daniel L. Ackman | Donahue, Goldberg, Weaver & Littleton | Lichten & Liss-Riordan, P.C. |
| 222 Broadway, 19th Floor | 109 S. 5th Street, Suite 4201 | 729 Boylston Street, Suite 2000 |
| New York, NY 10038 | Brooklyn, NY 11249 | Boston, Massachusetts 02116 |
| Tel: 917-282-8178 | Tel: 212.334.8813 | Tel: 617-994-5800 |
| dan@danackmanlaw.com | david@donahuegoldberg.com | sliss@llrlaw.com |

Attorneys for Plaintiffs