UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN NNEBE, *et al.*, | |
| Plaintiffs, | No. 06-cv-4991 (RJS) |
| -v- | OPINION & ORDER |
| MATTHEW DAUS, *et al.*, | |
| Defendants. | |

RICHARD J. SULLIVAN, Circuit Judge:

Defendants move to alter the judgment (Doc. No. 690 ("MAJ")) and for declaratory judgment (Doc. No. 693 ("MDJ")) with respect to damages in this long-running dispute. Both motions arise out of Plaintiffs' constitutional challenge to a policy under which the New York City Taxi and Limousine Commission ("TLC") summarily suspended taxi drivers upon notification of their arrest. The first motion seeks to alter the December 22, 2023 judgment awarding compensatory damages to ten classmembers who prevailed at a jury trial held in November 2023. The second motion requests a declaration that classmembers who did not previously request a damages hearing are entitled to only nominal damages. For the reasons stated below, Defendants' motions are DENIED.

## BACKGROUND

The Court presumes the parties' familiarity with the facts and history of this case, which have been described at length in prior orders both by this Court and the United States Court of Appeals for the Second Circuit. *See, e.g.*, *Nnebe v. Daus*, 665 F. Supp. 2d 311, 315–19 (S.D.N.Y. 2009) ("*Nnebe I*"); *Nnebe v. Daus*, No. 06-cv-4991 (RJS), 2014 WL 3891343, at *2–12 (S.D.N.Y. Aug. 8, 2014) ("*Nnebe II*"); *Nnebe v. Daus*, 184 F. Supp. 3d 54, 57–61 (S.D.N.Y. 2016) ("*Nnebe III*"); *Nnebe v. Daus*, 510 F. Supp. 3d 179, 184−88 (S.D.N.Y. 2020) ("*Nnebe IV*"); *Nnebe v. Daus*,

No. 06-cv-4991 (RJS), 2022 WL 615039, at *1–4 (S.D.N.Y. Mar. 1, 2022) ("*Nnebe V*"); *see also Nnebe v. Daus*, 644 F.3d 147, 150–55 (2d Cir. 2011) ("*Nnebe 2011 Appeal*"); *Nnebe v. Daus*, 931 F.3d 66, 70−79 (2d Cir. 2019) ("*Nnebe 2019 Appeal*").

In brief, this case presents a dispute in which taxi drivers have challenged the TLC's policy of summarily suspending drivers who are arrested for certain crimes. *See Nnebe V*, 2022 WL 615039, at *1–2. After years of litigation and several appeals, the Second Circuit determined in 2019 that the TLC's summary-suspension policy violated the drivers' due process rights by failing to provide an adequate reinstatement hearing for drivers to challenge the basis of their summary suspensions. *See id.* at *2. On remand, Plaintiffs moved to certify a class of all TLC-licensed drivers who were suspended under the TLC policy between 2003 and 2020. *See id.* at *3.

In March 2022, the Court granted that motion in part and certified an issue class as to liability alone, pursuant to Federal Rule of Civil Procedure 23(b)(3) and (c)(4). *See id.* at *6. Significantly, the Court declined to certify a class on damages, explaining that while the issue of liability hinged on a common question – whether the TLC's policy violated due process – the damages due to each classmember was a "highly individualized" inquiry. *Id.* at *7. The Court thus invited the parties to propose a framework for holding hearings on individualized damages. *See id.* at *14.

After receiving proposals and hearing argument, the Court ordered the dissemination of a Class Notice that permitted classmembers to opt out of the issue class on liability but did not, at that time, "require [them] to indicate . . . whether they intend[ed] to seek a damages hearing." (Doc. No. 544 at 1–2.) The Class Notice that was distributed in May 2022 informed classmembers that the TLC summary-suspension policy "denied suspended drivers their constitutional right to due process of law," that a class had been certified on that issue, and that any judgment as to that

issue would be "binding on all members of the Class" who did not opt out. (*Id.* at 5–6.) The Class Notice also stated that recipients "do not need to do anything to remain in the Class and receive nominal damages and the possibility of obtaining additional compensatory damages." (*Id.* at 6.)

After the Class Notice was mailed, only twelve drivers opted out of the issue class. (Doc. No. 550 at 2.) In August 2022, the Court directed Plaintiffs to supply a list of classmembers who wished to pursue damages at an individualized hearing. (Doc. No. 551.) Over the next five months, 8,273 classmembers notified Plaintiffs' counsel that they wished to pursue a damages hearing. (Doc. No. 573 at 1.) The Court thereafter determined that it would preside over a bellwether jury trial that adjudicated the damages for a first group of twenty classmembers selected at random. (Doc. No. 592.)

