1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  JONATHAN NNEBE, et al.,

4                    Plaintiffs,

5          v.                              06 Civ. 4991 (RJS)

6  MATTHEW DAUS, et al.,

7
                    Defendants.
8
   ------------------------------x
9                                          New York, N.Y.
                                           August 13, 2025
10                                         10:00 a.m.

11 Before:

12                    HON. RICHARD J. SULLIVAN,

13                                         Circuit Court Judge
                                           Sitting By Designation
14                    APPEARANCES

15 LAW OFFICE OF DANIEL L. ACKMAN
        Attorney for Plaintiffs
16 BY:  DANIEL L. ACKMAN

17 LICTHEN & LISS-RIORDAN PC
        Attorneys for Plaintiffs
18 BY:  SHANNON LISS-RIORDAN
        DAVID T. GOLDBERG
19
   NEW YORK CITY LAW DEPARTMENT
20 OFFICE OF CORPORATION COUNSEL
        Attorneys for Defendants
21 BY:  AMY WEINBLATT
        MARCY J. SIMONE
22

23

24

25

```
 1              (In open court; case called)

 2         THE COURT:  Good morning.

 3         ALL:  Good morning, your Honor.

 4         THE COURT:  Let me take appearances for the

 5  plaintiffs.

 6         MS. LISS-RIORDAN:  Your Honor, Shannon Liss-Riordan

 7  for plaintiffs.

 8         MR. ACKMAN:  Daniel Ackman for plaintiffs.

 9         MR. GOLDBERG:  And David Goldberg for plaintiffs.

10         THE COURT:  Ms. Liss-Riordan, Mr. Ackman and

11  Mr. Goldberg, good morning.

12         For the defendants.

13         MS. WEINBLATT:  Good morning, your Honor.  Amy

14  Weinblatt, Assistant Corporation Counsel for defendants.

15         MS. SIMONE:  Good morning, your Honor.  Marcy Simone

16  for defendants.

17         THE COURT:  Yes.

18         Ms. Weinblatt and Ms. Simone, good morning to you.

19         We have a lot of people here in the gallery, some of

20  whom perhaps are class members, I assume.

21         MS. LISS-RIORDAN:  Yes, your Honor, a number of class

22  members are here.

23         THE COURT:  So welcome.  This is a public courtroom,

24  so everyone is welcome.  You are certainly welcome here.  We

25  are here to pass on the fairness of a settlement that has been
```

 1    reached by the parties in this long-running case.  I have the

 2    papers from the parties which are pretty lengthy.

 3            Basically, Ms. Weinblatt, the City is not challenging

 4    the fairness of the settlement.  You're really just focused on

 5    attorneys' fees, is that right?

 6            MS. WEINBLATT:  Yes, your Honor.

 7            THE COURT:  But, I mean, the attorneys' fees are not

 8    coming out of the city's pocket.  They're really coming out of

 9    the plaintiff's pocket, right?

10            MS. WEINBLATT:  That's correct.

11            THE COURT:  But no plaintiff -- as I understand it, no

12    plaintiff has objected to a fee arrangement of up to

13    25 percent, is that correct?

14            MS. LISS-RIORDAN:  That's correct.

15            THE COURT:  Do you agree, Ms. Weinblatt?

16            MS. WEINBLATT:  I do, your Honor.  However, we still

17    assume the Court will apply the reasonableness standard, and

18    that was our argument.

19            THE COURT:  We'll talk more about this in a minute,

20    but I guess maybe we should just start with the preliminaries.

21            So there were 19,000 -- over 19,000 class members in

22    total.  Notice was sent to each of them, or almost each of

23    them.  There were a couple returned undeliverable, but a very

24    high percentage were successfully delivered by either mail,

25    email or other means of communication.  Of those in the class,

1    we now have how many who have filed claims?

2            MS. LISS-RIORDAN:  The number keeps rising every day,

3    but it's somewhere more than 6,000 at this point.  I think I

4    submitted the updated numbers as of Monday.

5            THE COURT:  Okay.  One thing that did puzzle me.

6    There were over 8,000 who represented that they wanted

7    hearings.

8            MS. LISS-RIORDAN:  Yes.

9            THE COURT:  When this was a much riskier proposition.

10           MS. LISS-RIORDAN:  Yes.

11           THE COURT:  Over 8,000 said I want a hearing, and now

12   that it's a sure thing with serious money on the table, for at

13   least many, only 6,000 have come forward.

14           MS. LISS-RIORDAN:  Yes.  We're actually very happy

15   with the claim rate we have so far in a case like this.  I've

16   done many cases like this with kind of sprawling classes going

17   back many years.

18           THE COURT:  I get that, but you have 8,000 --

19           MS. LISS-RIORDAN:  Yes.

20           THE COURT:  You represented that 8,000 wanted

21   hearings.

22           MS. LISS-RIORDAN:  Yes.

23           THE COURT:  They wanted to come to court and testify

24   and do all the things that have to do with having a hearing or

25   trial, actually.

```
 1              MS. LISS-RIORDAN:  Yes.

 2              THE COURT:  And yet of those 8,000 who were

 3    interested, at least 2,000 lost interest.

 4              MS. LISS-RIORDAN:  They haven't.  We still have six

 5    months from approval.

 6              THE COURT:  I get that.

 7              MS. LISS-RIORDAN:  We are doing everything to reach

 8    people.  As I explained this is a hard-to-reach population.  It

 9    took us many months to get the affirmations from the class

10    members that they want the hearings.  We are doing everything

11    we can to reach every single one of them so that they can get

12    the money that is now owed under the settlement, assuming it is

13    approved.

14              So I'm not surprised by it.  In fact, I was very

15    pleased by the claim rate that we received so far for a class

16    such as this.  This is a very, very good claim rate.

17              THE COURT:  I know.  But the rate was much higher for

18    people who said they wanted a hearing.

19              MS. LISS-RIORDAN:  Right, but it took us many months

20    to contact those people and get them to respond.

21              THE COURT:  It wasn't that many.  I can look at the

22    calendar, but I think the issue we sent the same notice to

23    people, effectively the same notice saying do you want a

24    hearing.  And they had, you know, what, 30 days or two months

25    to respond?
```

1              MS. LISS-RIORDAN:  It was more than that.  You

2    extended it at least a couple of times.  It was at least six

3    months in the campaign.  It took a lot of effort.  People

4    moved.  Addresses changed.

5              THE COURT:  But once they said I want a hearing, you

6    got a current address, and you know these are people who were

7    serious with these claims.

8              MS. LISS-RIORDAN:  Yes.

9              THE COURT:  It seems strange there are people who

10   haven't yet come forward.

11             MS. LISS-RIORDAN:  People move frequently.  People are

12   itinerant.  Some people are homeless.

13             THE COURT:  It may be some people who decided they

14   wanted hearings because of the settlement, they're not going to

15   make much because they have less than 30 days.

16             MS. LISS-RIORDAN:  You're right, it is possible that

17   people fall into that category may be less interested than the

18   people who had more than 30-day suspensions.

19             THE COURT:  Now there's some certainty.  Do you have a

20   breakdown as to the percentage of people who have filed?  I

21   mean, you do, right?  You said it was like over 55 percent of

22   people who were suspended for more than 30 days have filed

23   claims, right?

24             MS. LISS-RIORDAN:  No.  No.  No.  Our breakdown is

25   between the people who requested hearings and who didn't

1    request hearings.

2            THE COURT:  Have you done a breakdown otherwise?

3            MS. LISS-RIORDAN:  About 57 percent of those who

4    requested hearings have claims in the settlement, and about

5    12 percent who did not request hearing have claims in the

6    settlement.

7            THE COURT:  Have you done a breakdown in terms of the

8    folks who fit into the various categories?

9            MS. LISS-RIORDAN:  I have it on a spreadsheet, but I'm

10   sorry, I don't have that with me today.

11           THE COURT:  Rough estimate?  You told me -- you

12   represented yesterday or the day before that the number now is

13   about 110 million of the $140 million settlement?

14           MS. LISS-RIORDAN:  A little more than that, yes,

15   that's right.  What typically happens in these cases is that

16   the higher amounts -- the class members who have the higher

17   amounts will claim at higher rates, so I suspect that if I do

18   that math, it will be more of the people with the more

19   substantial worths that were claimed.  I believe it's in the

20   papers how many people had less than 30 days, and I think it

21   was at least a couple thousand.  So if you look at the math,

22   it's really not that surprising.

23           THE COURT:  But, in any event, we're at 110 now.  If

24   we have another few months for people to decide to opt in, not

25   opt in, but to make claims, you think we're going to be close

1     to the 140?

2                 MS. LISS-RIORDAN:  Yes, I'm feeling good about that.

3                 THE COURT:  Two people who opted out, is that correct?

4                 MS. LISS-RIORDAN:  Yes, although one is ambiguous

5     because he opted out and submitted a claim form, so the

6     administrator still needs to figure out what his intentions

7     are.

8                 THE COURT:  What are the reasons for the opt-out?  One

9     sounded ambiguous.  How about the other?

10                MS. LISS-RIORDAN:  No idea.

11                THE COURT:  And nobody still has objected?

12                MS. LISS-RIORDAN:  That's right.  I mean, we have

13    gotten inquiries about the settlement distribution, and I

14    expect that some of the class members who are here today have

15    questions about the settlement distribution, but we haven't

16    received any substantive objections to the settlement itself.

17                THE COURT:  All right.

18                MS. LISS-RIORDAN:  Meaning what category they fall

19    into figuring out their records.  Under the settlement, people

20    have the opportunity to object to the City's records regarding

21    their suspension rates, and we have a process by which the

22    administrator will sort those out through the administrative

23    process.  So I suspect you may be hearing some concerns about

24    that.  That's very typical in these cases, but that's not a --

25    we have not received any objections to the settlement itself.

```
 1              THE COURT:  So, I mean, I have people here.  At least

 2    one indicated sort of they wanted to be heard.  I was at this

 3    point going to see if anybody here has an objection to the

 4    fairness of this settlement?  I can explain what criteria go

 5    into a settlement and assessment as to whether it's a fair

 6    settlement.

 7              I am only interested in the fairness of this

 8    settlement relative to the plaintiffs.  This might be a bad

 9    deal for the City, but that's not part of the inquiry.  Do you

10    agree with that, Ms. Weinblatt?

11              MS. WEINBLATT:  We certainly don't think it's a bad

12    deal, but yes, no objections from the City.

13              THE COURT:  Right.  But, you know, generally the

14    fairness of a class action settlement turns on whether it's

15    fair for the plaintiffs.  We don't want plaintiffs to get

16    hosed, to put it colloquially.  And so the goal is to make sure

17    it is fair for them, recognizing that there is a lot of risk

18    and potential for delay and potential to not win.  I mean, we

19    had one bellwether trial.  We could have had others.  We could

20    have had thousands of others, as it turned out.  So there's a

21    lot of risk, both in terms of delay and the numbers.  I mean, I

22    think that there is a good chance if we had a couple more

23    bellwether trials, those numbers might have come down as the

24    lawyers and the City, in particular, gotten more used to how to

25    defend in a damages case, basically.
```

```
 1              In any event, so I think what I will do now is I will

 2    ask if there are those who wish to speak to make an objection

 3    to this settlement's fairness.  I'll ask you, just raise your

 4    hand.  I'll have you come to the lectern.  I'll ask you then to

 5    state your name, and then I'll ask you to tell me what it is

 6    that you are objecting to.  Okay?

 7              MS. LISS-RIORDAN:  I'm sorry, your Honor.  Also, just

 8    to let you know, Bhai Ravi Desai is here as well.  She's the

 9    executive director for the New York Taxi Workers Alliance.

10    They have been extremely helpful in helping us with outreach to

11    the class.  She can also speak to communications she and her

12    organization have had with many class members.  If you would

13    like that perspective, she's here.

14              THE COURT:  That's good to know.  Thank you.

15              So you were the first hand I saw, so please come up to

16    the lectern over here.

17              I'll get to everybody.  Don't worry about that.

18              Good morning.  If you could just -- everybody -- not

19    everybody is comfortable speaking in a courtroom.  Even lawyers

20    get nervous.  Just speak slowly and clearly.  Use the

21    microphone.  Don't stray from that.  You don't have to eat it.

22    You just have to be within probably six to 12 inches of it.

23    Tell me your name and spell your name for the record.

24              MR. JADA:  My name is -- are you able to hear me all

25    right, your Honor?
```

```
 1                 THE COURT:  Yes.

 2                 MR. JADA:  Are you able to hear me all right, your

 3    Honor?

 4                 THE COURT:  Yes.

 5                 MR. JADA:  My name is Ryan Jada.  R-Y-A-N.  Last name

 6    J-A-D-A.

 7                 THE COURT:  J?

 8                 MR. JADA:  J-A-D-A.

 9                 THE COURT:  J-A-D-A.  Jada?

10                 MR. JADA:  Yes.

11                 THE COURT:  So Mr. Jade?

12                 MR. JADA:  Actually, I'm speaking on behalf of my

13    father at the moment.  He passed away this past Friday.

14                 THE COURT:  So sorry for your loss.

15                 MR. JADA:  I hope that it is okay I can just speak on

16    his behalf?

17                 THE COURT:  Okay.  Sure.  Take a minute.

18                 MR. JADA:  He, you know, he was actually like

19    preparing his outfit for, you know, going to TLC to pick up

20    records the evening before August 8.  My father found out about

21    this case through friends of his who were cab drivers.

22                 He actually hadn't driven a cab in about a decade.

23    The law firm actually didn't -- they did not send us

24    information about where the case was going, and every part of

25    the case we actually had to reach out to the firm to figure out
```

 1    what was going on.  My father wanted a hearing, but he was

 2    unable to do so.  They said he was late.  Somehow by the grace

 3    of God, I think maybe two months ago or a month ago, I had

 4    reached -- he asked me about it.  He was like, oh, whatever

 5    happened with that case?  I kind of forgot.  I sent an email to

 6    the law firm.  They had mentioned that -- I looked it up on the

 7    internet, and I saw that the case was settling.  And I guess in

 8    March they had come to a consensus on how much money,

 9    et cetera, et cetera.

10         So I emailed the law firm.  I said, okay, we'd like to

11    proceed, and they said that because my father was late to the

12    trial, he's eligible to a lesser portion of the settlement.  My

13    father kind of voiced that was unfair because we actually

14    didn't get communication from the lawyers who are, I guess,

15    representing the plaintiffs.

16         So yeah, I guess, you know, because he didn't get a

17    hearing, which he did actually request one.  We kind of have a

18    very extensive record of communication with the law firm

19    regarding requests hearing of the sort.  I'm just going to be

20    frank.  I don't see how, you know, the many TLC drivers who

21    perhaps didn't get communication in the mail are eligible for

22    less money, right?  Like where --

23         THE COURT:  **Well, I mean, I'll have Ms. Liss-Riordan**

24    **respond to this, but, generally speaking, before this was a**

25    **class at all for damages purposes, we were set to have trials**

 1    **for anybody who thought they had a claim for damages.  It**

 2    **turned out that there were 8,000 people who requested those**

 3    **trials.  I mean, the Court directed a notice go out to all**

 4    **members of the class.**

 5           Now it's a class that extends all the way back to

 6    2003, so people move, et cetera.  But efforts were taken to

 7    make sure that last known addresses were utilized, phone

 8    numbers, email addresses as well.  So when did you first learn

 9    about this or your father first learn about this?

10           MR. JADA:  Sorry, your Honor.  My father has had the

11    same address in New York City for the past 30 --

12           THE COURT:  When did he first learn about this case?

13           MR. JADA:  In 2023, I believe, yes.  In 2023 is when

14    my father -- to be honest, that's when I first found out

15    through the case through my father.  He might have known

16    longer.  I don't live at my childhood home any more.  I think

17    when my father reached out to me, and I guess a friend of his

18    had told him about the case.  We saw the date, we sent a fax,

19    like, again, like everything was kind of like last minute that

20    was kind of my pops, I guess.

21           THE COURT:  It sounds like then you shall objecting to

22    the lower percentage recovery rate, which is 37.5 percent--

23           MR. JADA:  Yeah.

24           THE COURT:  -- for those who did not request

25    hearings--

1              MR. JADA:  Yes.

2              THE COURT:  -- in the time period that the Court set

3    for those who wanted hearings to request hearings?

4              MR. JADA:  Yes, your Honor, but at the same time, umm,

5    I guess in my father's case, we actually did request a hearing

6    within the timeframe.  We sent a fax.  We called.  And we

7    also -- we sent a letter as well, like...

8              THE COURT:  Well, I'll ask Ms. Liss-Riordan to respond

9    to that in a minute, but so your objection is that the

10   settlement which calls for a lesser recovery rate which is the

11   rate of 37.5 percent for those who did not request hearings in

12   a timely manner is not fair.  I think you also seem to be

13   suggesting that you maybe did request a hearing in a timely

14   manner and have been excluded from the higher amount.

15             So Ms. Liss-Riordan, are you familiar with Mr. Jada?

16             MS. LISS-RIORDAN:  Yes, I did hear about Mr. Jada's

17   concern, and obviously there were a lot of communications going

18   on.  We had many staff members who were working on accepting

19   these affirmations from class members if they wanted to request

20   a hearing.  I believe Mr. Jada had said that his father

21   submitted a request for a hearing in February of 2023, and I do

22   remember that your Honor extended a couple's of times the date,

23   and it may have just been an administrative error that he

24   wasn't included on the list of people who did request a

25   hearing.  I believe some of the class members who are here have

1    administrative issues with these things, and this is part of

2    what we will work out through the settlement administration

3    process.  So there are some people who are concerned about the

4    fact that there was a strict cutoff for when drivers could

5    request a hearing in order to fall into that category.

6           THE COURT:  That was the cutoff that I set.

7           MS. LISS-RIORDAN:  Yes, exactly.  So we've explained

8    to people that, unfortunately, there was nothing we could do

9    about that because that was set by the Court, but we did our

10   best to keep the records of who timely requested.  There may

11   have been some people who slipped through the cracks, and I'm

12   sure we can work that out through the administration --

13          THE COURT:  Why do you think there were people who

14   slipped through the cracks?  It seems to me the process was set

15   up to not have that happen.

16          MS. LISS-RIORDAN:  Well, as best as we can, we hoped

17   that that did not happen too often, but when you're dealing

18   with thousands of people, there are administration issues that

19   come up.  That's just pretty routine when you're talking about

20   this many people.

21          THE COURT:  All right.  Thank you, Mr. Jada.  That's

22   helpful to hear, and maybe others have similar concerns, so I

23   will listen to them.

24          There is a process built into this settlement for

25   people who dispute whether they made a timely claim or whether

 1    the amount of time that they were suspended is different than

 2    the documents provided by the taxi and limousine commission, so

 3    there is a process to resolve that which will not involve

 4    coming back to court and will not involve, you know, anything

 5    with the court.  The case will have been settled so the

 6    resolution will happen through the claims administration

 7    process that is part of the settlement agreement.

 8              So any other objections you have to the agreement?

 9              MR. JADA:  I apologize.

10              THE COURT:  No need to apologize.  Thank you.  I'm

11    very, very sorry for your loss.

12              MR. JADA:  Thank you.

13              THE COURT:  Sure.  Okay.  The gentleman there.

14              Good morning?

15              MR. OLORODE:  Good morning, your Honor.

16              THE COURT:  If you could please state your name and

17    spell your name for the record.

18              MR. OLORODE:  Good morning your Honor.  My name is

19    Taiwo Olorode.

20              THE COURT:  Could you spell your name?

21              MR. OLORODE:  T-A-I-W-O.  Last name is O-L-O-R-O-D-E.

22              THE COURT:  Pronounce that again for me?

23              MR. OLORODE:  Olorode.

24              THE COURT:  Olorode.

25              MR. OLORODE:  Thank you very much, your Honor, for

1    providing us, the class, some of the class members, the

2    opportunity to speak.

3          THE COURT:  Well, you're very welcome.  I should say

4    you don't even have to thank me, you can thank Congress,

5    because Congress passed a statute that said that a settlement

6    can't be approved in a class action unless there is a fairness

7    hearing at which people have an opportunity to be heard as to

8    the fairness of the settlement.

