UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JONATHAN NNEBE, *et al.*,

Plaintiffs,

-v-

MATTHEW DAUS, *et al.*,

Defendants.

No. 06-cv-4991 (RJS)

MEMORANDUM
AND
ORDER

---

RICHARD J. SULLIVAN, Circuit Judge:

Before the Court is (1) Plaintiffs' unopposed motion for final approval of the proposed class settlement and (2) Plaintiffs' request for attorneys' fees and costs pursuant to Federal Rule of Civil Procedure 23(h). (*See* Doc. No. 747 ("Mot.").) For the following reasons, the Court GRANTS Plaintiffs' motion for final approval of the settlement, GRANTS Plaintiffs' motion for attorneys' fees, and GRANTS IN PART and DENIES IN PART Plaintiffs' request for costs.

## BACKGROUND

The Court presumes the parties' familiarity with the facts and history of this long-running case, which are set forth in the Court's May 7, 2025 Order on Preliminary Approval, as well as other orders entered by this Court and the Second Circuit. (*See* Doc. No. 744 at 1–3 ("Preliminary Approval Order").) *See also, e.g.*, *Nnebe v. Daus*, 931 F.3d 66, 70−79 (2d Cir. 2019); *Nnebe v. Daus*, 510 F. Supp. 3d 179, 184−88 (S.D.N.Y. 2020).

On March 14, 2025, the parties reached a settlement agreement under which:

(1) Plaintiffs will stipulate to the dismissal of all claims against Defendants with prejudice, except for claims brought by class members who opt out of the settlement in a timely manner (Doc. No. 747-1 ¶ 29 ("Settlement Agreement"));

(2) Defendants will pay, inclusive of awards to class members, attorneys' fees, expenses, and costs, a total settlement amount of $140 million (*id.* ¶ 24);

(3) Plaintiffs' counsel may request no more than twenty-five percent of all funds distributed to class members and Named Plaintiffs in attorneys' fees, which will be paid before distributions to class members (*id.* ¶ 48)[1];

(4) Plaintiffs' counsel will be reimbursed for reasonable costs associated with the litigation, which will be deducted from the settlement fund before distributions to class members (*id.*);

(5) The costs incurred by Simpluris, as claims administrator, will be reimbursed from the settlement fund before distribution of the fund to class members (*id.* ¶¶ 24, 27; Doc. No. 740 at 7 ("Mot. for Preliminary Approval"); Mot. at 30; Doc. No. 758-8 at 1–9);

(6) Class members who requested a damages hearing and who timely submit claims will be awarded up to the following amounts following deductions for attorneys' fees, costs, and expenses:

| Duration of Suspension | Per Person Initial Distribution Cap (prior to deductions for attorneys' fees, expenses, and costs) |
|---|---|
| Suspended for **25** days or fewer | $700 |
| **26 to 31** total days suspended | $750 |
| **32 to 60** total days suspended | $21,000 |
| **61 to 90** total days suspended | $24,000 |
| **91 to 120** total days suspended | $27,000 |
| **121 to 210** total days suspended | $30,000 |
| **211 to 390** total days suspended | $33,000 |
| Suspended for **391 days or more** | $36,000 |

---

[1] The "Named Plaintiffs" are those individuals who "lent their name[s] to the actions." (Mot. at 14). They include Jonathan Nnebe, Alexander Karmansky, Khairul Amin, Eduardo Avenaut, New York Taxi Workers Alliance ("NYTWA"), Anthony Stallworth, Parichay Barman, and Noor Tani. (Settlement Agreement ¶ 9.)

| No Suspension End Date | $17,000 |
|---|---|

(Settlement Agreement ¶¶ 40, 48);

(7) Those Plaintiffs who did not request a damages hearing will receive 37.5 percent of amounts distributed in accordance with the categories enumerated in the chart above (*id.* ¶ 40);

(8) Named Plaintiffs and Trial Plaintiffs[2] will each receive an additional service award in the amount of $15,000 (*id.* ¶¶ 49, 63);

(9) If, after the first distribution, more than $250,000 of the settlement fund is unclaimed, sixty percent of the unclaimed funds (up to $22,500,000) will be distributed to class members *pro rata* with a cap of an additional thirty-five percent per person.  (*Id.* ¶ 42.)  The remainder will revert to the City.  (*Id.*)

As part of the Preliminary Approval Order entered on May 7, 2025, the Court:

(1) Preliminarily approved the agreement (Preliminary Approval Order at 14);

(2) Conditionally certified the settlement class (*id.* at 16);

(3) Appointed Plaintiffs' counsel as class counsel and Named Plaintiffs as class representatives (*id.*);

(4) Approved the method of distributing notice and sending reminders set forth in the Settlement Agreement (*id.* at 17);

(5) Revised the proposed class notice (*id.* at 17–18);

(6) Set a deadline for the submission of the motion for final approval (*id.* at 18); and

(7) Scheduled a fairness hearing for August 13, 2025 (*id.*).

Following preliminary approval, the claims administrator, Simpluris, sent notice of the proposed settlement and fairness hearing to the conditionally certified class of approximately 19,500 New York City taxi and for-hire vehicle drivers whose licenses had been suspended by the

---

[2] The "Trial Plaintiffs" are those individuals who participated in the November 2023 bellwether trials.  They include Abdoul Diane, Souleymane Diaby, Khadim Diop, Carlos Gonzabay, Dilawer Khan, Kevin O'Malley, Lenny Polanco, Olson Weekes, Ning Zhang, and Kamara-Jai Njenga Warren.  (Settlement Agreement ¶ 28.)

New York City Taxi and Limousine Commission ("TLC") based on their arrests on criminal charges between June 28, 2003 and February 18, 2020. (*See* Doc. No. 747-2 ¶¶ 4–13 ("Brunner Decl."); *see also id.* at 10.)

The notice informed class members that, subject to Court approval, up to twenty-five percent of all claimed funds may be awarded to class counsel in attorneys' fees. (*See id.* at 11–12.) Of the notice packets mailed to the 19,545 class members, only thirty-eight packets were returned as undeliverable and could not be re-mailed. (*Id.* ¶ 9.) Simpluris sent nine weekly email reminders and nine weekly text reminders to those class members with a valid email address and phone number who had not yet responded. (*Id.* ¶¶ 11–13.) The NYTWA also held a town hall meeting on June 23, 2025 to discuss the settlement with class members. (Doc. No. 747-3 ¶ 15 ("Liss-Riordan Decl.").)

On July 23, 2025, Plaintiffs filed this motion for final approval. The motion remains unopposed by Defendants to the extent that it seeks final approval of the agreement. (*See* Mot. at 2 n.1.) No class member has filed a written objection. (Brunner Decl. ¶ 20.) Nor has any state or federal authority upon being provided with notice of the proposed settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715(b). (Doc. No. 743.) Only two Plaintiffs expressed interest in opting out of the settlement. (*See* Brunner Decl. ¶ 20; Aug. 13, 2025, Fairness Hearing Tr., Doc. No. 759 at 8 ("Fairness Hearing Tr.").) And Simpluris continues to conduct searches for updated contact information to send reminders to class members. (Brunner Decl. ¶ 24.)