The Court held the jury trial in November 2023. Of the twenty classmembers selected, ten ultimately declined to participate in the trial. (Doc. Nos. 601, 630, 651.) The remaining ten all appeared and gave testimony about their suspensions, their past earnings as drivers, and the emotional distress they suffered while they were suspended. The jury also heard testimony from several other witnesses for Plaintiffs. At the close of Plaintiffs' case, Defendants made an oral motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). (Doc. Nos. 657, 659, 661, 663 ("Trial Tr.") at 303–04.)[1] In their brief remarks in support of that motion, Defendants argued that "none of the plaintiffs have produced any reliable or other evidence other than their own testimony about their lost income," which would preclude Plaintiffs from recovering any damages. (*Id.*) The Court reserved decision. (*Id.* at 306.) Defendants then called

---

[1] Defendants also made a Rule 50 motion with respect to one of the Plaintiffs (Kamara-Jai Njenga Warren), which is not at issue here.

their sole witness – a TLC lawyer who testified as to the TLC's summary-suspension policy and the reinstatement hearing process – before resting their case.

After a half day of deliberations, the jury returned a verdict awarding lost wages and emotional distress damages to each of the ten Plaintiffs who proceeded to trial. (Doc. No. 656-19 ("Verdict Sheet").) The Court reduced the verdict to a judgment on December 22, 2023. (Doc. No. 679.) The Court also entered judgment with respect to the ten absent Plaintiffs who declined to appear at the damages trial, awarding $1 in nominal damages to each. (*Id.*)

On January 19, 2024, Defendants filed the two motions at issue here. The first asks the Court to alter the judgment under Rules 50, 59, and 60. (MAJ at 1.) The second is described as a "motion for declaratory judgment" and asks the Court to issue an order declaring that all classmembers who failed to request a damages hearing are entitled to only nominal damages. (MDJ at 2.)

## DISCUSSION

I.    **Defendants' Motion to Amend the Judgment Under Rules 50, 59, and 60**

Defendants' motion to amend the judgment seeks relief pursuant to Federal Rules of Civil Procedure 50(b)(3), 59(e), and 60(b)(1). Rule 50 allows a party to move for judgment as a matter of law. *See* Fed. R. Civ. P. 50. This rule "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)). This burden is heavier still when "the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Id.* (internal quotation marks omitted). For these posttrial motions under Rule 50(b), the court may set aside the verdict only if "there exists such a complete absence of evidence supporting the verdict that the jury's findings

4

could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair[-]minded persons could not arrive at a verdict against it." *Id.* (internal quotation marks omitted).  Rule 50(b) has a strict preservation rule under which posttrial motions "can properly be made only if, and to the extent that, such a motion specifying the same grounds was made prior to the submission of the case to the jury." *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997).  "A Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a[n] . . . argument based on the latter." *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012).  If a party moves under Rule 50(b) on an unpreserved ground, "the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice," which "exists where a jury's verdict is wholly without legal support." *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).

Rule 59(e) authorizes a district court to "alter or amend [a] judgment to correct a clear error of law or prevent injustice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (internal quotation marks omitted).  This type of "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly."  11 Wright & Miller, *Federal Practice & Procedure* § 2810.1 (3d ed. 2024).  Moreover, a party may not "obtain judgment as a matter of law under Rule 59(e) after failing to comply with the carefully crafted structure and standards of Rules 50 and 51." *ING Glob.*, 757 F.3d at 96.  Thus, a party cannot obtain judgment as a matter of law under Rule 59(e) on grounds of insufficient evidence if the party did not make a timely motion under Rule 50(a).  *See id.*  Likewise, a party cannot obtain judgment as a matter of law under Rule 59(e) on grounds of an incorrect jury instruction if the party did not timely object to the jury charge before it was delivered, as required by Rule 51.  *See id.* at 97.

Rule 60(b)(1) allows a party to seek relief from a final judgment based on a "mistake," which may include "a judge's error of law." *Kemp v. United States*, 596 U.S. 528, 530 (2022). "[S]ince [Rule] 60(b) allows extraordinary judicial relief, it is invoked only if the moving party meets its burden of demonstrating exceptional circumstances." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1142 (2d Cir. 1994) (internal quotation marks omitted). This generally requires the movant to offer "highly convincing" evidence of error and "good cause for the failure to act sooner." *Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987) (internal quotation marks omitted).