9          So we are doing this by the book to make sure that I

10   have the information I need to determine whether this is a fair

11   settlement.

12         MR. OLORODE:  I thank the United States Congress.  I

13   thank you, your Honor.  I also thank the counsel for the class

14   members.

15         THE COURT:  Okay.

16         MR. OLORODE:  Your Honor, I don't know whether I have

17   to categorize have to say as an objection, but it's probably

18   best to say it is a cautious note.

19         THE COURT:  Perhaps a concern?

20         MR. OLORODE:  Yes.  I think some of my concerns were

21   raised earlier also at the beginning when you first opened the

22   court today.  You talked about having I think X amount of

23   people and about 2,000 have not returned the form.

24         THE COURT:  Right.  But they will have time to do

25   that.

1              MR. OLORODE:  Right.

2              THE COURT:  So if I approve the settlement, there will

3    be an additional 180 days for people to get in claims who

4    haven't already, which is a lengthy period of time.

5              MR. OLORODE:  Okay.  Your Honor, I'm one of those

6    people that fell in the category of suspension of more than 391

7    days.

8              THE COURT:  Okay.

9              MR. OLORODE:  I recall about two years ago, I think,

10   2023, yeah.  I received a call from somebody from the law firm

11   of Liss-Riordan and Jordon, I think.  So I had several phone

12   conversations with them.

13             THE COURT:  Yes.

14             MR. OLORODE:  In terms of also I went through the

15   process of interrogation with them, with staff members, to

16   figure out what the outcome of the case was.  For the record, I

17   was one of those people that the City never even gave me a

18   chance at all.  It was probably --

19             THE COURT:  Well, did you request a claim?

20             MR. OLORODE:  I actually went --

21             THE COURT:  Did you -- you requested a hearing?  A

22   trial?

23             MR. OLORODE:  Yeah, I went through a hearing.  I went

24   through a hearing before the taxi and limousine commission.

25             THE COURT:  Oh, no.  I'm sorry.  I should be clear.

1    So back in 2023 --

2              MR. OLORODE:  Right.

3              THE COURT:  -- we were trying to figure out whether or

4    not this should be a class action or not a class action.  I

5    certified it as a class action for liability.  The City had

6    violated the rights of people whose licenses were suspended

7    without due process --

8              MR. OLORODE:  Right.

9              THE COURT:  -- consistent with the opinion of the

10   Second Circuit.

11             Then the question was damages.  And so it wasn't clear

12   that we really had a class for damages because every tax driver

13   might have a different set of facts and different

14   circumstances, and so we had to figure out, well, how many

15   people want to have a hearing or a trial in front of the Court,

16   in front of me, to clarify how much they are owed, what their

17   damages are.

18             And so notice went out to the class members.  I

19   directed that it go out.  We settled on a process by which

20   information or notice should be sent out, and 8,000 people

21   responded that they wanted to have an opportunity to contest

22   damages, to make a case for damages.  Well, that would mean

23   8,000 trials.

24             So what we did is we then had what's called a

25   bellwether trial where I basically picked randomly 20 members

 1   of the class, and asked them to come here for the trial date.

 2   Now, of the 20, only ten showed up.  But of the ten who went

 3   forward, they won in varying amounts.  And they were different

 4   amounts.  Not everybody got the same thing.  Some got a few

 5   hundred dollars, and some got a few thousand or tens of

 6   thousands of dollars.  Maybe the lowest was a thousand or

 7   something.  There was quite a range.

 8            But the point is I set a deadline by which anybody who

 9   wanted to have their trial should let me know so we would have

10   an idea as to how many trials this would be, and then I had a

11   cutoff that said if you haven't made a request for a trial at

12   that point, then it's too late.

13            And so were you one of the people who requested a

14   trial?

15            MR. OLORODE:  I verbally requested it with one of the

16   staffs of the attorneys that called me, and what I was told is

17   I would receive something in the mail to indicate to sign it.

18            THE COURT:  And you never got it?

19            MR. OLORODE:  I never got one.

20            THE COURT:  And did you follow up?

21            MR. OLORODE:  I followed up.  As a matter of fact, I

22   actually called the law firm of Riordan Liss today, all you'll

23   keep getting is voice mail.  Nobody picks up the phone any

24   more.  The last time I was able to go back and forth with

25   somebody was two years ago.

1        THE COURT:  Well, when was it that you indicated you

2    had the phone call?

3        MR. OLORODE:  It was sometime in 2023.  It was

4    sometime in 2023.  So the -- I must commend them for a very,

5    very efficient work in working with the City to the point of

6    settling this case, but at the same time during the case

7    without taking the concerns or sending me or bringing me, the

8    class members along properly, it's practically almost like an

9    academic exercise without plaintiffs concerns.

10        THE COURT:  Well, I mean, I did have 8,000 people who

11    said they wanted to do this.  So it wasn't completely

12    ineffective.  It's a large class, and we did have a big return

13    rate.

14        MR. OLORODE:  Right.

15        THE COURT:  So you're saying you had a phone

16    conversation?

17        MR. OLORODE:  Not one.  Actually three phone

18    conversations.

19        THE COURT:  How did you first learn about this case?

20        MR. OLORODE:  I got a -- either I got a letter or

21    either they -- somebody called me.  Actually, they called me

22    from the law firm.  I think it's a Boston number, out of

23    Massachusetts.  So they explained to me what's going on about

24    the case.  That was in 2023.  And they also asked me what was

25    the outcome of the trial of my case before -- at that time with

 1    the TLC.  And I told them that I went to trial and I won.  They

 2    asked me, are you the interested in -- we will represent you.

 3    Are you interested in bringing this case?  We are considering

 4    the case -- considering filing the case against the City.  If

 5    you are interested, they said me, we will be your lawyer, you

 6    understand me, for a trial.  I said yes, I am interested.

 7         I think subsequently the gentleman I was speaking to,

 8    we spoke for nearly 45 minutes or so.  At some point the phone

 9    line went dead, and I called back.  I spoke to another staff

10    who apologized for the gentleman hanging up the phone on me,

11    right?  And since then I never thought of -- I never heard

12    anything else of this case until recently again when I saw the

13    letter saying that people was opting, I think -- or opt out by

14    June or July 21.

15         So I think the fairness of the selecting people,

16    finding -- I'm not saying that that's the intent of all of

17    this.  I think it's probably to -- it's probably in a very --

18    there's something positive behind it, but I think what may not

19    be the original intent is actually what we have here by trying

20    to deselect people, finding ways to deselect the class members.

21         At the end of the day, the reason why this case was

22    instituted against the City was because of the class members,

23    and to now find reasons why this is not entitled -- this is

24    not -- after when you come to a settlement, I think --

25              THE COURT:  Well, the reason it was successful against

1   the City is because a number of plaintiffs, named plaintiffs,

2   individuals came forward with lawyers to bring a case.  They

3   wanted to make it a class action from the beginning, but it

4   didn't become a class until, you know, 2022?  That was within

5   the liability class was established?

6           MR. GOLDBERG:  Yes.

7           THE COURT:  It was a long time coming.  And then the

8   trial, the bellwether trial, that was after there was a class

9   for liability but not yet a class for damages.  The class for

10  damages was not yet -- I mean, a preliminary settlement was not

11  reached with respect to that.  A preliminary certification was

12  not reached with that until 2023.  So, right, 2023 or 2024?

13          Anyway, the trial was in 2024.  It was November 2023

14  when we had the trial.  So, in any event, but it sounds like

15  your concern is similar to Mr. Jada's, which is that there was

16  some confusion around the notice, and so as a result, you are

17  not included among the folks who made claims who are therefore

18  entitled to a larger recovery.  Is that what you're saying?

19          MR. OLORODE:  That is right.

20          THE COURT:  You're in the 37.5 percent recovery?

21          MR. OLORODE:  Potentially.  I don't know because --

22          THE COURT:  Let me pause for a second.  Let me ask

23  Ms. Liss-Riordan or whoever at the front table to respond to

24  that.  It's a similar concern as Mr. Jada.

25          MS. LISS-RIORDAN:  Yes.  As I said, with a class this

1  size, there are going to be some administrative issues.  We

2  understand Mr. Olorode called us, spoke to us, and was

3  interviewed by our staff members.  Our staff members were then

4  to send the notices telling people that they could sign up for

5  a hearing.  Apparently, something happened somewhere along the

6  way.  I can't tell you why he didn't receive that or didn't

7  submit it, but if he told us that he wanted a hearing, I feel

8  like this is one of the administrative issues that we will work

9  out in the administration phase of the case.  He's disputing

10 whether he's in the correct category or not, and we will work

11 these issues out with the City.

12         THE COURT:  I guess the fairness of the settlement

13 will turn, at least in part, on whether or not there's a large

14 number of people who are going to be insisting they are in a

15 category and whether the administrative process is up to it.

16         So have you heard from Mr. Olorode before and Mr. Jada

17 before?

18         MS. LISS-RIORDAN:  I believe we -- I did hear Mr. Jada

19 contacted our firm.  I have not heard about this one.  I

20 expect, again, part of what our staff are going to be continue

21 to be doing after this is working through issues such as this.

22 I will say that, as we put in our papers, we brought on a large

23 number of staff to work on the process of reaching out to class

24 members to sign up for the hearing.  We answered their

25 questions.  We did outreach.  Along with the New York Taxi

 1    Workers Alliance, we did town meetings by Zoom.

 2           After that process, we scaled back our staff somewhat,

 3    so we didn't have as many people to answer the phone, but we

 4    were answering calls that came in and requests for information.

 5    So I apologize if there are going to be some class members who

 6    feel that they didn't receive the information that they wanted,

 7    but we were very attentive to trying to respond to class

 8    members.  That is a big part of what our firm has been doing

 9    these last couple of years.

10           THE COURT:  I think the bottom line is this, right,

11    that the settlement amount is capped.  It is 140 million.

12    Which is a lot of money, by the way.  Everybody should

13    understand this is a near historic settlement.  But, in any

14    event, it's not getting any bigger.  So if the number of people

15    who say actually I did contact the firm, and we were timely, I

16    should be in that other category, that means if everybody did

17    that, it's at least conceivable then that the 140 will not be

18    able to cover the class members, right?

19           MS. LISS-RIORDAN:  Right.  Right.  The way the

20    class -- the way the settlement is structured is that that is

21    the cap, so, right, if we get more than that amount claimed

22    people --

23           THE COURT:  Well, if everybody were to say we want

24    this now...

25           MS. LISS-RIORDAN:  It would be somewhere more than

 1    140, but based on our settlement discussions, we had an

 2    expectation regarding what claim rate we might get, and I think

 3    we just about hit it on the head.  So I don't think there is

 4    going to be an issue.  I do want everyone to know that we are

 5    advocating passionately for the drivers, and we will do

 6    everything we can to make sure people are in the proper

 7    category.

 8         THE COURT:  But that will be resolved by a claim

 9    administrator, not by the Court.  By then the case is over.

10         MS. LISS-RIORDAN:  Yes.  Yes.

11         THE COURT:  So if the claim administrator says, yeah,

12    sorry, you're out of luck, then that's how it goes, right?

13         MS. LISS-RIORDAN:  Yes.  Yes.  We'll have the process

14    but I think there will be sufficient funds to make sure that

15    everyone gets what they deserve, and we will be seeing that

16    process through to the end.

17         THE COURT:  Does the City care?  I mean, you and I

18    guess Ms. Weinblatt are trying to figure out if there are five

19    or 20 or a hundred people who were classified as folks who were

20    entitled to 37.5 percent of the recovery, and they say no, no,

21    I did timely contact the law firm, do you care whether they are

22    then added to the list that gets the recovery as though they

23    had made a claim on a timely basis?

24         MS. WEINBLATT:  Well, we would assume that the law

25    firm would carry out some inquiry as to whether they agree that

1    the person contacted them on time, check phone records or phone

2    logs or emails or whatever, to confirm that so that people

3    aren't making --

4              THE COURT:  You don't really have a dog in this fight

5    except to the extent there's a lot of money left over, then the

6    City would get some of what's left over.

7              MS. WEINBLATT:  We're not focused on that, your Honor

8    The higher claim rate, your Honor suggested if we have a one

9    hundred percent claim rate, I think then -- not I think, the

10   stipulation, assuming the Court approves it, would have the --

11   then effectively reduce the amount that each claiming class

12   member would get proportionately on a pro rata basis.  I just

13   want to make that clear.  So it's not going to go over

14   140 million.

15             THE COURT:  Of course.

16             MS. WEINBLATT:  Because it would be instead everybody

17   would get slightly less or somewhat less than the cap amount

18   that's in the stipulation.

19             THE COURT:  Right.  But the decision as to whether

20   somebody is in one category or another or whether they're

21   entitled to 37.5 percent or a full share of the recovery, given

22   whatever category they're in, will be up to the claim

23   administrator.

24             MS. WEINBLATT:  Yes.  The only position we have is we

25   want it to be accurate.  We don't want people claiming

1    something that they can't back up because that would give them

2    more money.  So other than accuracy, no, we have no position.

3         THE COURT:  I think I understand your concern to the

4    extent that it's not quite an objection, I think I understand

5    that too.  So let me hear from everyone else, and then maybe

6    we'll talk further.  Yes?

7         MR. OLORODE:  Your Honor, I'm not objecting to pretty

8    much what -- how this is -- how it's stratified, right?  The

9    concern I had which is an objection is having this whole idea

10   of deselecting drivers to like maybe total class member -- what

11   I had issues with what is what appears to be a process of

12   deselecting class member to be fourth tier class member, first

13   tier class member.

14        THE COURT:  Well, that's based on the length of the

15   suspension, right?  So the settlement is higher or --

16   individual claimants will get more or less depending on how

17   long they were suspended with other variables as well.  And so

18   you don't disagree that somebody who got suspended for 31 days

19   should be receiving a different number than somebody who was

20   suspended for six months, right?

21        MR. OLORODE:  Absolutely.

22        THE COURT:  So the settlement is somewhat elaborate

23   and was, you know, reached after a lot of negotiation, and it's

24   derived in large part from the jury verdict in the trial that

25   we had back in November of 2023.  That is how I think a lot of

 1    this got resolved.

 2            But the settlement calls for a claim administrator to

 3    be able to resolve questions as to whether somebody is in this

 4    tier or this tier or this tier, and for how long they were

 5    suspended.  There may be disputes about that.  To the extent

 6    there are disputes, there is a process.  So if you are okay

 7    with that process, then it seems to me you're not objecting to

 8    this settlement.

 9            If you think that that process is inadequate or if you

10    think that the fact that you might not be able to get what you

11    want as a result of this process means that this whole thing is

12    unfair, then that's an objection.

13            MR. OLORODE:  It's not a say about me.  I just happen

14    to have myself as an example, you understand me?

15            THE COURT:  Well, you're not alone.  It sounds like

16    Mr. Jada is in the same circumstance, or his father is.  And

17    there may be others.  I know there are a few who wish to speak.

18            MR. OLORODE:  Thank you very much, your Honor.  And I

19    thank the counsel the class members for their hard work.  Thank

20    you.

21            THE COURT:  Thank you.  Yes, in the back.  I'll get

22    everyone, so don't worry.  Are you together?

23            MS. ALSTON:  Yes.

24            THE COURT:  Could you state your name and spell your

25    name?

```
 1              MS. ALSTON:  May name is Desi, Austin.  D-E-S-I.  Last
 2    name A-L-S-T-O-N.
 3              THE COURT:  M. Alston, and with you -- and who the
 4    other person who is with you?
 5              MS. STOVER:  My name Carolyn Stover.  C-A-R-O-L-Y-N.
 6    S-T-O-V-E-R.
 7              THE COURT:  Ms. Alston, you are going to start?
 8              MS. ALSTON:  Yes.
 9              THE COURT:  You may proceed.
10              MS. STOVER:  Actually, I'm going to start for her.
11              THE COURT:  Ms. Stover?
12              MS. ALSTON:  I'm going to start by saying that her
13    name was one of the names that slipped through the crack, and
14    she wasn't notified as well.  She just found out about this by
15    text on last month.  And when she called me, I looked up
16    everything for her.  We discussed it.  Then I called TLC
17    several times.  I even called them again on this morning, and
18    upon speaking to them, they stated that they mailed out
19    documents in May of 2025.
20              THE COURT:  Well, this is -- so when was Ms. Alston a
21    driver?
22              MS. ALSTON:  I was driver around 2016.
23              THE COURT:  Okay.  And you were suspended during that
24    period?
25              MS. ALSTON:  Mmm-hmm.
```

```
 1                THE COURT:  For how long?

 2                MS. ALSTON:  I'm not -- I'm not exactly sure of the

 3     exact number, but I believe it was more than 43 not more than

 4     49.

 5                THE COURT:  43 as opposed to 49.

 6                MS. ALSTON:  Between 43 and 49 days I was suspended.

 7                THE COURT:  So I think the issue is not really the

 8     Taxi and Limousine Commission at this point.  Notice would have

 9     been sent out by the plaintiff's law firm at several points

10     saying there is a suit.  There are going to be trials.  If you

11     want to have a trial, let us know, and we'll tell the Court,

12     and then we'll plan accordingly.

13                And then there was another notice after the settlement

14     was reached saying we have this settlement.  If you want to opt

15     out, you can.  If you want to object, you can.  If you want to

16     make a claim, you can.  And so there were multiple

17     opportunities at which the 19,000 plus drivers who were part of

18     this class should have been notified.  So you're saying at no

19     point were you notified.

20                MS. STOVER:  Okay, so if I may address that.  Desi was

21     one that got slipped through the cracks.  Now, she received a

22     text message last month.  We called TLC.  Spoke to them over

23     the phone.  I believe may have spoken to them over the phone at

24     least twice last month and again this morning.  And, your

25     Honor, I'm just going to be honest with you, when I speak to
```

1    them on the phone, I did record their conversations from my

2    phone.  I'm just being honest.  Just being honest.

3            THE COURT:  Okay, well --

4            MS. STOVER:  So, nonetheless, when speaking to them

5    they stated that --

6            THE COURT:  Them being who, the law firm?

7            MS. STOVER:  TLC, the 800 number for the claims -- the

8    of -- the what?  No, this lady was in Florida, and she said

9    that the main office is in California.

10           THE COURT:  Okay.

11           MS. STOVER:  So, spoke to them, and they said that

12   they mailed out a packet in May.  My daughter said she didn't

13   receive that packet.  When I spoke to them, they said they also

14   sent another one in July.  I told them, I said, well, she

15   didn't receive anything in May.  She didn't receive anything in

16   July.  Could you give me the address, tell me the address that

17   you sent it to.  They gave the correct address.  She's not

18   sending -- she didn't receive it.

19           I asked them, could you send it through email?  They

20   said no.  The package should be received in the mail.  You

21   should get it in about a week or so.  She never got that

22   packet.

23           Spoke to them again this morning.  All of a sudden

24   this representative said, oh, I could just email it to you.

25           So the ball was dropped somewhere down the line.  When

1     we did speak to them in July, I did put a notice together.  I

2     sent it to them by certified mail with return receipt to make

3     sure that they received her request in regards to this case.

4     She's been stressed out because she was arrested, and the job

5     terminated her because of that.

6             THE COURT:  Right.  Well, that will be true of the

7     entire class.  So that's not unique.

8             MS. STOVER:  Right.

9             THE COURT:  So I guess the question is, is Ms. Alston

10    a claimant, but the position of the lawyers is that she is

11    subject to 37.5?

12            I guess maybe let me ask Ms. Liss-Riordan this.

13            Are you familiar with Ms. Alston?

14            MS. LISS-RIORDAN:  I'm not, but it sounds like there

15    was an issue regarding the claim packet.  And, again, the class

16    members will have another 180 days, so we can certainly get you

17    -- if you haven't gotten it already, we can get you the claim

18    packet so she can claim.

19            THE COURT:  Right, but the other issue is it sounds

20    like there was never a claim for -- there was never a request

21    for a trial/hearing.