On August 13, 2025, the Court conducted a fairness hearing, at which eight class members spoke concerning the settlement's fairness. None formally objected. The Court reserved decision on the motion for final approval and the attorneys' fee request. (*See* Aug. 13, 2025, Minute Entry.)

Finally, on April 28, 2026, the Court directed class counsel to submit updated figures regarding the apportionment of individual-settlement awards that reflected "(i) the number of class members in each respective suspension category who have submitted valid claims after previously requesting a damages hearing, and (ii) the number of class members in each respective suspension category who have submitted valid claims but did not previously request a damages hearing." (Doc. No. 767.)  Of those class members who requested a damages hearing, the number of claims and the distribution amounts are as follows:

| | Number of Claims | Per Person Initial Distribution Cap (prior to deductions) |
|---|---|---|
| Suspended for **25** days or fewer | 533 | $700 |
| **26 to 31** total days suspended | 106 | $750 |
| **32 to 60** total days suspended | 471 | $21,000 |
| **61 to 90** total days suspended | 402 | $24,000 |
| **91 to 120** total days suspended | 574 | $27,000 |
| **121 to 210** total days suspended | 766 | $30,000 |
| **211 to 390** total days suspended | 580 | $33,000 |
| Suspended for **391 days or more** | 596 | $36,000 |
| No Suspension End Date | 1,571 | $17,000 |
| **TOTAL** | 5,599 | $125,772,600 |

(Doc. No. 768 at i–ii.)

Of those class members who did not request a damages hearing, the number of claims and the distribution amounts are as follows:

5

|  | Number of Claims | Per Person Initial Distribution Cap (prior to deductions) |
|---|---|---|
| Suspended for **25** days or fewer | 201 | $262.50 |
| **26 to 31** total days suspended | 31 | $281.25 |
| **32 to 60** total days suspended | 123 | $7,875 |
| **61 to 90** total days suspended | 106 | $9,000 |
| **91 to 120** total days suspended | 142 | $10,125 |
| **121 to 210** total days suspended | 193 | $11,250 |
| **211 to 390** total days suspended | 186 | $12,375 |
| Suspended for **391 days or more** | 178 | $13,500 |
| No Suspension End Date | 463 | $6,375 |
| **TOTAL** | 1,623 | $13,249,481.25 |

(*Id.* at ii.)

To date, $139,022,081.20 out of the $140 million settlement fund has been claimed by Plaintiffs. (*See id.*)

## DISCUSSION

### I.    The Settlement.

Federal Rule of Civil Procedure 23(e) governs proposed class settlements. The Court previously found that preliminary approval was appropriate and ordered the parties to provide the class with notice of, among other things, the terms of the proposed settlement and the date and time of a hearing at which class members and the settling parties could be heard as to whether the Court should grant final approval. (Preliminary Approval Order at 18.) The parties have complied with the Court's Preliminary Approval Order (*see* Brunner Decl. ¶¶ 6–24), and the Court has

conducted a fairness hearing. All that remains, therefore, is for the Court to determine whether final approval is warranted. *See* Fed. R. Civ. P. 23(e)(2).

The Court may grant final approval of a settlement agreement "only after a hearing and only on finding that it is fair, reasonable, and adequate after" evaluating whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate[] . . . ; and (D) the proposal treats class members equitably relative to each other.

*Id.* The advisory committee notes to the 2018 amendment to Rule 23(e)(2) emphasize that these four factors are intended to supplement – not "displace" – the nine factors identified by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), which include:

> (1) the complexity, expense[,] and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement amount to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463 (citations omitted) ("*Grinnell* factors"). As it did at the preliminary-approval stage, the Court now considers the Rule 23(e)(2) factors, followed by any applicable *Grinnell* factors.

Though district courts "must carefully scrutinize [a] settlement to ensure its fairness, adequacy[,] and reasonableness," *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001), there is a "strong judicial policy in favor of settlements, particularly in the class[-]action context," *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotation marks omitted). What is more, the Court already found that it would "likely be able to . . . approve the proposal" before ordering that notice of the settlement be sent to the class. (Preliminary Approval

Order at 14 (internal quotation marks omitted).)  The Court incorporates its prior findings from the Preliminary Approval Order into the analysis below.

### 1.  Adequacy of Representation.

To evaluate the adequacy of representation under Rule 23(e)(2)(A), courts ask "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class[,] and 2) plaintiff's attorneys are qualified, experienced[,] and able to conduct the litigation."  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (internal quotation marks omitted).  For substantially the same reasons set forth in the Court's Preliminary Approval Order and March 2022 order granting certification of a liability class, *see Nnebe v. Daus*, No. 06-cv-4991 (RJS), 2022 WL 615039, at *11–12 (S.D.N.Y. Mar. 1, 2022), "the Court is satisfied that the Named Plaintiffs' interests do not conflict with the interests of other class members" and "that Plaintiffs' counsel . . . are all experienced class-action attorneys who have ably represented the class throughout this litigation."  (Preliminary Approval Order at 6.)  The Court therefore reaffirms its findings that the Named Plaintiffs and Plaintiffs' counsel have adequately represented the class.  This factor favors final approval.

### 2.  Arms' Length Negotiations.

Next, courts look to the "arms-length quality of the [settlement] negotiations" under Rule 23(e)(2)(B).  *See Moses v. N.Y. Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023).  The Court previously considered how the parties reached the proposed settlement with the assistance of Magistrate Judge Ona T. Wang and an experienced mediator, Stephen P. Sonnenberg.  (*See* Preliminary Approval Order at 7.)  No new information suggests that the negotiations were infected by fraud or collusion, so the Court finds that this factor also weighs in favor of final approval.

### 3.  *Adequacy of Relief.*

To determine the adequacy of the relief provided to the class in the proposed settlement, Rule 23 instructs courts to consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P. 23(e)(2)(C).

With respect to the first subfactor, the Court remains convinced that the amount of time and resources it would take to complete damages trials for each of the approximately 8,000 class members who requested them strongly favors approval of the settlement.  (*See* Preliminary Approval Order at 8 (describing how "it would take around 1,600 business days, or roughly six years, to complete damages trials" for each Plaintiff).)  As for the second subfactor, the Court is satisfied that the substantial proportion of class members who have submitted claims after receiving initial notice of the settlement further demonstrates that the proposed method of distributing relief will generally "facilitate[] filing legitimate claims" and "deter or defeat unjustified claims" without being "unduly demanding."  Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.