### A. *Lost Wages Damages*

Defendants maintain that the lost wages damages awarded to the ten trial Plaintiffs should be set aside under Rules 50(b)(3) and 59(e) because those Plaintiffs did not provide "[]sufficiently certain" testimony about their past earnings. (MAJ at 5.)[2] Defendants make two arguments in support of this motion. First, Defendants contend that Plaintiffs could not have proven their damages with reasonable certainty because they failed to corroborate their testimony about their past earnings with documentation. (*Id.* at 5–6.) Second, Defendants assert that Plaintiffs did not establish their lost wages with reasonable certainty because each offered only his own "vague" testimony that merely specified his weekly or monthly earnings in a "range" instead of an exact number. (*Id.* at 11.) Neither argument is persuasive.

#### 1. *Corroboration of Lost Wages Testimony*

As a general matter, compensatory damages must be established with "reasonable certainty." *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 108 (2d Cir. 2014) (internal

---

[2] This motion renews the Rule 50(a) motion that Defendants made at the close of Plaintiffs' case, which likewise argued that Plaintiffs had not proven their lost wages damages with the required "degree of certainty." (Trial Tr. at 303.) This aspect of Defendants' motion to alter the judgment is therefore properly preserved. *See McCardle*, 131 F.3d at 51.

6

quotation marks omitted); *see also Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 290 (2d Cir. 2023). But reasonable certainty does not equate to the establishment of damages with absolute precision. "The law . . . requires only that damages be capable of measurement based upon known reliable factors without undue speculation." *Myheal Techs., Inc. v. Fonar Corp.*, 100 F.3d 944, 944 (2d Cir. 1996) (unpublished) (internal quotation marks omitted).

Here, Defendants argue that Plaintiffs failed to establish their lost wages damages with reasonable certainty because Plaintiffs did not corroborate their testimony about their driving wages with documents or other evidence. But the Court is not persuaded that federal law strictly requires such corroboration. Indeed, Judge Gardephe rejected that very argument more than a decade ago, concluding that there is no rule "that a plaintiff's testimony is insufficient as a matter of federal law to support an award of compensatory damages for lost wages." *Tatum v. Jackson*, 668 F. Supp. 2d 584, 601 n.15 (S.D.N.Y. 2009).[3] And while the Second Circuit itself has not weighed in on this issue of federal law, other circuits have – and have generally recognized that the factfinder may calculate lost wages damages based on a plaintiff's testimony alone. *See, e.g.*, *Travers v. Flight Servs. & Sys., Inc.*, 808 F.3d 525, 539 (1st Cir. 2015) ("A jury, in making the loss calculation, could . . . rely on [plaintiff's] testimony about what he had lost and [was not] required instead to rely only on what [plaintiff] reported in terms of tip income."); *Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 461 (7th Cir. 2006) ("In calculating lost income, the district court is free to credit the plaintiffs' testimony regarding their sources and level of

---

[3] As Judge Gardephe explained, the corroboration issue is a matter of federal law, not state law. *See Tatum*, 668 F. Supp. 2d at 601 n.15. But even if the law of the forum state – New York – did apply, Plaintiffs' lost wages awards would still stand, since New York law permits plaintiffs to recover damages based solely on uncorroborated testimony. *See Norcia v. Dieber's Castle Tavern, Ltd.*, 980 F. Supp. 2d 492, 503 (S.D.N.Y. 2013) ("Damages for loss of past earnings may be awarded 'based solely on plaintiff's testimony without supporting documentation.'" (quoting *Kane v. Coundorous*, 783 N.Y.S.2d 530, 531 (1st Dep't 2004))); *see also Cenite v. Pyramid Floor Covering, Inc.*, 960 N.Y.S.2d 310, 310 (1st Dep't 2013) ("Although the lost earnings award was based solely on plaintiff's testimony, without supporting documentation, defendant did not challenge the testimony by using plaintiff's employment records or any other evidence.").

7

income."); *Prescod v. AMR, Inc.*, 109 F. App'x 155, 156–57 (9th Cir. 2004) (holding that "lost income" may be awarded "based on credible testimony alone").