22            MS. LISS-RIORDAN:  I'm not sure if I heard that.  We

23    did spend -- we spent, as we told you, six months diligently

24    trying to reach as many people as --

25            THE COURT:  Do you have a list of the 8,000 who wanted

 1    to -- who wanted hearings or trials on damages?

 2              MS. LISS-RIORDAN:  Yes.

 3              THE COURT:  You don't have it handy?

 4              MS. LISS-RIORDAN:  I don't have it handy.  I'm happy

 5    to take her number and check, and we'll figure this out

 6    afterwards.

 7              MS. STOVER:  Yeah.  She didn't get anything.  No

 8    notification.  Believe me, I would have been on top of it.

 9              THE COURT:  So I'll say this:  There are two dates

10    that really matter.  The first is those who wanted to have a

11    trial on damages had to let the Court know by a certain date.

12    I extended it a number of times, but that was back -- the end

13    date was 2023.  When was it, September?  August?  May?  I

14    forget what.

15              MR. GOLDBERG:  January 27.

16              MS. LISS-RIORDAN:  It was sometime in 2023, the

17    records will --

18              THE COURT:  Yeah, it was before the trial that we had

19    in November of 2023.  So the cutoff date, anybody who wants to

20    have a trial on damages has to let us know.  The settlement

21    then says for that group of people who said they wanted a

22    trial, they will be compensated according to the formula that

23    is set forth in this settlement.  For those, who didn't say

24    they wanted a hearing on damages or a trial on damages, they

25    are still entitled to something.  They can come forward and

1   make a claim, but they are going to be limited to 37.5 percent

2   to the damages they otherwise would have gotten had they

3   requested a trial.

4          MS. STOVER:  Correct.  So had they given -- sent the

5   information to notify her of this trial, then she would have

6   filled out the documents and notified the Court to say, hey, I

7   want to be a part of this.

8          THE COURT:  That's what I'm asking.  It sounds like

9   you're not --

10         MS. STOVER:  She didn't receive any of that.  She's

11  one of those balls that was dropped, and she didn't get any

12  type of --

13         THE COURT:  So there is a process -- as I said,

14  there's a process for resolving disputes like this.  In a class

15  of 19,000 people, there might be, you know, there could be

16  dozens or even a hundred people or more who fall into a

17  category where there's a dispute.  So there is a process that

18  is built into this settlement that says people who disagree

19  with what they're entitled to or how long they worked or how

20  long they're suspended, those are things that would be resolved

21  through the claims administration process.

22         So that would not be something I would resolve.  That

23  would be resolved through the process if I approve this

24  settlement.  And so that's really the purpose of this hearing

25  today is to determine whether I will approve this settlement as

 1    fair.  Otherwise, I don't, and we go forward with 8,000 trials

 2    again.

 3              MS. STOVER:  Right, I understand that.  But I just

 4    want the Court to know that had she been notified for whatever

 5    date in 2023 or 2024, she would have requested to be a part of

 6    that.  She is just finding out about this within this year, a

 7    month ago, and now we're here trying to sort this thing out,

 8    and her name was one of the names that slipped through the

 9    cracks that wasn't notified or else she would have been able to

10    have gotten due process like some of the other individuals.

11              THE COURT:  Well, I mean, there may be a dispute about

12    that so I don't know.  I guess the claim administrator would

13    ask, okay, well what evidence is there that anything was ever

14    mailed to this person at this particular address.  And I assume

15    somebody who was helping do the notice process at the law firm

16    would be in a position to answer what the processes were and

17    whether there's any record of what was sent out.  I'm not sure,

18    but that would be resolved later if I approve the settlement

19    for fairness.

20              MS. STOVER:  Yeah.  And, you know, every time I call,

21    I verify the address.  She's been at the same address since

22    2010 or 2011.

23              THE COURT:  Okay.

24              MS. STOVER:  Same apartment, same --

25              THE COURT:  It's a similar concern raised by Mr. Jada

```
 1             and Mr. Olorode.

 2                  MS. STOVER:  Is there anything you want to say?

 3                  THE COURT:  It's all right.  I get the concern.

 4                  MS. ALSTON:  I think you pretty much summed it up.  I

 5       didn't learn about the case until July 16 and that was through

 6       text.

 7                  THE COURT:  July 16 of this year?

 8                  MS. ALSTON:  Mmm-hmm.

 9                  THE COURT:  All right.  That is something I'll

10       consider.  I will hear if there others who have similar

11       concerns or different concerns, or both.  So thank you.

12                  The gentleman in the blue shirt.

13                  MR. LABIENTO:  Yeah, that's me.

14                  THE COURT:  Good morning.

15                  MR. LABIENTO:  Anthony Labiento, L-A-B-I-E-N-T-O.

16                  THE COURT:  Okay, Mr. Labiento?

17                  MR. LABIENTO:  I'm half Irish.  I have no objection,

18       your Honor, but I was hoping that you could be kind enough to

19       give me the definition a hearing as is being spoken of this

20       morning.

21                  THE COURT:  Hearing...

22                  MR. LABIENTO:  The hearing.  Can you give me a -- are

23       the hearings that we're talking about today that were

24       available, is that from criminal court?

25                  THE COURT:  No.  No.  No.  Let's be clear.  So this
```

1    was a case that was brought back in 2006 alleging that the

2    City's suspension process for taxi and limousine licensed

3    drivers after an arrest violated the Constitution.  So it was a

4    civil rights claim on behalf of some named plaintiffs,

5    individuals who said I don't like what's going on here.  They

6    found an attorney or two.  Mr. Ackman has been here from the

7    beginning.  And so they filed a complaint.  That case bumped

8    around for a long time.  It was always desired that it would be

9    a class action on behalf of all the drivers who were so

10   affected and sought money damages.  It's a civil case seeking

11   damages.

12          That case we had a number of sort of fits and starts.

13   It went -- I made a ruling.  It went up to the Second Circuit.

14   It got sent back down.  We then had a mini-trial at that point.

15   There then was another appeal to the Second Circuit.  In any

16   event, in 2023, it was clear at that point that the City was

17   liable for these rights violations for drivers.

18          Now, the only question then was what people are

19   entitled to as damages.  In some cases, if you weren't

20   really -- I mean, it was a deprivation of your rights because

21   you should have gotten notice of a hearing before the taxi and

22   limousine commission.  If you didn't get that in a timely way

23   or in a proper way, you might have been harmed in the sense you

24   didn't get your rights, but it didn't cost you any money

25   because your suspension was lifted very, very quickly.

 1          And so we had to figure out who was entitled to more

 2     than nominal damages.  Nominal damages being a dollar.  And

 3     changing the process.  The process was changed so the way that

 4     the taxi and limousine commission now does suspensions is

 5     different than it was before.  So we had to figure out how

 6     we're going to determine what damages are owed to people who

 7     might have been suspended for months or longer.  And so that

 8     was the process that we set upon, and so we asked -- I directed

 9     that notice be sent to all the class members, all the would-be

10     class members of the people who were drivers who were suspended

11     between 2003 and 2000--

12          MR. GOLDBERG:  20.

13          THE COURT:  20; that they be notified that there was a

14     case that if they wanted to assert a claim for damages, they

15     needed to let us know so that we would then decide to have a

16     trial.

17          It turned out that 8,000 people responded and said,

18     yeah, I'd like to do that.  So of those 8,000, we had a test

19     trial in November.  20 random people.  Ten showed up.  Ten

20     didn't.  Of the ones who did, they got varying degrees awarded

21     by a jury.

22          So then we had to decide, okay, well, that's ten --

23     actually, 20 out of 8,000.  How are we going to do this going

24     forward?  We can have some more trials so the parties can

25     figure out what was going on.  But the calculation was if we

 1    had a trial for each person, even if we did five at a time and

 2    one-day trials each, it would take six years to do it.

 3            So the settlement that was reached between the

 4    plaintiffs' lawyers and the City lawyers was we'll come up with

 5    a class-wide settlement that develops a methodology for giving

 6    damages to people who were suspended for a long time, and that

 7    was what was laid out in the materials that were sent out as

 8    part of the class settlement, okay?

 9            MR. LABIENTO:  Okay, I know the history.  I'm not

10    being clear with my question, I guess.  Everyone in this class

11    was arrested for an offense.

12            THE COURT:  Or charged with an offense.

13            MR. LABIENTO:  Or charged, okay.  But there was some

14    kind of adjudication for all of these cases, correct?

15            THE COURT:  Yes, most were dismissed or resolved

16    quickly.

17            MR. LABIENTO:  Let me give you a hypothetical.  Let's

18    say driver X was arrested on duty for an offense.  His license

19    is suspended for almost a year and his -- his or her resolution

20    was to attend anger management.  Does that qualify as a

21    hearing?

22            THE COURT:  No.  No.  That's part of the criminal

23    process.  The anger management is part of the criminal process.

24            MR. LABIENTO:  So the criminal process is not

25    factoring in here.

 1          THE COURT:  That's right.

 2          MR. LABIENTO:  How is that applicable to qualifying

 3   for the hearing category?

 4          THE COURT:  No.  The only issue is the suspension of

 5   the license and whether that cost you financially.

 6          MR. LABIENTO:  Okay.

 7          THE COURT:  And I guess psychologically too.

 8          MR. LABIENTO:  So in the hypothetical I gave you, is

 9   that a 37.5 guy or a hundred percent?

10          THE COURT:  No.  37.5 is for people who didn't say I

11   want to have a trial on damages.  So for those people who were

12   told if you want to have a trial on damages, let us know.  For

13   people who didn't for whatever reason, they just didn't get

14   around it to, didn't figure it was worth the effort, there was

15   no way --

16          MR. LABIENTO:  So that request had to come from that

17   person on his own.

18          THE COURT:  Yes.  Well, there was notice --

19          MR. LABIENTO:  Ignorant of that process.

20          THE COURT:  No.  It was explained in the notification.

21          MR. LABIENTO:  Then again, not everybody got -- I got

22   this notification now, but I didn't get the original

23   notification from the window of when to have this hearing.

24          THE COURT:  So it sounds like, as you've been

25   listening, there are a number of people who say they didn't

 1  learn about that first notification.  They didn't get that

 2  first notification.

 3        MR. LABIENTO:  Which is when?  Can you tell us when

 4  that first notification developed?  Originated?  Excuse me.

 5        MS. LISS-RIORDAN:  It was in 2022 and 2023 we were

 6  reaching out to class members.

 7        THE COURT:  It was over basically a six to 12 months

 8  period.

 9        MR. LABIENTO:  Can I direct the question to the

10  attorney?

11        THE COURT:  Sure.

12        MR. LABIENTO:  So this other -- I'm saying the three

13  testimonies, everybody was the same, but how did they know to

14  come today?  They must have gotten some notification about this

15  event.

16        THE COURT:  There's two kinds of notice.  Let's be

17  clear.  One was in 2022 to 2023, which is do you want to have a

18  damages trial?

19        MR. LABIENTO:  So that's the missing link.

20        THE COURT:  That's the first notice.

21        MR. LABIENTO:  That's the problem.

22        THE COURT:  Then there was a settlement after the

23  trial in November 2023.  So there's a trial that was -- there

24  was a settlement that was reached --

25        MR. LABIENTO:  Right.

1              THE COURT:  -- much later.

2              MR. LABIENTO:  Right.

3              THE COURT:  That's the notice that went out more

4    recently that told people to come here today.

5              MR. LABIENTO:  That's the one that everybody got?

6              THE COURT:  Some maybe didn't.

7              (Audience talking among themselves)

8              THE COURT:  Wait.  Wait.  Wait.  Only one person at

9    the microphone speaks, not everyone else.

10             MR. LABIENTO:  Okay, so that's the difference.

11             THE COURT:  Your concern is you didn't get notice.

12             MR. LABIENTO:  The first one I didn't get.  At least I

13   have -- I understand.  I have an education as to how I landed

14   in the category of 37.5.

15             THE COURT:  Right.  Now, as I said before, this

16   settlement contemplates a process for people to be able to say,

17   well, I shouldn't be in the 37.5 category, or I should be --

18   some agree that they're in the right category, but they are

19   saying that I should be in the more-than-31-days category as

20   opposed to the less-than-31-days category, which is a big

21   difference in terms of the settlement.  Generally -- the reason

22   why less than a month of suspension gets a relatively modest

23   recovery is because --

24             MR. LABIENTO:  I'm back to work.

25             THE COURT:  Right.  People were not harmed much by

1  this deprivation of rights.  It's still a deprivation, but it

2  didn't result in a big financial loss because the new process

3  that has been approved by the Court and now adopted by the TLC

4  generally takes about 30 days.  So even if you got the hearing

5  you're supposed to get, you might be suspended for about 30

6  days before you would now have a chance to get reinstated.

7          MR. LABIENTO:  Okay, this letter that we all got

8  today -- for today, excuse me -- the second notice, let's put

9  it like that.  The second notice, it said that Judge Richard J.

10 Sullivan will be rendering a decision on this matter --

11 granting a decision on this matter.

12         THE COURT:  On the fairness of the settlement, whether

13 to approve the settlement.

14         MR. LABIENTO:  Okay.  It didn't say that, the fairness

15 part.

16         THE COURT:  I think it did.  This is a fairness

17 hearing.

18         MR. LABIENTO:  Okay, fine, that's understood.  But

19 anyway, oh gosh.  So now we're saying that -- my last question

20 is now I'm hearing of a 180-day extension.

21         THE COURT:  No.

22         MR. LABIENTO:  So how would that affect your decision

23 if you're going to render one today?

24         THE COURT:  No.  So I am going to decide whether this

25 is a fair settlement.

```
 1              MR. LABIENTO:  So it's not a final thing today.

 2              THE COURT:  Well, I may not decide today, but I am

 3    going to decide.  Once I decide it is fair, there will still be

 4    180 days for people to put in claims for money.

 5              MR. LABIENTO:  Yeah.  Wow.

 6              THE COURT:  If there are disputes about whether or not

 7    someone is entitled to this much or this much, there is a

 8    process baked into this settlement that would allow people then

 9    to go through that.

10              MR. LABIENTO:  Well, will we be privy to how that

11    process --

12              THE COURT:  I think that should be in the materials

13    that was already sent out to you.  The terms of the settlement

14    are not going to change.

15              MR. LABIENTO:  Okay, but, I'm -- right, right.  But

16    hold on.  In 180 days, if you get X amount more people, those

17    figures are going to be --

18              THE COURT:  But that's in the settlement agreement

19    already.  So what it says is that there is a process to resolve

20    disputes as to whether someone should be in one category or

21    another category and entitled to this much or that much.

22    There's a process for that.

23              If it turns out that there was an underestimation or

24    an undercounting of people who were in a higher category who

25    were entitled to more money, if collectively the entire class
```

1   blows through the 140 million, then everybody will just get a

2   little less as a percentage pro rata, okay?

3          Now, it's not clear we're going to blow through the

4   140.  At this point claims have been made that total about 110,

5   but if there's six more months for people to make claims,

6   chances are we'll get closer to the 140.  Whether we get over

7   or not is not clear.

8          If we don't get to the 140, those who put in claims

9   will get sort of a second bite to get it upped a little bit,

10   and the City will also get an opportunity to get some of that

11   leftover money back.  But if we hit 140 --

12          MR. LABIENTO:  That was stipulated, if there's

13   anything left over, the City recovers it.  That's already in

14   the papers.

15          THE COURT:  It's pretty much all in there, I think.

16          MR. LABIENTO:  I'm sorry.  One more last question.

17   When this all becomes final in six months, does this Court

18   oversee our attorneys handling of the figures?

19          THE COURT:  No.  So, in other words, if I find that

20   this settlement is fair, this amount of money, this

21   distribution process, this claims administration process, then

22   I will call it fair, and this case closes here, and then your

23   recourse is through the administration process.  And if you're

24   not happy, that is the way that process works.

25          MR. LABIENTO:  The administration meaning what, the

1    state?

2            THE COURT:  No.  It's part of the settlement.  There

3    will be an administration process to resolve all these kinds of

4    disputes.  Hopefully, there won't be that many.  I've heard a

5    few today, but out of a class of potentially 19,000, that's not

6    a huge number.  But there could be more.  But there is a

7    process for that, and the process, it may be that some people

8    are going to be disappointed.  It's a third party.  It will not

9    be the Court.

10            MR. LABIENTO:  Thank you so much.

11            THE COURT:  All right.  Thank you.

12            Other folks who wanted to be heard on the settlement?

13   Yes.  Come on up.

14            State your name and spell name for the record?

15            MR. MURPHY:  Patrick Murphy.  Patrick, P-A-T-R-I-C-K.

16   Murphy, M-U-R-P-H-Y.

17            Good morning, Judge Sullivan.  I unequivocally am

18   opposed to the settlement.  The City of New York is the largest

19   law firm in the United States of America.  There are 28

20   divisions in the law department, corporation counsel, whatever

21   they call themselves on any given day.  I've dealt with these

22   people in state court numerous times, okay?

23            When you say there was a decision by a district court

24   judge, presumably yourself, Judge Sullivan, and then it was

25   appealed by the City of New York, and a three-member panel,

 1    appellate panel, I believe approved it.

 2              THE COURT:  No.  No.  What happened was I found there

 3    was no constitutional violation.  I found for the City the

 4    first time.  The Circuit sent it back.  We then had additional

 5    fact-finding that the Circuit asked to take place, and we had a

 6    mini-bench trial on that one.  Remember that one, Mr. Ackman?

 7              MR. GOLDBERG:  Sure.

 8              THE COURT:  So I then issued another ruling.  That one

 9    also ruled for the City, and then it went up to the Court of

10    Appeals, which reversed me and said, no, this is a

11    constitutional violation.  I found there was not a

12    constitutional violation in the City's then hearing and notice

13    process.

14              So it was at that point that it came back down, and

15    clearly at that point there was liability against the City and

16    the taxi and limousine commission, and the question was just

17    damages at that point.

18              So that's where we've been for the last couple of

19    years.  So we've been resolving the damages issues first with a

20    bellwether trial - it's a trial of 20 random people - to

21    determine whether or not these claims are good, to give I think

22    the parties a better opportunity to assess the value of these

23    claims.

24              And then after a lot of negotiation, including with a

25    magistrate judge in this courthouse, including with a private

1    mediator before that, the City and the plaintiff's counsel

2    reached a settlement.  And it's a settlement for $140 million

3    total, which is one of the largest settlements in the history

4    of the City.  So it's a big number.

5          In any event, that's why we're here today, so that

6    notice of the details of this settlement agreement were sent to

7    all the members of the class, or at least the goal was to send

8    it to all the members of the class so that they would

9    understand what the settlement was.  And if someone thinks this

10   is a bad deal, it ought to be 300 million, or might be a lot

11   more under the terms of this agreement, I don't think it

12   adequately compensates me, they can be heard.  They can object

13   and say this is not a fair settlement.  Or they can opt out and

14   say, well, I don't want anything to do with this settlement.

15   I'm going to take my own case forward and I'm going to do my

16   own thing.  And some people might opt out for other reasons.

17   But that's really what brings us here today, is for me to

18   assess whether this is a fair settlement.

19         And there are a number of criteria I have to consider

20   and I will go through that in a minute.  But I wanted to hear

21   from plaintiffs, members of the plaintiffs' class.  Of the

22   19,000, we have a couple dozen here, which is fine, and, you

23   know, I want to hear what people think.  Nobody has formally

24   objected at this point.  No one in writing has said "I object

25   and here is why."  But several today have come forward and

 1    said, well, I'm concerned that I'm not going to get as much as

 2    I should because this process undercounted me.  I didn't get

 3    notice earlier.

 4            So do you have a different concern, Mr. Murphy?

 5            MR. MURPHY:  Judge Sullivan, $140 million, there

 6    are -- it's not 19,000.  I believe if I heard you correctly,

 7    you said 19,000 people are part of this class action --

 8            THE COURT:  Yes.

 9            MR. MURPHY:  -- settlement.

10            Well, it's actually 20,000 in the literature that,

11    presumably these are the lawyers representing me.  I don't

12    know.  I don't know.  I'm sorry -- since I got here a little

13    bit late with the whole security problem or the situation,

14    because I'm usually used to state court, so I was put through

15    like a third degree to get in here.  Could you identify

16    yourselves?