Regarding the third subfactor, class counsel have requested an attorneys' fee equal to twenty-five percent of the total amount claimed from the settlement fund under Federal Rule of Civil Procedure 23(h).  (*See* Mot. at 17; *infra* at 17–31.)  This represents the maximum amount that class counsel may ask for under the agreement. (Settlement Agreement ¶ 48.)  Federal Rule of Civil Procedure 23(e)(2)(C)(iii) requires courts to "tak[e] into account . . . the terms of any proposed award of attorney's fees" when considering the adequacy of relief.  Because "an award

of attorney's fees can impact the amount of monetary relief provided to the class," courts must scrutinize fee requests to "prevent unscrupulous counsel from quickly settling a class's claims to cut a check." *Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112, 118 (2d Cir. 2025) (alteration adopted and internal quotation marks omitted). In so doing, courts should "compare the proportion of total recovery allocated to the class to the proportion of total recovery allocated to class counsel." *Id.* at 115.

While the Court will address whether a twenty-five-percent award is appropriate under Rule 23(h) in due course, it first finds that such an award does not weigh against final approval under Rule 23(e).[3] *See id.* at 121 (explaining that "Rule 23(h) and Rule 23(e) are distinct rules with distinct purposes"). There are no indications that counsel may have "undervalue[d] the class's claims in exchange for a higher attorney's fee, or in order to collect a fee more quickly." *Id.* at 118. This action has been pending for nearly two decades, and each individual-award amount is closely tied to the damages awarded at the bellwether trial. In addition, about 8,200 class members have entered into separate retainer agreements allowing class counsel to request an even greater amount – up to thirty-three percent of the recovery – in attorneys' fees. (*See* Doc. No. 756 ¶ 5 ("Suppl. Ackman Decl."); Doc. No. 757 ¶ 16 ("Suppl. Goldberg Decl."); Doc. No. 747-4, Exs. A, B; Fairness Hearing Tr. at 97.) Since class counsel have agreed to accept a lesser fee than that to which they would be entitled under the retainer agreements, there is little reason to fear that counsel have undervalued Plaintiffs' claims in exchange for a higher fee. For all these reasons, the award does not "cast doubt on the settlement's fairness," *Kurtz*, 142 F.4th at 119, and the Rule 23(e)(2)(C) factor weighs in favor of final approval.

---

[3] The Court previously entered an interim award of attorneys' fees for $2,550,386.50. (*See* Doc. No. 533 at 20; Mot. at 9 n.6; Doc. No. 752 at 3 n.5 ("Defs. Opp.").) These fees will be credited against the instant award to class counsel.

10

4. *Equitable Treatment.*

Turning to the fourth and final Rule 23(e)(2) factor, the Court must consider whether "the [settlement] proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Here, the Court must ask whether the proposed settlement "takes appropriate account of differences among [class members'] claims, and whether the scope of the release . . . affect[s] class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.

The Court reaffirms its prior assessment that "by apportioning the settlement funds on a *pro rata* basis" corresponding with "the lost-earnings and emotional-distress damages awarded at the bellwether trials," "the proposal 'fairly accounts for the key point of differentiation among class members' claims' and generally correlates to the relative value of each of their claims." (Preliminary Approval Order at 10 (quoting *Rosenfeld v. Lenich*, No. 18-cv-6720 (NG) (GPK), 2021 WL 508339, at *7 (E.D.N.Y. Feb. 11, 2021)).) And in response to the Court's Preliminary Approval Order, Plaintiffs have explained in greater detail how the parties selected the relevant ranges for the suspension-length categories. (*See* Mot. at 11–13.) Specifically, Plaintiffs clarified that the parties proceeded on the understanding that a delay of less than thirty-one days between license suspension and reinstatement would likely not entitle a particular class member to more than minimal damages. (*See id.* at 12 & n.8.) The Settlement Agreement thus provides that a driver whose license was suspended for thirty-one days would be entitled to a maximum of $750 in damages. (Settlement Agreement ¶ 40.) The Court finds that this modest damages award for those Plaintiffs suspended for less than thirty-one days strikes the appropriate balance and is reasonable under the circumstances, while "roughly replicat[ing] the way" in which damages were

awarded to the individual Trial Plaintiffs.  (Mot. at 12.)  It therefore accords with Rule 23's

mandate to "treat[] class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).

The Court is also satisfied that the incentive payments of $15,000 to the Named Plaintiffs

and ten Trial Plaintiffs, in addition to each Plaintiff's respective settlement award, do not weigh

against final approval.[4]  (*See* Preliminary Approval Order at 11.)  To begin, the Trial Plaintiffs'

efforts undoubtedly "benefited the class" because their preparation for and participation in the

November 2023 bellwether trial – where all ten Plaintiffs who appeared secured successful

outcomes – required a substantial commitment of time and "influenced the final settlement"

between the parties.  (Mot. for Preliminary Approval at 19–20; *see also* Mot. at 7.)  The Court

previously requested more information on how the Named Plaintiffs have "provided the

background information that forms the basis of the lawsuit, engaged in fact discovery, and devoted

considerable time and effort into the settlement process."  (Preliminary Approval Order at 11

(alterations adopted) (quoting *Moses*, 79 F.4th at 245).)  In response, Plaintiffs now assert that

(1) Jonathan Nnebe submitted a declaration and appeared at the 2014 bench trial concerning the

City's suspension policy; (2) Kairul Amin and Eduardo Avenaut each testified at the 2014 trial

and attended on other trial days; (3) Parichay Barman, Anthony Stallworth, and Noor Tani

appeared before the New York Office of Administrative Trials and Hearings in 2017;

(4) Stallworth submitted a declaration in support of Plaintiffs' motion for an injunction; and (5) all

otherwise proactively contacted class counsel to initiate the underlying cases.  (*See* Mot. at 14–

15.)  Given that the incentive awards "represent only a tiny fraction of the $140 million settlement

fund" (Preliminary Approval Order at 11) and "do not appear to be 'excessive compared to the

---

[4] Per the Settlement Agreement, the Trial Plaintiffs are only eligible to receive an incentive award if they file a settlement claim and "forego their verdict amounts."  (Settlement Agreement ¶ 63; Mot. at 13 n.11.)

service provided by the' Named Plaintiffs and Trial Plaintiffs" (*id.* (quoting *Moses*, 79 F.4th at 245)), the Court finds that they are no impediment to final approval.

Finally, the provision in the Settlement Agreement granting greater awards to those individuals who requested a hearing does not weigh against approval.  (Settlement Agreement ¶ 40.)  The justification for this disparity is simple:  those who did not request a hearing – even though they may have suffered a cognizable injury – effectively consented to $1 in nominal damages.  Although the Settlement Agreement will enable those class members to recover much more than $1, *see infra* at 14; Doc. No. 768 at ii, it follows that individuals who more actively participated in this long-running litigation will stand to gain more from the settlement than their more passive counterparts.