In short, Plaintiffs were not required to support their lost wages testimony with documentary proof. If Defendants wished to contest those claims, then the proper route was to challenge Plaintiffs' testimony through cross-examination or by introduction of contradictory evidence. Defendants failed to do so here. Indeed, they did not meaningfully cross any of the Plaintiffs on their claimed earnings, nor did they introduce any evidence to contradict or even cast doubt on Plaintiffs' claims.[4] And although Defendants easily could have obtained and introduced documents to check Plaintiffs' testimony on their earnings, such as their TLC earnings records, Defendants failed to produce a witness who could authenticate those records at trial (Trial Tr. at 350–55) and likewise failed to move to compel production of Plaintiffs' tax returns after Plaintiffs did not produce other financial records in contravention of the Court's discovery order (*id.* at 71).[5]

At bottom, Plaintiffs' testimony on their lost earnings went unchallenged, largely due to Defendants' own failures to obtain and introduce contradictory evidence or to meaningfully cross-examine the individual Plaintiffs. As was its right, the jury credited Plaintiffs' uncontroverted

---

[4] *See, e.g.*, Trial Tr. at 66 (cross-examining Olson Weekes by asking two questions to establish that he lacked documentary support for his lost wages claims but without otherwise challenging the extent of his claimed past earnings or establishing why his failure to retain records relating to his earnings in 2018 was unreasonable); *id.* at 96 (cross-examining Lenny Polanco by pointing out that he was seeking *less* money in lost wages than his financial disclosure documents indicated); *id.* at 116–18 (cross-examining Souleymane Diaby without asking a single question about the extent of his past earnings); *id.* at 149–50 (cross-examining Carlos Gonzabay by asking four questions to establish that he lacked documentary support for his lost wages claims but without otherwise challenging the extent of his claimed past earnings); *id.* at 174–75 (similar for Kevin O'Malley); *id.* at 197–98 (similar for Khadim Diop); *id.* at 221 (similar for Dilawer Khan); *id.* at 250–51 (similar for Ning Zhang); *id.* at 268 (similar for Abdoul Diane); *id.* at 298–99 (similar for Kamara-Jai Njenga Warren).

[5] In opposing Defendants' request for Plaintiffs' tax returns, Plaintiffs agreed to "produce all relevant non-tax return documents in their possession that relate to, or identify, income during relevant years – including but not limited to W-2 forms, 1099 forms, wage statements, and disability or unemployment payments." (Doc. No. 603 at 3.) In light of that representation, the Court ruled that Plaintiffs need not produce their tax returns. As it turned out, however, Plaintiffs produced no such documents to Defendants. who nonetheless – and inexplicably – waited until the eve of trial to bring this fact to the Court's attention. Had the Court been aware that Plaintiffs did not intend to produce any income documents to Defendants, it would have ordered them to produce their tax returns. (Trial Tr. at 71.) In light of this conduct, Plaintiffs are on notice that future requests for their tax returns will be granted.

testimony when it calculated damages for lost earnings. (*See generally* Verdict Sheet (awarding damages roughly based on Plaintiffs' claimed past earnings).) Defendants thus are not entitled to judgment as a matter of law on this issue under Rules 50 or 59.[6]

### 2. *Estimated Ranges of Lost Wages*

Separate from their corroboration challenge, Defendants also argue that Plaintiffs lost wages awards should be set aside because Plaintiffs estimated their past earnings using approximate ranges. (MAJ at 6–11.) As above, this issue turns on the "reasonable certainty" standard – namely, whether Plaintiffs' testimony about their past earnings was enough to calculate their lost wages damages with legally sufficient precision. But again, Plaintiffs were not required to prove their damages with mathematical precision, as most damages awards are an "approximation." *Myheal Techs.*, 100 F.3d at 944 (internal quotation marks omitted). Indeed, the degree of certainty required varies from case to case, depending on what evidence each plaintiff "might reasonably be expected to [have] available under the circumstances." Restatement (Second) of Torts § 912 cmt. d (Am. L. Inst. 1979).

Given the circumstances of this case, the Court has no hesitation concluding that the testimony offered was sufficient to establish Plaintiffs' lost wages with reasonable certainty. For starters, the drivers were estimating the wages they *would* have made in a hypothetical scenario, which means that any damages for lost wages would necessarily be approximate. And while each Plaintiff testified as to his approximate monthly earnings prior to his suspension, those ranges were fairly precise. Olson Weekes, for instance, testified that he earned around $2,000 to 2,500 per month (Trial Tr. at 50–51); Lenny Polanco said he took home between $4,000 to 4,500 (*id.* at 75,

---

[6] Defendants also ask, in a single sentence, that Zhang's jury award be set aside because he failed to comply with the Court's order that all income-related documents (other than tax returns) be disclosed. (MAJ at 12.) But Defendants did not preserve this argument in their Rule 50(a) motion and the Court thus declines to consider it.