17            THE COURT:  The back lawyers are the City's lawyers.

18            MR. MURPHY:  Okay, that's law department, corporate

19    counsel.  And who are you?

20            THE COURT:  The front lawyers are the lawyers

21    representing the plaintiffs, the named plaintiffs.  And now are

22    they are class counsel representing the class.

23            MR. MURPHY:  Okay.  So you said a $140 million.

24            THE COURT:  Yes.

25            MR. MURPHY:  There is not 19,000.  It's 20,000.

1    20,000 into $140 million comes out to $7,000 a piece.  Now,

2    from that $140 million, presumably there's that settlement

3    administrator, which is different than these attorneys right

4    here, and then they also get -- by the way, I'm just curious

5    because I was speaking to one of these attorneys who actually

6    cursed me out, okay?  And, unfortunately, I don't have my phone

7    because of your security, so I don't have my phone, so I can't

8    show you the --

9         THE COURT:  Well, what's the objection?  I think we're

10   really here to assess the fairness of the settlement.

11        MR. MURPHY:  I'm objecting to the representation.  I

12   just told you, you just made a statement that $140 million is a

13   huge amount, okay?  The City's budget is if -- you count all

14   the quasi-City agencies, the City's general budget is close to

15   $120 billion per year.

16        THE COURT:  I'm just saying relative to other cases

17   that have been brought in the history of the City.

18        So, Mr. Murphy, if you want to quibble with me, that's

19   great.  But I'm not giving you a mic to just sort of go off on

20   whether the City has deep pockets.

21        What is your objection to this settlement?

22        MR. MURPHY:  My objection, sir, is that the settlement

23   goes from 2003 to 2020, correct?

24        THE COURT:  Yes.

25        MR. MURPHY:  Okay.  So my license was illegal -- and,

1    by the way, the TLC is engaged in the same pattern and practice

2    of behavior because I spoke to an assistant commissioner who

3    told me literally two weeks ago that we never had any

4    administrative law judges deciding cases.  I was like, what are

5    you talking about?  I went before an administrative law judge

6    in Manhattan, okay, with a whole bunch of other drivers who

7    were represented by counsel.  I represented myself pro se.  It

8    didn't really matter if you had a lawyer or not, okay?  I was

9    arrested for, I don't know, driving while intoxicated, driving

10   while impaired.  My license was -- and I also have a CDL

11   besides a TLC and numerous other permits.

12          So, anyway, my license was suspended for four years

13   until the results of my criminal trial were dealt with, which I

14   was found not guilty.  So when I spoke to the counsel, one of

15   these -- it was a man, approximately two weeks ago, when he

16   called me back, and he pulled up my -- he pulled up like, quite

17   smugly, oh, you were busted for this, you were busted for that.

18   And I said, well, guess what?  I was found not guilty after

19   three years so -- and then --

20          THE COURT:  What's the objection?  Mr. Murphy, what is

21   the objection to the settlement?

22          MR. MURPHY:  The objection is that everyone is being

23   treated in a cookie-cutter fashion, okay?  This 2003 to 2020 is

24   17 years.  My license was suspended in the latter part of 2008,

25   so that's now when I finally do get --

```
1              THE COURT:  Did you request a trial on damages?

2              MR. MURPHY:  Unfortunately, Judge Sullivan, I did not.

3              THE COURT:  You got the notice?

4              MR. MURPHY:  I'm not disputing anything, but I will

5    tell you about the so-called administrator, okay?  When I sent

6    the documents in, including my W-9 temporary withholding form

7    for the City of New York, I don't know why I pay taxes at this

8    point, but they never got it, okay?  They never got it.  So I'm

9    really, really --

10             THE COURT:  Wait.  Wait.  There are two types of

11   notice that was sent out.  One was with respect to whether

12   members of the class wanted to have a trial on damages.  That

13   was back in 2022-2023.  There is another notice about whether

14   people believed this is a fair settlement, in which case if

15   they think it is not fair, they can object or they can opt out.

16   They can say I don't want to be bound by this.  I'm going to

17   pursue my open claims on my own dime with my own lawyer.  And

18   so it sounds like you did not request a damages trial back in

19   2022-2023, right?

20             MR. MURPHY:  That's correct, Judge Sullivan.  I'm not

21   one of these people who is going to come before you and say --

22   I'm not saying that they're saying that people who come before

23   you have said -- because I'm --

24             THE COURT:  I'm just trying to understand.  So, in any

25   event, the point I'm making is for the fact that there's going
```

 1   to be another six months for people to decide if they want to

 2   participate in this settlement.  But I will decide the fairness

 3   of this settlement before that.  And so the question is, do you

 4   think this is not a fair settlement.  And if so, why?  Why do

 5   you think it's not fair?

 6           MR. MURPHY:  I just told you.  There are particular --

 7   you said 19,000.  Their own documents they send out say 20,000,

 8   okay.  20,000 into $140 million comes out to $7,000.

 9           THE COURT:  Yeah, but I mean, you have to prove you

10   were damaged.

11           MR. MURPHY:  Excuse me.  Excuse me.  With all due

12   respect, then you have to take in the account that -- by the

13   way, I would like to know how much they're getting paid.

14           THE COURT:  Again, that was in the notice that --

15           MR. MURPHY:  No, it isn't in the notice.

16           THE COURT:  Well, up to 25 percent of the total.

17   We're going to talk about that going forward because there's a

18   dispute over that.

19           MR. MURPHY:  So it's 140 million minus the 25 percent,

20   correct?

21           THE COURT:  If I approve the 25 percent.

22           MR. MURPHY:  Because if I read correctly in the

23   documents that I received -- and, again, no one can explain to

24   me because after the assistant commissioner from TLC who

25   claimed like, again, we never had administrative law judges

1   deciding which is a bald-faced lie, because they're continuing

2   the same pattern and practice of abusing drivers like they did

3   before for like decades, okay?  And then when another employer

4   of the TLC called me up and spent 45 minutes discussing the

5   situation with me, his demeanor was totally different.  Why?

6   Because before he worked for the TLC, he was a driver, okay?

7   So he knew what the deal was.

8          Now, getting to -- okay, so it's $140 million, okay,

9   we still don't since there's like -- if you approve it, which

10  most likely since I believe you said twice you kind of like

11  were on the City's side.  You sided on the City's side.  Then

12  you overturned by a three-member appellate panel.  And then I

13  guess it went to the whole -- I don't know if it's like an

14  administrative deals with like eleven states.  I don't know

15  what district this is, but it presumably went to -- after it

16  went to the three-member tri --

17         THE COURT:  That was the Second Circuit.  The

18  three-judge panel was the Second Circuit.  The Second Circuit

19  sits in panels of three.  If someone wants to pursue an en banc

20  proceeding, they can ask the entire court to convene.  No one

21  asked for that.

22         MR. MURPHY:  Did you not say that it went back and

23  forth twice?

24         THE COURT:  It went up and down twice, yes.

25         MR. MURPHY:  Okay, so --

1          THE COURT:  Anyway, Mr. Murphy, we have a lot of

2    things we need to cover.  So you're objecting because you think

3    that the amount is too low, the distribution method is not

4    sophisticated or nuanced enough, and that the attorneys' fees

5    are too high.  Is that fair?

6          MR. MURPHY:  No.  Actually, I think 25 percent is

7    quite reasonable in terms of attorneys' fees.  And when you say

8    like, oh well, if you object to like the agreement, you can go

9    hire a lawyer.  You're an esquire, okay?  These two ladies are

10   esquires.  These three individuals here are esquires, okay?  Do

11   you know how expensive it is --

12         THE COURT:  Wait.  Wait. there are people who brought

13   this class action.  There are individual drivers who brought

14   the case.  Now, a person can opt out of the settlement if they

15   want, not be bound by these terms, and then they can pursue

16   whatever relief they want to pursue.

17         But the point is if people don't opt out and the

18   settlement is approved, then entire class is bound by the

19   settlement.  That's how a class action works.

20         MR. MURPHY:  Thank you for that.  What I feel really a

21   lot of disdain for is that the City of New York would even have

22   a chance to claw back any funds, okay, on a $140 million

23   settlement.

24         THE COURT:  That is if the money is -- that's if the

25   claims don't reach the 140 settlement, so ...

```
 1            MR. MURPHY:  What I read from the documents that were
 2   sent to me, okay, because I didn't ask for an individual
 3   hearing.  And I'm acknowledging that.  I was given notice,
 4   okay?  Other people may not have been given notice.  But I was
 5   given notice, and I chose not to, because I'd rather -- I'd
 6   rather not be on the 21st floor of 500 Pearl Street on the 13th
 7   of August 2025.  And if it sounds like I'm a little bit of an
 8   Irish temper, I do because it's 2003 to 2020 is 17 years, okay?
 9   When they suspended my license -- by the way, their
10   breathalyzer test, which the legal term is chemical test, I
11   even beat that, okay?  And they still, they still kept me in
12   the system for over three years like demanding that I plead
13   guilty to something that I didn't do, and it was bigotry.  I
14   was arrested simply because they saw my name, and they assumed
15   I was Irish.  In one minute I could go down 30 different
16   ethnicities and races --
17            THE COURT:  Mr. Murphy, this is not a hearing for
18   that, okay?
19            MR. MURPHY:  Excuse me?
20            THE COURT:  This is not the purpose of this hearing,
21   okay?  So I understand your concerns and objections to this
22   agreement.
23            MR. MURPHY:  I don't even know, your Honor, at this
24   point because the TLC when I spoke to, not the assistant
25   commissioner, but the --
```

 1              THE COURT:  Okay.  I'm here for a fairness hearing on

 2      this settlement.  I'm not here to hear about your discussions

 3      with the TLC and with the lawyers and what happened in 2003.  I

 4      understand your objections.  But I have some other people who

 5      are here and I want to hear from some other people.

 6              MR. MURPHY:  Excuse me.

 7              THE COURT:  No.  No.  No.  No.  You are not going to

 8      tell me how to run this courtroom.  I've given you a lot of

 9      time.  I think I've been very patient.  I understand your

10      concerns.  And now I'm going to move on to somebody else, okay?

11      If you want to opt out, you can.  You've not opted out of the

12      class?

13              MR. MURPHY:  To be honest with you --

14              THE COURT:  Well, two people have.  And you are not

15      one of the two, or are you?

16              MR. MURPHY:  Most -- most likely I am going to --

17      well, I'm imploring you to reject the agreement, okay, but --

18              THE COURT:  Okay, I understand that.

19              MR. MURPHY:  But -- and I would bet dollars to

20      doughnuts that you're not.  You're going to approve it.  So I

21      am going to accept -- but it would be nice if the lawyers,

22      these three lawyers would tell me, and the TLC would tell me

23      exactly -- because this is a whole thing of like, well, you get

24      $700 if it was suspended for whatever amount of time.  Well,

25      hey look it, my license was suspended for four years.  They

1    don't acknowledge that, okay?

2            THE COURT:  Who doesn't acknowledge that?

3            MR. MURPHY:  Excuse me?

4            THE COURT:  Who doesn't acknowledge that your license

5    was suspended --

6            MR. MURPHY:  The TLC.  And when you ask these lawyers

7    who are getting 25 percent of the 140 million --

8            THE COURT:  I haven't approved that yet, so it would

9    be -- that's the maximum amount.

10           MR. MURPHY:  Well, they're not working for free, okay?

11   But anyway, the bottom line is maybe someone could tell me,

12   these lawyers since they're getting something for this, and I'm

13   almost dead certain you are going to approve it, I should get

14   the max in terms of -- and the max is only 37.5 percent at this

15   point for people who didn't opt, correct?

16           THE COURT:  That is the terms of the settlement.

17           MR. MURPHY:  Excuse me.  It's 37.5 percent minus the

18   lawyers' fees and other administrative costs, correct?

19           THE COURT:  Well, it's 37 --

20           MR. MURPHY:  As I read the literature that was sent to

21   me.

22           THE COURT:  Right.  The 37.5 would be from the

23   calculation of damages that is in the settlement, right,

24   depending on -- so if you were 30 days or less than 30 days,

25   would be $700?

```
 1            MR. MURPHY:  $36,000, so you get 37.5 percent of

 2     $36,000 is approximately $13,000.  Then if you read that, if

 3     you read the literature that was sent out, then they subtract

 4     from that amount, besides the taxes, that is why you're sending

 5     in the W-9 City tax forms, they subtract the lawyers' fee and

 6     some other like --

 7            THE COURT:  Mr. Murphy, the point of this hearing is

 8     not for me to go through everybody's entitlement to dollars.

 9            MR. MURPHY:  This affects --

10            THE COURT:  Call the marshals, please.

11            Okay.  Sit down.  Thank you.

12            Is there another person who wishes to be heard on the

13     settlement?  Yes, in the back.  No, far back.  I'll get to you

14     in the striped shirt after that.

15            Could you stay close to the microphone?

16            MR. DAOROU:  My first name is B-I-Z-O-U-N-O-U-Y-A.

17     That's my first name.  My last name is D-A-O-R-O-U.

18            THE COURT:  D-A-O-R-O-U, Daorou.

19            MR. DAOROU:  Daorou.

20            THE COURT:  Thank you.

21            MR. DAOROU:  My concern is when I get arrested, that

22     time I lease a car, and it's $80,000 to be paid in three years.

23     And when I get arrested, I already pay 59,000.

24            THE COURT:  Hold on one second.  Just get closer to

25     the mic.
```

 1              MR. DAOROU:  When I get arrested, I lease a car to be

 2    paid three years $80,000.  And when I get arrested, I already

 3    pay 59,000.  The fact that I get arrest, they take the car from

 4    me.  And when I went back, I ask them that they give me the car

 5    because I pay for the car.

 6              THE COURT:  Who is the "they" you're talking about?

 7    The police?

 8              MR. DAOROU:  No.  Yeah.  When they arrest me, TLC

 9    suspended my license.  My license was suspended.

10              THE COURT:  All right.  But so this is about whether

11    you would get damages in relation to your suspension and the

12    income you lost as a result of that suspension.  So it's not

13    about having your car taken away from you.  That is not part of

14    this settlement.  So are you referring to what the police did

15    or are you referring to what happened as a result of the taxi

16    and limousine commission suspension of your license?

17              MR. DAOROU:  Yes, because the fact my license was

18    suspended, they take the car from me, and I wasn't able to pay

19    the car.  They take the car from me.  I already pay $59,000,

20    and the fact TLC suspend my license, I was not able to pay the

21    car if they take the car from me.  My question is that if the

22    City would reimburse me the money.

23              THE COURT:  I am not sure, what is your objection?

24    Are you objecting to this settlement?

25              MR. DAOROU:  No, I'm not objecting to the settlement

```
 1    I'm asking you a question.

 2              THE COURT:  The question is what?

 3              MR. DAOROU:  The fact that my car, I already pay

 4    $59,000 for the car.

 5              THE COURT:  The car was taken by the police?

 6              MR. DAOROU:  No.

 7              THE COURT:  It was taken by who?

 8              MR. DAOROU:  No, where I rented the car, it was a

 9    lease.  I lease the car where I paying 3 years 80,000.

10              THE COURT:  Right.

11              MR. DAOROU:  And then I get arrested, I already pay

12    59,000 for the car, but the fact that my car --

13              THE COURT:  In other words, you still had a lease on

14    the car, but you had no income to pay the lease?

15              MR. DAOROU:  Yes.  That time I don't have income to

16    pay the 80,000 complete, the 80,000 that I already pay 59,000.

17    They take the car from me because my license was suspended.  I

18    was not working, and the car, they take the car from me.

19              THE COURT:  This settlement is based -- it's a

20    formula.  You've seen the settlement.  It was sent to you, so

21    you've had a chance to read it?

22              MR. DAOROU:  Yes, your Honor.

23              THE COURT:  So the settlement basically calculates the

24    damages that would be paid based on the length of your

25    suspension, and so those are the terms of the settlement.  Do
```

1      you have an objection to that?

2                  MR. DAOROU:  No.

3                  THE COURT:  No?

4                  MR. DAOROU:  My concern is just the fact my car was

5      taken from me.

6                  THE COURT:  That won't be covered by this settlement,

7      Ms. Liss-Riordan.  Do you disagree?

8                  MS. LISS-RIORDAN:  No, unfortunately it's not.

9                  THE COURT:  This settlement is designed -- look, it's

10     a rough estimate, right?  It's based on calculations that are

11     going to apply to broad bands of people based on the length of

12     their suspension.  The thought is that this is a more efficient

13     way to make sure people get paid early because to have 8,000

14     trials would take a long time, and there is no certainty that

15     you would get anything.  But that is the settlement that's been

16     reached by the parties.  So this is a hearing designed to

17     figure out whether it's fair or whether it's not fair.  Do you

18     have any objections to the conditions and the terms of this

19     agreement?

20                 MR. DAOROU:  No, your Honor.

21                 THE COURT:  No.  All right.  Thank you, Mr. Daorou.

22                 The gentleman in the striped shirt?

23                 MR. LATMAN:  My name is Eric Latman.  L-A-T-M-A-N.

24     E-R-I-C.

25                 THE COURT:  Mr. Latman?

```
 1              MR. LATMAN:  I don't want to take up more of your time

 2     because I've heard a lot of people asking almost the same

 3     thing.  A lot of the questions were off course of what you're

 4     asking.  I got this notice recently.  It says from the taxi and

 5     limousine drivers suspension case.  I'm going to read to you

 6     just a little sentence.  It says here if you wish to object to

 7     the proposed settlement, you must mail your written objections

 8     as soon as possible.  Well, I took care of that.  I'm not

 9     objecting to what your -- what this case is about here today.

10              What I am bringing to your attention is what a lot of

11     other people brought to your attention.  I'm assuming based on

12     what I read here was about -- I found out about the settlement

13     going on, and then I'm not objecting to the award of

14     everything.  What I am concerned is that what a lot of people

15     said, the first group of letters that went out, I never

16     received it.

17              THE COURT:  You never got it?

18              MR. LATMAN:  I never got that part.  So I'm not

19     objecting to what's taking place now.  It's just that I never

20     found out about prior to the first group of letters that went

21     out.

22              THE COURT:  Okay.

23              MR. LATMAN:  That's the part I'm --

24              THE COURT:  That might be an objection though.

25              MR. LATMAN:  Okay.
```

```
 1             THE COURT:  So that could be an objection to whether

 2   capping your recovery at 37.5 percent of what you would

 3   otherwise get --

 4             MR. LATMAN:  Exactly.

 5             THE COURT:  -- is inappropriate or it might be an

 6   objection to whether the process that is built into this

 7   settlement is effective or appropriate given the lack of notice

 8   you got.

 9             MR. LATMAN:  Correct.  So I might have misunderstood

10   or might have misinterpreted what it says here because I didn't

11   know about the first set of letters that went out.  I just

12   heard it today.

13             THE COURT:  So you're saying if you would have gotten

14   a first set of letters, you would have requested a trial on

15   damages?

16             MR. LATMAN:  Yes.

17             THE COURT:  How long were you suspended for?

18             MR. LATMAN:  I was suspended for the maximum amount

19   that it says here, you know.  The thing is that I don't want to

20   -- you're not here to hear every individual criminal part of

21   the case or anything that was all taken care of in a different

22   court, okay, but my situation wasn't even a TLC matter.  I

23   mean, I had the license and because I got arrested and was

24   fingerprinted and went through the system, immediately I had to

25   turn in my license, and I had to go through the process of
```

1  going through criminal court to prove myself not guilty which

2  was and I got an official paper.

3          THE COURT:  Right.

4          MR. LATMAN:  From the court.  And it was on my own

5  that I had to go down to the TLC or I remember I was

6  communicating to them through a certain person in the TLC, and

7  they told me that it's going to all be cleared up.  In fact, I

8  had to go down to Long Island City to try to clear up the

9  matter and finally after seeing so many people years later, I

10  finally got my license back.  And when I did get the license

11  back, I got two violations on top of that because they said I

12  didn't go for my yearly urine test, and I explained to them

13  that you need to have your license to show when you go take the

14  test.  And they said that's not our problem.  You're supposed

15  to keep up with your license.  I said my license was suspended.