### 5.  *Remaining* Grinnell *Factors.*

The Court now considers those *Grinnell* factors not already covered by Rule 23(e)(2).  The Court adopts its prior finding that, on balance, "(1) the stage of the proceedings and the amount of discovery completed, (2) the ability of the defendants to withstand a greater judgment, (3) the range of the settlement fund in light of the best possible recovery, and (4) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation" weigh in favor of approval.  (Preliminary Approval Order at 12 (alterations adopted) (quoting *Amigon v. Safeway Constr. Enters., LLC*, No. 20-cv-5222 (PK), 2024 WL 5040436, at *6 (E.D.N.Y. Dec. 9, 2024)).)  *See also Grinnell Corp.*, 495 F.2d at 463.

Regarding the scope of the settlement "in light of the best possible recovery" and the reasonableness of the settlement "in light of all the attendant risks of litigation," the Court emphasizes that this settlement approximates – and likely exceeds – what Plaintiffs could have recovered had their claims proceeded to trial.  As discussed in the Preliminary Approval Order,

13

the average jury award for the ten Plaintiffs who appeared at the 2023 bellwether trial was $18,950. (Preliminary Approval Order at 13; Doc. No. 679 ("Judgment").)  If every remaining class member who requested a damages hearing received a comparable outcome, the total award would come to roughly $156 million.  (*See* Preliminary Approval Order at 13; Mot. for Preliminary Approval at 21.)  A settlement landing just below that number is reasonable given "the time and resources that would be expended by both sides should all class members proceed with further litigation." (Preliminary Approval Order at 13.)  But it is worth noting that ten of the twenty randomly selected bellwether Plaintiffs did not appear for trial and received $1 in nominal damages.  (Judgment at 1–2.)  Factoring in all twenty bellwether Plaintiffs – as opposed to just the ten who prevailed at trial – the average damages award reduces to $9,475.  If every class member who requested a damages hearing received that amount, then, the total award would be roughly $78 million – well below the settlement negotiated by the parties.

The settlement also allows those class members who did not timely request a damages hearing to receive more than nominal damages.  (*See* Preliminary Approval Order at 13; *see also* Mot. for Preliminary Approval at 21 (noting that absent the Settlement Agreement, "class members who did not request a damages trial would be awarded nominal damages").)  That means that *every* remaining class member will receive exponentially more than the $1 in nominal damages they would have received absent the Settlement Agreement.  (*See* Doc. No. 768 at ii.)  Indeed, as of April 28, 2026, the average payment for those who requested a hearing and were suspended longer than thirty-one days will be $25,266.13; for those who did not request a hearing but were also suspended for longer than thirty-one days, the average payment will be $9,480.95.  (*See id.* at i–ii.)  While the payments for those suspended for fewer than thirty-one days are far smaller – ranging between $700 and $750 per driver – that amount reflects the fact that "ten calendar days

plus fifteen business days of each Plaintiffs' suspension are not recoverable in the lost wages awards." (Doc. No. 720 at 15.) Accordingly, whether measured against "the best possible recovery" or the likely recovery "in light of all the attendant risks of litigation," the settlement reflects a remarkably beneficial outcome to the class that favors final approval. *See Amigon, LLC*, 2024 WL 5040436, at *6.

The Court also finds that the remaining *Grinnell* factor – "the class's reaction to the proposed settlement" – weighs in favor of final approval. *See id.* The "favorable reception of [a] settlement" from plaintiffs "who had little or nothing to do with the negotiation of the settlement is strong evidence" of its fairness. *Grinnell*, 495 F.2d at 462; *see also Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("It is well[ ]settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."). That makes sense. After all, "[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart Stores, Inc.*, 396 F.3d at 118 (internal quotation marks omitted); *see also Wellman v. Dickinson*, 497 F. Supp. 824, 830 (S.D.N.Y. 1980) (emphasizing the "presumption in favor of the settlement [agreement]" where "only a few members of the class object and their relative interest is small").

Here, not one of the 19,500 class members has filed a written objection. (Mot. at 3; Brunner Decl. ¶ 20.) And while eight class members asked to be heard at the fairness hearing, their concerns were either contradicted by the terms of the Settlement Agreement or involved specific challenges concerning the timeliness of their claims or the number of days they were suspended. For example, one individual suggested that the total settlement was too low, without explaining why the actual damages were higher or even acknowledging that the proposed settlement would be the largest due-process settlement ever reached by the City of New York. (*See* Fairness Hearing

15

Tr. at 51 (expressing that $140 million is "[not] a huge amount" considering "the City's general budget is close to $120 billion per year").)  Another disapproved of the provision stipulating that some settlement funds may revert to the City (*see id.* at 74–75), even though the Agreement makes clear that any reversion will only take place, if at all, after a second round of distribution to class members (*see* Settlement Agreement ¶ 42 (providing that, in the event more than $250,000 of the settlement fund is unclaimed, sixty percent will be distributed *pro rata* with a cap of an additional thirty-five percent per person)).  The remainder only challenged the notice- and claims-administration processes, not the fairness of the settlement itself.  (Fairness Hearing Tr. at 28–31.)  Indeed, one even "thank[ed] the [class] counsel [and] the class members for their hard work."  (*Id.* at 29).  The Court and class counsel both assured these members that they may raise these issues with the claims administrator by submitting documentation or a written explanation about "why the data is inaccurate in their case."  (Mot. at 13 n.10; Fairness Hearing Tr. at 46–47; *see also* Settlement Agreement ¶ 40 (explaining that the claims administrator "shall make best efforts to resolve [any] dispute" and "report [its] recommendation for said resolution to counsel for the parties for review").)

In short, the class's reaction to the settlement – which, again, may be "the largest due[-]process settlement against the City of New York in its history and one of the largest due[-]process settlements in the nation more generally" (Mot. at 17 n.12) – has been overwhelmingly positive and thus weighs in favor of final approval.

*     *     *

For all these reasons, the Court finds that, upon considering the applicable factors and holding a fairness hearing, the proposal is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  The Court therefore grants final approval of the settlement.  Having already conditionally

16

certified the class, the Court now grants final "certif[ication] [of] the class for purposes of judgment on the proposal." *Id.* (e)(1)(B)(ii). (*See* Preliminary Approval Order at 16.)

## II.    Attorneys' Fees.

The Court moves next to Plaintiffs' request for attorneys' fees. Federal Rule of Civil Procedure 23(h) provides that "[i]n a certified class action" like this one, "the [C]ourt may award reasonable attorney's fees and nontaxable costs that are authorized by . . . the parties' agreement." There are two established methods for calculating reasonable attorneys' fees: the "lodestar" method and the "percentage" method. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). The first calculates a "presumptively reasonable fee" by multiplying the attorney's "reasonable hourly rate" by the number of hours reasonably expended. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008) (internal quotation marks omitted). The second, true to its name, "calculates the fee award as some percentage of the settlement fund created for the benefit of the class." *Cent. State Sw. & Se. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 249 (2d Cir. 2007). Regardless of which method is used, "the fees awarded in common[-]fund cases may not exceed what is 'reasonable' under the circumstances." *Goldberger*, 209 F.3d at 47 (internal quotation marks omitted).