9

102–03); and Dilawer Khan stated that he earned monthly wages of $5,000 to 6,000 (*id.* at 208). On the higher end, Souleymane Diaby told the jury that he made $8,000 per month (*id.* at 113–14), while Carlos Gonzabay said he made $8,000 to 9,000 (*id.* at 121–22). But while the monthly wages asserted by the Plaintiffs differed, these differences were consistent with the Plaintiffs' testimony concerning their hours worked and the years during which they drove. All told, the largest "range" in monthly income provided by a Plaintiff was only $1,200. (*Id.* at 195–96 (Khadim Diop's testimony that he earned $4,800 to 6,000).) These ranges can hardly be said to be unreasonable here, given that the earnings of taxi drivers generally fluctuate from month to month. (*Id.* at 279 (testimony about how driver earnings vary).). And all but one of the Plaintiffs' suspensions occurred more than five years before the trial – several over a decade prior – which makes the use of approximate ranges even more justifiable. (Doc. No. 651-1.) In short, given that approximations were unavoidable and that the ranges provided were relatively narrow, Plaintiffs' estimations were sufficient to establish their lost wages with reasonable certainty under the circumstances.

  B. *Emotional Distress Damages*

  Defendants also argue that nine of the ten awards for emotional distress damages should be set aside because those nine Plaintiffs did not corroborate their testimony about their emotional distress. (MAJ at 13.) According to Defendants, a plaintiff who does not physically manifest his emotional distress can obtain damages for emotional distress only if he substantiates his claims of distress with other evidence. (*Id.*) Because only one Plaintiff (Gonzabay) claimed a physical manifestation and the remaining nine failed to corroborate their emotional distress claims, Defendants assert that those nine emotional distress awards should be struck under Rule 50(b)(3) or 59(e).

This challenge fails for the simple reason that Defendants did not properly preserve it. Defendants made their oral motion under Rule 50(a) on the sole ground that Plaintiffs failed to establish their lost wages with reasonable certainty. (Trial Tr. at 303–04.)  That motion did not so much as hint that there was a defect in Plaintiffs' emotional distress claims.  Defendants now urge the Court to excuse that failure because the Court itself raised questions as to whether Plaintiffs needed to corroborate their emotional distress claims. (*Id.* at 427–28.)  But the Court flagged that issue during the charge conference, well after Defendants had missed their opportunity to make a timely Rule 50(a) motion.  And even at that point, Defendants still did not ask the Court to modify its proposed instruction on emotional distress damages. (*Id.* at 429.)  At bottom, Defendants repeatedly failed to raise this issue with the Court and thus did not preserve it under Rule 50(a). Defendants thus may obtain relief under Rule 50(b) only if the emotional distress awards are "wholly without legal support" or otherwise constitute a "manifest injustice." *ING Glob.*, 757 F.3d at 97.  That is not the case here.

At trial, each Plaintiff sought so-called "garden[ ]variety" emotional distress damages. *Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006); *see also MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012).  Unlike the "significant" and "egregious" categories of emotional distress awards, garden variety emotional distress claims "lack extraordinary circumstances and are not supported by any medical corroboration." *MacMillan*, 873 F. Supp. 2d at 560 (alterations and internal quotation marks omitted).  As a result, "the evidence of [garden variety] mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Id.* (internal quotation marks omitted).  Because such harm is uncorroborated and not particularly severe, the damages awarded for garden variety

11

emotional distress are fairly modest, "generally" ranging from "$30,000 to $125,000." *Id.* at 561 (internal quotation marks omitted); *see also Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010).

The awards here fell well within those parameters and certainly are not "wholly without legal support." *ING Glob.*, 757 F.3d at 97. In all, the highest emotional distress award was only $10,000 – far below the "$30,000 to $125,000" figures typically given for garden variety claims. *MacMillan*, 873 F. Supp. 2d at 561 (internal quotation marks omitted). The remaining awards were even smaller, including six that were under $3,000. (Verdict Sheet at 1–3, 5, 9–10.) And as even Defendants concede, each of the nine challenged awards were supported by at least some testimony from Plaintiffs about how their suspensions impacted their emotional wellbeing. (MAJ 15–17.)