16  So I'm not telling you that that part is something that you're

17  concerned about.  All I'm saying is that based on what I heard

18  today, a couple of people said the same thing about the notice,

19  they didn't receive the first notice.  That's the part I'm

20  saying about.  Otherwise, I don't really object to what's

21  taking place except for that part.

22          THE COURT:  All right.  Thank you very much.

23          MR. LATMAN:  Thank you very much for your time.

24          THE COURT:  Thank you, Mr. Latman.

25          So, Ms. Liss-Riordan, we've heard I guess a recurring

1    series of people, class members, saying they didn't get the

2    first set of notifications.  It's not true.  Mr. Murphy got

3    that first set, but there are some that didn't get the notice

4    that asked them to decide whether they wanted to have a hearing

5    or a trial on damages.

6         Do we think it is a larger number than the handful

7    we've got today?

8         MS. LISS-RIORDAN:  I don't know, your Honor.  I will

9    say that we spent, I think it was, about six months doing

10   everything we could to notify people and reach people.  We were

11   trying to get that number up as high as possible, obviously,

12   and with the help of the New York Taxi Workers Association.  We

13   had phone banks.  We were sending out repeat mailings.  We were

14   sending out emails.  We were doing everything we are doing now

15   to reach people.

16        The truth of the matter is it is hard to reach people,

17   especially when you don't have something concrete to offer them

18   like money.  When you are administering a settlement to people,

19   it's much easier to make the case that people should sign here,

20   and they'll get their settlement share.  It was a difficult

21   process.  You will recall that I had raised with you that we

22   didn't think there should be a definite cutoff date because

23   this case was going to go on for awhile, so why did we need

24   this arbitrary cutoff date, but you, your Honor, ruled we need

25   to have a cutoff date, so --

 1           THE COURT:  Well, we needed to have some certainty, I

 2   think as to --

 3           MS. LISS-RIORDAN:  Yes.  Right.

 4           THE COURT:  -- what number of people wanted to have

 5   trials.

 6           MS. LISS-RIORDAN:  So anyone who says that they

 7   believe that they didn't receive the notice or that they told

 8   us that they did want to have a hearing but they didn't somehow

 9   make it on to the list, we will look into those through the

10   settlement administration process, and I appreciate what the

11   City said, that they will work with us cooperatively.  And if

12   there is a good explanation for why someone either if they

13   actually didn't get that outreach before or they say that they

14   did respond but somehow it didn't make it onto our list, we

15   will listen to that, we will work that through the

16   administration process, and I expect we will be able to resolve

17   those issues.

18           THE COURT:  That will be administered by whom?

19           MS. LISS-RIORDAN:  By the administrator.

20           THE COURT:  Which is Simpluris?

21           MS. LISS-RIORDAN:  Yes, that's right.

22           THE COURT:  Anybody else who I have not heard from?

23   Yes.  Okay.  State your name and spell your name for the

24   record.

25           MR. UZOUKWU:  Good morning, your Honor.  My name is

1    Afam, first name, A-F-A-M.  My last name lame U-Z-O-U-K-W-U.

2             THE COURT:  Say it again.

3             MR. UZOUKWU:  Uzoukwu, U-Z-O-U-K-W-U.

4             THE COURT:  Tell me about the settlement and whether

5    you have an objection.

6             MR. UZOUKWU:  Your Honor, I'm not against the

7    settlement per say since the agreement had been reached, but

8    the issue I have is primarily with the administrator, the claim

9    administrator.  I got the first letter 2023, and it indicated

10   in that letter that I am interested in pursuing what the TLC

11   did against me.  I went to jail, and they suspended my license

12   for a long time.  It cost me money and a loss of income for a

13   long time, and I never heard again from the administrator.  I

14   tried to keep up by calling, sent email --

15            THE COURT:  You got notice about the trial for

16   damages?

17            MR. UZOUKWU:  Yes, sir.

18            THE COURT:  Before the settlement?

19            MR. UZOUKWU:  Yes, I do, and I indicated I'm

20   interested.  I never heard back from them.

21            THE COURT:  Well, I will ask Ms. Liss-Riordan to

22   respond to that, but we had a trial for the first 20.  I think

23   the other, you know, 8,000 and change wasn't clear when they

24   would have a trial so, they probably weren't notified that

25   we're going to have a trial for you because we didn't set a

1  date for trial.  We had a trial for the first 20, and then

2  after that, there were lengthy discussions about settling it.

3  But if you indicated you wanted to have a trial on damages,

4  then you would be subject to this settlement, and the formula

5  set forth in the settlement agreement would determine what

6  amount you would be paid.  Do you have any questions about that

7  or do you understand that?

8          MR. UZOUKWU:  Umm, I don't have any -- I don't have

9  any objection to that per se.

10         THE COURT:  Okay.

11         MR. UZOUKWU:  But I could have preferred to come in

12 with my own lawyer in addition with the claim administrator and

13 what they are doing.  The claim administrator did not do very

14 good job in listening to the victim, the people that are

15 presenting they treated us like a number.

16         THE COURT:  Well, the administrator is not going to

17 pick -- you know, is going to just basically decide whether or

18 not someone is in one category or another, whether the amount

19 of days was, you know, 31 as opposed to 61, and whether someone

20 made a claim or made a request for a trial on damages.  It

21 seems to me that's going to be limit of those disputes by the

22 claims administrator.  Do you understand that?  It's not going

23 to be a separate damages hearing -- it's not going to be a

24 separate damages trial before a claims administrator.  It's

25 going to follow the formulas that are set forth in this

1    agreement.  So that's going to be a pretty -- it's a

2    mathematical calculation in most cases.  The variables will be

3    the number of days a person was suspended.

4            Ms. Liss-Riordan.

5            MS. LISS-RIORDAN:  Your Honor, I think what I'm

6    hearing here and when we were signing people up for the

7    hearings, we had a number of class members who were eager to

8    have these hearings.  We were talking to, we were interviewing

9    them, we were getting their information.  We were putting

10   together lists of class members who we were going to propose

11   would go early in a hearing.

12           THE COURT:  Trials, really. These were --

13           MS. LISS-RIORDAN:  Trials, exactly.

14           THE COURT:  Jury trials.

15           MS. LISS-RIORDAN:  And then your Honor decided to do a

16   random pick, so we told people that we were going to include

17   them on the list.  We told people that if we had any say in

18   what order the trials would go in, we were going to try to push

19   people forward who were particularly eager to go forward, but

20   we didn't have anything else to say until we found out what was

21   happening.

22           We did answer questions.  As I said, we have had staff

23   members on the case who were responding to requests.  We

24   weren't sending out regular updates to everyone, but when

25   people asked us for information, we gave them updates about

1   what was happening with the case.  And now that we have a

2   settlement, we were very pleased to let people know we had a

3   settlement.

4              THE COURT:  So are there any other concerns you have?

5              MR. UZOUKWU:  No.  That I am not pleased that I fought

6   TLC.  I didn't participate.  Even if I didn't fight TLC

7   personally, in addition with the class action, at least I could

8   have been present, but I never heard anything, any more

9   information, so I didn't participate.  All I had --

10             THE COURT:  Didn't participate in what?

11             MR. UZOUKWU:  Participate in the trial.

12             THE COURT:  Well, the trial was -- I mean, that was a

13  random selection of 20 people.

14             MR. UZOUKWU:  That's not what she said.  That's the

15  first time I'm hearing that; that it was a random pick.  It was

16  a random pick.

17             THE COURT:  I think it's in the class settlement

18  notice.  In any of event, do you object to the terms of the

19  settlement?

20             MR. UZOUKWU:  No.  I believe this is the best they can

21  do with what they have, so I'm not objecting, no.

22             THE COURT:  Okay.  Thank you very much.

23             I know there are some folks who have spoken, and there

24  are concerns about whether or not they should be included in

25  the group that made claims, and I think that there is a process

1    to resolve that, but there are other things we need to cover

2    today, so I am going to move on, so if you -- Ms. Stover, what?

3    I just think that we are losing sight of the fact that this is

4    a fairness hearing about this particular class action

5    settlement.

6           MS. STOVER:  Yes.  Just a quick question, and I like

7    that you remember my name.  Is there a possibility that I can

8    get a free transcript of this hearing today?  I have to pay for

9    it?

10          THE COURT:  Yes, they have to be purchased, but it is

11   a public record that people can get.

12          MS. STOVER:  That was my only question.

13          MS. LISS-RIORDAN:  Your Honor, I would just ask before

14   you end the comment section, that you might want to hear from

15   Ms. Desai who can talk about her interactions with drivers in

16   response to some of them.

17          (Reporter inquires of person talking from the

18   audience)

19          THE COURT:  Sir, please come up to the microphone.

20          MR. UZOUKWU:  The only aspect I had issues with was

21   this idea of the City giving money with the right hand and

22   collecting remaining whatever is left in the pot with the left

23   hand.

24          THE COURT:  It's only with respect to the unclaimed

25   portion if there is any.  In other words, there's 19,000

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  potential people to make claims.  If only 5,000 make claims,

2  then it may be that we don't exhaust the amount of money.  So

3  it's not a settlement where whoever makes a claim is going to

4  split that pot.  It's whoever makes a claim is going to get

5  compensated according to the formula in the settlement

6  agreement.  If there's money left over, then it will be

7  distributed among those who made claims to some point, but the

8  balance then goes back to the City.  That's a hypothetical.

9  It's not clear we are going to reach that.  As of today, about

10  110 million has been claimed.

11          Is that correct, Ms. Liss-Riordan?

12          MS. LISS-RIORDAN:  Yes.

13          THE COURT:  That's with potentially six months to go

14  for people to make claims.

15          MR. UZOUKWU:  Your Honor, humbly and respectfully, I

16  still think the City should not be able to claw back anything.

17  If the class members have to go four rounds, five rounds, until

18  whatever the City has willingly said it is actually offering as

19  a settlement is exhausted.

20          THE COURT:  No. No.  The City has said that -- the

21  parties have said they think this is a fair way to compensate

22  people, and so this is the formula.  If that formula only

23  totals 120 million, it doesn't mean that anybody who was

24  compensated according to the formula got less than what they

25  deserved.  The formula is designed to get people their fair

1    resolution.

2           It could be argued that this is a higher resolution

3    than would be possible at a trial.  But it's a sure thing.  So

4    that's the settlement.  There are settlements that are

5    structured different ways.

6           If your objection is that there should be no provision

7    that allows for the City to get anything back, that the 140

8    should go to the class members, that they should be given even

9    more than what this formula calculates for them, then your

10   objection is noted then, I guess, but...

11          MR. UZOUKWU:  Officially what I am requesting is for

12   that aspect of the settlement to be stricken from the record

13   from the settlement the way it's structured.  Everything else--

14          THE COURT:  Well, I don't know, the City may say then

15   no deal, and then we'll have 8,000 trials.

16          MR. UZOUKWU:  Okay.  Your Honor.  Thank you.

17          THE COURT:  Thank you.

18          Ms. Desai.

19          MS. DESAI:  Good morning, your Honor.

20          For the record, my name is Bhairavi Desai.  First name

21   B-H-A-I-R-A-V-I.  Last name D-E-S-A-I.

22          And I am the executive director of the New York Taxi

23   Workers Alliance.  The taxi workers alliance is the

24   organizational plaintiff in this case.

25          THE COURT:  Yes.  And you testified at the trial, I

1    think.

2           MS. DESAI:  I did, yes.  And also at the jury trial.

3           So just really to add to what Ms. Liss-Riordan has

4    already said, our organization did work with the law firm to

5    contact the different class members, both in 2023 and then

6    recently.  I have no personal knowledge of the individuals who

7    have spoken so far, but I can tell you, generally speaking,

8    that there are a lot of people working on this.  I mean, from

9    our union office alone, we had like over six, seven staff that

10   were working just on this outreach where we were emailing

11   people, texting them, and also we were using both what's called

12   an auto-dialer where you can, you know, it's automatically

13   dialing, and so that's how you can make mass phone calls.  So

14   for some weeks we were making as many as like 5,000 calls at a

15   time.

16          Then we also engaged in direct phone banking with the

17   individual numbers that we had.  This was in 2023.  We also did

18   media work in the general mainstream media with a couple press

19   conferences and press releases so that even through the

20   mainstream news, you know, potential class members could be

21   notified of the deadline to sign up for the hearing.  And then

22   recently as the settlement notice has gone out, we similarly

23   have been engaging in robo calls, text messages, emails, and

24   phone banking.  We used our own social media channels,

25   particularly Facebook.  We also like paid for advertising to

1     boost up the posts on Facebook.  So we also had some of members

2     who were very active on TikTok make videos to try to reach a

3     broader audience.

4            From our experience, what we have found is that -- and

5     this is similar to another class action settlement that we

6     worked on regarding wage theft, where it was a $328 million

7     wage theft settlement case that we were part of with the

8     Attorney General's office.

9            In large part, both in that settlement case and in

10    this one, many times people think it's a spam.  They find it

11    hard to believe that there could be a settlement.  Many people

12    we talked to even forgot about their arrest, about the

13    suspension.  It had happened so many years ago for many

14    families.  People have moved on.  We found that there are many

15    individuals who are no longer living in this country.  There

16    are people who have passed away.  And so it's been difficult,

17    it was a difficult process even in 2023 to reach so many

18    people.  To be honest, we were really proud of the 8,000 number

19    because that took a lot of work to be able to reach that many

20    people.

21           But again, I this think that for some folks, we found

22    the messages had gone to their spam folder.  Some people were

23    skeptical.  They didn't believe this was real.  They thought

24    this was a scam.  Some people -- there were some language

25    issues as well for some of the folks, but I know that in the

1    website, you know, that's translated into different languages,

2    when we did our robo call recordings, our prerecorded messages,

3    we also tried to do some in different languages.  So we tried

4    to even identify the language group of individuals just based

5    on their names, you know, to the best of our ability.

6          So we tried a variety of ways to really reach the

7    maximum number of people.  I hear the frustrations of the folks

8    that have spoken, and I do think that this administrator, we

9    worked with different class settlement administrators, we've

10   actually found Simpluris to be very good, very efficient.  When

11   we had issues and we call them from the office, we do find they

12   will email people fairly immediately, and, you know, we will be

13   happy to work with the individuals.

14         Part of the reason that we played a role is because we

15   have a physical office, so as opposed to the fund administrator

16   who you are contacting by email or on the phone.  And so one

17   thing we've said to people is if you're skeptical, if you're

18   not sure, come, you know, this is a physical office that you

19   can come to a public space, you know, that could really answer

20   your questions.

21         THE COURT:  Right, but when you say you would work

22   with them, this would ultimately be decided by the claim

23   administrator, right?

24         MS. DESAI:  Yes, we don't have decision-making power,

25   but if there are individuals who want to be able to formulate

1    their arguments or put papers together, they want to be able to

2    email or scan, we have staff that are able to help individuals

3    do that.

4            THE COURT:  All right.  I mean, we have had, I think,

5    at least half a dozen people today indicate that they did not

6    get notice.  Maybe it's a larger number or maybe it's a

7    relatively smaller number.  It's hard to say at this point.

8    It's certainly a large class over a long period of time, so

9    there are challenges communicating with that many people.  I

10   don't denigrate the efforts made by you or your organization or

11   others.  The issue simply is whether or not I think this

12   settlement sufficiently accounts for that.  And so --

13           MS. DESAI:  If I may take one more minute, your Honor.

14           THE COURT:  Sure.

15           MS. DESAI:  I also just really have to say this has

16   been like a real labor of love for the attorneys that were

17   involved.  Mr. Ackman and I met in 1997 and, you know, but in

18   terms of working on this case really from the very beginning

19   and just as someone that works for a union that represents

20   drivers, he, I just have to say, this has been so meaningful to

21   see a semblance of justice.  I know people really, really

22   suffered when they went through this crisis, and not having a

23   fair hearing to defend themselves truly felt like insult upon

24   injury, and so just to I think be at this point after all of

25   these years, almost two decades to be talking about this

1    settlement, it's truly so meaningful, and I think that, you

2    know, for many of the people that we've spoken with, it's --

3    the settlement amount is going to be transformative.  They are

4    never going to get back everything they lost.  Because many

5    things in life you just what can't quantify, especially when

6    you feel you've been dealt an injustice, but we're really

7    thankful to our attorneys and for the City to be willing to

8    make the settlement and thank you to you, your Honor, for

9    presiding over this case for so many years.

10              THE COURT:  It's been a lot of years, I will say that.

11   But in any event, no need to thank me.  Thank you for speaking

12   here today and for the efforts you've made to try to make sure

13   the settlement was publicized and the case was publicized

14   before this when it wasn't yet a class for damages purposes.

15   Thank you, Ms. Desai.

16              MS. DESAI:  Thank you.

17              THE COURT:  So what I think it might be worth doing

18   now is just sort of reminding everybody what the criteria are

19   for a class action settlement.  The Court is primarily focused

20   on the fairness vis-a-vis the plaintiffs, and that includes a

21   number of factors that are set forth in the parties' papers

22   certainly the plaintiffs' papers.  The first is that it's a

23   fair and reasonable and adequate settlement, and one of the

24   first inquiries on that score is whether the class

25   representatives and the class counsel have adequately

 1   represented the class.

 2          This was an unusual class in the sense it didn't get

 3   certified until the very end, and so it was not a class action

 4   -- putative class action, but it wasn't certified as a class

 5   until much later with respect to damages.  And so that made it

 6   a somewhat unusual case.  But certainly the class

 7   representatives who drove this case for 15 years and class

 8   counsel who have been here for most of that time, Mr. Ackman

 9   was here from the very beginning, others joined as the case

10   progressed, certainly I think have adequately represented the

11   class.  They have been very zealous, tenacious, tireless, you

12   know, I think that the fact this went up to the Circuit twice,

13   had a couple trials and then a lengthy negotiation with the

14   City over a settlement I think does demonstrate just how

15   zealous the class counsel were in this case.  So that one seems

16   to me to be, I think, pretty clear.

17          Another criteria is whether or not the settlement was

18   proposed at arm's length.  We don't want to have a situation

19   where settlements are made sort of in a back room without

20   anybody really looking out for the interest of the class.  This

21   was one that was done with a lot of an assistance from

22   Magistrate Judge Wang, and so I am confident that this was

23   arm's length.  These parties fought -- they fought allot.  I

24   mean, not inappropriately, but this was very hotly contested

25   from the beginning.  So there is no suggestion of any kind of

1    collusion or anything in this case which I think could be

2    supported by the record.

3          The next issue, and this is really the big one, is

4    whether the relief is adequate.  And that turns on assessment

5    of the costs, of the risks, of the potential delay associated

6    with a trial, and associated with appeals, and the fact that

7    there is a lot of uncertainty that comes with litigation.  So

8    we had a bellwether trial.  We could have had more, I think one

9    of the chief reasons for having that trial of 20 randomly

10   selected plaintiffs was to see if we could figure out what

11   these claims were worth with a cross-section, not cherrypicked

12   by the plaintiffs, not cherrypicked by the defendants, but

13   randomly selected.  And that was interesting.  Of the 20

14   selected, ten didn't show for a variety of reasons.  But ten

15   did litigate the case, came and testified, and they all

16   prevailed, and they all got damages in varying amounts.

17         That verdict or those verdicts did inform the

18   settlement here.  I think there is no guarantee, candidly, that

19   those results would have been replicated in the future.

20   There's a good chance that the success in the first trial might

21   have diminished by the second or third trials.  It's hard to

22   know.  I think parties can get used to litigating a case, and

23   it becomes more clear what the issues are in a damages-only

24   trial.  So it seems to me that that trial was a good win for

25   the plaintiffs, and because that become the bar and the method

1    by which the settlement was developed, it seemed to me that was

2    a very good result for the plaintiffs.

3          This is a $140 million settlement which is

4    historically large settlement in New York City or in where New

5    York City is a defendant.  So that is, you know, I think it's a

6    data point that's worth considering.  It's not dispositive.

7    Someone suggested it should be larger or that there are

8    components of this settlement agreement that allow the City to

9    claw back on some -- not claw back, but get some money that's

10   unclaimed back, some portion of it.  It's not clear that is

11   going to happen.  At this point I suspect it is not likely

12   going to happen given where we are with six months to go if the

13   case is approved for the class settlement.  But certainly I

14   think that this is a pretty good settlement as these things go.