The Settlement Agreement contemplates the use of the percentage method, and neither party has requested that the Court rely on the lodestar method. (Settlement Agreement ¶ 48.) This aligns with the "overwhelming trend" in this Circuit "to award a percentage of the [settlement] fund." *Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 435 (S.D.N.Y. 2014). Because the Court finds that the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution" of class actions such as this one,

17

it will calculate the fee award through a percentage of the settlement fund. *Wal-Mart Stores, Inc.*, 396 F.3d at 121 (internal quotation marks omitted).

As explained above, Plaintiffs request attorneys' fees equal to twenty-five percent of the total amount claimed from the fund. (*See* Settlement Agreement ¶ 48.) Defendants, by contrast, urge the Court to limit Clas Counsel's fees to 3.5 percent, with a hard cap of $4,900,000. (*See* Doc. No. 752 at 25 ("Defs. Opp."); *see also* Fairness Hearing Tr. at 90 (Defendants' counsel acknowledging that a proper fee award "ought to be in the neighborhood of [$]5 to 7 million").) The Court therefore turns to whether Plaintiffs' requested fee is reasonable, beginning with the factors laid out by the Second Circuit in *Goldberger v. Integrated Resources, Inc*. *See* 209 F.3d at 50.

To assess the reasonableness of a fee award in a class-action settlement, courts in this Circuit consider: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public[-]policy considerations." *Id.* (alteration adopted and internal quotation marks omitted) (the "*Goldberger* factors"). The Court finds that each factor favors the requested award.

*First*, Plaintiffs' counsel have devoted extraordinary "time and labor" to this long-running and "especially large and complicated" litigation. *Wal-Mart Stores, Inc.*, 396 F.3d at 122 (commending "lead counsel [for] devot[ing] tremendous time and labor to this case for seven years"). Daniel Ackman filed the complaint in 2006; David Goldberg appeared in 2009 before the first appeal; and Lichten & Liss-Riordan ("LLR") has been involved since 2019. The case also involved labor-intensive tasks like outreach to the 19,500 class members, two trips to the Second Circuit, a bench trial in 2014 to determine the actual contours of the City's suspension policy, a

18

week-long jury trial in 2023 to determine damages for twenty bellwether Plaintiffs, and extensive settlement negotiations before a magistrate judge and mediator. (*See* Liss-Riordan Decl. ¶ 30.) *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) (crediting class counsel's work on "labor-intensive activities such as: conducti[ng] an extensive background investigation, drafting a 218-page complaint, responding to and making various motions, [and] engaging in discovery"). That combination justifies a sizeable award.

*Second*, the Court acknowledges the "magnitude and complexities" of this litigation. *Goldberger*, 209 F.3d at 50 (internal quotation marks omitted). Plaintiffs' counsel shepherded this case through various procedural postures, from summary judgment to class certification to trial. Along the way, the case presented novel legal questions that necessitated resolution by the Second Circuit on two separate occasions. All the while, the sheer size of the class – about 19,500 members – required skilled case management. Even after the legality of the City's driver-suspension policy was resolved by 2019, daunting legal work remained. At that time, Defendants maintained that Plaintiffs were entitled only to nominal damages of $1 and argued that those drivers who believed they were entitled to more would have to prove as much at trial. More than 8,000 Plaintiffs requested individual-damages trials; the bellwether trial resolved just twenty of those claims. That left Plaintiffs' counsel with the twin tasks of (1) estimating lost wages and emotional-distress damages for more than 8,000 drivers, and (2) negotiating a settlement that would fairly compensate a large class (and thus obviate the need for individual-damages trials that would otherwise last for the better part of a decade). In short, the depth and breadth of this lawsuit, which far exceeded a mine-run civil-rights case, weigh in favor of the requested fee.

*Third* – and particularly relevant here – the risk assumed by Plaintiffs' counsel was enormous.  The Second Circuit has "historically labeled the risk of success as perhaps the foremost important factor to be considered in determining whether to award" an enhanced fee, *id.* at 54 (internal quotation marks omitted), and Plaintiffs' counsel assumed significant risk here.  This litigation did not permit counsel to "piggyback[] off of a previous case"; instead, class counsel pursued novel legal theories and devoted a substantial percentage of "its legal staff to work on a case that spanned [numerous] years without any guarantee of recovery."  *Wal-Mart Stores, Inc.*, 396 F.3d at 122 (internal quotation marks omitted).  Because the "risks could have meant the end of the litigation with no recovery for class members and no fee for counsel," the Court agrees that "[c]ounsel should be rewarded for undertaking them and for achieving substantial value for the class." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 441 (E.D.N.Y. 2014).

And as discussed above, even after the Second Circuit ruled on the legal issues relating to liability in 2019, Plaintiffs still confronted considerable risks and challenges concerning the calculation and collection of damages.  That further differentiates this litigation from a traditional securities class action, in which plaintiffs' ability to prove liability is usually dispositive and leads to a prompt settlement with easily calculated damages.  *See, e.g.*, *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517, 522 (S.D.N.Y. 2015) ("It is common knowledge that almost all securities class actions are settled." (internal quotation marks omitted)), *aff'd sub nom. DeValerio v. Olinski*, 673 F. App'x 87 (2d Cir. 2016).  In this federal civil-rights lawsuit, Plaintiffs (and class counsel) confronted the prospect of over 8,000 separate trials on the issue of damages – each with unique facts and varying odds of success.  The risk, in other words, was substantial.  *See Sakiko Fujiwara*, 58 F. Supp. 3d at 433 (emphasizing that "[p]laintiffs faced risks in establishing their

damages"). With this in mind, the Court finds that this "foremost factor" weighs in favor of the requested percentage fee. *Goldberger*, 209 F.3d at 54 (internal quotation marks omitted).

*Fourth*, the Court has consistently recognized that Plaintiffs' counsel "are all experienced class-action attorneys who have ably represented the class throughout this litigation." (Preliminary Approval Order at 6.) The result in this case, a historic settlement from the City of New York, "provides further evidence of the quality of their work." *Maley*, 186 F. Supp. 2d at 373; *see also Wal-Mart Stores, Inc.*, 396 F.3d at 117 (highlighting that counsel obtained "the largest antitrust settlement ever" (internal quotation marks omitted)). This case therefore presents a situation in which a sizeable fee is warranted to reflect counsel's perseverance in the face of initial setbacks, as well as their ultimate success. And it bears repeating that not one class member – out of 19,500 – has objected to the Settlement Agreement or the proposed fee award.