Defendants are correct that Plaintiffs failed to corroborate their testimony with other evidence. (*Id.* at 13–14.) But as the Court explained during the charge conference, the Second Circuit has never held that such corroboration is required for claims of garden variety emotional distress. (Trial Tr. at 427–28.) And while Defendants point to a 2002 decision from the Second Circuit stating that a plaintiff's subjective testimony is "*generally* insufficient" to sustain an award of emotional distress damages, *Patrolmen's Benevolent Ass'n of N.Y.C. v. City of New York*, 310 F.3d 43, 56 (2d Cir. 2002) (emphasis added), that observation is by definition not a brightline rule and does not compel a different result when (as here) the garden variety emotional distress awards are relatively modest. Indeed, that appears to be the rule followed by the majority of district courts in this Circuit, which do not require corroboration for garden variety emotional distress claims. *See, e.g.*, *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) ("In 'garden variety' emotional distress claims, the evidence of mental suffering is generally limited to the testimony of

the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." (internal quotation marks omitted)); *Mugavero*, 680 F. Supp. 2d at 578 (quoting *Olsen*); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 96–97 (E.D.N.Y. 2020) (same). Given the unsettled nature of this question – and the fact that multiple district courts have endorsed a rule that does not require corroboration for claims of garden variety emotional distress – the Court cannot say that this is one of the extraordinary cases where the emotional distress awards are "wholly without legal support." *ING Glob.*, 757 F.3d at 97. Defendants' motion under Rule 50 must therefore be denied. And because Defendants failed to comply with Rule 50 and similarly failed to object to the Court's jury instructions on emotional distress, the Court also denies their motion under Rule 59(e). *See id.* (holding that a party cannot obtain relief under Rule 59(e) if it failed to comply with Rules 50 and 51).

C. *Reinstatement Hearings*

Defendants next argue that three Plaintiffs – Diop, Khan, and O'Malley – failed to establish eligibility for damages because they did not demonstrate that they would have requested a reinstatement hearing had a constitutionally adequate one been available. (MAJ at 17.) According to Defendants, this entitles them to judgment as a matter of law under Rule 50(b) and Rule 59(e).

As background, the Court instructed the jury that, in order to recover compensatory damages, each Plaintiff would need to show that, had the Defendants provided an adequate reinstatement hearing, (1) "he would have requested a reinstatement hearing," and (2) "he would have secured reinstatement of his taxi license" at that hearing. (Verdict Sheet at 1.) Each Plaintiff testified at trial that he would have requested a hearing had one been available. (MAJ at 17.) Defendants point out, however, that Diop, Khan, and O'Malley gave other testimony that called into question whether they in fact would have requested a hearing. For instance, Diop testified that, although he read the TLC letter informing him of his suspension, he did not notice that portion

13

of the letter indicating that he had a right to a hearing. (Trial Tr. at 197.) Khan testified that he was not even sure he received the TLC letter and, if he did, then he "didn't pay any attention to it." (*Id.* at 219.) O'Malley testified that he read part of the TLC letter but did not read the portion informing him that he could request a reinstatement hearing. (*Id.* at 164.) According to Defendants, it was inconceivable that these three Plaintiffs would have requested a hearing since they failed to fully read the TLC letter they did receive.

Problematically, Defendants again failed to make this argument in their Rule 50(a) motion. (*Id.* at 303 (arguing only that Plaintiffs failed to establish their lost wages with reasonable certainty).) Defendants must therefore show that awarding damages to these three Plaintiffs would be a "manifest injustice" that is "wholly without legal support." *ING Glob.*, 757 F.3d at 97. Once again, Defendants cannot meet that exceedingly high bar here. Each of these three Plaintiffs testified that he would have requested a reinstatement hearing had an adequate one been available to him – testimony that the jury was free to credit. (MAJ at 17.) And other testimony offered at trial supported an inference that these Plaintiffs would have been even more likely to request a hearing if Defendants had provided a constitutionally sufficient hearing process for suspended drivers. In particular, the jury heard testimony from the director of the local taxi union who explained that, when the reinstatement hearing process was constitutionally defective, drivers generally knew that "once you are suspended, it would be almost impossible to have that suspension lifted." (Trial Tr. at 274.) But after Defendants overhauled the reinstatement procedures, the union began to encourage drivers to exercise their right to a hearing, since drivers were much more likely to win reinstatement under the new rules. (*Id.* at 278–79.) One of the Plaintiffs who was suspended under the new hearing format even testified that he decided to seek a reinstatement hearing at the union's encouragement. (*Id.* at 291.) From this testimony, the jury

14

could have reasonably concluded that these Plaintiffs would have requested a hearing if the new, more favorable hearing process had been in place when they were suspended.  Because the Court cannot say that these Plaintiffs' awards were without legal support, Defendants' motion on this ground is denied.