15         Attorneys' fees is another consideration, and this is

16   one where there is dispute among the parties.  So I think I do

17   want to talk about that some more in a minute.  But I'm just

18   looking at the different factors that a Court considers in

19   deciding whether it's a fair settlement.  And there are factors

20   set forth in a case called *Grinnell*, so they're the *Grinnell*

21   factors, and these I think also line up in finding that this is

22   a fair settlement.

23         So I'm happy to hear, Ms. Liss-Riordan, anything else

24   you want to say with respect to the fairness of the settlement

25   independent of the attorneys' fees because I want to come back

1  to that, but otherwise just in terms of adequacy and fairness

2  and reasonableness anything you wish to say?

3          MS. LISS-RIORDAN:  Yes.  Sure.  We said it in our

4  papers, but I just want to put on the record here, we are very

5  proud of this settlement.  It was by no means -- even after the

6  many, many years that Mr. Ackman, and then joined by

7  Mr. Goldberg, litigated this case up to the Second Circuit

8  twice.  It was quite an accomplishment to obtain the liability

9  ruling.  Even after that point, success was by no means a

10  foregone conclusion, as you, of course, know yourself, your

11  Honor.  It was very unclear how anyone was going to be able to

12  prove that they were actually entitled to damages because there

13  were serious hurdles that had to be met because the standard

14  was the drivers would have to show that had a constitutionally

15  adequate hearing been available, they would have requested one

16  and they would have prevailed at it.

17          THE COURT:  Right.

18          MS. LISS-RIORDAN:  So you've heard today a sampling of

19  the class members who we've been working with for these last

20  several years, taking their questions, explaining to them about

21  the case, encouraging them to be a part of it, fighting for

22  them avidly in order to get to a fair place.  We did the

23  bellwether trial.  We were extremely pleased with the results.

24  We appreciated the jury's verdict, obviously, and then the way

25  you handled the trial, your Honor, we felt like that was a

 1    good, fair indication of what may happen.  And it was not a

 2    foregone conclusion that they were going to win anything.  So

 3    we were very, very pleased with the results of the jury trial.

 4         And then after that, we appreciated the efforts of the

 5    City to sit down and talk with us before launching into 8,000

 6    hearings.  And, again, it was by no means a foregone conclusion

 7    that we were going to reach a result like we did.  It took more

 8    than a year of negotiations.  We had at least, I believe, four

 9    in-person sessions with a private mediator, which is really

10    quite a lot, in addition to ongoing conversations with a

11    magistrate judge, and came out of it with an agreement that

12    individually for the people who requested hearings, many, if

13    not most, may actually be receiving more than what the test

14    case, so-called bellwether plaintiffs, received.  So we think

15    that is more than adequate.  We are very, very happy about

16    getting that result.

17         Oftentimes when you have this kind of a class action

18    case, and there is some type of a test case trial, the

19    settlement that results is a much smaller amount than what you

20    recovered at trial because the defendant doesn't believe that

21    you are actually going to go through and do all of those types

22    of hearings.  This wasn't a case where because you didn't

23    certify the case as a class action on damages in your class

24    certification order, only on liability, there was still a

25    question mark about whether people were going to be able to

1    actually recover damages because they had to prove that they

2    would have requested it and then won a hearing.  So to

3    negotiate an amount of a settlement that will get people even

4    potentially more than they would have achieved if they achieved

5    comparable to the test case plaintiffs, frankly, we feel that

6    is extraordinary result.

7         You've heard from some class members today who are

8    unhappy about the administrative issues receiving notice, and

9    we will work through all that.  We are --

10        THE COURT:  What does that mean to "work through all

11   that" because I understand your point, and it's not shocking

12   that in a group this large, there will be some things that slip

13   through the cracks.  But what does it mean to work through

14   that?

15        MS. LISS-RIORDAN:  We will have staff members who are

16   taking these questions, who are looking into why that happened,

17   why people might not have received something that they say they

18   should have received because they were at that address.  We

19   will be working with the New York City Taxi Workers Alliance

20   which is going to continue to help us speak to class members to

21   understand what their concerns are and make a claim case for

22   the administrator as to why someone should be in a different

23   category.

24        THE COURT:  In other words, you're not in a position

25   to say, okay, good enough, we'll put you in the other category.

1          MS. LISS-RIORDAN:  Right.  Right.  Right.  No, it's a

2     process.  We have a lot to work through, and it's going to be a

3     lot more work.  But all I was going to say is you've heard from

4     a few people who are concerned about those administrative

5     aspects.  We have been on the phone with many, many class

6     members who have been very appreciative about what happened

7     here and are very excited to receive their settlement payment.

8          THE COURT:  Do you have a sense as to how many people

9     fall into the category of the several folks who spoke today,

10     like Ms. Alston and others who said they didn't get notices?

11          MS. LISS-RIORDAN:  I don't.

12          THE COURT:  Is it just a handful or are we talking

13     about is it potentially hundreds or thousands of people?

14          MS. LISS-RIORDAN:  I don't have a sense of it.  I

15     seriously doubt it's thousands.  I seriously doubt it's

16     hundreds.

17          THE COURT:  Okay.

18          MS. LISS-RIORDAN:  These things just happen in a class

19     this size, and a class that is not always that easy to

20     communicate with, and many people who are not native English

21     speakers.  But we have staff dedicated to it and we have the

22     New York Taxi Workers Alliance working with us, and we are

23     committed to seeing it through.  I know you said it's just one

24     data point, but we do believe this to be an historic settlement

25     for New York City as well as due process cases in general.

1  We're very proud of it.  We're very pleased to be here today.

2  It's been a long, long road, and we look forward to your

3  decision.

4          THE COURT:  We have some other things to talk about,

5  but okay.  Thank you.

6          MS. LISS-RIORDAN:  Thank you.

7          THE COURT:  Ms. Weinblatt, anything you would like to

8  say with respect to the fairness factors other than attorneys'

9  fees because I want to sort of carve that out.

10          MS. WEINBLATT:  Just briefly, your Honor, once the

11  liability finding was made, the City was interested in reaching

12  a fair resolution.  We agree that the bellwether trial was an

13  excellent first step, and we used that information as we

14  proceeded with the negotiations, and we think it's -- setting

15  aside the issue of attorneys' fees, we think it's a fair

16  resolution.

17          THE COURT:  I think the estimate was that if everybody

18  who indicated they wanted a damages trial were to have a trial,

19  it would take six years, assuming five trials a day -- five

20  individuals having a trial on a given day, and the judge doing

21  nothing but this case.  So do you want to speak to that?

22          MS. WEINBLATT:  Agreed.  That certainly influenced our

23  very strong interest in settling the case because devoting that

24  type of resource for that length of time was something

25  impractical.

1           THE COURT:  And also probably not practical for the

2     individual plaintiffs, I mean, to wait that long, and an

3     additional five years if you're at the end of that line would

4     be a long time and no certainty.  It's not at all clear to me

5     that the results would have gotten better.  I think they may

6     have gotten worse over time.  I think that's the nature of

7     trying a case.  You sort of get comfortable once you realize

8     what you need to do to refute arguments about damages, and I

9     think there's a good chance that the damages in the future

10    trials might have been a lot lower potentially.

11          Let's then talk about attorneys' fees because this is

12    where there is a tremendous disagreement.  No one would

13    disagree that counsel are entitled to be compensated, and the

14    statute under which this case was brought requires that the

15    losing entity, the of city actor, the state actor, has to pay

16    attorneys' fees, reasonable attorneys' fees.  That's baked into

17    the statute.  There's already been an award of interim fees,

18    but there are more fees to be had here.  So it's a question of

19    how much.

20          So the settlement contemplates 25 percent, or up to

21    25 percent of the amount claimed, which if 140 million were

22    claimed, that would be then 35 million to the lawyers, right?

23    So the City is suggesting it should be, I think, effectively

24    just the reasonable hours worked and paid based on the lode

25    star calculated by actually looking at what the actual hours

1  worked, whether there should be a reduction of some hours that

2  were excessive or fees that were above reasonable rates.  We

3  kind of did that already for the interim payment.  And so the

4  City is basically coming back and saying it ought to be in the

5  neighborhood of 5 million or so, right?

6      MS. WEINBLATT:  Essentially, your Honor, except I

7  would note two things:  One, there is no way to do a lode star

8  calculation because counsel didn't submit any time records, so

9  certainly -- I'm sorry, go ahead.

10      THE COURT:  Well, I mean, the Court could direct

11  everybody to go back and do that, but there is a rough

12  estimate, and I did an interim payment, so I have some notion

13  of the hours spent to date prior to the trial.  It didn't

14  include the trial.

15      MS. WEINBLATT:  Yes.

16      THE COURT:  But the bulk of hours is probably

17  pretrial.  So the post trial and post settlement have been a

18  lot.  I get it.  But, in any event, your position though is it

19  ought to be in the neighborhood of 5 to 7 million, right?

20      MS. WEINBLATT:  Yes, your Honor, that is our position.

21  And if I may, can I just offer a case citation?

22      THE COURT:  Sure.

23      MS. WEINBLATT:  Which is I have a hard copy if the

24  Court wants to see it.  *Hernandez v. Compass One LLC*.  I can

25  give you an Lexis and a WestLaw cite.  The Lexis cite is 2021

1    U.S. District Lexis 193461.  The WestLaw cite is 2021 WL

2    4639334.  It's a 2021 case from the Southern District.  The

3    case Docket No. is 20 CV 7040.  It is a district court case,

4    but it simply addresses the issue of attorneys' fees and the

5    evaluation of reasonableness in the context where there is a

6    retainer agreement, so I just wanted to bring that case to the

7    Court's attention.

8            THE COURT:  I want to talk about the retainer

9    agreement in a minute because there is some dispute or, I'm not

10   clear, the extent to which there are retainer agreements with

11   the plaintiffs as a whole.

12           So 25 percent, I think Mr. Murphy suggested, that that

13   didn't seem excessive when you consider that generally

14   contingent fee cases is a third or more in some cases.  But for

15   class actions, it's not typically that the percentages are that

16   high.  Sometimes they are; sometimes they're not.  There are a

17   number of factors that courts consider, and generally a lode

18   star or at least a lode star check is often done by a court to

19   make sure that the multipliers aren't too high.  In other

20   words, the amount going to attorneys is not far, far in excess

21   of the hours worked or the amount of work done.

22           So I guess two things that come to mind to me, and I

23   want to hear from Ms. Liss-Riordan on this or others from the

24   front table.  Does the fact that this is a civil rights case

25   with a statute that contemplates the reasonable payment -- the

1   payment of reasonable fees make it of different than your

2   typical contingent fee case.  From what I could tell, the

3   largest multiplier for a civil rights case, a 1983 case

4   involving New York City, was under three.  The multiplier was,

5   I think, 2 and three quarters to 2.9 maybe.  And so this would

6   be, if I'm just even using the plaintiff's sense as to what the

7   lode star would roughly be, and I don't really have a lot of

8   data to know if that's right, this would be a multiplier of

9   five or six or maybe even seven times the number of hours

10  expended at your usual rates.  So if you can address that

11  first.

12          MS. LISS-RIORDAN:  Sure, your Honor.  If I could just

13  note a couple of things first.  First of all, we've provided

14  case sites to that the percentage of fund is the trend even in

15  this district and this circuit.

16          THE COURT:  Most of the cases you cited -- most of

17  them, not all, but most of them were like securities class

18  actions, right, that don't have a fee-shifting provision in the

19  statute.

20          MS. LISS-RIORDAN:  Well, the cases that our firm

21  litigates every day are fee-shifting cases involving wage

22  claims, as well as discrimination claims.  Those are

23  fee-shifting cases, and I've never seen a court distinguish

24  based on whether there is a fee shifting provision in a statute

25  so --

1              THE COURT:  You could see why there might be a

2    distinction to be made.  I think the risk is a little different

3    when there is a statute that says you're going to get paid as

4    opposed to having a class action fairness resolution for a

5    large class.  So I can see some differences.  Maybe it

6    shouldn't be dispositive, and I understand your position, but

7    if we stick to the civil rights-style cases that have cost

8    provisions in them, I didn't find anything that had a

9    multiplier close to this one.  I don't know if you've done that

10   kind of apples-and-oranges analysis, but it is a concern of

11   mine.

12             MS. LISS-RIORDAN:  Your Honor, Mr. Goldberg is going

13   to talk for a minute about that aspect of it, the civil rights

14   case.  I will just say the types of cases that I've been

15   litigating for more than 25 years are discrimination cases and

16   wage-and-hour cases that have fee-shifting provisions, and all

17   of the cases that we have settled have been based on a

18   percentage of fund.  So I've never heard a court question

19   whether or not percentage of fund is appropriate based on a

20   fee-shifting issue, so I don't know why a civil rights case

21   would be different from any EEOC case, any Title VII case, an

22   FLSA case, and this is how we've seen --

23             THE COURT:  It's just riskier.  On a individual basis,

24   it's riskier.

25             MS. LISS-RIORDAN:  Right.  We always get percentage of

1    fund for FLSA, state wage-and-hour cases, as well as

2    discrimination cases, and I've never had a court question that.

3         I do want to point out the due process case that was

4    recently against the City, *Miller v. City of New York*, which we

5    noted in our papers, was a case in which the City did not

6    oppose a 25 percent percentage of the fund for a civil rights

7    case against the City.  It was in the range of a 50-plus

8    million dollar settlement.  So we're just curious about why the

9    City has chosen to make such an attack on our request for fees

10   in this case, which has been a much more long-standing case,

11   involved much more risk, especially from the beginning, but

12   even as I noted before, was still an enormous risk even after

13   the Second Circuit decision because of the uncertainties about

14   whether or not a class could recover damages on a class-wide

15   basis.

16        I will submit this is not your usual case.  Again, the

17   bellwether case, it was not like a class -- I mean, a class

18   wasn't certified for damages because the results of particular

19   plaintiffs was not going to actually inform what others would

20   get.

21        THE COURT:  No, I get that.

22        MS. LISS-RIORDAN:  The reason our firm was I believe

23   brought into this case by Mr. Ackman is because we do have a

24   history and reputation for taking on this type of mass

25   individual claim, and as we explained in our papers, we've done

1    that, and we are doing that and we are ready to do that.

2           THE COURT:  No, look.  I don't think you have to

3    justify yourself on that score.  I just think the question is

4    the *Miller* case with a lode star check was under three times

5    the multiplier for what the hourly rate would have been.  So

6    this one is double that.

7           MS. LISS-RIORDAN:  Yes, I agree.  Our calculation is

8    it's somewhere in the fives, depending how you count the hours.

9    We recognize if the Court were to say that the reasonable hours

10   should be less than what we've submitted, then the multiplier

11   could go somewhat up.  I think we've submitted to you many

12   cases showing that courts have generally accepted lode star

13   multipliers under ten, even above ten.  They're cited in the

14   cases.  For this case, given the length of the representation,

15   given the extreme risks, given the enormous amount of costs

16   that was put into this, as well as the time that was put in by

17   the lawyers who then couldn't go to work on other cases, this

18   was a big commitment by all of counsel.  Obviously, the --

19          THE COURT:  There's no question about the commitment.

20   I just think the commitment, I mean, reasonable rates for the

21   hours expended would put you in the $6 million range, according

22   to you, right?

23          MS. LISS-RIORDAN:  Yes.

24          THE COURT:  So the settlement calls for up to

25   35 million, so it's a big jump.

1              MS. LISS-RIORDAN:  Right, with a credit for the amount

2     of the interim award that was already awarded.

3              THE COURT:  I get that too.

4              MS. LISS-RIORDAN:  Right.  Right.  All I'm saying is

5     that the market looks at this, the system that we have

6     encourages top plaintiffs' lawyers to work on cases that may be

7     very risky, but through this process allows for firms to take

8     big risks because of the possible upside, and our firm is

9     pulled in a lot of different directions.  We were very happy to

10    be part of this case.  I'm very proud of this case.  It's not a

11    case that, given the fact that there's the risk of no payment

12    whatsoever if you're not successful, it's not the type of case

13    that our firm economically would have been able to get involved

14    in if there weren't this potential upside that entices a firm

15    like ours to be involved.  So that's what courts recognize, and

16    it's a way for class members who do not have the ability to pay

17    for lawyers at market rates are able to get top-notch

18    representation.  We, of course, are going to defer to your

19    Honor's discernment to figure out what's reasonable.  We

20    recognize the City has cited a number of cases, including the

21    cases attached to its opposition, in which the amount of the

22    attorneys' fees was going to affect how much the City would

23    pay.

24              This isn't one of those cases because, as you noted,

25    the money is not coming out of the City's pocket.  It's the

1   class members who at this point would be paying for the

2   representation.  Every one of the class members who requested a

3   hearing did sign a retainer form in which we said we'd be

4   seeking up to, I believe we said a third, and no one questioned

5   that, and no one has raised an objection to that.  That is just

6   the market for what payments are for lawyers' services in the

7   City.  Again, it's not going to be more money out of the City's

8   pocket.

9          THE COURT:  No, that's for sure.  I guess my question

10  is this:  There are retainer agreements with what all 8,000 who

11  signed them--

12         MS. LISS-RIORDAN:  Yes.

13         THE COURT:  -- who indicated they wanted to have a

14  trial.

15         MS. LISS-RIORDAN:  Yes.

16         THE COURT:  And the rest of the class no, no retainer

17  agreements?

18         MS. LISS-RIORDAN:  Right, the people who didn't

19  request hearings, that's right, we don't have an agreement.

20         THE COURT:  That's right.  And the people who

21  requested hearings are going to account for the lion's share of

22  the settlement.

23         MS. LISS-RIORDAN:  Correct.  Yes.

24         THE COURT:  So you have a contractual arrangement with

25  them to receive --

1          MS. LISS-RIORDAN:  Up to a third.

2          THE COURT:  -- up to a third.  So what does that mean?

3   This is purely a hypothetical, but if I say okay, I'm going to

4   award attorneys' fees of ten percent or a dollar amount of

5   $12 million, this is purely hypothetical, you would then still

6   collect from the people who signed retainer agreements to 25 or

7   to 30 percent?

8          MS. LISS-RIORDAN:  We're submitting it to your Honor's

9   discretion, of course, because we're seeking a class

10  settlement, but I'm just telling you we do have signed retainer

11  agreements from individuals who requested a hearing.

12         THE COURT:  No, that's my question for you.  So if I

13  said I think 15 -- purely hypothetical -- 15 percent would be

14  appropriate, then you're not going to seek to enforce your

15  retainer agreements?

16         MS. LISS-RIORDAN:  I mean, it wasn't our plan.

17  Technically legally I think we could, but that wasn't our plan.

18         THE COURT:  It seems to me really my -- the inquiry

19  for me is whether or not, you know, a settlement agreement that

20  includes retainers, that's unusual, right, because most of the

21  time you don't have the class certified so late, but the class

22  identified and contacted by counsel, so that you've got 8,000

23  retainer agreements.  This is an unusual setup.  I'm not

24  faulting anybody.  That's just the way it went.

25         So it seems to me that I can either decide that a

1   settlement that includes a retainer agreements like this is not

2   fair or I can say it's fair, and then, you know, whether you

3   decide to collect -- I mean, I could give a lower number, but

4   whether you decide to collect on your retainer agreements is up

5   to you.  That creates a different problem, I guess, for people

6   who didn't sign retainer agreements, they would be subject to a

7   different attorneys' fee, right?

8           MS. LISS-RIORDAN:  If that's the way it worked out.

9   I'm going to sit down and let me co-counsel --

10          THE COURT:  Well, these are considerations I have.

11  Because one of the factors that goes into whether it's fair is

12  the relevant recovery of the class, and it would seem -- it

13  would be unusual if those who were most assertive and came

14  forward to say "I want to have my trial" end up paying a higher

15  percentage of attorneys' fees than everybody else.