*Fifth*, "[c]ourts consider the size of a settlement to ensure that the percentage awarded [as attorneys' fees] does not constitute a windfall." *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013). To be sure, the Second Circuit has explained that the percentage used in calculating a fee award should "follow a sliding-scale" that "bear[s] an inverse relationship to the amount of the settlement" to avoid over-compensating class counsel "to the detriment of the class members they represent." *Wal-Mart Stores, Inc.*, 396 F.3d at 122 (internal quotation marks omitted); *cf. Cent. State Se. & Sw. Areas Health & Welfare Fund*, 504 F.3d at 249–50 (affirming thirty-percent award from $42.5 million settlement fund). But as should be clear by now, this is no ordinary case. Class counsel is typically appointed by the court and does not enter into retainer agreements with class members apart from the named plaintiffs. Here, however, Plaintiffs' counsel reached out to thousands of drivers before the damages class was certified to identify those drivers interested in pursuing an individual-damages trial. As part of this process, counsel entered

21

into percentage-based retainer agreements with thousands of drivers, each of whom agreed that counsel could request fees of up to thirty-three percent of any damages award. (*See* Suppl. Ackman Decl. ¶ 5; Suppl. Goldberg Decl. ¶ 16; Fairness Hearing Tr. at 97.)  Although the Court is not bound to apply the percentage negotiated in those agreements, *see* Fed. R. Civ. P. 23(h), it is telling that not one class member has objected to this aspect of the settlement. (*See* Fairness Hearing Tr. at 56 ("Actually, I think 25 percent is quite reasonable in terms of attorneys' fees"); *see also* Mot. at 19–20.)  As a result, there is persuasive evidence from the class itself that a twenty-five percent fee does not constitute a windfall.  *See Maley*, 186 F. Supp. 2d at 362 (noting that "the lack of objections may well evidence the fairness of the [s]ettlement"); *see also McBean v. City of New York*, 233 F.R.D. 377, 393 (S.D.N.Y. 2006) ("In common[-]fund cases, awards in the range of 25% are common.").

Courts in this Circuit have long emphasized that the role of the court when evaluating class-action settlements is neither "to reopen and enter into negotiations with the litigants in the hope of improving the terms of the settlement," nor "to substitute its business judgment for that of the parties who worked out the settlement." *Levin v. Miss. River Corp.*, 59 F.R.D. 353, 361 (S.D.N.Y. 1973) (Weinfeld, *J.*), *aff'd*, 508 F.2d 836 (2d Cir.1974); *see also, e.g.*, *Dubose v. Harris*, 82 F.R.D. 582, 591 (D. Conn. 1979) ("And, even if it were possible, it is not the function of this Court to remake the settlement agreed to by plaintiffs' counsel and HUD.").  Instead, the "Court's role is a more 'delicate one,'" *Levin*, 59 F.R.D. at 361 (quoting *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972) (Friendly, *C.J.*)), that is limited to "determin[ing] whether the settlement is fair, reasonable, and adequate," *Trinidad v. Pret a Manger (USA) Ltd.*, No. 12-cv-6094 (PAE), 2014 WL 4670870, at *4 (S.D.N.Y. Sept. 19, 2014), while nonetheless functioning as "guardian of the

rights of the class members" in fee determinations, *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 282 (S.D.N.Y. 1993); *accord Goldberger*, 209 F.3d at 53.

Considered in this light, the Settlement Agreement cannot be said to pose an unjustifiable risk that the award may "yield too little for the client-class, and an unjustified golden harvest of fees for the lawyer[s]." *Goldberger*, 209 F.3d at 48 (internal quotation marks omitted). In fact, the settlement negotiated by Plaintiffs' counsel will almost certainly result in damages awards for Plaintiffs (even after the deduction of attorneys' fees) that far exceed what they would recover if pressed to go forward with individual-damages trials. (*See* Preliminary Approval Order at 13.) For starters, the Settlement Agreement allows Plaintiffs who did not request a damages trial to recover 37.5 percent of the distribution awarded to those who did, notwithstanding the Court's prior ruling that drivers who failed to timely request a damages trial would be limited to nominal damages of $1. (*See id.* at 4; Settlement Agreement ¶ 40.) It also permits drivers suspended for less than thirty-one days to receive between $700 and $750, even though the Court previously ruled that it was "not improper for a driver's license to remain suspended up to the time that the driver requests a hearing and for the additional ten calendar days plus [fifteen] business days followed by the driver's request for a hearing." (Trial Tr. at 516.) And finally, as noted above, for drivers who were suspended for more than thirty-one days, the average settlement amount actually exceeds the average damages recovered by the twenty randomly selected Plaintiffs at the bellwether trial. (*See supra* at 13–15.)

Moreover, absent a settlement, the attorneys' fees associated with conducting damages trials for over 8,000 Plaintiffs – which the Court previously observed would take 16,000 business days – would be truly astronomical, dwarfing the $140 million settlement amount. (*See* Preliminary Approval Order at 8.) Indeed, assuming a seven-hour court day and an hourly rate of

$450, Ackman's fees for the time spent in court – never mind the time spent preparing for 8,000 damages trials over the course of six years – would exceed $50 million if Plaintiffs were to prevail in all damages trials. Coupled with the fact that prolonged litigation will only further delay recovery for Plaintiffs – some of whom have been waiting to collect for nearly two decades – these considerations weigh strongly in favor of the requested fee award.

*Finally*, public-policy considerations weigh in favor of granting the request for attorneys' fees. It is well established that "[p]ublic policy favors the award of reasonable attorneys' fees in class[-]action settlements." *Jermyn v. Best Buy Stores, L.P.*, No. 08-cv-214 (CM), 2012 WL 2505644, at *12 (S.D.N.Y. June 27, 2012). That is especially true in civil-rights cases like this one, where "[t]here is a 'strong federal public policy favoring enforcement of the civil[-]rights laws so important to the advancement of modern society.'" *Stinson v. City of New York*, 256 F. Supp. 3d 283, 297 (S.D.N.Y. 2017) (quoting *Red Bull Assocs. v. Best W. Int'l, Inc.*, 862 F.2d 963, 967 (2d Cir. 1988)). Courts must fashion fee awards that "adequately encourage plaintiffs' counsel to continue bringing cases of merit in the future," *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 511 (S.D.N.Y. 2009), while recognizing that "[a]n award of fees in excess of that required to encourage class litigation . . . does not necessarily serve public policy," *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 400 (S.D.N.Y. 2013) (internal quotation marks omitted). Mindful that fees paid to class counsel must be "both fair and rewarding," *In re Merrill Lynch Tyco Rsch. Sec. Litig.*, 249 F.R.D. 124, 142 (S.D.N.Y. 2008) (internal quotation marks omitted), the Court concludes that an award of twenty-five percent strikes an appropriate balance here.