### D. *Suspension Time Periods*

Defendants also ask the Court to amend the judgment under Rule 60(b)(1) on the grounds that the jury awarded each Plaintiff compensation for six extra days of suspension.  (MAJ at 12.)  They argue that, even under the new, constitutionally adequate TLC rules, a driver who prevails at his suspension hearing may still be suspended for at least ten calendar days following the driver's receipt of notice of suspension plus fifteen business days after the driver has requested a hearing.  Because Due Process allows for drivers to be suspended while their reinstatement challenge is pending – up to thirty-one calendar days in total – Defendants argue that thirty-one days of earnings should have been subtracted from each Plaintiff's lost wages award.  Defendants argue, however, that the jury subtracted only twenty-five days from each award and thus ask the Court to "*pro rata* deduct[] . . . six days" of pay from each Plaintiff's award.  (*Id.* at 13.)

The Court agrees that ten calendar days plus fifteen business days of each Plaintiffs' suspension are not recoverable in the lost wages awards.  But even so, Defendants have not established that the jury overcompensated the Plaintiffs, especially not with the sort of "highly convincing" evidence required to set aside a judgment under Rule 60(b)(1).  *Kotlicky*, 817 F.2d at 9 (internal quotation marks omitted).  Defendants elide the fact that the Court correctly instructed the jury on the length of each suspension: "I instruct you that it is therefore not improper for a driver's license to remain suspended up to the time that the driver request[ed] a hearing and for the additional *ten calendar days plus 15 business days* follow[ing] . . . the driver's request for a hearing."  (Trial Tr. at 516 (emphasis added); *see also id.* (instructing the jury on the exact timeline

15

of TLC suspension notices, hearing requests, administrative judge decisions, and TLC chair final determinations).)[7]  Defendants point to no hard evidence that the jury failed to follow these instructions, nor could they given that the verdict form does not reveal how the jury calculated each lost wages award.  (Verdict Sheet at 1 (listing lost earnings as a single dollar figure for each Plaintiff).)  In fact, as Plaintiffs point out, the jury appears to have correctly subtracted about a month of earnings from each Plaintiffs' nominal lost earnings award.  (Opp. to MAJ at 14–15.)  Moreover, the only reason to suspect that the jury might have overcompensated Plaintiffs is that Defendants *themselves* urged the jury to deduct 25 – not 31 – days from each award during their summation.  (Trial Tr. at 480 ("[T]here is a period of time from the request to decision of 25 days that is entirely permissible and, therefore, not compensable in this case.").)  Defendants cannot meet the heavy burden required under Rule 60(b)(1) when their only evidence of a "mistake" is rank speculation that *their own misstatements* might have invited the jury to err.

## II.     Defendants' Motion for Declaratory Judgment

Separate from their motion to amend the judgment, Defendants filed a "motion for declaratory judgment" asking the Court to declare that all classmembers who failed to request a damages hearing are entitled to only nominal damages.  (MDJ at 2.)  Defendants argue that because the Court imposed a deadline – January 27, 2023 – by which classmembers were required to request an individualized damages hearing, and because only 8,273 classmembers did so, the remaining 11,256 classmembers are barred from seeking compensatory damages and may obtain only nominal damages.  (*Id.* at 1.)

As a threshold matter, Defendants' motion is procedurally defective.  "Because an action for a declaratory judgment is an ordinary civil action, a party may not make a *motion* for

---

[7] Defendants did not object to this instruction at trial, nor do they challenge it in their posttrial motion.

16

declaratory judgment, but rather, the party must bring an *action* for a declaratory judgment." *Int'l Bhd. of Teamsters v. E. Conf. of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y. 1995); *see also N.Y. SMSA Ltd. P'ship v. Town of Carmel*, No. 19-cv-10793 (PMH), 2022 WL 624428, at *4 (S.D.N.Y. Mar. 1, 2022) ("A motion for declaratory judgment is inconsistent with the Federal Rules of Civil Procedure."). Declaratory judgment is a remedy, not "a cause of action" or vehicle for a motion. *Chevron Corp. v. Naranjo*, 667 F.3d 232, 245 (2d Cir. 2012) (internal quotation marks omitted). If a party wishes to seek declaratory judgment against its opponent, then the party must already be asserting another "substantive claim" for which declaratory judgment may be awarded as a remedy. *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993). Here, Defendants have not asserted any claim (or counterclaim) against Plaintiffs on which declaratory judgment could be awarded. (Doc. No. 600.) Because there is no cause of action through which the Court could grant a declaratory judgment, Defendants' motion is improper.