16          MS. LISS-RIORDAN:  Right.  Right.  All we're saying is

17  that these individuals were notified that we would be

18  requesting this fee, and they signed off on a retainer that

19  they thought was reasonable.  Again, there was the potential we

20  were going to have to take all their claims to trial.  So it

21  was a typical contingency fee arrangement.  It turns out that

22  we have been able to reach this agreement which we are

23  submitting to the Court for approval, so we're not seeking the

24  full amount that these individuals already agreed to pay, and

25  when the notice went out for the class settlement, we haven't

1    heard any objections to the 25 percent request, which is also

2    well within what courts have recognized to be fair and

3    reasonable, even in a so-called mega settlement.

4            But I want to sit down and let Mr. Goldberg speak.

5            THE COURT:  Mr. Goldberg.

6            MR. GOLDBERG:  Thank you, your Honor.  I just wanted

7    to pick up a few points.  The first is I think this, as

8    Ms. Liss-Riordan is saying, it's evidentiary that is 25 percent

9    reasonable?  Every single person who had in front of them said

10   25 percent or more, and that's thousands of people and they

11   said --

12           THE COURT:  Because of the retainer or because of the

13   class.

14           MR. GOLDBERG:  I would say both the retainer agreement

15   and the failure to object.  We don't have a single objection.

16   You heard Mr. Murphy --

17           THE COURT:  In fairness though, the class notice says

18   up to 25 percent, but it doesn't give a number and doesn't

19   really specify why it would be 25 as opposed to 15.

20           MR. GOLDBERG:  Sure.  Absolutely.  In terms of what's

21   reasonable, and obviously there's no one number that is

22   reasonable, but it is significant even in the *Miller* case we

23   were discussing, there were objectors as to the fee.  You heard

24   some of the most strident objections today.  Mr. Murphy said

25   this is a disdainful settlement, and you said what about the

1   fee, and he said, no I think 25 percent for the lawyers is

2   fair.  And that's because as we've said, that is what the

3   market says.  And because you raised the question of Section of

4   1983 and the interaction, I think this is a complicated

5   question, but the bottom line is contingency fees now are

6   absolutely the norm in Section 1983 cases where there are

7   damages.

8        The reason there's a Section 1988 in the fee shifting

9   is there are tons of 1983 cases where there are no damages.

10  First Amendment, Second Amendment, affirmative action, nobody

11  has any monetary damage for having their gun taken away or

12  having their speech taken away, but they get fees because

13  otherwise no one would do the cases, right?  That's the core

14  case for 1988.  And the real question in those cases is how

15  much should the defendant pay, right, and that's because the

16  money always comes directly out of defendant.

17       As you said earlier today, the question here really is

18  what is fair as to between us and our clients, and that's a

19  very different question.  And the norm absolutely prevalent is

20  to say fees are still available, but you do it on a contingency

21  basis, and just to say, you asked about the multipliers.  The

22  *Miller* case you said was under three.

23            THE COURT:  By my calculation, it was.

24            MR. GOLDBERG:  I'm not sure.  I think what I have in

25  front of me is their motion for approval, and they said it was

1    somewhere around 4.3.

2          THE COURT:  I have 2.97.

3          MR. GOLDBERG:  They said it was going to go down

4    because they had more work to do, and that is sort of similar.

5    They are in almost exactly the same position that we are in

6    terms that they had a very difficult class to administer, and

7    they anticipated lots of hours.  But they did mention in their

8    papers, and, I can candidly say, I haven't looked this case up,

9    but they say Judge Koeltl approved an application with a

10   multiplier of 4.7 against the City of New York.  And the

11   citation for that case is *Jones v. City of New York*.  But they

12   just have the Civil Case No. 17 Civ. 07577.  And they cite the

13   ECF 221-222.  I haven't looked that up.

14         They have an extensive list of multipliers well above

15   five.  We obviously have our list, so it's not -- I would not

16   say it's common in civil rights cases, but I don't think it's

17   unheard of.  And, again, it's in the ballpark of

18   reasonableness.  And as we've said, the Murphy -- sorry, the

19   *Miller* case has -- there are a lot of similarities.  In that

20   case, again, the City actually agreed that 25 percent was

21   reasonable, and the case that they appended to their brief

22   *Gaetano*, they said it should be up to 16.5 percent in a case

23   where the judge himself, Judge Berman, ultimately awarded

24   20.8 percent, and he found that the various factors counseled

25   against a larger fee because -- you know, it was a lower fee

1   because they didn't have great success and because the

2   plaintiffs in that case suffered a lot.  So he said the quality

3   of the representation counseled against the reduction.  So it

4   was pretty clear that he was proceeding from a baseline above

5   20.8 percent, and that's the case that they've asked you to

6   look at.

7          I think it really would be -- this is ultimately a

8   matter of what is fair and reasonable.  And we've heard from

9   people who are in the class, and no one seems to think that

10  this is unreasonable, and, again, we could justify in all the

11  ways about the risk and the success, and you've acknowledged, I

12  don't want to take a lot of your time on that, but this is --

13  people don't win large procedural due process verdicts, damages

14  verdicts.  A lot of people don't even bother to bring damages

15  claims because of the *Carey v. Piphus* problem, and because it's

16  very hard to get a certified class. And if you can't get a

17  certified class, you're going one at a time.  And one of the

18  things we saw in the papers from the City is that this case

19  would be no different if it was just ten percent of the people.

20         THE COURT:  The case would be no different if it was

21  ten percent of the people?

22         MR. GOLDBERG:  They said if it was 1,950 people

23  instead of 19,000, it would have been the same work. The

24  magnitude of this case is they're suggesting we are sort of

25  benefiting from the fact that this is a really large class, but

1    what you've said and what we heard today, this was not a large

2    class.  This was 19,000 individual clients who were calling us

3    all of the time.

4            THE COURT:  Well, not all, I mean, right?

5            MR. GOLDBERG:  No, not all -- not everyone, but we had

6    these people, you know, legally they had individual cases, if

7    they went to trial, they would be individual cases, and we

8    treated them like -- there are a lot of classes where there are

9    20,000 people, and you talk about absent class members, and

10   most of the people are not engaged, and they're very happy when

11   they get their check for a hundred dollars or whatever.  This

12   is a group of people.  It didn't become a class until it was

13   certified on May 7 of this year conditionally.

14           Up until that point, the fact that the class was so

15   large, and the people were so upset and angry and aggravated

16   that they had waited so long, that that was a major part and

17   that figured into the settlement, it figured into we think the

18   City did the honorable thing, but they had the potential to

19   walk away.  And that was a real threat because we then would be

20   dealing with 19,000 angry people saying where's my money it's

21   been 20 years.

22           THE COURT:  But the point is if you did that over the

23   next six years, you would be making the same amount of money

24   you're making now as you propose, even though the number of

25   hours would be many multipliers higher, right?

1          MR. GOLDBERG:  If we did this for the next six years,

2     the statutory attorneys' fees would be off the charts.  The

3     City --

4          THE COURT:  Probably.

5          MR. GOLDBERG:  The City references in their papers

6     that there should be what we put in for our hours for the

7     trial, they said reduce it by 35 percent, something like that.

8     That would take you around $300,000, I think was my -- so if

9     you think 300,000 for ten people, and you multiply that by

10    8,000, it's a giant number.  We're not going to win every one

11    so that's a consideration.  I heard your Honor say a number of

12    numbers you think we could get worse in these trials because

13    the City would get better at them.  I would like to believe we

14    could get better as well.

15         THE COURT:  You had a lower ceiling.

16         MR. GOLDBERG:  But we would have -- you know, I think

17    there were things about the damages we got, we heard from the

18    jury that they would have given more money for emotional

19    distress than we basically asked for, so -- or we failed to ask

20    for, so I think that's --

21         THE COURT:  I'm not sure if that helps your argument.

22    I think the numbers are not high enough.

23         MR. GOLDBERG:  What it really says is this is a case

24    that needed to settle for all sorts of reasons.  I'd also say

25    six years is a very, very conservative estimate.  You have

1    other work to do beyond *Nnebe v. Daus*, and I suppose one-day or

2    two-day trials, or maybe it would be a little longer than that,

3    and then there would be post judgment in every single one of

4    those cases because they would have the right to appeal as long

5    as they were individual cases, so the City and our clients

6    might have --

7         THE COURT:  I think it's very likely people would not

8    have shown up.  We have ten out of the first 20 did not come.

9    I've got to believe if this went on for a number of years,

10   people are like it's too speculative and too much work, I'm not

11   coming.  So I do think the certainty and the speed that is

12   represented in this settlement agreement is not something that

13   should be ignored.  That's a pretty big --

14        MR. GOLDBERG:  We were desperate to settle this case.

15   I think that is really important to say is that this is a case

16   that needed to settle for those reasons because the people who

17   fell off after six years or ten years are people who are

18   deserving people who we wanted to get something for, so it's

19   absolutely a motivator for us, and we think it's a great thing,

20   again, that's why we're grateful to the City for stepping up

21   and recognizing that that regime would be fundamentally --

22        THE COURT:  What about the retainer?  It does seems to

23   me that, generally speaking, the case law suggests that where

24   there's a retainer agreement but still a fee-shifting provision

25   or it's a class action where the court is going to award

1    attorneys' fees, that doesn't trump or eviscerate the retainer.

2              MR. GOLDBERG:  I think there's a Supreme Court case

3    from 1990.  I can't remember the name.  I'll get it to you.

4    It's in our papers.

5              THE COURT:  *Venegas*.

6              MR. GOLDBERG:  I mean, again, the basic construct is

7    that when a Section 1988 fee is reasonable, you know, that

8    there's a test for that, and basically, you know, we know it's

9    the lode star test is the basic way.  But then that doesn't

10   mean that's what's reasonable for the attorney to collect.

11             THE COURT:  1988 controls what the losing defendant

12   must pay, not what the prevailing party must pay his lawyer.

13             MR. GOLDBERG:  Exactly.

14             THE COURT:  So the bottom line is for those in the

15   courtroom who might be glazing over at this point where there

16   is a retainer agreement where it says the lawyer will get a

17   third, the court is not typically going to say that that is not

18   enforceable.

19             MR. GOLDBERG:  But, again, I think we're not asking

20   you to enforce the retainer agreement so much as to say that we

21   are willing to forego -- if you awarded 25 percent to

22   everybody, we will forego our right to collect 33 percent for

23   sure.  And, again, I would go further and say for a

24   reasonable -- if there's a reasonable fee, we're not going to

25   collect because we think it should be distributed.  Again,

1    that's one of the principals of a common fund is everybody who

2    benefits should pay proportionally or equally in some way, and

3    so if we were to take the people who got involved later and

4    just, you know, got the notice about the 25 percent, it just

5    seems like a fair and reasonable thing is that everybody in the

6    class pays a quarter of what they're recovering.  And, again,

7    if there's money left over, this is not a case where we're

8    asking -- we say, wow, what a big number we got for the

9    clients, we're only getting paid for the money that people

10    actually recover.

11        So it's very structured in a very clean and neat way,

12    and I think people instinctively say 25 percent sounds

13    reasonable to me.  And I know there are arguments about whether

14    it's 25 percent or 20.8 percent, but I think it's very hard to

15    say 3.5 percent is a way -- that would be a very unfair and

16    unreasonable, and that's essentially what the City is saying we

17    should get.  And this is a giant class settlement.  This is the

18    money the class is paying us.

19        When we had the interim fee award, it was a very

20    different situation.  It wasn't a class.  There wasn't a damage

21    claim.  And the question was what is the fair amount for the

22    City to pay in a non-damages posture.  If we come back and say,

23    we should get a lot because now we've set everybody up to win,

24    I think the Court would likely say that's crazy.  That isn't

25    part of your reasonable fee because nobody knows whether the

1  class will be certified.  Nobody knows whether anybody will get

2  damages.

3       THE COURT:  I'm going to give Ms. Weinblatt an

4  opportunity to speak to this issue too.  One of the points

5  she's made is that without some better documentation, it's

6  impossible to do a lode star check on a settlement like this,

7  which even courts that are doing percentage fee awards often do

8  a lode star check.

9       MR. GOLDBERG:  Your Honor, I'm going to be candid

10  about that.  I think she singles out -- the City singles me out

11  as the prime offender in this, and they suggest that I haven't

12  kept contemporaneously records.  I think you said there have

13  been three fee applications:  The original, the interim one,

14  the fees-on-fees, and the trial.  I don't think you looked at

15  the trial one because we asked you not to.  But, you know, I

16  kept the hours, it is my understanding and to the extent that

17  this is -- you know, that the main factor in the lode star

18  check was knowing how many hours.  And, again, if you looked at

19  this was part of a reasonableness inquiry that looked at how

20  much effort, and it's not exactly about how much the City needs

21  to pay, which is, you know, they say there's heightened

22  scrutiny in cases where it's the City -- where it's the public

23  that's here.  I think I could supplement what I have at the

24  same time, there are a bunch of cases that say you don't go

25  through the whole virtue of the percentage method as you don't

1    get into the level of fly-specking --

2            THE COURT:  It's not the level of it, but there's a

3    check --

4            MR. GOLDBERG:  Right.  I think if they are -- in

5    essence, if they are requiring me to provide, I definitely take

6    exception to the suggestion that this time wasn't expended.  At

7    the same time, if you subjected my hours, my contemporaneous

8    hours to the same scrutiny that you did in the past, I think

9    you would find maybe I've gotten a little bit better.  I've

10   learned some lessons, but the reality is lawyers block billing

11   and things like that happen when you have multiple cases going

12   on.  I want to be candid that the record -- if this were a 1988

13   petition, a lot of those hours might -- not every single one of

14   them would be allowed.  I think everyone would know that I also

15   worked a lot of hours that weren't record, and if you look at

16   the papers because this is a bit personal to me that they said

17   the main base of my prior records was that I didn't record

18   conversations and emails.  And I think that's again very

19   typical, to the extent I'm not a great timekeeper, it redounds

20   to the City in a 1988 case.  But all of which is to say we

21   understand the lode star cross check is not an absolutely

22   hollow exercise, but I also don't think it's an exercise and

23   the kind of thing you get into when the City is right to say we

24   don't pay damages that he didn't approve, and we are not going

25   to pay fees you don't fully approve to our satisfaction.  I

 1   think the case law bears out that it's the approach and the

 2   attitude because it's just one factor in assessing

 3   reasonableness, you don't obsess about these kind of picayune

 4   things about who recorded the email in matters like that.

 5         THE COURT:  All right.  I'm mindful of the fact that

 6   people are here.  We are going to wrap up by 1:00, so you can

 7   get something to eat.  I may not resolve this today.  This is

 8   hearing which I can take views from individual members of the

 9   plaintiffs class and also talk to the lawyers about fairness.

10         I will say this:  other than this the attorneys' fees

11   that we're talking about now, this strikes me as a very

12   favorable settlement for the plaintiffs.  I think there is no

13   guarantee.  In fact, there's a very good chance that individual

14   trials would have resulted in damages amounts that are far less

15   than what are represented in this settlement.

16         I also think it is worth noting that this is case that

17   died not once, not twice, in the district court, and the

18   lawyers continued to be tenacious and tend to fight this thing

19   to the end and they got a result that is an impressive result

20   by any measure of cases in this courthouse.  I think that is

21   fair to say.  I don't think there is any question this was an

22   arm's length negotiation.  There is no question that counsel, I

23   think, very zealously and capably represented the class.  The

24   same is true I think for the class representatives who have

25   lived with this case a long time.  Some of you learned about

1    this case very recently.  Others have been living with it for a

2    decade and half.  I think that makes this an unusual case, and

3    I think this is a very favorable resolution for the plaintiffs.

4         I think that's true, probably whatever the attorneys'

5    fees are.  Whether they are five percent or 25 percent, it

6    seems to me that this is still, I think the plaintiffs will end

7    up with more money in their pocket than they otherwise might

8    have had, had this been litigated differently or had we not had

9    a settlement, and we continued with more bellwether trials.

10        But the attorneys' fees is an issue that's important

11   and I have to make sure that I get that right.  We are going to

12   talk about the attorneys' fees for the next few minutes.  I

13   will not rule on this today.  I will rule with an order that

14   will come out probably in a couple weeks.  I may ask for some

15   additional papers on attorneys' fees from the parties.

16        If anybody wants to slip out now, I won't be insulted,

17   I will give you the chance.  Thank you for being here.  You

18   didn't have to come, but this meant a lot to you, and I hope it

19   was informative, and you were able to follow what was going on.

20        Ms. Weinblatt, I'm happy to hear from you now on the

21   issue of attorneys' fees.

22        MS. WEINBLATT:  Thank you, your Honor.

23        I'm going to try to respond to your Honor's questions

24   and to Mr. Goldberg and Ms. Liss-Riordan, what they've

25   articulated.

1          First of all, what the City wants is that the

2      plaintiffs' attorneys be paid a reasonable fee, as is the

3      standard in this circuit, and that almost uniformly means a

4      lode star cross check.  It's very difficult to do a lode star

5      cross check without any actual contemporaneous time records.

6      And I certainly didn't say Mr. Goldberg didn't have

7      contemporaneous time records.  What I said was that nobody

8      submitted them.

9          Mr. Goldberg himself mentioned that he had them and he

10     remitted them, but he did not provide them.  Mr. Ackman didn't

11     provide them.  Mr. Maitland didn't provide them.  And

12     Ms. Liss-Riordan didn't provide them.  so It's very difficult

13     to evaluate what would be reasonable here.  We offer as a

14     comparison your Honor's original fees award, which did include

15     contemporaneous time records, and that was more time and -- I'm

16     sorry, yes, that was more time and nearly 33 percent more

17     docket entries, and the court found a reasonable award at that

18     point was 2.54 or --

19         THE COURT:  Right, but that's a different inquiry,

20     right?  That's an inquiry under the fee-shifting provision of

21     the statute.

22         MS. WEINBLATT:  Yes.  But as a cross check, we think

23     it's relevant.

24         THE COURT:  But, I mean, for a class action, in other

25     words, that would be true if this were not a class action.  The

1   fees that the City would have to pay as the losing party would

2   be the reasonable fees, reasonable hourly rates multiplied by a

3   reasonable number of hours expended.  So that's what that

4   exercise was for the interim payment.

5          The resolution after the class action is different,

6   right?  Then the mandate is deciding whether this entire

7   settlement is fair and whether the attorneys' fees are

8   reasonable in light of the class action consideration.  It

9   seems to me there's some overlap, but that's a different

10  calculus.

11         MS. WEINBLATT:  It's somewhat different, but we think

12  it's related.  It's illuminating for the comparison to be made.

13         THE COURT:  What about the fact that really no

14  plaintiff class member has objected to a fee of 25 percent?

15         MS. WEINBLATT:  If I could speak to that with

16  reference to the *Venegas* case.  I'm going to reference the case

17  that I cited earlier *Hernandez v. Compass One*, which is a

18  Southern District case, and they are quoting another Southern

19  District case -- again, I have hard copies if that would be

20  helpful.

21         THE COURT:  No.  No.

22         MS. WEINBLATT:  The court in the *Hernandez* case

23  quoting this other case, *Gurung v. White Way Threading* says

24  *Venegas* did not hold that in a case where a court has a

25  statutory responsibility to assure that the allocation of

1     settlement proceeds is reasonable and fair to the plaintiff

2     that the court must defer to a lawyer's retainer agreement with

3     his or her client.

4            THE COURT:  No, it doesn't say that.  I think the

5     issue is if the court says I think a fair and reasonable return

6     is 15 percent, I mean, is your view that that would bar counsel

7     from enforcing their retainer agreement?

8            MS. WEINBLATT:  I think it might, your Honor.  What if

9     the retainer agreement said they get 50 percent or this was the

10    example in this case or that the attorneys get paid a thousand

11    dollars an hour?  We do think that the reasonableness inquiry

12    that the Court can do does extend to the retainer agreement.

13    That is our position.  But if I could quickly try to move on.

14           THE COURT:  But I do think that I the *Venegas* case and

15    others are basically making clear that courts don't typically

16    view retainer agreements as unenforceable or unconscionable

17    contracts.

18           MS. WEINBLATT:  I assume that's true.

19           THE COURT:  I'm not sure that my statement as to

20    attorneys' fees is going to make those retainer agreements

21    unenforceable.  Do you think it would?