That thousands of Plaintiffs agreed to attorneys' fees in excess of twenty-five percent of any settlement likewise reflects that the twenty-five percent award is reasonable and not an unconscionable retainer agreement. The Supreme Court has observed that fee-shifting statutes

24

like 42 U.S.C. § 1988 "control[] what the losing defendant must pay, *not* what the prevailing plaintiff must pay his lawyer"; as such, they "do[] not interfere with the enforceability of a contingent-fee contract." *Venegas v. Mitchell*, 495 U.S. 82, 90 (1990) (emphasis added). And while it is true that contingent-fee agreements are not strictly controlling in class actions under Federal Rule of Civil Procedure 23(h), courts in this Circuit have recognized that "[w]here attorneys and clients make private agreements not to exceed 25 [percent] of the plaintiff's recovery, the equities [generally] favor enforcement of the privately-negotiated compensation arrangement." *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 867 (E.D.N.Y. & S.D.N.Y. 1991), *vacated on other grounds*, 982 F.2d 721 (2d Cir. 1992); *id.* at 866 (underscoring courts' reluctance "to intrude into a plaintiff's private contractual rights with his or her attorney"); *see also Dunn v. H.K. Porter*, 602 F.2d 1105, 1111 (3d Cir. 1979) (explaining that where "the lawyer and client have entered into a contractual fee agreement prior to the litigation, the considerations stressed above argue in favor of deference to the parties' contractual arrangement").

Here, the twenty-five percent fee proposed by Plaintiffs promotes the equitable treatment of class members. At the fairness hearing, class counsel expressly disclaimed any intent to enforce the pre-class certification retainer agreements, confirming that "if [the Court] awarded 25 percent to everybody, [class counsel] will forego [its] right to collect 33 percent" from those who signed the retainer agreements. (Fairness Hearing Tr. at 107; *see id.* (Goldberg: "[W]e're not asking [the Court] to enforce the retainer agreement[s]").) Moreover, the lack of *any* objection to the settlement – including from those who had executed retainer agreements with a thirty-three percent fee award – is strong evidence of the reasonableness of the lower, twenty-five percent award. *See In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 311 (E.D.N.Y. 2006) (stressing that "[l]ack of objection is strong evidence of [a fee award's] fairness"). Class counsel's stipulations and the

25

class's lack of objections to the settlement, as well as the Supreme Court's and Second Circuit's stated unwillingness to invalidate reasonable contingent-fee agreements, all support the proposed fee award here.

In sum, after carefully weighing the *Goldberger* factors, the Court is satisfied that the requested twenty-five percent fee is reasonable.  *See* 209 F.3d at 50.[5]

\*        \*        \*

By any measure, this nearly twenty-year lawsuit stands apart.  The "magnitude and complexities of the litigation," the risks assumed by class counsel, the "time and labor expended," the historic nature of the settlement, and public-policy considerations all weigh in favor of the requested award.  *Id.* (internal quotation marks omitted); *see also Wal-Mart Stores, Inc.*, 396 F.3d at 124 ("There is no doubt this case dominated the lives of all involved for many years.").  The Court therefore approves an award of attorneys' fee equal to twenty-five percent of all settlement funds claimed by the filing deadline.

## III.    Request for Costs.

In addition to attorneys' fees, it is well established that class "[c]ounsel is entitled to reimbursement from the common fund for reasonable litigation expenses."  *In re Merrill Lynch & Co., Inc. Rsch. Rep. Sec. Litig.*, 246 F.R.D. 156, 178 (S.D.N.Y. 2007); *see also In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 418 (S.D.N.Y. 2018) ("It is well[ ]settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred and

---

[5] Because "[t]he trend in this Circuit is toward the percentage method," *Wal-Mart Stores, Inc.*, 396 F.3d at 121, and in light of the unique circumstances of this case – including the presence of retainer agreements between much of the class and class counsel, the fact that the settlement class was not certified until *after* the bellwether trial (*see* Preliminary Approval Order at 15–16), and the parties' concerted efforts toward settlement – the Court sees no reason to engage in a lodestar analysis.  *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 553 (2010) ("The lodestar method was never intended to be conclusive in all circumstances."); *Sakiko Fujiwara*, 58 F. Supp. 3d at 435 (reiterating that the "overwhelming trend" in this Circuit is "to award a percentage of the [settlement] fund").

customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients."), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020); Fed. R. Civ. P. 23(h).  In its Interim Fees Order, the Court awarded $26,947.78 for costs incurred by Ackman and $9,466.28 for costs incurred by Fried Frank.  (Doc. No. 533 at 17 ("Interim Fees Order").)  Plaintiffs now seek reimbursement of an additional $388,807.57 in costs, including (1) $207,541.75 incurred by LLR, and (2) $181,265.82 that LLR agreed to pay the NYTWA for its assistance in class-member outreach, which represents roughly 0.28% of the gross settlement amount.  (Liss-Riordan Decl. ¶¶ 38–39.)  Liss-Riordan's declaration breaks down LLR's expenses as follows:  (1) $9,162.70 for the class notice; (2) $68,240.54 for its campaign to sign drivers up for individual-damages hearings; (3) $28,922.98 in mediation costs; (4) $71,461.48 for a database and other computer software collecting and tracking class-member information; (5) $24,527.75 for travel costs associated with the November 2023 bellwether trial; (6) $5,226.30 for travel costs related to other court hearings; and (7) $181,265.82 to "pay [the] NYTWA for its costs in assisting with outreach to the class."  (*Id.*)

Defendants do not dispute that LLR is entitled to $9,162.70 for the class notice and $68,240.54 for the damages-hearing campaign.  (Doc. No. 760 at 5 ("Defs. Suppl. Opp.").)  After reviewing the itemized invoices from the company responsible for mailing the class notice (*see* Doc. No. 758-1 at 1–4), as well as notices related to individual-damages hearings (*see* Doc. No. 758-2 at 1–40), the Court agrees that those costs are reasonable.

Defendants dispute the reasonableness of the remaining costs, however.  With respect to mediation costs, Defendants assert that LLR is not entitled to $18,715.00 – its share of the fees paid to the private mediator – because the parties agreed to split those costs in advance of the mediation.  (*See* Defs. Suppl. Opp. at 4; Doc. No. 758-7 at 21–22; Doc. Nos. 761-1; 761-2; 761-

3.) But that is beside the point. Plaintiffs are not asking *Defendants* to pay for their share of the mediation-related costs; they are simply requesting that class counsel be reimbursed from the common fund for out-of-pocket expenses. *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 165 (S.D.N.Y. 2011) ("It is well established that counsel who create a common fund are entitled to the *reimbursement of expenses that they advance to a class*." (emphasis added)). In other words, class counsel request that their costs be taken off the top of the total settlement, which permits them to be reimbursed for reasonable expenses. Since mediation services "are typical to prosecuting this type of litigation," *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 411 (S.D.N.Y. 2019), and since no Plaintiff has objected to class counsel being reimbursed for those legitimate expenses, the Court finds it reasonable to reimburse LLR $18,715.00 in mediation costs. *See also Lewis v. Roosevelt Island Operating Corp.*, No. 16-cv-3071 (AL) (CSN), 2018 WL 4666070, at *10 (S.D.N.Y. Sept. 28, 2018) (highlighting that "courts in this [d]istrict have [regularly] awarded mediation expenses"); *Sakiko Fujiwara*, 58 F. Supp. 3d at 439.