In theory, the Court could construe Defendants' motion as one for *summary* judgment as to damages – that is, as a motion under Federal Rule of Civil Procedure 56 asking the Court to rule as a matter of law that the classmembers who did not request a damages hearing (the "Non-Requesting Classmembers") are entitled to only nominal damages. *See, e.g.*, *Int'l Bhd. of Teamsters*, 160 F.R.D. at 456 (construing an improper motion for declaratory judgment as one for summary judgment). But even that motion would still fail on the merits because the Non-Requesting Classmembers may seek damages in *another* forum outside the scope of this proceeding.

Critically, the Court here certified a class under Rule 23(c)(4) as to liability alone. This means that the classmembers who failed to opt out would be bound by a judgment as to liability, but they would not be bound by this Court's rulings on damages. *See* Fed. R. Civ. P. 23(c)(4)

17

advisory committee note to 1966 amendment ("[T]he action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims."); *Bennett v. Dart*, 53 F.4th 419, 420 (7th Cir. 2022) ("A class certified under Rule 23(c)(4) resolves the *issue* [that was certified], not the whole case.  Class[]members . . . receive the benefit of a declaratory judgment (if the class prevails) on the issue but would need to proceed in individual suits to seek damages.").  A classmember in a successful issue class may therefore pursue his damages claims either in "separate hearings" before the district court, *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013), or by filing a new damages action in another forum that relies on the preclusive effect of the district court's classwide ruling as to liability, *see* 2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 18.27 (6th ed. 2023) ("*Newberg & Rubenstein*") (explaining how classmembers may rely on the preclusive effect of classwide findings on the issue of liability against defendants in follow-on damages suits).

After the Second Circuit found that Defendants were liable and this Court certified an issue class as to liability, classmembers seeking compensatory damages could either request a damages hearing in this proceeding or file a follow-on suit in another court.  Although the Court gave classmembers five months to request a damages hearing, the Non-Requesting Classmembers failed to do so and thus waived their right to a damages hearing before this Court.  *See In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 129 (2d Cir. 2011) (explaining, in an analogous context, that classmembers waive their opt-out rights when they fail to adhere to a court-imposed opt-out deadline).[8]  But the fact that the Non-Requesting Classmembers have waived their right to seek

---

[8] Plaintiffs do not argue that the Court should permit the Non-Requesting Classmembers to make belated requests for damages hearings as part of this proceeding.  (Opp. to MDJ at 1–2 (acknowledging that Non-Requesting Classmembers had missed the deadline for damages proceedings but arguing that they are still entitled to "file an action for damages *in another forum* until their statute of limitations expires").)  Nor could they, given that such

18

damages in this case does not necessarily mean that they have waived their right to damages altogether. At least in theory, the Non-Requesting Classmembers could file suits for damages outside of this proceeding and could rely on this Court's classwide liability finding as "a *res judicata* determination of liability." *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 319–20 (S.D. Fla. 2001). In the event that the Non-Requesting Classmembers were to seek damages in another forum through a follow-on suit, Defendants would certainly be free to argue in that forum that the Non-Requesting Classmembers are precluded from pursuing those claims. *See* 2 *Newburg & Rubenstein* § 18.27 (discussing preclusion arguments raised in other forums during follow-on suits). But since this Court did not certify a damages class, it is not the province of this Court to issue a summary judgment ruling on those as-yet hypothetical follow-on suits.

## CONCLUSION

For the reasons set forth above, Defendants' motions are DENIED. IT IS HEREBY ORDERED THAT the parties shall file a joint letter no later than September 27, 2024 proposing next steps and a schedule for the remainder of this litigation, including whether additional damages hearings are necessary for the remaining classmembers who timely requested such a hearing. The joint letter shall also set out, as necessary, any areas of disagreement between the parties. The Clerk of Court is respectfully directed to terminate the motions pending at Doc. Nos. 690–91 and 693.

SO ORDERED.
Dated: September 13, 2024
New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

---

failures may be excused only for "a violation of due process or excusable neglect." *In re Am. Express*, 672 F.3d at 129 (citing Fed. R. Civ. P. 6(b)(1)(B)).