22           MS. WEINBLATT:  I think your Honor has the authority

23    to do that, yes.  If the fees would render the payment

24    unreasonable, then yes.

25           THE COURT:  It seems to me what I have the authority

 1   to do is to say that this settlement which contemplates, you

 2   know, which involves a significant percentage of the class with

 3   retainer agreements is not fair because it means the lawyers

 4   are going to get 25 percent regardless of what I say about

 5   attorneys' fees if they're going to enforce those contracts.  I

 6   think I have the ability to same I'm not going to play by those

 7   rules, so we'll just try 200 cases or we will come up with

 8   something different.  But I don't think it's my place to say

 9   I'm going to negate these retainer agreements.  You think I

10   have the authority to do that?

11           MS. WEINBLATT:  Based on the *Hernandez* case, which is

12   a Southern District case, yes, I think the Court has the

13   authority to do that.

14           THE COURT:  You have some other points you wanted to

15   make.

16           MS. WEINBLATT:  Yes, briefly.  We cited -- and I won't

17   take up your time by reciting them, but we cited a number of

18   cases for the argument that the higher a settlement amount, the

19   lower a fee -- a lower fee is appropriate.  That's on page 17

20   of our memo in opposition to the application.

21           I'll just briefly read a quote:  In cases where a

22   class recovers more than 75 to $200 million, fees in the range

23   of 6 to 10 percent and even lower are common.

24           Also, if I may, the City -- plaintiff's counsel

25   referred to, and the Court has noted that, the $140 million

1    won't change whether the Court awards two percent, 20 percent,

2    or 50 percent of the $140 million to class counsel.  And that's

3    true.  We -- this was a very hard-fought settlement.  The

4    $140 million is intended to compensate the class members with

5    reasonable fees therefrom going to plaintiff's counsel.  It

6    does matter on principle to the City whether that's ten

7    percent, 2 percent --

8            THE COURT:  Do you think if it's 25 percent, do you

9    think it's not a fair settlement?  Do you think the plaintiffs

10   are getting a bad deal?  Your view is they should get nothing,

11   right?

12           MS. WEINBLATT:  We believe because they failed to

13   submit contemporaneous time records, the Court should not award

14   them nothing.  We certainly think they should get reasonable

15   fees.

16           THE COURT:  No, I'm asking that from the perspective

17   of the plaintiffs, do you think this settlement with a

18   25 percent attorney fee award is unfair to the plaintiffs?

19           MS. WEINBLATT:  We agreed to defer the fees to your

20   Honor.  We think the Court will award something consistent with

21   fairness.  We think anything over three to four to perhaps

22   five percent is unreasonable, but no, we think the settlement

23   is fair.

24           I also want to address briefly the risk.  They have

25   referenced a high rate of risk.  Certainly there was high risk

1    up through the 2019 Court of Appeals decision when liability

2    was established.  But once liability was established, there was

3    no risk

4            THE COURT:  No risk?

5            MS. WEINBLATT:  Virtually.

6            THE COURT:  We had a whole trial at which you argued

7    that none of these plaintiffs should get anything.  I think you

8    thought one of the ten should get something, but you argued to

9    the jury that they should get nothing, right?

10           MS. WEINBLATT:  We argued that they should be put to

11   their proof --

12           THE COURT:  Right.  You argued they hadn't proved it,

13   and therefore they should get nothing.

14           MS. WEINBLATT:  We believe that after the 2019 Court

15   of Appeals decision, we believed liability had been

16   established, and the City owed reasonable damages that could be

17   proven to each of the class members.  We were surprised during

18   that bellwether trial that there was virtually no evidence of

19   any damages, and we argued that damages should be proven with

20   documentary evidence.  Clearly, the jury disagreed.  We

21   recognize that at a subsequent trial documentation could have

22   been presented.  We wanted to settle for a reasonable amount of

23   compensation to each of the class members, and we recognize

24   that compensation would be made.  So it wasn't like counsel

25   after that date -- our belief is that counsel would certainly

1   walk away with payment.  The only question was how much based

2   on how much each of the class members would be entitled --

3   would demonstrate entitlement to.

4           THE COURT:  But I don't hear you saying that this is a

5   bad deal for the plaintiffs if the percentage of attorneys'

6   fees is ten percent or higher.  I don't hear you saying that.

7   Am I wrong?

8           MS. WEINBLATT:  No, you're not wrong, your Honor.

9   It's a better deal for the plaintiffs if their award is a

10  higher percentage.

11          THE COURT:  Well, yes, that's true -- I think that's

12  right because the plaintiffs will get to keep some portion of

13  whatever the reduction is.

14          MS. WEINBLATT:  Yes.  They will get -- right.  They

15  will get to keep a higher portion of whatever the reduction is.

16          THE COURT:  Anything else you want to say with respect

17  to attorneys' fees?

18          MS. WEINBLATT:  I think that's it.  Thank you.

19          THE COURT:  So what are you looking for?  For the

20  Court to be able to do a lode star check, which is that is a

21  rougher, quicker and dirtier assessment of the attorneys' fees

22  than would be true as we did for the interim payment.  So what

23  would you be looking for?

24          MS. WEINBLATT:  I'm not sure why you're saying it

25  would be rougher and dirtier.

1          THE COURT:  Well, because the lode star check -- the
2     whole point is not to sort of just do a lode star.  Courts have
3     the discretion to do a lode star method where they basically
4     figure out this is the hourly rate times the number of hours
5     reasonably expended.  This is the amount.  And then a judge can
6     say, okay, I'm going to multiply that by two to account for the
7     fact that there is are a lot of efficiencies that come with
8     class action.  A lot of plaintiffs would get benefits that they
9     wouldn't have if this were not a class action.  And so there
10     should be a premium that goes to that.  It might be two times.
11     It might be three times.

12          The other method that is typically done, and done
13     increasingly now in class actions, is just a straight
14     percentage.  That's the point that plaintiffs' counsel is
15     making.  And those straight percentage cases do these lode star
16     checks, but it doesn't seem to me it's the same degree of
17     attention and detail that goes into the first method I
18     described.

19          MS. WEINBLATT:  Perhaps it's slightly rougher, but we
20     would still need time records in order to do that calculation
21     even if it's more approximate.

22          Also, may I bring up one minor point about costs that
23     I think and hope was an error on the plaintiffs part, which is
24     costs and I understand that that is a small amount of the total
25     that they're asking for, but I feel compelled to raise it.

```
 1                THE COURT:  Okay.

 2                MS. WEINBLATT:  We had agreed to go into mediation,

 3    which the City rarely does.  Private mediation, which the City

 4    rarely does.  It was something --

 5                THE COURT:  With respect to costs?

 6                MS. WEINBLATT:  Well, we agreed to go into mediation

 7    with plaintiffs' counsel on the condition that we were

 8    splitting costs; that they were not going to then come after

 9    the City to reimburse them for those costs.

10                We got authority for only a certain amount of money.

11    We expended virtually 99 percent of that authority, and

12    plaintiff's counsel nevertheless included mediation fees in

13    their request for costs, which I think totaled $23,000.  I

14    think, I apologize, we overlooked that when we were doing our

15    memo in opposition.  I'm hoping that counsel will agree that

16    they agree will -- will confirm that they agreed that the fees

17    for the mediation itself was going to be split permanently, not

18    transferred -- no effort was going to be made to transfer that

19    back to the City.

20                THE COURT:  You're basically saying the total costs

21    which were represented by plaintiffs' counsel to be

22    $388,807.57, that's not attorneys' fees, that's the costs

23    associated with the case, that should be reduced by about

24    $23,000, or was it more than that?

25                MS. WEINBLATT:  I'm saying the specific fee should be
```

1    taken off the top.  I'm not conceding any or all of the rest of

2    it is reasonable, but yes.

3              THE COURT:  How am I going to know what else to be

4    taking off?

5              MS. WEINBLATT:  Well, we did include a point on costs,

6    and we would refer the Court to that.  That is point six.  I'm

7    bringing this up now because it was overlooked in our papers.

8    For instance, I noted that the firm -- Liss-Riordan's firm

9    claimed $68,000 on a campaign to sign up drivers for hearings.

10   There is no information, no details, no explanation, no --

11             THE COURT:  That's an attorney's --

12             MS. WEINBLATT:  No, that's a cost.

13             THE COURT:  So the cost being what?

14             MS. WEINBLATT:  I don't know because all it says is:

15   Campaign to sign drivers up for individual hearings.

16             There are other expenses that are night expenses are

17   $181,000.  We don't concede that that is reasonable.  Those

18   aren't explained.  There is no detail provided, similar to

19   contemporaneous time records.  They simply announce what they

20   are and don't support or explain the majority of these fees.  I

21   am only raising the mediation fee.

22             THE COURT:  What is your number for fees?

23             MS. WEINBLATT:  Well, we didn't -- you want us to -- I

24   did not subtract the amount of fees sought minus --

25             THE COURT:  Well, not fees.  Costs.

1              MS. WEINBLATT:  I mean costs.

2              THE COURT:  I mean, I've got to pick a number of for

3    costs, right?  That comes off the top.  They're saying 388,000.

4    You're saying what?

5              MS. WEINBLATT:  The 23,000 for mediation we think

6    should be taken off.  This 68,000 on campaign to sign up

7    drivers, we don't know what that is.  There is no explanation I

8    think that should be taken off.  There's a database, there's a

9    claim for 71,461 for a database for collecting and tracking

10   class member information.  That can be done on a PowerPoint or

11   an Excel spreadsheet.  We don't know what that is.  We don't

12   know why it was necessary.  There's no explanation.  Even minor

13   things like flights.  One of the trial members had to be flown

14   here from his home in Ireland.  They billed the City under 500,

15   I think 457 for that flight.  Yet there was a $1,200 bill for

16   Ms. Liss-Riordan to fly to New York, presumably First or

17   Business Class, we don't think that's reasonable.  $300 in taxi

18   rides in one day for five cab rides, we don't think that's

19   reasonable.  But, again, there's no detail provided.

20   Obviously, these costs are significant, but they pale in

21   comparison to the attorneys' fees, but we think reasonable

22   costs and reasonable fees only is what should be paid.

23             THE COURT:  Well, no, I get that, but I think the

24   question is I've got to be able to make a determination on

25   that.  You're saying I should just be taking those all of those

1    off because they haven't provided sufficient background?

2              MS. WEINBLATT:  Yes.

3              THE COURT:  23, 68, 71 cabs are --

4              MS. WEINBLATT:  320 something I think.

5              THE COURT:  Over the span of how many --

6              MS. WEINBLATT:  One day.

7              THE COURT:  This is the trial days.

8              MS. WEINBLATT:  I don't know.

9              THE COURT:  Well, 11/21/23 was the trial day.

10             MS. WEINBLATT:  No, the trial was over I think on the

11   16th.

12             THE COURT:  Anything else you want to say?  I'll then

13   give plaintiffs a chance to respond, and then I think we'll

14   call it a day for today.

15             MS. WEINBLATT:  I think that's it for now, your Honor.

16             THE COURT:  Ms. Liss-Riordan.

17             MS. LISS-RIORDAN:  Thank you, your Honor.

18             Just a mistake that Ms. Weinblatt made is that we are

19   not asking the City to pay for the shared mediation fees.

20   We're asking our clients to pay.  So it goes back to the same

21   question as this is not additional amounts that the City is

22   going to have to pay these costs.

23             THE COURT:  Wait.  The cost of 388,000 that you

24   submitted does not include the mediation fee?

25             MS. LISS-RIORDAN:  No.  No.  No.  The 23- or 24,000

1    that she is objecting to because she said that we didn't say --

2    we agreed we wouldn't ask the City to pay for it.  We're not

3    asking the City to pay for it.  We're asking our clients to pay

4    for it.  This is not coming out of the City's pockets.  It's

5    coming out of our clients' pockets, whatever costs you approve,

6    just like the attorneys' fees.

7            THE COURT:  You're saying that the costs -- the

8    defense are not paying the costs upfront out of the

9    141 million?

10           MS. LISS-RIORDAN:  No.  No.  No.

11           THE COURT:  So they are paying for it.

12           MS. LISS-RIORDAN:  Right.  I'm saying it's coming out

13   of -- no, no.  The fees and costs are going to be subtracted

14   from what the clients receive, the class members receive.  So

15   Ms. Weinblatt said we shouldn't be asking the City to pay the

16   other half of the mediation costs.  We submitted it as our

17   costs, and we're asking for it to come out of the settlement

18   that would come going to the class members.

19           THE COURT:  So you should get paid for half of the

20   mediation costs that they paid.

21           MS. LISS-RIORDAN:  No.  They paid half, and we

22   advanced half, and we're asking for reimbursement now from the

23   settlement for the half we paid.  I'm just responding to that

24   small point she made that she said we were never going to ask

25   the City to pay the 24,000.  I'm saying we're not asking the

 1    City to pay for it.  We're asking our clients to pay for it.

 2    That's my point there.

 3            THE COURT:  Then I guess by that logic then, all the

 4    costs are clients' costs.

 5            MS. LISS-RIORDAN:  Yes.

 6            THE COURT:  So the City shouldn't care, is what you're

 7    saying.

 8            MS. LISS-RIORDAN:  Exactly.  I'm happy to answer any

 9    questions you have.

10            THE COURT:  I still have to make sure that they're

11    reasonable costs.

12            MS. LISS-RIORDAN:  Agreed.  The database that we used

13    that Ms. Weinblatt believes we could have done with an Excel

14    spreadsheet, our firm concentrates on doing mass actions.  We

15    represent hundreds or thousands of individuals who have

16    individuals or claims and individuals hearings like in this

17    case.  We have a very sophisticated database that we use to

18    communicate with class members to store their information.  We

19    were in contact with thousands of class members.  We obtained

20    documents from many of them.  We compiled information that they

21    gave us about the facts of their case.  You can't keep that all

22    organized on a spreadsheet.  We used a system called Leverage

23    that allows us to retain efficiently and in an organized way

24    lots of information you get for lots of clients.

25            THE COURT:  I mean, it seems that the objection is to

1    the lack of precision and detail that was provide in your

2    submission.

3         MS. LISS-RIORDAN:  Right.  Well, I'm happy to show the

4    City or show the Court whatever receipts you want to see.

5    Typically, again, in a lode star cross check, courts don't ask

6    for those things.  If the court wants to see some receipts --

7         THE COURT:  I don't generally think of costs as part

8    of the lode star cross check.  I'm thinking that's more

9    attorneys' fees, hours, rates, et cetera.

10        MR. GOLDBERG:  I know you're eager to finish things

11   up, but I just want to say since we are at the level of minor

12   points, but these are actually significant ones.  The real

13   number if you're doing a percentage here is 142.5 because the

14   City has put up $140 million now, and 2.5 as part of the

15   interim fee.  So that is if you say what if we recover

16   entirely, that's the right number so we're talking about apples

17   to apples and doing percentages and all of that --

18        THE COURT:  Well, I mean the 2.5 is going to count.

19   Again, that will be offset.

20        MR. GOLDBERG:  It truly will at the fee level, but I'm

21   also saying if you're trying to think of -- this is, again, a

22   pretty small point, much bigger than the cost, but not a huge

23   point.  They say it's 3.5 percent.  If you actually make the

24   denominator a little bigger, what they're asking is for us to

25   get even less and similarly 25 percent -- I just wanted to say

1    that is the right number if you're doing the percentage.

2         THE COURT:  So for those who are here, I hope I've had

3    a chance to hear your thoughts on this settlement.  I haven't

4    heard anyone say they think this is a bad settlement or a

5    settlement that should not be approved.  There are some people

6    saying they should be treated differently under this

7    settlement, and there is a process that will allow for that.

8    No guarantees it will go the way you want, but there is a

9    process built in.

10        I haven't heard anybody say this is a bad deal, and I

11   wouldn't want it, and I don't think the Court should approve

12   it.  Maybe Mr. Murphy kind of said that, but mostly he seemed

13   to be suggesting $140 million is not enough but without

14   explaining why he thinks different lawyers or a different

15   scenario would yield more money.  And that's not clear to me

16   that that would be the case.

17        I certainly am likely to approve this settlement.  I

18   think the only question for me is what the attorneys' fees will

19   be.  It doesn't necessarily mean that they will be 25 percent.

20   That is standard in a contingent fee case to have a one-third

21   arrangement with an attorney.  That's reflecting the alliance

22   of the interest of clients and counsel.  It also accounts for

23   the fact that plaintiff is not putting up any money; that the

24   lawyer is taking the risk by bringing a case.  And we want to

25   encourage lawyers to take cases, especially cases like this one

1  that involve a large class of people, many of whom would never

2  have brought a case on their own because of the cost of getting

3  a lawyer, the cost of initiating their own case on their one

4  claim might have been prohibitive.  So I think I am likely to

5  find this is a fair settlement; in fact, quite a good

6  settlement.

7           But the lawyers' fees bit I still want to work on.  I

8  am going to ask then counsel -- I'm going to ask plaintiffs'

9  counsel to submit more detailed time sheets that indicate hours

10 worked with, if you have time sheets, I'll take a look at them.

11 I'm not going to flyspeck them in the way I did in the prior

12 interim billing analysis.  It's just to get a feel for it.  The

13 costs, I think I do need to know what the costs are.  I would

14 like to get more detail on the points that Ms. Weinblatt raised

15 I don't think this should take too long.  I'm anxious to get

16 this resolved.  We could start the clock on the remaining 180

17 days, so the remaining claims could come in, and we could get

18 people paid because people have waited a long time to get paid,

19 and I'm sure everybody in this room wants that process to move

20 quickly.  So the sooner I approve the settlement as fair, the

21 sooner payment will take place.

22          So anything before we break?  Okay.  Thank you all for

23 being here.  Thank counsel as well.

24          Counsel, if you need a copy of the transcript, you can

25 take that up with the court reporter.  You'll have to pay for

1    it, of course, but they'll take it up with you now or on the

2    website.

3            Let me thank the court security officers here as well.

4    Appreciate you coming up on short notice.

5            How long do you think it will take you to get the time

6    sheets and costs?

7            MS. LISS-RIORDAN:  My case administrator is in Ireland

8    for two weeks.  So it's a couple weeks before she comes back.

9    I might need 30 days; hopefully sooner, but she just left.

10            THE COURT:  Sooner would be better.  If you could do

11    it in pieces too, just so we can have something with respect to

12    costs.

13            MS. LISS-RIORDAN:  Your Honor, with respect to the

14    time records, I submitted what I have because I do contingency

15    fee work, I don't keep daily time sheets.  I gave what I

16    believe to be extremely reasonable conservative estimates of

17    the hours I spent.  I think I spent way more than that number

18    of hours on this case.

19            THE COURT:  You've submitted what you have?

20            MS. LISS-RIORDAN:  I've given what you have.

21            MR. GOLDBERG:  I'll have it within ten days.

22            THE COURT:  Okay.  Ms. Weinblatt, you're looking for

23    more from Mr. Ackman as well?

24            MS. WEINBLATT:  We're looking for time records from

25    all the attorneys who are submitting applications for fees,

 1    including the two who work at Ms. Liss-Riordan's firm.

 2            MS. LISS-RIORDAN:  Who are no longer at the firm and

 3    had very minor hours in the case.  And, again, we used

 4    reasonable estimates when we're making submissions to the

 5    court.  That's what we've done and that's what courts have

 6    approved.

 7            THE COURT:  Send me and the City what you have.  I'll

 8    give you 30 days, but sooner is better because it means I can

 9    approve this thing quicker.

10            Ms. Weinblatt, is that okay with you?

11            MS. WEINBLATT:  Yes, your Honor.

12            THE COURT:  You want two weeks after that to respond?

13            MS. WEINBLATT:  Just in case.  Thank you.

14            THE COURT:  I'll issue a minute entry that says that

15    30 days from today would be September 12.  And then

16    September 26.  If we could move faster --

17            MS. LISS-RIORDAN:  Then we'll respond within two

18    weeks.

19            THE COURT:  I want to move as quickly as I can, but I

20    recognize the time of year.  Thank you all.  Have a good day.

21            (Adjourned)

22

23

24

25