Defendants further contend – in a single sentence – that LLR should not be reimbursed for "databases to which [c]lass [c]ounsel apparently has regular subscriptions." (Defs. Suppl. Opp. at 4; *see generally* Doc. No. 758-5.) But in seeking to strike the costs "incurred related to the database [class counsel] used for collecting and tracking class member information, as well as a dedicated website, email, and telephone number for the case" (Doc. No. 758 ¶ 9 ("Suppl. Liss-Riordan Decl.")), Defendants minimize the "substantial costs" associated with the purchase, maintenance, and use of computer software in a complex class action that involved 19,500 class members and spanned nearly two decades, *Berlinsky v. Alcatel Alsthom Compagnie Generale D'Electicite*, 970 F. Supp. 348, 352 (S.D.N.Y. 1997). Here, LLR set up a database and utilized subscription services that included "detailed survey responses" and provided for "document collection," as well as

28

various ways for class members to contact class counsel. (Suppl. Liss-Riordan Decl. ¶ 3; *see id.* at 5; Doc. No. 748-2 at 36.) These services were integral to securing a favorable settlement in this case, and the Court will therefore approve Plaintiffs' request for $71,461.48 in costs.

Defendants next challenge the travel expenses incurred by LLR – a Boston-based law firm – in traveling to New York. (Defs. Suppl. Opp. at 4; *see also* Doc. No. 758-7 at 8, 38–39.) According to Defendants, all travel-related expenses should be denied for out-of-district counsel since "New York City has no shortage of skilled class[-]action lawyers." (Defs. Suppl. Opp. at 4.) The Court agrees.

"Courts in this Circuit have routinely denied travel expenses for counsel where Plaintiffs retained out-of-district counsel, particularly where out-of-district counsel charged rates similar to those charged in-district." *Makinen v. City of New York*, No. 11-cv-7535 (ALC) (AJP), 2016 WL 1451543, at *8 (S.D.N.Y. Apr. 12, 2016) (collecting cases). By contrast, "[i]f an out-of-district attorney sought to charge rates that were markedly lower than those charged within the forum district, then a reasonable paying client might well understand that such savings would come at the expense of travel costs." *Id.* (internal quotation marks omitted).

Here, the LLR attorneys charged a *higher* hourly rate than their local counterparts, and, in some cases, failed to submit time records altogether. (*See* Liss-Riordan Decl. ¶¶ 31–34; Fairness Hearing Tr. at 130; Defs. Suppl. Opp. at 2 n.1.) And while there can be no doubt that LLR's expertise helped to achieve a favorable result for Plaintiffs, the Court agrees with Defendants that this case was not "beyond the competence of forum[-]district law firms," obviating the need to reimburse LLR for its travel expenses. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 188 F. Supp. 3d 333, 345 (S.D.N.Y. 2016) (internal quotation marks omitted). In short, the Court is not convinced that a reasonable paying client would agree to pay LLR's travel

29

expenses in addition to the firm's rates. *See Makinen*, 2016 WL 1451543, at *8 ("No reasonable paying client . . . would choose to pay in-district attorney rates, and then, in addition, pay for the out-of-district attorney to travel into the district." (internal quotation marks omitted)). Accordingly, the Court will deny Plaintiffs' request for (1) $24,527.75 in travel costs related to the November 2023 bellwether trial; (2) $10,207.98 in travel costs related to the mediation; and (3) $5,226.30 in travel costs related to attending other court hearings. (*See* Liss-Riordan Decl. ¶ 38; Doc. No. 758-7.)

Finally, the Court is not persuaded that Plaintiffs' request for $181,265.82 to reimburse the NYTWA for assistance in class-member outreach is reasonable. (*See* Doc. No. 758-8 at 9; Mot. at 30; Defs. Opp. at 24.) Though Liss-Riordan asserts that the NYTWA "provided significant assistance throughout the case" (Suppl. Liss-Riordan Decl. ¶ 13) by "encouraging drivers to sign up for damages hearings," "helping to publicize the settlement, and "encourag[ing] class members to submit claims to participate in the settlement" (Mot. at 30), the Court does not find that class counsel's request for reimbursement "to pay [the] NYTWA for its costs in assisting with outreach to the class" can be justified as litigation expenses. (Liss-Riordan Decl. ¶ 39.) This is particularly true considering (1) LLR paralegals billed more than 2,000 hours for similar activities that are covered as part of attorneys' fees (*id.* ¶ 36); (2) the parties have already agreed to hire Simpluris as the claims administrator to "administer[] notice to the class" (*id.* ¶ 40; Mot. at 30); and (3) the NYTWA's outreach costs are on top of what the Court previously approved. (*See generally* Preliminary Approval Order.) Given that class counsel submitted one page of correspondence from the NYTWA projecting its costs through the end of the settlement-administration period (*see* Doc. No. 758-8 at 9), the Court finds that a single sparse estimate with no supporting

30

documentation does not suffice to show that these costs are reasonable.[6]

\*       \*       \*

To summarize, the Court will (1) grant the request for $9,162.70 for the class notice; (2) grant the request for $68,240.54 for class counsel's campaign to sign up drivers for individual-damages hearings; (3) grant the request for $18,715.00 in mediation-related expenses; (4) grant the request for $71,461.48 for the purchase and maintenance of a database collecting and tracking class-member information; (5) deny the request for $24,527.75 in travel costs associated with the November 2023 bellwether trial; (6) deny the request for $10,207.98 in travel costs related to the mediation; (7) deny the request for $5,226.30 in travel costs related to other court hearings; and (8) deny the request for $181,265.82 in costs to reimburse the NYTWA for its assistance in class-member outreach.  All told, this yields $167,579.72 in reasonable costs and expenses.

## CONCLUSION

For the reasons set forth above, Plaintiffs' unopposed motion for final approval of the proposed class settlement is GRANTED.  IT IS HEREBY ORDERED THAT, pursuant to the terms of the parties' Settlement Agreement, class members will have 180 days from the entry of this order to submit a claim for payment.

Plaintiffs' request for attorneys' fees is GRANTED, and their request for costs is GRANTED IN PART and DENIED IN PART.  Plaintiffs are awarded attorneys' fees equal to twenty-five percent of the total amount claimed from the settlement fund and $167,579.72 in costs, which are to be deducted from the settlement fund before any distribution to the class members.

---

[6] To the extent that class counsel outsourced to the NYTWA tasks that would otherwise have been handled by paralegals during the final phase of the litigation, class counsel may of course compensate the NYTWA from the attorneys' fees awarded in this action.

31

The Court authorizes Simpluris to deduct $123,711.00 – its quoted costs for administering the settlement notice and making distributions to class members – from the settlement fund.

The Clerk of Court is respectfully directed to terminate the motions pending at Doc. Nos. 747 and 766. Within thirty days of the final distribution from the settlement funds, the parties shall file a stipulation of dismissal of all claims except for those of the opt-out Plaintiff(s).

SO ORDERED.

Dated: June 30, 2026
       New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation